# 24 CV 366

## IN THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF NEW YORK

TERRANCE MACK,

Petitioner,

-vs-

JULIE WOLCOTT,
Superintendent of Attica Correctional Facility,
Respondent.

MEMORANDUM AND LEGAL AUTHORITY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

Case No:

UNITED STATES DISTRICT COURT
FILED
APR 19 2024
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

Abbreviations for references to the state court record (Monroe County Court).

| | |
|---|---|
| A1 | Appendix filed for the Direct Appeal (KA 09-01764) |
| A2 | Appendix filed for the CPL 440 Appeal (KA 18-00983) |
| CPL330M | Motion to Set Aside Verdict (06/10/2009) (Vacca) (A2 1218-1237) |
| CPL440M | Motion to Vacate Judgment (01/13/2017) (A2 23-1056) |
| CPL440P | People's Response (03/22/2017) (*see* A2 1057-1122) |
| CPL440R | Reply Affirmation (03/28/2017) (*see* A2 1123-1156) |
| H1 | Hearing transcript (CPL 440) (11/20/2017) (Ciaccio, J.) |
| H2 | Hearing transcript (CPL 440) (11/21/2017) (Ciaccio, J.) |
| H3 | Hearing transcript (CPL 440) (02/18/2022) (Dollinger, J.) |
| H4 | Hearing transcript (CPL 440) (04/22/2022) (Dollinger, J.) |
| MCCD1 | Monroe County Court Decision (05/11/2018) (Ciaccio, J.) (A2 6-19) |
| MCCD2 | Monroe County Court Decision (01/25/2023) (Dollinger, J.) |
| PHDM1 | Post-Hearing Defense Memorandum (01/10/2018) (A2 1160-1184) |
| PHPM1 | Post-Hearing People's Memorandum (01/17/2018) (A2 1185-1193) |
| PHDM2 | Post-Hearing Defense Memorandum (05/27/2022) |
| PHPM2 | Post-Hearing People's Memorandum (06/17/2022) |
| PHDRM2 | Post-Hearing Defense Reply Memorandum (07/01/2022) |
| SH | Suppression hearing transcript (April 9, 2009) (Geraci, J.) |
| T | Trial transcript (May 4-8, 2009) (Geraci, J.) |

Terrance L. Mack, DIN 09B2000, proceeding
*Pro Se* but requesting the assignment of counsel
(Memorandum prepared by David R. Juergens, Esq).

# Table of Contents

Factual and Procedural Background — 1

The Crime (09/29/2007) — 1

The Arrest (11/04/2008) — 2

The Indictment (11/25/2008) — 3

Inv. Soprano meets with Jessica Smith (01/13/2009) — 4

Jail Meeting about Mr. White (02/25/2009) — 4

Jail Meeting with the Prosecution (03/19/2009) — 5

Mr. Mack's Proposal for a Physical Line-Up (04/09/2009) — 6

*Wade* Hearing (04/09/2009) — 7

Physical Line-Up Proposal Fell Through (04/30/2009) — 8

Case for the Prosecution — 9

    Jasmine Shaw (T 204-237) — 10

    Charnette Grayson (T 238-268) — 11

    Megan Torres (T 333-397) — 12

    Inv. John Penkitis (T 413-422) — 17

    Ronaldo Donald (T 423-449) — 18

Case for the Defense — 20

    Kionna Speed (T 543-563) — 20

    Carolyn Kenesha McHenry (T 618-633) — 20

    Shatora Hampton (T 634-645) — 21

    Precious Scott (T 564-577) — 21

    Jessica Smith (T 578-595) — 22

    Terrance Mack (T 646-671) — 22

Alibi Rebuttal Witness - Samuel Soprano (T 687-698) — 23

Closing for the Defense — 24

Closing for the Prosecution — 28

Jury Instructions — 31

Jury Deliberation - Overview    31

    Pre-Deadlock Deliberation    31

    Post-Deadlock Deliberation    33

    Guilty Verdict    35

CPL 330 Motion by Paul Vacca    35

Sentence    36

Direct Appeal (KA 09-01764)    36

CPL 440 Motion    37

Original Proceedings on the CPL 440 Motion    37

    Christopher Travis White (H1 83-114)    37

    Sonia Spaight (H1 114-136)    38

    Bessie Mack (H1 136-152)    39

    Geoffrey Resnick (H1 153-172)    40

    Paul Vacca's Failure to Interview Christopher Travis White    40

    Judge Ciaccio's Denial of the CPL 440 Motion    44

Appeal of Judge Ciaccio's Denial of the CPL 440 Motion (KA 18-01203)    45

Post-Remittal Proceedings on the CPL 440 Motion    46

    Defense Expert on Human Memory    46

    Paul Vacca on Human Memory    51

Mr. Mack Requested Comprehensive Review    54

Judge Dollinger's Denial of the CPL 440 Motion    54

Appeal of Judge Dollinger's Denial of the CPL 440 Motion    54

Point I:    Paul Vacca's numerous, unprofessional blunders prejudicially denied Mr. Mack of his Federal Constitutional rights to the effective assistance of counsel and a fair trial under 28 U.S.C. § 2254.    55

1.    Counsel failed to investigate the key alibi witness (Christopher Travis White).    57

2.    Counsel failed to call three witnesses who would have supported the alibi defense (Bessie Mack, Jerome Walker, and Sonia Spaight).    71

3. Counsel failed to consult with, or call, an expert on the science of memory and perception, or otherwise become familiar with the science as it relates to eyewitness identification. 78

4. Counsel failed to educate the jurors about the danger of misidentification posed by cross-racial identification ("own race bias"). 87

5. Counsel failed to educate the jurors about the danger of misidentification posed by "weapon focus." 90

6. Counsel failed to educate jurors about the lack of correlation between witness confidence and witness accuracy. 92

7. Counsel failed to educate jurors about the problem of "event stress." 97

8. Counsel failed to educate jurors about the tendency of witnesses to overestimate time ("event duration"). 99

9. Counsel failed to educate jurors about the problem of "partial disguise." 102

10. Counsel failed to educate jurors about "facial distinctiveness." 103

11. Counsel failed to educate jurors about the problem of "unconscious transference." 104

12. Counsel failed to object to inadmissible testimony and evidence about a non-blinded, photo-array procedure conducted with the People's single eyewitness. 106

13. Counsel asked open-ended questions that prompted the People's single eyewitness to bolster her in-court identification of Mr. Mack with new testimony. 120

14. Counsel inadequately addressed the distance, the darkness, and the viewing angle. 123

15. Counsel failed to impeach the eyewitness with the content of her 911 call. 126

16. Counsel failed to object to impeachment testimony from the State's unnoticed, alibi rebuttal witness. 128

17. Counsel gave an ineffective closing argument because he failed to give the jurors numerous reasons to doubt the accuracy of the identification. 133

18. Counsel gave an ineffective closing argument because he needlessly required the jurors to adopt his theory that only women were involved in the attack and that all attackers came from a van. 134

19. Counsel did not elicit how Mr. Mack did not match Ms. Torres' description of the suspect. 136

20. Counsel did not ask the jailhouse informant about the facts of the crime underlying his youthful offender adjudication. 137

21. Counsel did not object to the prosecutor's erroneous closing statement about Mr. Mack's relationship to all of the defense witnesses. 138

22. Counsel never obtained any telephone records. 139

23. Counsel never elicited evidence regarding his arrest date and immediate report of an alibi defense. 141

24. Counsel failed to object to the court taking the verdict without addressing the jury's request for instruction on the law and a read-back of testimony. 144

Request for Relief 156

# FACTUAL AND PROCEDURAL BACKGROUND

## The Crime (09/29/2007)

On Saturday, September 29, 2007, after dark,[1] around 7:30 p.m., a sudden, violent, street brawl erupted at the intersection of Dewey Avenue and Driving Park Avenue in Rochester, New York. A group of all, or mostly, women (20-30 people), armed with weapons (sticks, bats, 2x4s, bottles or knives), attacked a smaller group (6-7 people) led by Latasha Shaw. The conflict was over in minutes. During the fracas, Ms. Shaw was stabbed to death (T 208-209, 242, 339-340; 363, 366, 368, 385, 489). The People's theory of prosecution was that the attackers came from the front porch of a brown house near the intersection (310 Driving Park).

Including the participants, the police estimated that almost one hundred people witnessed the incident. Many people called 911, including a teenager named Megan Torres who viewed the melee from a porch about 158 feet away.[2] Later that same night, when questioned by a police officer, Ms. Torres stated that she was unable to identify anyone involved in the attack (T 357).

The media gave this homicide extensive coverage. Public pressure to solve the case was intense. But the police failed to arrest or charge anyone for more than thirteen months. At trial, no physical, forensic, video or cell phone evidence would establish Terrance Mack's presence anywhere near the crime scene.

---

[1] The sun set at 6:56 p.m. and official twilight ended at 7:24 p.m. (H3 7-8; A2 294).

[2] At a post-conviction hearing, the parties stipulated that distance was 158 feet (H3 7).

## The Arrest (11/04/2008)

On November 4, 2008, three Rochester police investigators traveled to Elmira, New York to arrest Terrance Mack.[3] At 8:30 a.m., the police took Mr. Mack into custody. Mr. Mack waived his *Miranda* warnings and agreed to speak with the police. When asked whether he knew why the police wanted to speak with him, Mr. Mack said no (A2 140).

An investigator explained that they wanted to speak with him about "an assault that occurred on 9-29-2007 at 325 Driving Park [in Rochester]. Mack right away stated that he wasn't there. [They] continued to speak with him about it and he denied any involvement. Mack stated that he heard about the incident from family members in Rochester" (A2 140). For twelve hours, Mr. Mack unequivocally maintained that, when the crime took place, he was in Elmira, not Rochester. He took a lie detector test. Even so, at 6:50 p.m., the police took Mr. Mack to booking (A2 140-141.) Newspapers and television stations reported Mr. Mack's arrest and displayed his picture to the public (SH 5).

Rochester City Court assigned Paul J. Vacca, Esq. to represent Mr. Mack. Mr. Vacca retained an investigator (Geoffrey Resnick) who interviewed witnesses, took statements, and wrote reports. Although the defense had no statutory duty to disclose statements from defense witnesses until after the People presented their direct case at trial (CPL 240.45 [2] [a]), Mr. Vacca provided the People with copies of all statements and reports as he received them (A2 272-274). Mr. Vacca did not obtain telephone records for Mr. Mack or any defense witness (H3 74-75; A2 194).

---

[3] Mr. Mack spells his first name "Tarrance" (H2 3; A2 137).

2

An indictment charged Mr. Mack and his female cousin (Ebony Mack) with Gang Assault in the First Degree (Penal Law § 120.07). In a separate count, Ebony Mack was charged with Murder in the Second Degree (Penal Law § 125.25 [1]) (A2 21-22).[4] The People provided a CPL 710.30 notice for Mr. Mack's oral, post-arrest statements and for a photo array procedure conducted on October 24, 2007, roughly three weeks after the crime. The photo array viewer was a teenager named Megan Torres (A1 142; H3 9; Defense Exhibit G).

After arraignment (12/02/2008), Mr. Vacca served the People with notices listing eighteen "alibi" witnesses (A2 154-155, 173-174). Apparently, most were persons who might testify that Terrance Mack was not at the crime scene. Accordingly, most were not "alibi" witnesses as contemplated in the New York statute and, therefore, pretrial notice of their testimony was not required (see CPL 250.20 [1]). Despite this long list of potential defense witnesses, Mr. Mack remained incarcerated throughout the entire criminal action.

At the future trial, Mr. Vacca would call three witnesses (Kionna Speed, Carolyn McHenry, and Shatora Hampton) who testified that Mr. Mack was not present at the Rochester crime scene, and two witnesses (Precious Scott and Jessica Smith) who placed Mr. Mack in Elmira. But Mr. Vacca never called three Rochester witnesses (Bessie Mack, Jerome Walker, and Sonia Spaight) who would have testified that Mr. Mack was not present at 310 Driving Park, Rochester, on the crime date. Additionally, Mr. Vacca never

---

[4] At a separate trial, Ebony Mack, represented by David Murante, Esq., was acquitted.

3

investigated Christopher Travis White who would have testified that, on 09/27/2007, he was in Elmira with Mr. Mack for most of the day.

**Inv. Soprano meets with Jessica Smith (01/13/2009)**

On January 13, 2009, almost four months before trial, two investigators from the District Attorney's Office (Samuel Soprano and Robert Siersma), traveled to Elmira to speak with Mr. Mack's girlfriend Jessica Smith (T 688-689). At trial, the People would call Inv. Soprano (T 689-693) to rebut Ms. Smith's alibi testimony (T 588-594). Soprano did not prepare a report of this meeting and did not take a written statement from Ms. Smith. In fact, Soprano would not even remember whether he took any notes. (T 695.) At a post-trial hearing, Mr. Vacca testified that the People never served him, at any time, with an alibi rebuttal notice (*see* CPL 250.20 [2] [required ten days before trial]).

**Jail Meeting about Mr. White (02/25/2009)**

On February 25, 2009, the defense investigator (Resnick) attended a meeting with Mr. Vacca and Mr. Mack at the Monroe County Jail. Mr. Resnick made notes during that meeting (H1 154-156). The trio discussed two potential witnesses who were in state prison – Travis White and James Jenkins (H1 155). After the meeting, Mr. Resnick checked on the locations for both inmates on the Department of Corrections website. On March 3, 2009, he located Christopher Travis White at the Lakeview Shock Incarceration Facility (H1 156). On March 5, 2009, he prepared a report for Mr. Vacca, stating that the next available visitation date for Mr. White was on March 15, 2009 (A2 184-185) (H1 156-157).

Although Mr. Resnick had some control over scheduling, he relied upon Mr. Vacca to tell him who to locate and who to interview (H1 162). Mr. Resnick wrote the follow-up report (03/05/2009) so that Mr. Vacca had Mr. White's location. If Mr. Vacca had directed Resnick to interview Mr. White, Resnick would have done so (H1 163). After submitting his report, however, Inv. Resnick had no subsequent notes to indicate that Mr. Vacca had asked him "to do anything with Mr. White" (H1 167). As per their working relationship, Inv. Resnick would wait to hear from Mr. Vacca on whether to interview Mr. White (H1 167).

Mr. Resnick had no knowledge regarding why Mr. White was never interviewed (H1 170). Moreover, in his notes made during the jail meeting (02/25/2009), he never recorded that Mr. Mack did *not* want Mr. White (or Mr. Jenkins) interviewed or called as a trial witness. As Inv. Resnick testified, he would have written down such a statement (H1 157). Instead, Mr. Mack gave both names to Mr. Vacca for the specific purpose of having Inv. Resnick locate them (H1 157-158).

**Jail Meeting with the Prosecution (03/19/2009)**

On March 19, 2009, the prosecutor (Sandra Doorley) and the two investigators from the DA's Office (Samuel Soprano and Robert Siersma) met with Mr. Vacca and Mr. Mack at the Monroe County Jail (T 15-16, 513-514; *see* A1 110-117 [letters about this meeting]). During this meeting, there was discussion about different cell phone numbers that Mr. Mack had been using.

## Mr. Mack's Proposal for a Physical Line-Up (04/09/2009)

Immediately prior to a scheduled *Wade*[5] hearing, the prosecutor advised the court about a potential resolution of the case (SH 3-6). The prosecutor told the trial court that Mr. Mack had submitted numerous letters to her "on behalf of an alibi defense." The prosecutor and her investigators had been trying to corroborate or disprove Mr. Mack's alibi, but had not "really made much headway" (SH 3-4). At that point, Mr. Mack had been in jail for more than five months. On his own initiative, Mr. Mack had suggested in a letter to the prosecutor, "that he stand in a physical line-up" (SH 4).

Based upon Mr. Mack's suggestion, the prosecutor proposed suspending the hearing, placing Mr. Mack in a physical line-up and *dismissing* the indictment if their sole identification witness (Megan Torres) could not identify Mr. Mack. Mr. Vacca remarked, however, that "this [was] the first [he had] heard of this proposal" and then stated his gross misunderstanding of a key fact that the parties were about to litigate at the *Wade* hearing: "Miss Torres was shown a photographic array on September 29th [the crime date] and could not identify Mr. Mack. She was then shown a photographic array on October 24th and she identifies Mr. Mack. That's my understanding" (SH 4).

The prosecutor corrected Mr. Vacca's glaring error, stating that October 24, 2007 was the only time that the police showed Ms. Torres an array containing Mr. Mack's photograph. Mr. Vacca then asked for additional time to discuss the line-up proposal with

---

[5] *United States v Wade* (388 US 218, 235 [1967]).

6

Mr. Mack. The court agreed to the request but directed the parties to proceed with the *Wade* hearing. (SH 4-5.)

## *Wade* Hearing (04/09/2009)

John Penkitis was a principal investigator for this homicide. On 10/02/2007, three days after the crime, he prepared an array containing six photographs with Mr. Mack's image at the #3 position. On cross-examination, Mr. Vacca asked:

Q.     Investigator, how did you develop Terrance Mack as a suspect in this case to include in the photographic array?

A.     His name came up through what witnesses told us and through computer checks as relationships to Ebony Mack.

Q.     All right. So he was developed as a suspect because of his relationship with Ebony Mack?

A.     And also I -- I also need to add he was also a person developed through the location of 310 Driving Park.

Q.     And how is 310 Driving Park connected to Terrance Mack?

A.     Through our computer checks, it's shown that that was an address that his name came up at.

(SH 15-16.)

Mr. Vacca did not seek any further clarification on this topic. Notably, the People would never present any evidence to show that Mr. Mack ever resided at or used 310 Driving Park as an address (*see* A2 282 [Listing previous addresses for Mr. Mack). Nor did they establish that any eyewitness, other than Megan Torres, claimed that Mr. Mack was involved in the crime

On direct examination, Inv. Penkitis testified about the circumstances surrounding the photo array identification. He described standard instructions allegedly given to the witness during this unrecorded session. Ms. Torres selected Mr. Mack's photograph, stating, "that's the guy," circling the number (#3), and initialing it ("MT"). Inv. Penkitis then wrote her oral statement ("THAT'S THE GUY") onto the array itself (SH 8-20; *see* A1 142; H3 9; Defense Exhibit G).

When the hearing concluded, Mr. Vacca never argued that the photo array itself, or the photo array procedure, was unduly suggestive. Instead, he argued that the identification testimony of Megan Torres should be suppressed because she did not have an adequate opportunity to view the suspect (SH 34-35). As the People argued, however, establishing an "independent basis" for an in-court identification of Mr. Mack was not the relevant issue at this *Wade* hearing. Indeed, Megan Torres had not testified so the hearing record contained no facts about her opportunity to view the suspect (SH 35-36). The court denied suppression of Ms. Torres's prospective in-court identification, finding that neither the photo array itself nor the photo array procedures were unduly suggestive (SH 36-39).

**Physical Line-Up Proposal Fell Through (04/30/2009)**

Three weeks later, on a Thursday, the parties were in court again. The physical line-up shad not taken place yet. The trial was on the calendar for Monday (05/04/2009). The parties had re-scheduled the line-up for Tuesday (05/05/2009). The original agreement was to postpone the trial so that the line-up could take place. But the prosecutor unilaterally changed the terms of the deal. Originally, the People would move to dismiss the indictment

8

if Ms. Torres did not select Mr. Mack. However, based upon new information (a jail inmate, seeking to reduce his five-year sentence for first-degree robbery, claimed that Mr. Mack had made an admission), the prosecutor now would only agree to Mr. Mack's release from custody if he were not selected. Mr. Mack's trial would then be adjourned until after his co-defendant's case was tried. Rejecting this new offer, Mr. Mack opted for the Monday trial date (Minutes of April 30, 2009 at 2-5).

### Case for the Prosecution

Although nearly one hundred people saw the assault on Latasha Shaw, the prosecutor only called three witnesses to the crime. Only one (Megan Torres) identified Mr. Mack as a participant.

In their opening statement, the People described their theory of prosecution. The perpetrators of the assault on Latasha Shaw came from the porch of 310 Driving Park (where Bessie Mack and her husband Jerome Walker lived). "When [Latasha Shaw and her group] got past the intersection where Driving Park and Dewey meet, a gang of people came from the porch of this brown house . . . 310 Driving Park" (T 197-198). From ten to thirty people came off the porch. "In that gang was the Defendant, and these people, this gang, including the Defendant, were carrying various objects," including knives, sticks, bats, and bottles (T 198). After Latasha Shaw dropped her cell phone, the attack commenced.

> "The phone is on the ground. She was hit with a bottle by the Defendant, Terrance Mack. She was held down by the Defendant, Terrance Mack. Others in the gang beat her with sticks, others beat her with small bats and others had knives and beat her and stabbed her with knives. Members of the

9

jury, you are going to hear a description of what happened. It was a melee in the truest sense of the word. It was a wild mob attacking an innocent woman who was just trying to gather facts to help her daughter."

(T 198.)

### Jasmine Shaw (T 204-237)

Jasmine Shaw, the victim's daughter (age 16), described an earlier fight between her group (Jasmine, friend Jellia and cousin Ajee) and another group of girls. Jasmine suffered some facial injuries. She went to her brother's house and called her mother. Latasha Shaw and other family members drove to the area (T 205-208).

Latasha Shaw, accompanied by her older sister (Charnette Grayson), two daughters (Jasmine and Jayoena), and other family members, walked toward the Dewey Avenue/Driving Park Avenue intersection. Using her cell phone, Ms. Shaw called 911, requesting police assistance to investigate the alleged assault on Jasmine. Ms. Shaw's group was headed toward a brown house located at 310 Driving Park Avenue (T 208-210; *see* A2 103-105 [transcript of 911 call).

It was dark; the streetlights were on (T 234). Many people were on the porch of the brown house and were yelling. Suddenly, ten to fifteen women came running off the porch toward them. Latasha said to run, so Jasmine ran. A skinny, brown-skinned woman (with a "twenty-seven piece" weave in her hair) threw a bottle. Latasha dropped her cell phone and stopped to pick it up. Jasmine thought that the thrown bottle hit her mother on the head, causing her to fall. When Jasmine turned around, she saw fighting in the street with

10

ten to fifteen women around her mother. Jasmine ran up Dewey Avenue for help. When she turned around again, the attackers were gone (T 210-213, 218-226).

**Charnette Grayson (T 238-268)**

Charnette Grayson, the victim's older sister, went with Latasha Shaw and other family members to investigate the prior assault on Jasmine. When their group arrived at the intersection, it was *dusk* (getting dark). Ms. Shaw was on her cell phone with 911 (T 238-241, 243-244, 263).

Ms. Grayson saw a porch-full of people at the brown house near the corner (310 Driving Park Avenue). Ten to fifteen people (probably more), males and females, came off the porch. Some of the women were older than 19-20 years old. Some of the men (approximately four) were middle-aged. The attackers were carrying weapons – silver flashes (knives), 2x4s, different house tools. Latasha Shaw said to run. Ms. Grayson ran (T 244-246, 258).

But Ms. Shaw fell, so Ms. Grayson stopped and tried to help. When Ms. Shaw tried to push herself up, a guy grabbed her hood, yanked her back and held her as she was surrounded. They were kicking and hitting Ms. Shaw. Girls were jabbing at her with something. A lady hit Ms. Shaw over the head with a red stick. Ms. Grayson was fighting against other attackers (first a female, then another girl, then a guy). She blocked someone from hitting her with a stick or a bat and managed to wrest it away. She did not recall seeing any bottles or any broken glass. Ms. Grayson did not see the face of the guy who

11

grabbed Ms. Shaw. Nor could she not describe what he was wearing (T 246-249, 258-267).

When the attackers fled, Ms. Grayson turned Ms. Shaw over. Two knives fell out. Ms. Grayson attempted CPR until the police arrived (T 247-250).

### Megan Torres (T 333-397)

On September 29, 2007, around 7:30 p.m., it was "starting to get dark outside. The streetlights were coming on" (T 341). Megan Torres, a teenage lifeguard, was on a friend's porch on Dewey Avenue with "a bunch of their friends" about 150 feet away from the intersection Dewey Avenue and Driving Park Avenue (T 334-337, 344). Notably, Ms Torres had testified before the grand jury that she observed the street brawl from 100 to 150 feet away (A2 312) and, during their opening statement, the People adopted this estimate (T 199). Mr. Vacca never asked Ms. Torres about this 50-foot difference. Nor did he establish that the actual distance was 158 feet (H3 7).

Ms. Torres heard a lot of commotion, a lot of argument, "a lot of screaming back and forth between girls" (T 337). When she turned in that direction, Ms. Torres saw the victim walking fast across the intersection. Twenty to twenty-five people, males and females, carrying weapons (broomsticks, bottles, knives), were running toward her (T 338-339). Ms. Torres called 911 (T 375) and supposedly "was on the phone with the cops as [the incident] was happening" (T 340). Mr. Vacca never confronted Ms. Torres with the content of her 911 call, showing that she called 911 only *after*, not during, the incident (A2 107-109).

12

Ms. Torres testified that she did not see what caused the victim to go to the ground, but that she saw a male (identified in court as Mr. Mack) hit the victim over the head with a bottle (T 342-343). Ms. Torres admitted, however, that she told the police, on the night of the incident, that a female hit the victim on the head with an object, possibly a bottle, and the victim fell to the ground (T 360-361). Ms. Torres explained the discrepancy by saying that *both* a female and a male hit the victim with a bottle (T 361). Ms. Torres also claimed that the bottle had shattered (T 359-360), but no shattered glass was found (T 283, 312-313, 328, 332).

Mr. Vacca never confronted Ms. Torres with her 911 call where she never mentions any male perpetrator and states that the victim was *stabbed* with a glass bottle and a knife. In response to a direct question, Ms. Torres told the 911 operator that she did not know which person stabbed the victim, commenting that, "It was a whole group of girls . . . It was over like twenty girls that went over there." (A2 107-108). Ms. Torres never mentioned anyone, male or female, hitting the victim in the head with a bottle.

At trial, Ms. Torres said that the male who hit the victim with a bottle, identified in court as Mr. Mack, then grabbed the victim and everybody else "started hitting her with different objects, bottles, broomsticks, knives. [Ms. Torres] saw her get stabbed, but [Ms. Torres] didn't see exactly who stabbed her" (T 339). Twenty-five to thirty people were around Latasha Shaw (T 363). Four or five were men. However, except for being African-American, Ms. Torres could not describe any of the women or the other men (T 366-367). "[E]verybody was all over the place" (T 364). Ms. Torres could not remember where Jasmine Shaw or Charnette Grayson was located at that time (T 362). She could not

13

remember how many people had bottles (T 340). She saw approximately three people with knives (T 340-341). She "didn't see that many [with broomsticks] because there was so many people, so [she] couldn't exactly see how many people had them" (T 341). When asked if she "focused [her] attention on the group or on one side," Ms. Torres testified that she "was trying to focus on different people, but [she] couldn't identify everybody because everything was going on so much" (T 341).

Ms. Torres stated that Mr. Mack was "the only one that [she] could clearly see enough to identify" (T 368). She allegedly observed him for thirty seconds to a minute (T 369). But she did not focus and train on him. She "was trying to focus on different people to see if [she] could identify anybody, and most of them were turned away from [her]" (T 369).

When the police sirens blared, "all the people that were hitting her and everything took off in different directions . . . A lot of them ran toward the area that [she] was, down Dewey, but they ran in every direction that they could to get away before the cops got there" (T 343). "[E]verybody was obstructing everybody else's view at a certain point because everybody was trying to get away" (T 368-369). Ms. Torres did not notice whether people were carrying objects as they ran away from the scene because she "wasn't paying attention that much" and she was on the phone with 911 (T 344).[6] Ms. Torres then "went over and asked Charnette which is Latasha's sister, if she wanted [Ms. Torres] to try to do CPR or anything . . . but [Charnette] said that there was nothing they could do" (T 344).

---

[6] As noted, Ms. Torres called 911 after the crime (A2 107-109).

14

Ms. Torres's direct examination concluded with no mention of the photo array conducted three weeks after the crime (T 333-348). Under New York law, only proof of a prior, in-person identification was admissible (CPL 60.30). In addition, Ms. Torres had not provided the jury with any physical description of the male perpetrator who allegedly hit Ms. Shaw in the head with a bottle and grabbed her during the assault. Importantly, Ms. Torres's sole basis for identifying Mr. Mack was that she had supposedly seen him in the neighborhood "quite a few times" on the brown porch of 310 Driving Park Avenue (T 343). When asked to specify how many was "quite a few times," Ms. Torres could only answer "more than once" (T 357). Furthermore, she did not know the person's name and did not claim that she ever interacted with him (T 357). The People did not present any proof that Mr. Mack had ever lived at 310 Driving Park or in that neighborhood. Nor did they dispute that, on 09/29/2007, Mr. Mack was living in Elmira.

On cross-examination, Mr. Vacca elicited from Ms. Torres that, on the night of the crime, she told a police officer that she could *not* identify anyone involved in the assault on Latasha Shaw. Yet, for reasons that defy explanation, Mr. Vacca proceeded to elicit inadmissible testimony from Ms. Torres, establishing that she had made a prior, *photographic identification of Mr. Mack*:

Q.    Okay. And then, then you change your mind; is that correct?

A.    Yes.

Q.    How does that happen? [Open-ended question]

A.    Because the day that [the police officer] asked me, I was scared to identify anybody because I didn't know who was watching or what was going on. Once I had talked to my dad, my dad told me that the right thing to do was to let them know what I saw.

15

Q. When did you let them know?

A. They had contacted me once I had gotten to my house. After the incident happened, they had contacted me a couple of times.

Q. Did they go over to your house?

A. Yes.

Q. Did they talk to you?

A. Yes.

Q. Did they show you pictures?

A. Yes.

Q. How many times did they show you pictures?

A. They had showed me one time.

Q. One time they showed you pictures?

A. One time that I remember.

Q. Right. You identified Mr. Mack?

A. Yes.

Q. Okay. That's because you knew him from the neighborhood, correct?

A. No, that's because I saw him leaving the incident and from hitting her with the bottle.

(T 358-359).

Q. Okay. Did you call them up and say, I want to talk to you about the case?

A. Yeah, after I had talked to my dad and let him know what I had saw, and he told me that the right thing would be to call and let them know what I saw. Then I called them, and my dad also called them.

(T 362).

On cross-examination, Ms. Torres described the male perpetrator as 5'5"-5'6", 20-25 years old, with an average build (T 376-379). Although Mr. Mack testified, defense counsel neither elicited from him nor otherwise established that he was taller, older, and

16

heavier than Ms. Torres's description (5'10", 29 years old, and 200 lbs.) (H3 72; Defense Exhibit K).

At the prosecutor's request, the court ruled that Mr. Vacca's questioning had opened the door to additional testimony and evidence related to Ms. Torres's photo array identification of Mr. Mack (T 381). Mr. Vacca failed to register any protest.

### Inv. John Penkitis (T 413-422)

On October 24, 2007, John Penkitis and another investigator met with Ms. Torres, at her home, to discuss what she saw on September 29, 2007. Inv. Penkitis knew that Terrance Mack was a suspect because, three days after the crime (10/02/2009), he prepared the photo array (A1 142). Consequently, this was not a "blinded" procedure.

Inv. Penkitis explained to Ms. Torres that they were going to show her a series of photographs and that, if anyone looked familiar, to point that person out and to tell them why that person looked familiar. They showed her, one at a time, six separate photo arrays (males and females). Out of the six photo arrays, Ms. Torres made one selection, picking #3 (a photo of Terrance Mack) from one of the six arrays. Mr. Vacca did not object to any of this testimony. Nor did he argue against submission of the unredacted photo array into evidence (T 417-421). The photo array had a circle around #3, the initials "MT", and a handwritten note ("THAT'S THE GUY") (A1 142; H3 9; Defense Exhibit G).

On cross-examination, defense counsel asked no questions about the physical exhibit itself or the photo array procedure. Instead, he elicited that Inv. Penkitis's estimate

that between seventy-five and one hundred persons may have witnessed the incident (T 421).

Later, Mr. Vacca recalled Inv. Penkitis as a defense witness to establish that Penkitis showed Mr. Mack's photo array to a large number of eyewitnesses who could make no identification (T 598-613).[7] During her cross-examination, the prosecutor elicited that each one of the six photo arrays shown to Megan Torres on October 24, 2007 contained a photo of a different suspect possibly involved in the Latasha Shaw case (T 615-616). The prosecutor ended by asking Inv. Penkitis "[i]sn't it true that [Mr. Mack] had been developed as a suspect during the course of your investigation and your conversation with seventy-five to one hundred people?" Inv. Penkitis answered "Yes, that's correct" (T 616).

Mr. Vacca never objected to this murky response and never sought to clarify how Mr. Mack had become a suspect in the first place. As the investigator's testimony at the *Wade* hearing seemed to suggest, Mr. Mack's family relationship with his cousin and co-defendant Ebony Mack (A2 145) and her mother Bessie Mack (who, on 09/29/2007, lived at 310 Driving Park) may have been the sole reason that Penkitis put Mr. Mack's photo into that array (SH 15-16).

### Ronaldo Donald (T 423-449)

Only ten days before the trial date, Ronaldo Donald popped up as a prosecution witness.

---

[7] During this process, the Court sustained numerous objections by the People.

On April 21, 2009, Mr. Donald was sentenced to five years in prison for first-degree robbery (forcibly stealing a necklace using a dangerous instrument [a knife]). The victim was cut during the robbery. For an earlier third-degree robbery (a felony, not a misdemeanor),[8] Donald had been given youthful offender status. (T 423-426, 434.)

At trial, Mr. Donald was in custody, serving his five-year sentence. He claimed that Mr. Mack, on April 22, 2009, supposedly admitted running off the porch and grabbing Latasha Shaw. For his testimony, Donald hoped to get a "violent felony override" that he thought would substantially reduce his actual prison time (T 428-430, 436-438, 445-447). Based upon television news reports, Donald already knew that Mr. Mack had been arrested for the Latasha Shaw stabbing. He also knew the victim's brother ("Mugsy"). Donald and Mugsy had been friends since high school.

On cross-examination, when asked whether he had spoken about the alleged admission with anyone other than a prosecutor, Mr. Donald volunteered that he took "a polygraph, a lie-detector test" (T 445-446). Mr. Vacca never moved to strike the answer. Nor did he ask for any curative instruction. Although Mr. Vacca asked Donald about his conviction for robbery in the first degree (T 433-435), he failed to ask Donald any questions about the facts underlying Donald's earlier commission of robbery in the third degree.

---

[8] The Monroe County Court (Dollinger, J.) wrongly characterized the original conviction (replaced by the youthful offender adjudication) as only a misdemeanor (MCCD2 12).

## Case for the Defense

Three witnesses testified that Mr. Mack was not at the scene of the Rochester crime. Two witnesses and Mr. Mack testified that he was in Elmira on that date.

## Kionna Speed (T 543-563)

On September 29, 2007, around 2:00 p.m., Kionna Speed went to 310 Driving Park Avenue around 2:00 p.m., to visit her aunt Bessie Mack. Later, she was involved in a fight between her group of girls (Kionna, Shatora and Ebony Mack) and Jasmine Shaw's group of girls. After the fight, Kionna's group returned to 310 Driving Park (T 543-549).

Ms. Speed described her observations of the assault on Latasha Shaw. She named at least ten people, including herself, who were at 310 Driving Park (including Bessie Mack, Jerome Walker, and James Jenkins) and another ten women who, shortly before the assault, arrived in a large van near the intersection. The women from the van attacked Latasha Shaw. Kionna's mother (Jessie Speed) called 911 (T 546, 549-560). Kionna Speed's cousin Terrance Mack was *not* present at 310 Driving Park (T 545-549, 555, 558-559).

## Carolyn Kenesha McHenry (T 618-633)

On September 29, 2007, Carolyn Kenesha McHenry lived at 310 Driving Park Avenue with her cousin Bessie Mack. She identified at least eight people who were at that address (including Sonia Spaight and Jerome Walker). Her cousin Terrance Mack was not present (T 619-620, 27.)

Ms. McHenry described her observation of the earlier fight involving one group (Shatora Hampton, Kionna Speed, Ebony Mack) and Jasmine Shaw's group (T 621). She also described her observation of the assault on Latasha Shaw. A large, black truck pulled up. Five or six females exited, including Diane Lawhorn. They chased Ms. Shaw. A female in a blue hoodie threw a bottle at Latasha Shaw. It was dark. Crowds from the outer streets gathered (T 621-626). Her cousin Terrance Mack was *not* present (T 627).

### Shatora Hampton (T 634-645)

Shatora Hampton described her involvement in the earlier girl fight between her group and Jasmine Shaw's group (T 635-636, 642). Ms. Hampton, who was *not* a blood relative of Terrance Mack (T 637; A2 158), described the assault on Latasha Shaw. She also identified numerous people (including Jerome Walker) who were present at 310 Driving Park before the assault on Ms. Shaw (T 637-639, 643). Terrance Mack was *not* present at that address or in the area of the assault (T 637, 639).

### Precious Scott (T 564-577)

On September 29, 2007, Ms. Scott was living with her sister in Elmira, New York. Between 11:00 a.m. and 12:00 noon, her nephew Terrace Mack *and her cousin Travis* [White] brought her food from McDonald's (T 565-567, 572, 574). Between 5:30 p.m. and 6:00 p.m., she called Mr. Mack *on his cell phone* and spoke with him (T 567-568, 573-574). Ms. Scott testified that, during this time, she would see Mr. Mack in Elmira on a regular daily basis (T 569-570).

### Jessica Smith (T 578-595)

On September 29, 2007, Jessica Smith and Terrance Mack were living at 500 Hathorn Court, Elmira, New York. Mr. Mack was the normal caregiver for their infant daughter when Ms. Smith went to work. That day, Ms. Smith worked from 6:57 a.m. until 7:19 p.m. (T 580-583). Both when she left that morning and when she returned that evening (around 7:45 p.m.), Mr. Mack was at home in Elmira with the baby (T 583-586). Ms. Smith needed to take a taxicab to and from work (T 589).

Ms. Smith testified that she spoke with Mr. Mack during the day when he called her either *on his cell phone* or on their landline (T 589-592). On cross-examination, she denied telling two investigators from the District Attorney's Office that she called Mr. Mack several times on the landline (T 590-594).

### Terrance Mack (T 646-671)

On September 27, 2007, Terrance Mack was living at 500 Hathorn Court, Elmira, New York, with Jessica Smith and their daughter (T 647-648, 660). He testified that, on that date, he was not in Rochester or at 310 Driving Park Avenue where his aunt (Bessie Mack) and her husband (Jerome Walker) lived (T 649-650). Instead, he was in Elmira watching his infant child while Ms. Smith worked (T 650, 660-661). Mr. Vacca never elicited Mr. Mack's arrest date (11/04/2008), more than thirteen months after the crime, or his immediate report of an alibi defense. Mr. Vacca never established the distance or travel time between Rochester and Elmira or the fact that Mr. Mack did not own a car to make that two-hour road trip.

22

On cross-examination, Mr. Mack testified that he saw both Precious Scott (T 671) and Christopher Travis White (T 663) on the crime date. The prosecutor also asked him about the telephone landline. Mr. Mack reminded the prosecutor that she, the defense attorney and he had a meeting at the jail where Mr. Mack had told the prosecutor that he was using a number of cell phones. Mr. Mack gave the prosecutor his cell phone numbers, and the prosecutor said that she would check those out. (T 660-661, 665-667, 670-671.) Significantly, the prosecutor never introduced any of Mr. Mack's cell phone records to refute his alibi defense.

Mr. Mack denied making any "admission" to jail inmate Ronaldo Donald. Although Mr. Mack agreed that Donald asked him about his charges, Mr. Mack testified that he did not discuss the matter with Donald. Mr. Mack also denied Donald's claim that they went to school together (T 650-651, 654-659).

Mr. Vacca never conducted any re-direct examination for any of the defense witnesses. Indeed, during his closing statement, Mr. Vacca commented that he puts his "witnesses on the stand as they come in, without prep" (T 722).

### Alibi Rebuttal Witness - Samuel Soprano (T 687-698)

The People failed to serve an alibi rebuttal notice for Inv. Soprano (CPL 250.20 [2]) (A2 23, 50-51, 77-79, 1132-1135) (H3 73-74). Nevertheless, they still called him to rebut the alibi testimony of Jessica Smith. Inv. Soprano testified about his memory of an unrecorded, oral statement that Ms. Smith allegedly made during a meeting (01/13/2009) and about the content of telephone records (not admitted into evidence) of Ms. Smith's

23

landline. According to Soprano, the telephone records contradicted Ms. Smith's alleged oral statement to Soprano that she had spoken with Mr. Mack on the landline (T 688-694). Mr. Vacca only raised "hearsay" as an objection to the testimony (T 689-690).

Despite Ms. Smith's testimony that she spoke with Mr. Mack on his cell phone (T 588-594), neither the prosecutor nor the defense attorney introduced any telephone records for Mr. Mack's cell phone.

### Closing for the Defense

Mr. Vacca never argued to the jurors that Mr. Mack was taller, older, and heavier that the eyewitness's description of the suspect (Ground 19). Nor did he point out that Mr. Mack, when arrested, more than thirteen months after the crime, immediately reported to the police that he was in Elmira on the date of the crime (Ground 23).

Instead, Mr. Vacca began his review of the trial evidence with a faulty recollection of the eyewitness's testimony. Around noon, as Ms. Torres walked to work, she allegedly saw Mr. Mack sitting on the steps of 310 Driving Park, wearing a baseball hat, a brown shirt, blue jeans and white sneakers (T 708-709). After work ("about 5:00 or 5:30"), as Ms. Torres walked by 310 Driving Park, she saw Mr. Mack still sitting there and "a lot of other people sitting on this porch" (T 709). Mr. Vacca commented, "Now, I am unclear on this, because I think she says she walked by a third time at about seven o'clock, and at that time he was sitting on the porch with a lot of other people" (T 709). To be clear, Ms. Torres testified that she walked by the porch *twice*, going to work around 12:30 p.m. and coming from work around 7:00 p.m. (T 383-384).

24

Rather than treating the alleged sightings as two separate events, Mr. Vacca argued that Ms. Torres was making a broader claim. "First of all, she would have him sitting on that porch from 12:30 in the afternoon until 7:30 or quarter to 8:00 at night. All right. Does that sound reasonable to you? It doesn't sound reasonable to me." (T 709.)

Mr. Vacca repeated Ms. Torres's testimony that, "she says she sees an individual dressed like that jump into the crowd and hit the victim with a bottle . . . and also she claims she knows him from the neighborhood, that he is someone *who lives* in the neighborhood" (T 709 [emphasis added]). While Ms. Torres did say that she thought she knew the perpetrator from the "neighborhood" (T 343, 357), she never actually said that he *lived* in the neighborhood. Rather than stretching testimony, Mr. Vacca could have emphasized how Ms. Torres provided no details or corroborating evidence to prove any prior contact with this person other than her own claim of two sightings on the crime date.

Rather than merely repeating Ms. Torres's clothing description, Mr. Vacca also could have argued that no other witness described any attacker as wearing "a baseball hat, a brown shirt, blue jeans and white sneakers" (T 708-709) and no one ever confirmed that Mr. Mack had worn such clothing. Rather than merely mentioning that the suspect was wearing a *hat*, Mr. Vacca, if adequately prepared (Ground 3), could have discussed how "partial disguise" (Ground 9) will reduce the reliability of eyewitness identification, how Ms. Torres never said that the suspect had unique features or "facial distinctiveness" (Ground 10), and how "unconscious transference" (Ground 11) may have played a role in this case.

Mr. Vacca then mused about Ms. Torres's motive for testifying:

"Why did she come in and testify to this? I just don't know except I think she was a lot closer to Latasha Shaw and the Shaw family than she will admit. On direct examination and on my initial cross, she denied knowing Latasha Shaw, but in her Grand Jury testimony that I questioned her on, she said Latasha Shaw was not that type of person, she was the type of person that tried to work everything out. Then as it turns out, her male friend's mother and Ms. Shaw were best friends. So, the District Attorney may say to you she had no interest in this case, she wasn't at all related to the case, but that is not accurate. She was intimately related to the case."

(T 709-710.)

Later, Mr. Vacca argued, "Megan Torres is wrong. She's mistaken on this case. *I don't know her motive* for coming in and saying that *and holding so steadfast*. Are you going to convict my client on that? The answer is, you can't." (T 721 [emphasis added].) If Mr. Vacca consulted, or called, an expert on human memory and perception, he could have learned about the science (Ground 3), providing the jurors with viable explanations for Ms. Torres's steadfast confidence in her identification testimony (Ground 6) (lack of correlation between confidence and accuracy).

Having opened the door to inadmissible proof of the photo array identification (Ground 12), Mr. Vacca had to address it. However, he did not try to "discredit Ms. Torres's identification" by arguing that her father pressured her into making an identification or that her "previous viewings of the defendant prior to the photo array identification" somehow discredited her selection of Mr. Mack (*contrast* MCCD2 12). What Mr. Vacca actually did was merely repeat Ms. Torres's damaging testimony (Ground 13).

"Now, when asked on September 29, 2007 by the police, can you ID anybody, what did you see, her answer was, no. She then says that she talked

26

> to her father. Her father said, you better call the police and cooperate. So, on the 24th of October, 2007, Investigator Penkitis shows her a photographic array and identifies Terrance Mack, but she claims that she knew Terrance Mack from the neighborhood. *I think we have an identification of somebody just that she recognized.* She did not recognize any of the other individuals in the photographic array."

(T 711-712 [emphasis added].) Oddly, Mr. Vacca seems to suggest, without qualification or explanation, that Ms. Torres *recognized* Mr. Mack's photograph.

Mr. Vacca should have emphasized that the undisputed proof established that, on the crime date, Mr. Mack lived in Elmira with his girlfriend (Jessica Smith) and their infant daughter (Trianna) (T 583, 647-648). According to Ms. Smith's timecard (A2 148), she worked from 6:57 a.m. to 7:19 p.m., arriving home around 7:45 p.m. (T 582-587). Although the prosecutor elicited that Ms. Smith took a taxicab to and from work (T 589), Mr. Vacca never established that Mr. Mack did not own a car. That relevant information could have set up two powerful questions for the jurors:

- How did Mr. Mack get to Rochester?

- Who was watching Trianna (if not Mr. Mack)?

Instead, Mr. Vacca strangely downplayed the undisputed proof of Elmira residence by opining, "Now, whether or not he lived in Elmira is irrelevant now as far as I am concerned, because we also have witnesses that saw the incident that say they knew Terrance and he was not there. There is no motive for these witnesses to come in and lie." (T 723). Regarding such lack of motive, Mr. Vacca could have argued, additionally or alternatively, that one of the three Rochester witnesses (Shatora Hampton) was *not* a blood relative (T 637; A2 158).

27

Mr. Vacca also could have suggested alternative scenarios still consistent with Mr. Mack's innocence. He could have argued that, even if one or more attackers were male and/or came off the porch of 310 Driving Park, Mr. Mack was not one of them. Instead, he needlessly asked the jurors to adopt two hardline positions: (1) that "no men" were involved in the attack on Latasha Shaw (T 712-713, 718-719), and (2) that all attackers only came from a vehicle that pulled up near the intersection (T 723-724) (Ground 18).

Lastly, Mr. Vacca failed to give the jurors numerous reasons to doubt the accuracy of the eyewitness identification (Ground 17), such as cross-racial identification (Ground 4), "weapon focus" (Ground 5), "event stress" (Ground 7), "event duration" (Ground 8), and "viewing angle" (Ground 14).

### Closing for the Prosecution

The prosecutor built her summation around the defense attorney's many blunders.

On the defense failure to call Christopher Travis White as an alibi witness (Ground 1), the prosecutor exploited Mr. White's absence from the trial. The prosecutor emphasized this gap in the alibi defense by reminding the jurors that Mr. Mack, "rattled off a bunch of names of all the people he was with, all these males. *You haven't heard from them.*" (T 730 [emphasis added]).

On the defense failure to object to any testimony from Inv. Soprano, the un-noticed alibi rebuttal witness (Ground 16), the prosecutor affirmatively used Soprano's testimony to rebut the alibi defense:

> "Jessica Smith told the investigators that work for the District Attorney's Office, because we looked into this alibi, she said, no, I called him several times during that day, throughout the day, to check on the baby, which a

28

mother would normally do. I used this phone number from work at the United Cerebral Palsy. I called the landline, and he was there. There are no ingoing or outgoing phone calls to that landline the entire course of the day."

(T 731.)

On the two inflexible arguments made by Mr. Vacca (Ground 18), the prosecutor urged the jurors to accept the People's version, noting testimony from Jasmine Shaw that, "the group, the gang, came from 310 Driving Park, the porch of the brown house. They didn't get out of a van or a car." (T 732) and testimony from Charnette Grayson that, "She sees the gang come off the porch at 310. They are not coming from this van." (T 732). The prosecutor pointed out that Ms. Grayson and Megan Torres both said that males were involved (T 732-734).

On the defense failure to establish that it was dark during the assault (Ground 14), the prosecutor maintained that there was still some light, arguing, "7:30 p.m. in September, it was dusk" (T 734).

The prosecutor exploited bolstering identification testimony from Megan Torres elicited by the attorney's open-ended questions during cross-examination (Ground 13):

> "What did she say? She was able to focus on the Defendant because he was in the forefront, he was the head of the crowd. She could clearly see his face because she had seen him earlier that day." (T 735.)

> "He's in the forefront, he's in the lead. She can recognize his face. He was the same person who was on the porch steps at 12:30. He was the same person who was on the chair on the porch at 7:00 p.m. He was the same person who was leading the gang. She sees him take the bottle, and she sees him strike Latasha on the head." (T 736)

> "Who was in the forefront? (T 745).

29

The prosecutor exploited the attorney's multiple failures regarding the photo array evidence (Ground 12):

> "On October 24th, twenty-five days after Ms. Shaw's death, after looking at six separate photo arrays, thirty-six people, Megan looks at it, points to Number 3, the Defendant. She says, it is him. She says, that's the guy I saw. She says, that's the guy that hit her on the head with the bottle. This is twenty-five days after, not May 5, 2009, when she IDs him in court."

(T 738.)

> "How did that happen? Investigator Penkitis told you there were people, we call them persons with information. Investigator Penkitis and Investigator Dominic, they made phone calls, they knocked on doors, they tried to find anyone with information. During that process, what did they gain? They gained information that people may have been involved. What they did was they put together photo arrays. So, from those seventy-five to one hundred people, they had information, and they put together the photo array of Terrance Mack. Twenty-five days later, they showed it to Megan Torres, and she identified him."

(T 738-739.)

Finally, Mr. Vacca failed to object to the prosecutor's incorrect statement of what jurors could consider an important fact:

> "All of the alibi witnesses here were blood relatives of the Defendant. They were cousins, they were aunts, all with an alibi, as I submit to you, all here to help Mr. Mack."

(T 729.)

However, Shatora Hampton was not a blood relative (T 637; A 158) and a competent attorney would have objected to the prosecutor's mischaracterization.

## Jury Instructions

Despite the fact that Mr. Mack is black and the identifying witness is white, Mr. Vacca failed to request a cautionary instruction on the dangers of cross-racial identification. As described in various grounds for relief in Point I, the identification instruction provided to the jurors in this case (T 759-762) did not adequately addressed every reliability factor that a competent attorney could have raised at Mr. Mack's trial.

## Jury Deliberation - Overview

The trial began on a Monday (T 22). The court told prospective jurors that the case should end by Friday (T 28). On Thursday, proofs were closed. On Friday morning, for two hours, the jurors listened to closing statements and final instructions. Lunch was ordered. Deliberation commenced (T 704-773). Almost eight hours later, deliberation ended (T 773, 788).

The jury's deliberation covered two periods: five hours of pre-deadlock deliberation (12:30 p.m. – 5:42 p.m.) and two hours of post-deadlock deliberation (6:02 p.m. – 8:10 p.m.) (T 773-783, 786-788). During the pre-deadlock period, the trial court immediately responded to all jury notes. Yet, for reasons never explained to the jurors, the trial court stopped responding during the post-deadlock period (T 788-790).

## Pre-Deadlock Deliberation

At 2:20 p.m., after roughly two hours of deliberation, the jury sent out its first note, requesting:

"1.    Smoke Break for Juror Number 2 and Juror Number 10;

31

2. Megan's testimony – all;

3. 911 tape from Latasha's cell phone;

4. Ronaldo's testimony – direct;

5. Charnette Grayson's testimony – all;

6. Crime scene – actual evidence of bat"

(T 775) (A1 152). Immediately, the trial court responded to this jury note except for the first request ("Smoke Break") (T 774-775). Instead of allowing the smokers to satisfy their craving, the court had the stenographer read the testimony of Megan Torres (T 776-777). When that read-back was finished (roughly an hour and a half later), defense counsel requested a five-minute break. The court agreed, noting that it would "also give the Reporter a chance to catch her breath" (T 777). The court took a recess (3:50 - 4:13 p.m.) while the jury continued to deliberate (T 777).

During the recess, the jury sent another note (A1 153), rescinding its request for Charnette Grayson's testimony. As a result, Ms. Grayson's testimony was not read back (T 777). Thereafter, Ronaldo Donald's direct testimony was read back, the victim's 911 tape was played and the physical evidence was provided (T 777-780).

At 4:37 p.m. (more than two hours after the original request), the court finally gave the smokers (two jurors and one alternate) their smoke break (T 781).

At 5:42 p.m., the jury sent another note (T 783). By that time, except for that one smoke break, the jury had been kept together continuously, either in court or in the jury room, for well over seven hours. The jury asked two questions and announced a problem:

"1. How late are we allowed to deliberate tonight?

2. What is the protocol for a deadlock?

32

Problem: We are deadlocked"

(T 783-785) (A1 155). Once again, the court immediately responded to the jury note. The court re-read its original instruction on the unanimous-verdict requirement and the process of jury deliberation. However, in response to their specific question ("How late are we allowed to deliberate *tonight*"), the court cryptically stated that there was *"no* time limit." The court told the jurors to resume their deliberation and that dinner menus would be provided (T 784-786).

### Post-Deadlock Deliberation

The court never told the jurors that it intended to stop their deliberation at approximately 9:00 p.m., to sequester the jurors overnight, and to have them resume their deliberation on the following day (a Saturday). In addition, the court never told the jurors that it would not address any jury notes at all for the next two hours. Outside the presence of the jury, the court told the attorneys that they could "remain unavailable" until 7:30 p.m., because, on a Friday night, it would possibly take some time to get the jurors their dinner. The court said that it would address any jury questions or concerns at 7:30 p.m. (T 786).

At 6:03 p.m., the court recessed (T 786). During the court's dinner break, the jury sent out three separate notes:

At 6:20 p.m.,

> "We would like to have the instructions regarding the *importance of a single witness in a case versus multiple witnesses* and the instructions about the *meaning of reasonable doubt* read back to us" (A 156 [emphasis added]).

At 6:43 p.m.,

"1.    To hear Megan Torres' testimony regarding Terrance Mack's leaving of the crime scene"

2.    Need more jury request sheets" (A 157).

At 6:47 p.m.,

"Smoke break" (A 158).

At 7:51 p.m. (not 7:30 p.m.), the court finally re-convened. The three unanswered jury notes were read into the record. (T 786-787). The following exchange took place:

THE COURT: [F]irst of all, obviously, I can read the single witness charge and the reasonable doubt charge. I have reviewed my notes, and I have also checked with the Court Reporter. *I don't believe there is any testimony regarding Megan Torres' testimony regarding Terrance Mack leaving the crime scene.* Do you remember any?

THE PROSECUTOR: *Not specifically to him*; just people in general.

THE COURT: *They* [the jury] *are talking about him though.* Do you?

THE DEFENSE ATTORNEY: There is no testimony on that, Your Honor, *because he wasn't there.*

THE COURT: Well, *there is testimony that he was there*, that somebody saw him going there, Ms. Torres, *but I don't believe there is any testimony from her regarding him* [Terrance Mack] *leaving the crime scene.*

THE DEFENSE ATTORNEY: There is none, Your Honor.

THE COURT: *Do you agree with that?*

THE PROSECUTOR: *Yes.*

THE COURT: Okay. *The Reporter*, as I said, *she doesn't recall any such testimony. I reviewed my notes, and I don't see any such testimony.*

(The Court Deputy handed the Court a further note from the jury.)

THE COURT: Regarding that, *I will simply respond that there is no testimony to be read back regarding that matter. Okay.*

THE PROSECUTOR: *That's fine.*

34

THE COURT: I obviously will read the other instructions to them. Counsel, approach for a second.

(Counsel approached the bench.)

(There was an off-the-record bench discussion.)

(Court Exhibit 9 was marked ["WE THE JURY have come to a verdict"] [A 159].)

THE COURT: We are going to take a short recess.

(The proceedings recessed at 7:54 p.m. and reconvened at 8:10 p.m.)

(T 787-788 [emphasis added].)

### Guilty Verdict

Mr. Vacca never asked the court to address the jury's three substantive requests (two instructions on the law and one clarification about testimony). Nor did he object to the taking the verdict without some court inquiry into whether any of the jurors still wanted an answer to the requests (Ground 24). Thus, at 8:10 p.m., the court accepted the jury's guilty verdict (Gang Assault in the First Degree [Penal Law § 120.07] [a class B violent felony offense]) (T 788-790).

### CPL 330 Motion by Paul Vacca

In a CPL 330 motion filed before sentencing, Mr. Vacca asserted under oath that the verdict should be set aside because Christopher Travis White was a key witness who could not be located (A2 1225, 1230-1233).

## Sentence

Despite vehemently protesting his innocence, Mr. Mack received 25 years in prison and 5 years of post-release supervision (Sentencing Minutes of June 17, 2007 at 5-6, 14-17).

## Direct Appeal (KA 09-01764)

Terrance Mack's post-conviction saga has been a rollercoaster of initial success followed by bitter disappointment. In a 3-to-1 decision, the Appellate Division, Fourth Department granted Mr. Mack a new trial based upon the trial court's failure to address three substantive jury notes before accepting the verdict (*People v Mack*, 117 AD3d 1450 [4th Dept 2014]). The dissenting Justice (Stephen Lindley) granted the People leave to appeal.

In a 6-to-1 decision, the Court of Appeals reversed, finding that the court's failure to address outstanding jury notes did not constitute a mode-of-proceedings error. Accordingly, Mr. Vacca's failure to object caused the error to be unpreserved for appellate review. (*People v Mack*, 27 NY3d 534 [2016]).

On remand from the Court of Appeals, two Appellate Division Justices (Henry Scudder and Edward Carni) would have reviewed the error in the interest of justice and would have granted a new trial because the trial court's failure to address the jury notes caused serious prejudice to Mr. Mack. However, three Justices declined to review the error because Mr. Vacca never raised any objection. (*People v Mack*, 142 AD3d 755 [4th Dept 2016].)

## CPL 440 Motion

In 2017, Mr. Mack filed a CPL 440 motion (A2 23-97), accompanied by exhibits (A2 98-299) and relevant transcripts (A2 300-1056), identifying numerous instances where he suffered substantial prejudice from Mr. Vacca's constitutionally deficient representation.

## Original Proceedings on the CPL 440 Motion

The Monroe County Court (Ciaccio, J.) ordered a hearing on the claim of ineffective assistance of counsel but incorrectly limited its scope. The court summarily denied all other contentions raised in the CPL 440 motion, including a request for telephone records possessed by the People (A2 24, 61-63, 95-97) (Minutes of August 30, 2017 at 2-4).

On November 20, 2017 (H1) and November 21, 2017 (H2), the court held a hearing to explore what reasons, if any, justified Mr. Vacca's failure to investigate Christopher Travis White as an alibi witness, and his failure to call Bessie Mack, Jerome Walker and Sonia Spaight in support of an alibi defense. Mr. Vacca had listed all four persons in Mr. Mack's notice of alibi (A2 1214-1217) and had included Bessie Mack, Jerome Walker, and Sonia Spaight as potential witnesses in the list that the trial court read to the jurors (T 26).

At the hearing, Mr. Mack called five witnesses. The People called none.

## Christopher Travis White (H1 83-114)

On Saturday, September 29, 2007, Mr. White, age 22, was living in Elmira, New York (H1 84). He remembered being in Elmira with his best friend Terrance Mack on that date because Mr. Mack *received a phone call* from someone who said that members of Mr.

Mack's family were "in custody about or under investigation about a murder" (H1 85). Mr. White remembered picking up Mr. Mack and his infant daughter earlier in the day, driving around and going to a corner store at some point (H1 86, 103-105). Notably, Mr. Mack did not have a car at that time and relied upon others for transportation (H1 88). When Mr. Mack received the phone call that his "mother and his aunts were being held for investigation," Mr. White recalled, "sitting right next to" Mr. Mack (H1 86) and that it was getting dark (H1 105). Mr. Mack started "making calls and getting calls trying to figure out what was going on" (H1 86).

In September of 2008, roughly one month before Mr. Mack's arrest (11/04/2008), Mr. White went to state prison for a felony drug conviction, serving his sentence at Lakeview Shock Camp (H1 86, 92-93). During a visit, Mr. White's ex-wife (Marissa Watkins) told him that the police had arrested Mr. Mack but she did not give him any information about any trial (H1 86-87, 93, 106-107). While Mr. White was at Lakeview, his only visitors were his mother and his ex-wife (H1 92-93). Only after Mr. White's release from shock camp (05/07/2009) did he learn about Mr. Mack's conviction (H1 88). Thereafter, Mr. White spoke with Inv. Resnick and provided him with a sworn statement (A2 188) (H1 86-87, 93, 106-109, 113).

### Sonia Spaight (H1 114-136)

On Saturday, September 29, 2007, around 4:00 p.m., Ms. Spaight, age 36, went to the home of Bessie Mack (Terrance's aunt) and Jerome Walker (Bessie's husband) at 310 Driving Park in Rochester. Both Bessie and Jerome were present (H1 114-117, 124). Ms.

Spaight recalled this particular day because "[a] young lady got killed . . . [o]n the corner of Dewey and Driving Park" (H1 115).

At approximately 7:30 p.m., the fatal stabbing took place (H1 117-118). Ms. Spaight did not see who actually stabbed Ms. Shaw but she did see a group of females attacking Ms. Shaw (H1 123-124, 135-136). When the police arrived, Ms. Spaight was still at 310 Driving Park (H1 117-118). She observed the police taking Bessie Mack and Jerome Walker into custody (H1 118). Terrance Mack is Ms. Spaight's nephew by marriage (H1 115, 128). At no time on that day did Ms. Spaight see Terrance Mack (H1 119, 136).

Ms. Spaight received a subpoena for Mr. Mack's trial and was present at the courthouse. Yet, Mr. Vacca never spoke with her about testifying at the trial and never called her into the courtroom to be a witness (H1 119-122).

### Bessie Mack (H1 136-152)

On Saturday, September 29, 2007, Bessie Mack, age 41, and her husband Jerome Walker, age 43 (who died in 2013), were at home (310 Driving Park, Rochester) *for the entire day*. Bessie's nephew Terrace Mack was not present. Some time that afternoon, between 1:00 and 2:00 p.m., Sonia Spaight came over (H1 137-139, 146-147, 152). Sonia was doing Bessie's hair (H1 139, 147-148).

Bessie Mack did not witness any part of the fatal stabbing (H1 139). After someone came up and reported that there was a fight outside, Bessie Mack, Jerome Walker and Sonia Spaight went onto the porch. But only Ms. Spaight left the porch (H1 147-149). After the

39

stabbing, the police took both Bessie Mack and Jerome Walker into custody for questioning (H1 140, 149-150). Contrary to Mr. Vacca's testimony (H1 25, 34, 52-54), Bessie Mack never went to Mr. Vacca's office (H1 146). She was not called as a defense witness at Terrance Mack's trial (H1 142).

### Geoffrey Resnick (H1 153-172)

On February 25, 2009, Mr. Resnick attended a meeting with Mr. Vacca and Mr. Mack at the Monroe County Jail. Mr. Resnick made notes during that meeting (H 154-156). The trio discussed two potential witnesses who were in state prison – Travis White and James Jenkins (H 155). After the meeting, Mr. Resnick checked on the locations for both inmates on the Department of Corrections website. On March 3, 2009, he located Mr. White at the Lakeview Shock Incarceration Facility (H 156). He prepared a report for Mr. Vacca, stating that the next available visitation date for Mr. White was on March 15, 2009 (H 156-157).

### Paul Vacca's Failure to Investigate Christopher Travis White

Before the hearing, Mr. Vacca had received a copy of the CPL 440 motion, the table of exhibits, the table of relevant transcripts and the appendix from the direct appeal (H1 9-10). Mr. Vacca and Terrance Mack gave conflicting testimony about why Mr. Vacca never investigated Christopher Travis White as an alibi witness. At the 2017 hearing, Mr. Vacca claimed that Mr. Mack made this decision:

> "I spoke to my client about [James] Jenkins and Christopher White being called as witnesses in the case and he told me that *they were incarcerated, I don't want to call them as witnesses*, and one of the reports from [Geoffrey] Resnick he talks about

Jenkins and he talks about White both being incarcerated in State correctional facilities, okay.

*My client did not want them called as witnesses.* This was like a puzzle. We picked out the witnesses that could testify as valid alibi witnesses in this case. So the answer to the question about White, White was not interviewed or called and neither was Jenkins, *but it was at the direction of my client* because we had enough people, five, plus two that the prosecution had for a total of seven that we felt were enough alibi witnesses without causing problems."

(H1 47 [emphasis added].)

On the People's cross-examination, Mr. Vacca claimed once again that two or three witnesses for the prosecution were pseudo "alibi" witnesses for Mr. Mack because they testified that "no men" were present during the attack (H1 69-70). To be clear, the People only called three witnesses to the assault on Latasha Shaw: Jasmine Shaw, Charnette Grayson and Megan Torres. Only Jasmine Shaw (the victim's daughter) testified that no men were involved in the attack.

Because Mr. Vacca's 2017 explanation for not interviewing or calling Mr. White as an alibi witness *directly contradicted* his 2009 explanation (that Mr. White, a crucial defense witness, could not be located), follow-up questions were asked:

Q.   So is it your testimony that Mr. Mack told you not to call Christopher Travis White?

A.   *He told me not to call him because he was in custody* as well as Jenkins *because he was in custody.*

Q.   And based on that you didn't call 'em?

A.   We didn't call 'em. No, we didn't call 'em. We interviewed several other witnesses, 17 or 18, and we were able to distill it down to five people where times fit. Most of them were unavailable. I tried calling them. [Inv.

41

Geoffrey] Resnick called some of them. I don't remember anything, it was over a year ago, I can't remember. We are lucky we got the alibi witnesses that we did.

* * *

Q:      *You let Mr. Mack make the decision not to call Mr. White?*

A.      *Mr. White* and Mr. Jenkins.

(H1 47-48 [emphasis added].)

As a side note, in this particular case, leaving such an important decision to the client would have been especially egregious. Mr. Mack's Pre-Sentence Investigation ("PSI") report, page 4, states: "School records contained in the defendant's Probation file confirm that he was classified as a special education student . . . The defendant was noted to have been classified as educable mentally retarded and was reportedly granted an IEP diploma at the conclusion of his schooling."

On cross-examination, the People elicited some vague, generic testimony from Mr. Vacca:

> "Well, I've examined thousands and thousands of witnesses in criminal cases and in speaking to these witnesses I tried to secure the witness that would be most credible before a jury, most believable before a jury and support the defendant's position."

> * * *

> "Yes. I believe that the witnesses that we chose were the best witnesses to testify in this case."

(H1 71-72).

Nevertheless, concerning the specific reason for not investigating Christopher Travis White as an alibi witness, Mr. Vacca's 2017 excuse remained the same – it was Mr. Mack's personal decision:

42

Q. And in terms of both Mr. Jenkins and Mr. White you indicated you knew that they were both in State correctional facilities, correct?

A. Correct.

Q. Can you tell the Court what was your thought process in terms of the witnesses that were incarcerated through the state system?

A. *My client indicated to me he did not want to call them as witnesses in this case.*

Q. And as an attorney who has been practicing for as long as you have, can you explain to the Court your thought process behind witnesses in State custody?

A. Well, my thought process is *the defendant is telling me don't talk to them, they are in custody, it's going to look bad before a jury having someone testify who is in custody,* as far as these individuals are concerned I really don't know what they are going to say, they may hurt me, don't call them. I just put my efforts in another area.

(H1 74 [emphasis added].)

In stark contrast, Mr. Mack testified that he *never told* Mr. Vacca that he did not want Christopher Travis White to testify as a defense witness. Mr. Mack described Mr. White as his best friend (H2 4). Instead, Mr. Mack testified that he wanted Mr. Vacca to call everyone listed in the alibi notices but that he could only "vouch for" being with Mr. White and Precious Scott in Elmira on that day (H2 18). Mr. Mack testified further that he did not have any specific discussion with Mr. Vacca about which witnesses to call and which witnesses not to call (H2 19, 21) and that he thought Mr. Vacca "was going to call everybody" (H2 25).

## Judge Ciaccio's Denial of the CPL 440 Motion

The Monroe County Court (Ciaccio, J.) concluded that Mr. Vacca's failure to investigate Mr. White as an alibi witness was constitutionally deficient performance. Judge Ciaccio found that Mr. Vacca he had no legitimate, strategic reason for this failure. Instead, Judge Ciaccio found that Mr. Vacca simply *forgot* to interview Mr. White.

> "[Mr.] White was not called to testify at the trial. The Court finds Mr. Vacca to have been credible in relating *that he forgot* about White's presence when he made the CPL 330 motion [asserting that White was an essential alibi witness and, claiming, erroneously, that White could not be located before trial]. As to whether Vacca failed to call White and Jenkins as witnesses because he formulated a trial strategy based on what defendant's comments [were], or because the defendant told him not to call him as a witness, *the Court finds that testimony inaccurate.*"

(A2 10 [emphasis added].)

In sum, Judge Ciaccio accepted Mr. Vacca's 2017 explanation that, when he filed the erroneous CPL 330 motion in 2009, he simply forgot that Mr. White "was at this boot camp" (H1 49). However, Judge Ciaccio *rejected* Mr. Vacca's 2017 testimony that he failed to investigate Mr. White as an alibi witness because Mr. Mack did not want Mr. White to testify (H1 74). Indeed, Judge Ciaccio accepted as credible Mr. Mack's testimony that he "never told his attorney Paul Vacca not to call White and Jenkins as witnesses" (A2 11). Thus, Judge Ciaccio found that Mr. Vacca had no legitimate trial strategy for his failure to interview or call Mr. White as an alibi witness. "[D]efense counsel's failure to call White as a witness was not the result of any strategy but rather was the product of neglect" (A2 17).

44

Judge Ciaccio noted further that Mr. "White was a key and perhaps indispensable witness" (A2 15) and that "Mr. Vacca's failure to call Christopher White was perhaps egregious" (A2 17). Nonetheless, Judge Ciaccio ruled that, after "having observed and heard White's testimony [in 2017, about the 2007 crime], this Court cannot say that counsel's failure to call White was prejudicial" (A2 17-18). Judge Ciaccio opined that, "it is unlikely, had [Mr. White] testified at trial, that a jury would have believed him when he said he was with the defendant or credited his testimony to an extent necessary to reach a different result" (A2 17).

**Appeal of Judge Ciaccio's Denial of the CPL 440 Motion (KA 18-01203)**

The Appellate Division, Fourth Department, unanimously reversed the County Court's decision to limit the scope of the hearing and remitted the matter for a full hearing on Mr. Mack's unified claim of ineffective assistance of counsel. The Appellate Division explained that, on a CPL 440 motion, a hearing court must determine whether "the cumulative effect of multiple errors rendered defense counsel's performance ineffective" (*People v Mack*, 195 AD3d 1601 [4th Dept 2021]). The Appellate Division did not render a decision on whether, standing alone, counsel's failure investigate Christopher T. White as an alibi witness was ineffective assistance of counsel. Instead, the Appellate Division reversed and ordered a full hearing "on defendant's respective claims of ineffective assistance of counsel in their entirety." (*Id.* at 1602.)

45

## Post-Remittal Proceedings on the CPL 440 Motion

On February 18, 2022 (H3) and April 22, 2022 (H4), the Monroe County Court (Dollinger, J.) expanded the CPL 440 hearing to include *all* claims of ineffective assistance of counsel. The parties stipulated that, "the transcripts from the prior hearing and all exhibits that were admitted would be part of the record" for Judge Dollinger to consider (H3 4). Mr. Mack called two witnesses (Paul Vacca and Dr. Charles Brainerd). The People called none.

## Defense Expert on Human Memory

Charles Brainerd, a Cornell University professor with a Ph.D. in experimental psychology, conducts scientific research on human memory and cognition (H4 5). Dr. Brainerd was qualified to testify as an expert in the field of cognitive psychology and eyewitness identification approximately ten times in three different states (H4 7, 55) and consulted as an expert with defense attorneys and prosecutors in many more cases (H4 75). The People did not object to the court qualifying him as an expert in perception, human memory, and cognitive psychology (H4 8).

Dr. Brainerd testified about how human memory works and about numerous factors that scientific studies have shown can reduce the reliability of eyewitness identification. By 2009, when Mr. Mack's trial occurred, the scientific research in eyewitness identification was very advanced and findings about the major factors affecting the reliability of eyewitness identification had acquired general acceptance in the relevant scientific community. (H4 10, 16, 53.)

Dr. Brainerd testified that human memory has three stages:

An "initial stage that involves encoding information and storing it in memory . . . And then, once memories are stored, before they are tested, there is a period of time in which the memories consolidate, and then they can be forgotten. And, the different memories being forgotten at different rates, different kinds of memories being forgotten at different rates, that's a retention or forgetting interval. And then, finally, memory people usually talk about a retrieval stage which is what happens when you access your memories for purpose of recall or recognition."

(H4 16-17.)

Another important feature of human memory is important the distinction between verbatim memory and gist memory:

"[W]hen we are experiencing events, we actually encode two distinct forms of information. We encode the literal verbatim form of the information, and that's the source of verbatim memories. But, at the same time, we use that information to retrieve concepts, gist, bottom lines, which we store in parallel. The two are stored in parallel. They are disassociated in memory. They don't interact much. One doesn't correct the other. So, we come out of an experience with verbatim literal memories and memories for certain kinds of gist as well. What happens is with time, very short period of time, the verbatim memories fade. They fade rapidly. And, the gist memories are much more stable."

(H4 20.)

Dr. Brainerd continued:

"[E]yewitness identification is a verbatim test, not a gist test. For a memory researcher, it's a very hard verbatim test because, if you have a fair lineup where a suspect and lures are all of the same [gist features such as] age, race, gender, body build and general physiognomy, the way you make a correct identification is on small details that make a face a unique face or relatively

unique face relative to other people. That's a really classic verbatim memory test. Verbatim memory is very important and fades rapidly." (H4 21.)

Dr. Brainerd noted that laypeople have "a lot of common sense beliefs which are simply not consistent with the experimental evidence" (H4 17, 76). For example, contrary to popular belief, memory does not work like a video camera (H4 17). Instead, memory can actually change.

> "Reconstruction is a post-event process . . . we think about and attempt to regenerate events that we experienced in the past, and that creates a number -- that creates certain distortions in our memories. When we reconstruct, we don't use the actual events, we don't use our memory for the actual literal events. What we do, we use our memory for the gist of our experience. The way our lives operate, our lives, essentially, consist of passing through a series of prototypical situations each day. It's like a tablo. We pass through getting up in the morning, getting ready for the day, having breakfast, driving to work. These are tablos that have very typical events associated with them. When we reconstruct, we think in those kinds of terms. Let's see, it was Saturday night, it was a baseball game, and we reconstruct. We try to reconstruct and recover events, and what we do, we recover some events that are true, but we also import things that are false into our memories."

(H4 17-18.)

Dr. Brainerd elaborated:

> "A surprising characteristic of our memories . . . is that our memories incorporate subsequent information we receive that was not part of the original events at all, even if it's only in the form of statements. It doesn't have to be in the form of anything real. It takes that information, and it incorporates it into our memories for the original events as though it were part of the events. So, in the case of criminal investigations where you have a later eyewitness identification or later witness memory reported in an interview or interrogation, the typical sources [of post-event information] are discussions of the events that occur with family members, discussions of the

events that occur with other witnesses and friends, media reports, discussions that may occur with investigating police officers and so on. Those are the major sources."

(H4 46-47.)

This surprising characteristic (memory malleability) leads to the phenomenon of "false memory" – recalling an event or the context of an event that did not happen. Dr. Brainerd explained that a false memory occurs (1) by suggestion (receiving post-event information) and (2) by reconstruction (spontaneously generated memories caused by normal distortion processes in the brain) (H4 19). Dr. Brainerd agreed that the record contained five discrepancies in the testimony of Megan Torres that could be examples of false memory.

First, before the grand jury, Ms. Torres testified that the victim, Latasha Shaw, was trying to talk to the people in front of the brown house (310 Driving Park) and get them so that they would not fight. In other words, she was trying to play peacemaker. (A2 305.) But an objective review of Ms. Shaw's 911 tape shows that did not happen. Instead, Ms. Shaw spoke with the 911 operator and was not involved with any "negotiation" (A 103-105). (H4 21.)

Dr. Brainerd stated:

"It could be a false memory. It could arise from both methods I talked about. If it arose as a function of suggestion, for example, it could be from post-event information the person read about, heard about, was told about, saw on media reports. It could be a spontaneous false memory that comes from ruminating and thinking about the events and thinking if I can remember anything more about the events, yes."

Second, at the grand jury, Ms. Torres testified that she saw 20 to 30 people come off the porch of the brown house at 310 Driving Park (A2 305-306). It came out at trial, however, that she could not have seen anybody come off that porch based on the location of where she was sitting (the porch of 868 Dewey Avenue) (T 369-370).

Dr. Brainerd stated:

"Well, barring lying, it would have to be [a false memory] if it were physically impossible. I know I have seen other cases and eyewitness identification very similar where people report after the fact having seen certain kinds of things that they couldn't possibly have seen because there was a tree or a building in the way, that sort of thing, yeah."

(H4 22.)

Third, Ms. Torres testified at the grand jury that she saw the glass bottle in this case shattered and there was broken glass at the crime scene (A2 308). She repeated this testimony at trial (A2 603-605; T 359-361). But police investigation recovered no broken glass (A2 527, 556-557, 572, 576/T 283, 312-313, 328, 332). Dr. Brainerd opined this appeared to be a false memory: "Yes. It's an example of a gist because it's consistent with the other events." (H4 25.)

Fourth, at trial, Ms. Torres testified she was on her cell phone with the police *during* the incident (A2 584, 619; T 340, 375). Yet, the transcript of her 911 call shows that she called *after* the incident was over (A2 107-109; Defense Exhibit F) (H4 27.)

Lastly, at trial, Ms. Torres testified that she observed three people with knives chasing the victim (T 339-341). At grand jury, however, she testified that she only saw a

knife after the fact and did not observe anyone with knives during the incident itself (A2 305) (H4 27).[9] Inexcusably, Mr. Vacca never impeached Ms. Torres with this blatant discrepancy.

When asked if witnesses who report false memories exhibit that they actually believe those memories, Dr. Brainerd stated,

> "Yes. So, oftentimes with false memories, they're not only believed at very high levels. That is to say, the idea if you have a false memory, it's somehow low confidence and you are very doubtful about it. That common sense assumption is incorrect. It's not what the research shows. And, indeed, people, when they are having a false memory, will oftentimes -- it will be accompanied by a very vivid imagery and very sound and sites of real experience will be imported into it. That has a name in the scientific literature called phantom recollection where you feel an amputated limb that isn't actually there."

(H4 23.)

### Paul Vacca on Human Memory

Mr. Vacca readily admitted that he lacked any education or training in how human memory works. He had no idea that the memory process has stages (H3 18-19), agreeing that he had only "a layperson's understanding" of how memory works, "people forget things, people remember things." (H3 20-21.)

When asked whether his trial preparation included any review of scientific studies on eyewitness identification, Mr. Vacca suggested that his primary defense was "alibi" rather than mistaken identification:

---

[9] Mr. Vacca never asked Ms. Torres about this discrepancy.

"No, but I've done it before on other cases. You gotta realize that up to this point I had been practicing for 30 years. So a lot of this stuff you could see from my closing argument, you could see in the paperwork, you could see that a lot of the questions, a lot of handling of it is from experience. So I didn't hire an expert in identification to come in and testify in this case because really – it really wasn't identification, except as to Torres, but it was alibi, was he there? And I could go into that now if you want me to, but . . ."

(H3 18.)

During his jury voir dire, his questioning, and his closing argument, Mr. Vacca failed to mention most of the factors (discussed in Point I) shown by scientific studies to reduce the reliability of eyewitness identification. When asked to give a strategy reason for not consulting with an eyewitness expert in a one-witness identification case, Mr. Vacca replied,

"Well, we didn't -- we didn't consult with one here because we had a number of alibi witnesses. There were in my view, in my view, eight or nine alibi witnesses,[10] okay? I started working on the alibi area the day after he was arrested. And to me there were eight or nine alibi witnesses with this, in addition to Mr. Pen -- Officer Penkitis speaking to 75 to a hundred people trying to get an identification, and he couldn't find anybody that was an alibi witness, although he talked to that many people. And I'll go into the other ones if you want, but..."

(H3 26-27.)

Mr. Vacca continued, "I just felt that what we had was sufficient, it was enough. We had a number of alibi witnesses, there was only one eyewitness, and I felt her testimony

---

[10]  Contrary to Mr. Vacca's view, only the Elmira witnesses (Precious Scott, Jessica Smith, and the *uncalled* Christopher Travis White) would qualify as alibi witnesses under the New York statute (CPL 250.20 [1]).

was questionable." (H3 105.)  When asked by the prosecutor if consulting or calling an eyewitness expert or an expert on memory would have detracted from his "overall theory" that he was going to present, Mr. Vacca responded, "It may have. It may have." (H3 105.) On redirect examination, however, when asked to explain how consulting with or calling an expert might detract from the defense, Mr. Vacca stated, "Well, I don't know if it would've helped, I don't know if it would've hurt.  I really don't know." (H3 136-137.)

Alternatively, Mr. Vacca provided a second rationale for failing to consult with an expert.  The prosecutor questioned Mr. Vacca:

Q.  Why did you not want to go down the route of calling an expert regarding memory?

A.  *Because I don't understand it, how's the jury going to understand it?*  I could learn it, I'm sure, but it's just never come up.

Q.  And in your career as a defense attorney --

A.  Right.

Q.  -- never had an expert with regards to memory --

A.  No.

Q.  -- of how it's formed, how it applies, things of that nature?

A.  No.

(H3 99 [emphasis added].)

53

## Mr. Mack Requested Comprehensive Review

Mr. Mack asked Judge Dollinger to consider each individual claim of ineffective assistance of counsel (A2 23, 51-60, 1135-1142, 1160-1184) (*see* Grounds 1 to 24) (PHDM2 15-89).

Mr. Mack argued that the cumulative effect of all errors deprived him of the effective assistance of counsel and a fair trial (PHDM2 8).

## Judge Dollinger's Denial of the CPL 440 Motion

In his Decision and Order, Judge Dollinger affirmed and incorporated by reference "the findings of fact made by Judge Ciaccio in his decision dated May 11, 2018" (MCCD2 4). Yet, Judge Dollinger made a specific finding that *directly contradicted* Judge Ciaccio's finding about the reason for Mr. Vacca's failure to investigate Christopher Travis White:

> "Two witnesses on the list, Christopher White and James Jenkins, were incarcerated at the time of trial. Mr. Vacca *consulted with defendant and Mr. Resnick* [defense investigator] *and decided not to interview either witness.* It was Mr. Vacca's opinion that it might have a prejudicial effect on the jury to have two incarcerated witnesses testify on the defendant's behalf. Mr. Vacca was also concerned that calling witnesses that he considered highly prejudicial would be detrimental to defendant's alibi defense."

(MCCD2 5 [emphasis added].)

Judge Dollinger made other adverse findings of fact and conclusions of law that Mr. Mack will address under the relevant grounds for relief listed below.

## Appeal of Judge Dollinger's Denial of the CPL 440 Motion

On February 28, 2023, Mr. Mack filed an application for leave to appeal with the Appellate Division, Fourth Department, raising all issues contained in the CPL 440 motion.

54

On April 25, 2023, Justice Stephen Lindley, the same justice who granted leave to the People on Mr. Mack's direct appeal, denied Mr. Mack's request for leave to appeal. By receiving this denial, Mr. Mack exhausted his available remedies in the state courts of New York (28 USC § 2254 [b] [1] [A]).

**Point I:** **Paul Vacca's numerous, unprofessional blunders prejudicially denied Mr. Mack of his Federal Constitutional rights to the effective assistance of counsel and a fair trial under 28 U.S.C. § 2254.**

A federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court if it concludes that the adjudication of the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" (28 USC § 2254 [d]).

"While the precise method for distinguishing objectively unreasonable decisions from merely erroneous ones is somewhat unclear, it is well-established in this Circuit that the objectively unreasonable standard of § 2254 (d) (1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief" (*Sorto v Herbert*, 497 F3d 163, 169 [2d Cir 2007] [internal quotation marks and alteration omitted]). That increment, however, "need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence" (*Overton v Newton*, 295 F3d 270, 277 [2d Cir 2002] [internal quotation marks omitted]).

Applying the review standard of 28 U.S.C. § 2254 (d), Mr. Mack is entitled to prevail on his Petition because he was prejudicially denied effective assistance of counsel and a fair trial, and the state court's rejection of his claims was contrary to or involved an unreasonable application of clearly established federal law.

The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. (*Estelle v Williams*, 425 US 501, 503 [1976]; *Drape v Missouri*, 420 US 162, 172 [1975]). The Supreme Court has described the right to a fair trial as "the most fundamental of all freedoms" (*Nebraska Press Ass'n v Stuart*, 427 US 539, 586 [1976]). Similarly, the Court has held that "[a]n accused's right to be represented by counsel is a fundamental component of our criminal justice system" (*United States v Cronic*, 466 US 648, 653 [1984]). Further, the Court has repeatedly held that "the right to counsel is the right to the effective assistance of counsel" (*Strickland v Washington*, 466 US 668, 686 [1984], quoting *McMann v Richardson*, 397 US 759, 771, n 14 [1970]).

The Court has explained that the "right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial" (*Lockhart v Fretwell*, 506 US 364, 368-69 [1993], quoting *Strickland*, 466 US at 684) and that "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial" (*Cronic*, 466 US 648, 658 [1984]).

Under clearly established federal law, in order to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that (1) his attorney's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different (*Strickland v Washington*, 466 US 668 [1984]). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome" (*Id.* at 694). The defendant, however, "need not show that counsel's deficient conduct more likely than not altered the outcome of the case" (*Id.* at 693).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result" (*Id.* at 686). The result of the proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome" (*Id.*, at 694). A defendant satisfies the prejudice prong if a reasonable probability exists that at least one juror would have struck a different balance (*Wiggins v Smith*, 539 US 510 537 [2003]).

"The right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing" (*Cronic*, 466 US 648, 656 [1984]). However, Mr. Vacca's many blunders prevented meaningful adversarial testing of the prosecution's case. The result was a denial of effective assistance of counsel and a fair trial.

**(1)    Counsel failed to investigate the key alibi witness (Christopher Travis White).**

Mr. Vacca retained the services an investigator (Geoffrey Resnick) and assigned him to locate and interview potential witnesses. Although Mr. Vacca personally interviewed *some* of the individuals located by the investigator, he never identified those individuals (*see* Ground 2).

More than five months before trial, Mr. Mack gave Mr. Vacca the name "Travis White." Christopher Travis White was an alibi witness in the classic sense because he would have testified that Mr. Mack was in Elmira (two hours from Rochester) during the entire day of the crime. Mr. Vacca put the name ("Travis White"), without an address, on a notice of alibi served on the People (A2 1217). Also, Mr. Vacca had a statement from Precious Scott, asserting that, on the crime date, in Elmira, "Tarrance and Travis" brought her some food from McDonald's (A2 1202). At trial, consistent with her prior statement, Ms. Scott testified that, on the crime date, she saw Mr. Mack and Mr. White together in Elmira around lunchtime (T 567, 572). Mr. Mack also testified that, on the crime date, he was in Elmira with Christopher Travis White (T 663).

During a pretrial, jail meeting (02/25/2009) with Mr. Vacca and the defense investigator (Resnick), Mr. Mack gave the name "Travis White" once again. After the meeting, Inv. Resnick located Mr. White. In a report (03/05/2009), prepared two months before the scheduled trial date, Inv. Resnick informed Mr. Vacca that "Christopher T. [for Travis?] White" was in custody at the Lakeview Correctional Facility in Brocton with a "next visit date" of "March 15" (A2 1212). If Mr. Vacca had asked Inv. Resnick to interview Mr. White at the correctional facility, he would have done so. (H1 51, 74, 154-158, 162-163). But Mr. Vacca never made that request (H1 29).

Judge Ciaccio, not Judge Dollinger, heard the CPL 440 hearing testimony of three witnesses (Vacca, Resnick, and Mack) on the reason why Mr. White was never interviewed. Judge Ciaccio found, based upon his first-hand, credibility assessment, that Mr. Vacca's failure to investigate Mr. White as an alibi witness was the product of neglect

58

(Vacca just forgot). Because Judge Ciaccio's ruling was favorable to Mr. Mack under the first prong of *Strickland* (performance), Mr. Mack, in his post-remittal argument to Judge Dollinger, focused on the second prong (prejudice) (PHDM2 8-10, PHDRM2 2-7).

On the second prong, Judge Ciaccio had ruled that Mr. Vacca's failure to investigate Mr. White was not sufficiently prejudicial to warrant a new trial. As argued below, when Judge Ciaccio made this ruling, he applied the wrong standard. Moreover, Mr. Mack presented Judge Dollinger with additional reasons to change Judge Ciaccio's ruling on prejudice, including examples of where Judge Ciaccio had misread the record. However, Judge Dollinger ignored these reasons. Even worse, Judge Dollinger revisited the first prong of *Strickland* and flipped the ruling from favorable to adverse.

A fair-minded jurist is not someone who, consciously or unconsciously, seeks to maintain the status quo by bending logic to the State's favor and ignoring those facts and arguments that favor the defense. The review must be careful, not cursory. Yet here, even Judge Dollinger's description of the procedural history contains two avoidable mistakes.

First error: "On remittal, the Fourth Department declined to review the defendant's unpreserved contentions and *held* that the jury's verdict was supported by sufficient evidence" (MCCD2 2 [emphasis added]). The Appellate Division actually stated, "With respect to the proof of guilt, defendant *did not challenge on appeal* the weight or sufficiency of the evidence" (*People v Mack*, 142 AD3d 755, 760 [4th Dept 2016] [emphasis added]; *see also* Brief for Appellant, KA 09-01764). While the three-judge majority did comment, "there is ample evidence supporting the jury's verdict" (*id.*), that dictum was a response to the position of the two-judge dissent who would have reviewed

59

the unpreserved jury-note error (*see* Ground 24) in the interest of justice and would have granted a new trial (without even considering the quality of Mr. Vacca's representation).

Second error: "Defendant's application to reargue before the Court of Appeals was denied and his direct appellate rights are therefore exhausted" (MCCD2 2). This statement is wrong on both the facts and the law. Mr. Mack's motion to reargue before the Court of Appeals, denied at 28 NY3d 944 (09/08/2016), was a final effort to avoid a reversal by the Court of Appeals and its remittal of Mr. Mack's direct appeal to the Appellate Division. The motion to reargue exhausted nothing. On 10/31/2016, Justice Scudder denied Mr. Mack's application for leave to appeal to the Court of Appeals from the Appellate Division's 3-2 decision on remittal to affirm the judgment.

Although Justice Scudder's leave denial would have exhausted Mr. Mack's state remedies on his direct appeal, at that point in time, Mr. Mack had insufficient grounds for federal relief. He needed to file the CPL 440 motion to develop a sufficient record for his present claims. After Judge Dollinger denied the CPL 440 motion and Justice Lindley denied leave to appeal (04/25/2023), Mr. Mack's state remedies were exhausted.

Circling back, Judge Dollinger's analysis of Mr. Mack's substantive issues was less than fair-minded. To begin, he conflated Mr. Vacca's failure to *investigate* Christopher Travis White as a classic alibi witness who would place Mr. Mack in Elmira (Ground 1) with Mr. Vacca's failure to *call* as witnesses Bessie Mack, Jerome Walker, and Sonia Spaight who would testify that Mr. Mack was not present at 310 Driving Park in Rochester (Ground 2). For Mr. Vacca's Ground 1 failure, Judge Dollinger *changed* Judge Ciaccio's favorable ruling under the first prong of *Strickland* into an unfavorable ruling by recasting

the substance of Mr. Vacca's conduct. Judge Ciaccio correctly viewed the conduct as a non-decision (Mr. Vacca just forgot) (MCCD1 10). Judge Dollinger incorrectly viewed the same failure as an affirmative, somehow-reasonable choice to refrain from investigating this key alibi witness. This modified ruling is both logically unsound and based upon an objectively unreasonable determination of the facts in light of the evidence presented.

As Judge Ciaccio found, this Court also should find that Mr. Vacca's failure to investigate Mr. White was constitutionally deficient performance because Mr. Vacca had no legitimate, strategy reason to ignore Mr. White as an alibi witness. A decision is "strategic" only when it is a "conscious, reasonably informed" decision made "with an eye to benefitting" the accused (*Pavel v Hollins*, 261 F3d 210, 218 [2d Cir 2001]), "made after thorough investigation of [the] law and facts relevant to plausible options" (*Strickland v Washington*, 466 US 668, 690 [1984]).

In light of the testimony presented at the original CPL 440 proceeding, Judge Ciaccio faced a binary choice concerning the attorney's failure to investigate Mr. White. On one hand, he could have accepted Mr. Vacca's 2017 testimony that Mr. Mack, back in 2009, personally directed him not to interview Mr. White and that was the sole reason for Mr. Vacca's failure. On the other hand, Judge Ciaccio could have accepted Mr. Vacca's 2009 affidavit, where he swore that Mr. White was *a crucial defense witness* who could not be located before the trial (A1 117-133), and that Mr. White's unknown location was the sole reason for Mr. Vacca's failure.

But Judge Ciaccio could not accept the second reason because it was proven to be untrue. Inv. Resnick testified (and Mr. Vacca agreed) that, in March of 2009, two months before trial, Resnick had located Mr. White at the Lakeview shock camp. When asked to explain this proven error, Mr. Vacca testified that, in 2009, when he drafted the affidavit, he *forgot* that Mr. White had been located. Mr. Mack argued to Judge Ciaccio that, in either event, Mr. Vacca's performance was constitutionally deficient.

If Mr. Vacca failed to investigate Mr. White because Mr. Mack directed him not to do so, then Mr. Vacca inexcusably deprived Mr. Mack of an attorney's professional judgment on a critical, strategic decision. The right-to-counsel guarantee is "a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is represented by experienced and learned counsel" (*Johnson v Zerbst*, 304 US 458, 462-463 [1938]). The right to counsel is crucial to a fair trial because it "protect[s] an accused from conviction resulting from his own ignorance" (*id.* at 465; *see also Powell v Alabama*, 287 US 45, 68-69 [1932]; *Gonzalez v United States*, 553 US 242, 249-250 [2008]) (A2 1165-1167). In addition, the attorney's inaction fatally undermined Mr. Mack's Federal constitutional rights to compulsory process, to present a defense and to a fair trial (*see Washington v State of Texas*, 388 US 14, 19 [1967]; *Chambers v Mississippi*, 410 US 284, 302 [1973]) (A2 1168-1170).

If Mr. Vacca failed to investigate Mr. White because he "just forgot," then Mr. Mack received ineffective assistance of counsel based upon inexcusable, attorney neglect (*see*

*e.g. Byrant v Scott*, 28 F3d 1411, 1418-1419 [5th Cir 1994] [counsel's failure to investigate alibi witnesses was unprofessional conduct]).

Judge Ciaccio resolved this binary choice by finding that Mr. Vacca's failure to interview Mr. White "was not the result of any strategy but rather was the product of neglect" (A2 17). Judge Ciaccio gave Mr. Vacca the benefit of the doubt concerning the proven inaccuracy of his 2009 affidavit. In other words, Judge Ciaccio found that Mr. Vacca's affidavit about Mr. White's "unknown location" was wrong (but not perjury).

Since the performance ruling was favorable to Mr. Mack, Judge Ciaccio failed to address another disturbing feature of Mr. Vacca's selective memory. In 2017, Mr. Vacca *remembered* that, eight years earlier, his specific reason for failing to interview Mr. White was that Mr. Mack told him not to interview Mr. White. This assertion directly contradicts Mr. Vacca's 2009 affidavit where he states, under oath, that Mr. White was never interviewed only because this crucial defense witness could not be located. Mr. Vacca testified that the blatant error in his 2009 affidavit was caused by his own faulty memory (he *forgot* that Resnick had located White). Yet, Mr. Vacca's testimony raises another question. During the eight-year gap (from 2009 to 2017), did Mr. Vacca's memory improve? In other words, while preparing his 2009 affidavit, did Mr. Vacca *also forget* that Mr. Mack supposedly *told him* not to interview Mr. White, but then suddenly *remembered* that alleged conversation in 2017? That would be remarkable because, as Dr. Brainerd explained, human memory does *not* improve with age.

In a less-than-fair-minded "analysis," Judge Dollinger reversed Judge Ciaccio's ruling that Mr. Vacca's failure to investigate Christopher Travis White as an alibi witness

was constitutionally deficient performance. Judge Dollinger gave no factual or legal basis for rejecting Judge Ciaccio's ruling. More specifically, Judge Dollinger:

- Failed to address Judge Ciaccio's specific finding that the reason for Mr. Vacca's failure to interview Mr. White (based upon Vacca's 2017 testimony) was that Vacca simply *forgot* that White had been located (constitutionally deficient performance);

- Failed to adopt Mr. Vacca's alternative explanation (based upon Vacca's 2017 testimony) that the specific reason for his failure was that Mr. Mack directed him not to interview Mr. White (also constitutionally deficient performance); and

- Failed to address Judge Ciaccio's charitable finding that Mr. Vacca's testimony about not interviewing Mr. White "because the defendant told him not to call him as a witness" was "inaccurate" (A2 10).

Ignoring Judge Ciaccio's findings, Judge Dollinger assumed, without record support, that Mr. Vacca had a legitimate strategy reason for failing to investigate Mr. White as an alibi witness. Judge Dollinger then conflated that "strategy" with Mr. Vacca's alleged rationale for failing to call three Rochester witnesses who Inv. Resnick had interviewed.

> "Mr. Vacca, Mr. Resnick and the defendant discussed which witnesses were credible and whose testimony would provide the best chance of acquittal. Mr. Vacca concluded that some of the potential alibi witnesses were more likely to contradict other alibi witnesses than to give beneficial testimony. Mr. Vacca called the five alibi witnesses that he believed gave his trial strategy the best chance of succeeding. The alibi witnesses that were called all testified in support of his defense strategy. The decision not to call Christopher White was part of a *legitimate*, albeit unsuccessful, *trial strategy*."

(MCCD2 8 [emphasis added].)

Judge Dollinger's findings and conclusions are objectively unreasonable.

First, except for Mr. Vacca's "inaccurate" testimony about Mr. Mack telling him not to interview Mr. White, the hearing record contains no proof of any discussion involving "Mr. Vacca, Mr. Resnick and the defendant" about "which witnesses were credible and whose testimony would provide the best chance of acquittal" (*id.*). Inv. Resnick testified that he would locate and interview people that Mr. Vacca identified as potential witnesses. Inv. Resnick did not give his opinion on who should testify and had no idea why Mr. Vacca did not call any particular witness. For his part, Mr. Mack thought that Mr. Vacca would try to call every witness listed in the alibi notices.

Second, Mr. Vacca was in no position to assess whether Mr. White would be credible as an alibi witness or would provide testimony that might increase or decrease Mr. Mack's "chance of acquittal" (*id.*). Without interviewing Mr. White, Mr. Vacca had absolutely no basis to evaluate Mr. White's recollection or to conclude that he was "more likely to contradict other alibi witnesses than to give beneficial testimony" (*id.*).

Where an attorney intends to raise an alibi defense, and, well before the scheduled trial, knows the location of a key alibi witness, the mere fact that such location is a state correctional facility (two hours from Rochester) is not a legitimate reason for failing to interview such witness. Thus, Judge Dollinger's conclusion that Mr. Vacca had a legitimate, strategy reason for failing to investigate Mr. White was an objectively unreasonable application of *Strickland*'s first prong (*see e.g. Foster v Wolenbarger*, 687 F3d 702, 707-709 [6th Cir 2012]; *Bigelow v Haviland*, 576 F3d 284, 287-289 [6th Cir 2009]; *Avery v Prelesnik*, 548 F3d 434, 437-438 [6th Cir 2008]).

65

Under the second prong, Mr. Vacca suffered prejudice because Mr. Vacca's failure to present the key alibi witness was an error "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable" (*Strickland v Washington*, 466 US at 687-688). Mr. Mack showed that Mr. White was ready, willing, and able to appear as a witness and would have given testimony in support of Mr. Mack's alibi defense. The Monroe County Court's conclusion that Mr. Vacca's failure to investigate Mr. White did not prejudice Mr. Mack is an objectively unreasonable application of *Strickland*.

Despite Mr. Mack's request for a new ruling (PHDM2 8-10), Judge Dollinger did not address the issue of prejudice other than to mention and misquote Judge Ciaccio's personal assessment of Mr. White's "credibility" (MCCD2 8). Thus, Judge Ciaccio's ruling on prejudice was the last state court decision to address this specific issue. For factual and legal reasons, however, Judge Ciaccio's "lack of prejudice" ruling was an objectively unreasonable application of *Strickland*.

On the facts, Judge Ciaccio erred when he concluded that Jessica Smith (Mr. Mack's girlfriend) had contradicted Mr. White's testimony about being "with Mack and Mack's daughter when the phone call came in" regarding a murder in Rochester (A2 11). Contrary to Judge Ciaccio's erroneous finding, Ms. Smith *did not arrive home at 7:19 p.m.* (A2 11). Instead, as shown by both her time card and her trial testimony, Jessica Smith *clocked out* from work at 7:19 p.m. (A2 148; T 583), arriving home, as best she could recall, at "almost 7:45" p.m. (T 584). Simply put, the facts do not support Judge Ciaccio's finding of an alleged contradiction.

On the law, Judge Ciaccio erred by applying the wrong standard of review.

66

Preliminarily, Judge Dollinger's misquote needs clarification. Judge Ciaccio never "found [Mr. White's] testimony incredible" and never found "it likely that the jury would have also" (MCCD2 8, supposedly quoting "Decision and Order May 11, 2018, pg 7"). This "quoted" language does not appear on "pg 7" or anywhere else in Judge Ciaccio's decision (A2 6-19).

Judge Ciaccio actually said that:

> "White testified that if he had been called to testify at the trial, he would have said that he spent the day with the defendant. The Court finds him to be credible on that statement alone, in other words, on what he would have said if he had been called to testify."

(A2 11.)

Judge Ciaccio continued:

> "Thus, while this Court credits [White's] testimony that he never spoke with defense counsel and was never called to testify, and that if he had been called, he would have testified that he was with the defendant on the day in question, it is unlikely, had he testified at trial, that a jury would have believed him when he said he was with the defendant or credited his testimony to an extent necessary to reach a different result. While defense counsel's failure to call White as a witness was not the result of any strategy but rather was the product of neglect, it had in all likelihood no net effect."

(A2 17.)

Judge Ciaccio articulated the wrong standard for finding prejudice under *Strickland*. He merely stated his personal view that jurors would not have believed Mr. White's testimony and, therefore, the guilty verdict would not have changed. But this kind of credibility determination was not within Judge Ciaccio's province. Instead, "our Constitution leaves it to the jury, not the judge, to evaluate the credibility of witnesses in

67

deciding a criminal defendant's guilt or innocence" (*Ramonez v Berghuis*, 490 F3d 482, 490 [6th Cir 2007]). "The actual resolution of the conflicting evidence, the credibility of witnesses, and the plausibility of competing explanations is exactly the task to be performed by a rational jury, considering a case presented by competent counsel on both sides" (*id.* at 490-491). "In the end, weighing the prosecution's case against the proposed witness testimony is at the heart of the ultimate question of the *Strickland* prejudice prong" (*id.* at 491).

As Judge Ciaccio recognized, the People built their case on very limited evidence - "one eyewitness, one prison informant and one jail call" (A2 15). Judge Ciaccio also observed that, "White's absence from the trial left a gap that the People exploited in their closing argument: 'All of the witnesses were blood relatives.' Christopher White was not a relative. Defendant 'rattled off a bunch of names of all the people he was with, all these males. *You haven't heard from them* (emphasis added).'" (A2 14.) Thus, Judge Ciaccio correctly concluded that, "what White could say about being with Mack at the time of the attack" made Mr. White "a key and perhaps indispensable witness" (A2 15).

Even though jurors could have discredited Mr. White's trial testimony based upon factors such as bias and his criminal record, there exists a reasonable probability that one or more jurors may have accepted such testimony as a basis for finding reasonable doubt. Thus, when viewed in proper context, the trial absence of Mr. White's testimony prejudiced Mr. Mack's case because such testimony would have corroborated testimony given by other defense witnesses and would have filled a large, unnecessary hole in the alibi defense.

All it would have taken is for "one juror [to] have struck a different balance" between the competing stories (*Wiggins*, 529 US at 537).

"To evaluate a claim of prejudice, the court must assess how reasonable jurors would react to the additional alibi testimony had it been presented . . . [P]otential alibi witnesses coupled with an otherwise weak case renders the failure to investigate the testimony sufficient to 'undermine confidence' in the outcome of the jury verdict. We do not ask whether [defendant] was ultimately innocent, but, rather, whether he was deprived a reasonable shot of acquittal." (*Avery v Prelesnik*, 548 F3d 434, 439 [6th Cir 2008]; *Strickland*, 466 US at 696 ["a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming support"].)

Judge Ciaccio's erroneous focus on what the trial jurors would have believed contains other significant flaws. Judge Ciaccio expressed concern about Mr. White's inability to provide more details about what took place on the crime date. Yet, Judge Ciaccio heard testimony given in 2017 about a 2007 crime. If Mr. Vacca had done his job, the trial jurors would have heard Mr. White's testimony in 2009 about a 2007 crime and, eight years earlier, Mr. White's recollection presumably would have been better. Moreover, Mr. White did not conform his testimony in a manner that might suggest collusion. For example, when asked whether he saw Precious Scott on 09/29/2007, Mr. White testified, "I'm actually not sure. I don't remember that part." (H1 88.) Judge Ciaccio's additional concern about Mr. White's non-violent, criminal record may not have bothered one or more jurors especially since one of the People's main witnesses (Ronaldo Donald) was serving a five-year sentence for a violent felony.

Here, Judge Ciaccio made a personal judgment about how persuasive Mr. White seemed to him. He did not find that Mr. White would have given false testimony. As noted, however, evaluating the persuasive value of witness testimony is a matter within the province of the jury, not the court.

Finally, neither Judge Ciaccio nor Judge Dollinger mentioned that Mr. White came forward as soon as possible. He was incarcerated before Mr. Mack's arrest and was not released from custody until one day before the almost-deadlocked jury rendered its guilty verdict (on a Friday night at 8:10 p.m.). During his incarceration, Mr. White had no communication with anyone regarding Mr. Mack's trial. Thus, nothing in this record demonstrates a suspicious failure to come forward that might tend to cast doubt upon the truthfulness of Mr. White's alibi testimony (*see* A2 188).

Fair-minded jurists would not debate that failing to call Mr. White to bolster Mr. Mack's alibi defense was prejudicial error because Mr. White's testimony "easily could have tipped the balance" in Mr. Mack's favor (*Bigelow v Haviland*, 576 F3d 284, 289-292 [6th Cir 2009]). Standing alone, the fact that the People exploited the absence of Mr. White during their summation (T 730; A2 10-18) demonstrates prejudice. A reasonable probability exists that, if Mr. White had testified, these almost-deadlocked jurors would have remained deadlocked. Mr. Vacca's inexcusable failure to investigate Mr. White as an alibi witness prejudiced Mr. Mack's alibi defense. The Monroe County Court's conclusion to the contrary unreasonably applied *Strickland*.

70

**(2) Counsel failed to call three witnesses who would have supported the alibi defense (Bessie Mack, Jerome Walker, and Sonia Spaight).**

Mr. Mack challenged Mr. Vacca's unexplained failure to call two witnesses who, on the date of the crime, lived at 310 Driving Park *and were home all day* (Bessie Mack and Jerome Walker) and a third witness who was visiting that address (Sonia Spaight). The Monroe County Court (Ciaccio, J.) concluded that Mr. Vacca's failure to call these witnesses was "more strategic than neglectful" and that, "their testimony was compromised by their relation to the defendant and was merely cumulative of other witnesses" (A2 18).

Judge Ciaccio did not address how other defense witnesses had a "relation" to Mr. Mack.[11] Nor did Judge Ciaccio consider that the Rochester witnesses (Speed, McHenry, or Hampton) gave no testimony as to whether Mr. Mack was present at 310 Driving Park around noontime. However, both Bessie Mack and Jerome Walker, who were at home all day, would have given non-cumulative testimony that Mr. Mack *was not present* on the porch of 310 Driving Park *around noontime*, thus directly rebutting contrary testimony given by Megan Torres.

After remittal from the Appellate Division, Mr. Mack asked Judge Dollinger to revisit Judge Ciaccio's ruling (1) because Mr. Vacca did not provide any specific factual basis for his failure to call Bessie Mack, Jerome Walker, or Sonia Spaight and (2) because Judge Ciaccio made factual errors regarding the substance of the proposed testimony (PHDM2 10-15).

---

[11] Kionna Speed (cousin); Carolyn McHenry (cousin); Precious Scott (aunt); and Jessica Smith (girlfriend).

Mr. Mack argued that Mr. Vacca's conclusory assertion that he picked the "best" alibi witnesses was not a valid substitute for descriptive facts. Significantly, Mr. Vacca erred at the initial CPL 440 hearing when he testified that Bessie Mack, a witness listed in the notice of alibi (A2 173), was Mr. Mack's *mother* (H1 34, 52-54). After remittal, when Mr. Vacca had a second opportunity to provide a specific reason for not calling Bessie Mack (Mr. Mack's aunt by blood),[12] he failed to do so (H3 65-66). Nor could Mr. Vacca give any reason for not calling Sonia Spaight (Mr. Mack's aunt by marriage) (H1 33, 56; H3 67).

Jurors must have wondered why the defense did not call Bessie Mack (age 41), Jerome Walker (age 43), and Sonia Spaight (age 36) as witnesses to support Mr. Mack's alibi defense. All three were on the list of potential trial witnesses that the trial court read to the jury (T 26). Moreover, the three Rochester witnesses called by the defense all testified that Bessie Mack, Jerome Walker, and/or Sonia Spaight were present at 310 Driving Park: Kionna Speed (age 18) (T 544-546, 549, 553), Carolyn McHenry (age 20) (T 619-620), and Shatora Hampton (age 16) (T 636-637). Defense counsel elicited the names Bessie Mack, Jerome Walker, and Sonia Spaight during his cross-examination of Inv. Glenn Weather (T 684). Even Terrance Mack testified that Bessie Mack and Jerome Walker *lived* at 310 Driving Park (T 650). Hence, it is highly unlikely that the twelve jurors failed to notice the glaring absence of these three uncalled witnesses.

---

[12] Judge Dollinger incorrectly described Bessie Mack as an aunt by marriage (MCCD2 5).

In addition, Judge Ciaccio erroneously devalued the proposed testimony from Bessie Mack, Jerome White, and Sonia Spaight by misreading the facts. For example, Judge Ciaccio stated:

> "Counsel or his investigator had learned that Bessie Mack, Jerome Walker and Sonia Spaight were inside 310 Driving Park at the time of the attack on Shaw. In statements given to Resnick, each potential witness said he/she *did not witness the attack*, but rather heard that something was going on and stepped outside and onto the porch of 310 Driving Park *just after the attack*."

(A2 8 [emphasis added].)

For Sonia Spaight, this finding is wrong. In her statement, given to the defense investigator almost six months before trial, Ms. Spaight stated, under oath, that she witnessed the attack:

> "On September 27, 2007, I was visiting Bessie Mack on Driving Park. I saw two (2) groups of people fighting. One of the groups had about six (6) people. The other group – I do not know how many were there but Latasha Shaw was in this group. Shaw was on the ground with about five (5) people around her – it looked like they were punching her. I went over and told them to get off of her. They scattered. *Tarrance Mack was not part of either group. Tarrance Mack was not one of the people I told to get off Shaw. I did not see Tarrance Mack at all that day. Tarrance Mack was not in the area of Driving Park and Dewey Avenue when I saw the group of people fighting and the people on Shaw.* Tarrance Mack is my nephew. I have known Tarrance Mack all his life. If Tarrance Mack had been there when Latasha Shaw was attacked I would have seen him. I did not see him."

(A2 149 [emphasis added].) Consistently, at the CPL 440 hearing, Ms. Spaight testified about witnessing the attack on Latasha Shaw (H1 123-124, 135-136).

For Jerome Walker, this finding is wrong. In his statement, given to the defense investigator almost six months before trial, Mr. Walker stated, under oath, that he witnessed the attack:

> "On September 27, 2007 . . . I heard people yelling when I was inside the house. When I went back out, people were running toward Dewey Avenue. *I saw some people around someone and I saw hands swinging. Tarrance Mack was not one (1) of the people I saw at this time. Then everyone started scattering, running away. Tarrance Mack was not one (1) of the people I saw running away.*"

(A2 150 [emphasis added].) Sadly, Mr. Walker died before the CPL 440 hearing (H1 152).

For Bessie Mack, this finding is wrong. In her statement, given to the defense investigator almost six months before trial, Ms. Mack stated, under oath, that she witnessed the attack:

> "On September 29, 2007, I was living at 310 Driving Park. I was in my house and then went out on the porch. I saw a group of people down the road. *It looked like a fight was going on in the middle of the group of people.* Tarrance Mack is my nephew. I did not see Tarrance Mack in the group of people. As far as I know, Tarrance was in Elmira that day."

(A2 159 [emphasis added].) Consistently, at the CPL 440 hearing, Bessie Mack testified that she saw Sonia Spaight leave the porch and try to break up the fight (H1 148).

Importantly, Mr. Vacca could not explain how testimony from these three witnesses, all stating that Mr. Mack was not at 310 Driving Park, would have been inconsistent with Mr. Mack's alibi defense or somehow would have confused the jury (H1 54-56; H3 131-133). Because Mr. Vacca left *almost half* of the alibi defense on the proverbial table

(calling only five of nine available witnesses), Mr. Mack urged Judge Dollinger to grant him a new trial (PHDM2 10-15).

Judge Dollinger never addressed how Judge Ciaccio had misread the record. Instead, he muddied the water, conflating the analysis for uncalled witnesses by treating the failure to investigate witnesses and the failure to call witnesses (who were investigated) as the same issue.

> "Mr. Vacca interviewed the witnesses to evaluate their ability to recall events and test their credibility . . . Mr. Vacca concluded that some of the potential alibi witnesses were more likely to contradict other alibi witnesses than to give beneficial testimony. Mr. Vacca called the five alibi witnesses that he believed gave his trial strategy the best chance of succeeding. The decision not to call Christopher White was part of a legitimate, albeit unsuccessful, trial strategy."

(MCCD2 8.)

> "The same logic and conclusions relevant to Mr. Vacca's decision not to call Mr. White apply to Mr. Vacca's decision not to call Sonia Spaight, Bessie Mack, and Jerome Walker. Those decisions were made by Mr. Vacca, an experienced criminal defense attorney, after weighing the potential benefit of their testimony in the context of his theory of the case. The record reflects that these decisions were strategic, albeit unsuccessful decisions."

(MCCD2 8.)

> "Mr. Vacca called a total of five witnesses at trial. He called the alibi witnesses that he believed were the most credible and would be most helpful in his effort to establish that defendant was not at the scene of the crime rather, defendant was in Elmira, New York when Latasha Shaw was murdered. Defense counsel's 'decision to not call a witness, whose testimony he assessed as weak, [i]s a strategic legal decision which does not amount to ineffective assistance of counsel' (*People v Smith*, 82 NY2d 731, 733 [1993])."

"Defendant has failed to demonstrate the absence of strategic explanations for Mr. Vacca's decision not to call Christopher White and other alibi witnesses."

(MCCD2 9.)

Judge Dollinger's conclusions rest upon an objectively unreasonable determination of the facts in light of the evidence presented at the CPL 440 proceeding. As discussed in Ground 1, Mr. Vacca never investigated Mr. White so he had no basis to assess the strength of Mr. White's prospective testimony. Furthermore, Mr. Vacca did not refute testimony from both Bessie Mack and Sonia Spaight that Mr. Vacca never met with them or otherwise discussed their prospective testimony. Mr. Vacca did not testify that he had any basis to suspect that their trial testimony might be fabricated. Nor did he articulate their relation to Mr. Mack as a basis for failing to call them. As noted, Mr. Vacca called three witnesses who were blood relatives (two cousins and an aunt) and one witness who had two children with Mr. Mack (Jessica Smith). In contrast, neither Jerome Walker nor Sonia Spaight were blood relatives.

Like Mr. Vacca, Judge Dollinger could not articulate any specific reason for the attorney's failure to call Bessie Mack, Jerome Walker, or Sonia Spaight as witnesses to support Mr. Mack's alibi defense. Instead, Judge Dollinger merely repeated Mr. Vacca's self-serving conclusions about picking the "best" witnesses based upon some unknown weighing process that ostensibly did not include interviewing the three uncalled "witnesses to evaluate their ability to recall events and test their credibility" (MCCD2 8).

While appellate courts must strive to avoid second-guessing an attorney's decision to not call a witness whose testimony the attorney assesses as weak or potentially damaging, Mr. Vacca never provided any reason to believe that Sonia Spaight, Bessie Mack, or Jerome Walker (despite being in jail) would have given weak or potentially damaging testimony. Indeed, Mr. Vacca could not explain how testimony from these three witnesses, all stating that Mr. Mack was not at 310 Driving Park, would have confused the jury or conflicted with other defense testimony (H1 54-56; H3 131-133).

Mr. Vacca had no legitimate, strategy reason for failing to call Bessie Mack, Jerome Walker, or Sonia Spaight and that failure prejudiced Mr. Mack's defense. All three witnesses would have contradicted the People's theory of prosecution that Terrance Mack was part of a group that left the front porch of 310 Driving Park Avenue and participated in the attack on Latasha Shaw (PHDM2 10-15; PHDRM 19). Each witness was indisputably present at 310 Driving Park on the date of the crime.

Although Mr. Vacca, in his opening statement, did not expressly "promise" to call Bessie Mack, Sonia Spaight and Jerome Walker as witnesses, the court, at Mr. Vacca's request, read all three names to the jurors and various defense witnesses testified as to their presence at the scene. These numerous references likely caused some jurors to expect that such witnesses would be called and their glaring absence likely created negative inferences against Mr. Mack (*compare United States ex rel Logan v Williams*, No. 12 C 6170, 2023 WL 4297606, at *11 [ND Ill June 30, 2023] [finding "a reasonable probability that the trial would have come out differently absent trial counsel's broken promise"]).

The unexplained absence of these three, important witnesses calls the fairness of the trial into doubt and undermines the proper functioning of the adversarial process. The Monroe County Court's conclusion that Mr. Vacca's performance was not constitutionally deficient and did not prejudice Mr. Mack's defense is an objectively unreasonable application of *Strickland*.

**(3) Counsel failed to consult with, or call, an expert on the science of memory and perception, or otherwise become familiar with the science as it relates to eyewitness identification.**

Eyewitness identification testimony is fragile, intangible evidence derived solely from a witness's memory, as it exists at the time of trial. It is malleable proof that can change based upon many factors. In court, an identification witness makes a binary choice as to whether the defendant is the same person observed on a prior occasion. When jurors make their own binary choice (guilty or not guilty), they must evaluate what weight, if any, they should give to this intangible evidence. That evaluation, to be valid, should include an assessment of the many factors that scientific research has shown will affect the accuracy of such evidence. Simply put, jurors cannot properly weigh identification testimony without knowledge of these many factors and some basic understanding about how human memory works.

"Mistaken eyewitness identifications are the single greatest cause of wrongful convictions in this country" (*People v Boone*, 30 NY3d 521, 527 [2017]). "[A]ccording to the Innocence Project, eyewitness misidentification was present in an astonishing 71 percent of the cases in which subsequent DNA testing established the factual innocence of wrongfully convicted defendants. *See* Innocence Project, *Eyewitness Identification*

78

*Reform*, www.innocenceproject.org/eyewitness-identification-reform (Last Visited Mar. 16, 2020)" (*United States v Nolan*, 956 F3d 71, 75 (2d Cir 2020).

Courts, lawyers, and psychologists have long known that human perception and memory are far from perfect and that eyewitnesses are often unwittingly mistaken (*United States v Wade*, 388 US 218, 228 [1967]). Yet, laypeople are much less cognizant of inherent, recurring problems with eyewitness identifications. Indeed, there is "a significant disparity between what the psychological research shows and what uninstructed jurors believe" (*Boone*, 30 NY3d at 529).

As a result, New York courts have approved of the use of expert testimony to educate jurors about psychology and the factors that diminish the reliability of eyewitness testimony (*People v Mooney*, 76 NY2d 827, 829-830 [1990]). In 2009, when Mr. Mack went to trial, the use of eyewitness expert testimony had become a well-established defense practice (*People v LeGrand*, 8 NY3d 449, 453-454 [2007] [defense counsel had sought to call an expert in a *2001* trial]). In fact, admission of such evidence had become required in cases relying on eyewitness testimony without forensic or other reliable corroborating evidence (*LeGrand*, 8 NY3d at 452 [2007]; *People v Abney*, 13 NY3d 251 [2009]; *People v Muhammad*, 17 NY3d 532 [2011]; *People v Santiago*, 17 NY3d 661 [2011]).

Notably, in January of *2008*, the Criminal Jury Instructions added the language applicable to an identification expert:

> "*NOTE: Add if applicable:* You may also consider the testimony of (*specify*), who gave an opinion about the factors bearing on the accuracy and reliability of an identification. You will consider that testimony in accordance with the instruction [on expert testimony]" (emphasis added)

(http://nycourts.gov/judges/cji/1-General/CJI2d.Identification-Witness_Plus.pdf).

If eyewitness identification is a contested issue, a competent attorney will take the time to investigate what factors might reduce the accuracy of the identification. Initially, this process would include legal research on eyewitness identification and perhaps a review of scientific studies addressing the topic. Many cases reported before Mr. Mack's trial (May of 2009) would have prompted a competent attorney to learn about the science (*see People v Brooks*, 128 Misc 2d 608, 617 [Westchester County Ct 1985] [Dr. Buckhout will "take the stand as a live learned treatise on the subject of eyewitness identification to assist the jury by bringing to their attention scientific studies with which they would not otherwise be familiar"]; *People v Lewis*, 137 Misc 2d 84, 87 [Monroe County Ct 1987] [After the witness's expertise is established, Dr. Kathleen Chen, Ph.D. may testify about "the factors which scientific research has demonstrated are relevant in a determination of whether or not a reliable identification has been made . . . She will be allowed to testify as to scientific studies with which the jurors would not otherwise be familiar"]; *People v Beckford*, 141 Misc 2d 71, 77 [Sup Ct, Kings County 1988] [Defendant "produced an alibi defense" and given that the People can cross-examine the defense expert or call experts of their own, they "cannot claim substantial prejudice"]; *People v Cordes*, 71 AD3d 912, 913-914 [2010] ["upon retrial, should consider the relevancy of expert eyewitness identification testimony"]; *People v Nazario*, 100 AD3d 783 [2d Dept 2012] [Reversed and new trial ordered because, at a trial conducted before 2009, the court improperly precluded testimony from an expert on eyewitness identification]).

80

The Monroe County Court (Dollinger, J.) acknowledged that the defense expert (Charles Brainerd) testified regarding more than eighteen factors that may affect the accuracy of eyewitness identification (MCCD2 6) but inadequately addressed whether Mr. Vacca's failure to educate himself or the jurors about the vast majority of these reliability factors was deficient performance or caused prejudice to Mr. Mack. Instead, the court implicitly excused Mr. Vacca's failure to consult with an expert by claiming (erroneously) that Vacca "directly addressed" four factors ("distance and lighting, viewing angle, [and] event stress") during cross-examination of Megan Torres (MCCD2 9). As discussed in Ground 7 ("event stress") and Ground 13 ("the distance, the darkness, and the viewing angle"), the court grossly over-valued what little Mr. Vacca accomplished on these four factors. Moreover, the court omitted any mention of the many reliability factors that Mr. Vacca failed to raise in support of a mistaken identification defense: Ground 4 ("own race bias"); Ground 5 ("weapon focus"); Ground 6 (witness confidence); Ground 8 ("event duration"); Ground 9 ("partial disguise"); and Ground 10 ("unconscious transference").

After stating that, "Mr. Vacca chose a trial strategy that focused on the defendant's alibi and Ms. Torres's identification being mistaken" (MCCD2 9), Judge Dollinger failed to discuss whether consulting with an expert on memory and perception could have assisted with that chosen strategy. As Mr. Mack argued, if Mr. Vacca had consulted with or called an expert, he could have provided the jurors with many reasons to doubt the accuracy of the identification. Providing such reasons to jurors is the essence of a mistaken identification defense. Limiting those reasons by remaining ignorant of the science is not a legitimate strategy. It is an inexcusable neglect.

81

The state court failed to perceive this critical difference. Instead, in boilerplate fashion, the court remarked, "While a different strategy might have been more effective, this Court cannot conclude that such strategy was unreasonable in the context of the defendant's overall trial strategy" (MCCD2 10). Generously interpreted, the court seems to suggest that relying upon cross-examination to promote a mistaken identification defense is not an unreasonable strategy.

In some cases, that assessment might be partially true. Where an attorney has learned the science and, during voir dire, questioning, closing argument, and jury instructions, establishes most of the memory and perception factors that cause mistaken identification, perhaps the representation is constitutionally adequate. Nonetheless, courts have recognized the "substantial degree of acceptance within the scientific community concerning data on the reliability of eyewitness identifications" and have concluded that this data establishes that "traditional methods of informing factfinders of the pitfalls of eyewitness identification 'cross-examination, closing argument, and generalized jury instructions' frequently are not adequate to inform factfinders of the factors affecting the reliability of such identifications" (*State v Lawson*, 352 Or 724, 759–760, 291 P3d 673, 695 [2012]).

In this one-witness identification case, Mr. Vacca neglected his professional duty to learn about the science of memory and perception. For example, Mr. Vacca admitted that he did not conduct any voir dire based upon scientific findings.

> Q. During jury voir dire did you ask the prospective perspective jurors about their understanding as to how memory works?

A.    No. (H3 27)

Q.    Did you ask them about any common misconceptions about the accuracy of eyewitness identification?

A.    We've been down this road already. I'm not a -- I'm not a medical doctor. I'm not a psychologist or psychiatrist, although I should have majored in it. But anyway...

Q.    Well, we're just focused on the jury voir dire, and I guess I'm looking for yes or no.

A.    Yeah, I didn't talk to them about memory philosophy or whatever, whatever you call it.

(H3 27.)

Given the tremendous impact of eyewitness testimony on a jury, the numerous factors that may reduce the reliability of an identification, and the "significant disparity between what the psychological research shows and what uninstructed jurors believe" (*see Boone*, 30 NY3d at 529), an attorney's failure to consult with an eyewitness expert can be deficient and prejudicial performance (*United States v Nolan*, 956 F3d 71, 81-82 [2d Cir 2020] ["Counsel also failed to render reasonable professional assistance by neglecting to call or even consult an expert to testify about the unreliability of the eyewitness identifications under the egregious circumstances presented in this case"]).

Importantly, Mr. Vacca's concurrent pursuit of an alibi defense was *not* a conflicting strategy. Instead, an expert on perception and memory would have directly complemented and strengthened that defense. An alibi defense is an identity defense. Its success depends on the jury having doubts about the evidence putting the defendant at the scene of the crime.

In short, Mr. Vacca needed to give the jurors relevant reasons to doubt Ms. Torres and to explain why she could be mistaken. While Mr. Vacca attempted, through cross-examination, to show that Ms. Torres was untrustworthy and had an inadequate opportunity to see the assailant, he was severely hamstrung by the lack of expert testimony explaining the significance of many factors affecting her ability to form a reliable memory.

Mr. Vacca admitted having only "a layperson's understanding" of how memory works (H3 20-21). He suggested that he did not consult with an expert on eyewitness identification either because he focused on the alibi defense (H3 18, 26-27) or because, if he did not understand the science, a jury would not understand it (H3 99). Neither justification for failing to consult with an expert is a legitimate strategy in a one-eyewitness case with a mistaken identification defense. "I don't understand it" is a reason to learn the science, not an excuse to remain uneducated about how perception and memory work - the central components of eyewitness identification. Even reviewing the scientific research into the problems with eyewitness identification testimony would have educated Mr. Vacca on many well-established, reliability factors.

It is remarkable, in 2022, almost 13 years after Mr. Mack's trial, and after receiving a copy of Mr. Mack's CPL 440 motion (A2 261, 299) (H1 9-11), containing detailed descriptions, that Mr. Vacca still could not describe many of the common factors that scientific studies show can reduce the accuracy of eyewitness identification. The motion explains every factor (A2 214-215). Yet, Mr. Vacca made no effort to educate himself.

Given the critical significance of identification testimony from a single eyewitness, the attorney's decision to pursue both an alibi and a mistaken-identification defense, and

84

the high stakes of Mr. Mack's case (a class B violent felony charge), a minimum requirement for effective representation was for the attorney to learn about the numerous perception and memory factors that can contribute to mistaken identification.

On the failure to consult with or call an expert, however, Judge Dollinger concluded,

> "Any value that an expert may have had is tempered by the fact that the identification in this case was *confirmatory*. The identifying eyewitness had seen the defendant 'in the neighborhood quite a few times on the brown porch' and had also seen him earlier that day on the same porch. The *confirmatory* identification was corroborated by the confession by the defendant to the jailhouse cooperator and by a jail call made by the defendant to his father in which he made an implicit confession."

(MCCD2 9 [emphasis added].)

This conclusion is objectively unreasonable because it assumes as true a contested fact. While the People characterized the in-court identification as "confirmatory," this characterization rested solely upon the testimony of Megan Torres. No other prosecution witness described any prior contact or relationship between Ms. Torres and Mr. Mack that would establish any basis for her vague claim of familiarity. On the other hand, Mr. Mack testified that he was in Elmira, not Rochester, during the crime, and five defense witnesses supported Mr. Mack's testimony. Thus, whether Ms. Torres's identification was "confirmatory" or mistaken was an issue of fact for the jurors, not the court, to resolve. Judge Dollinger's finding was not a fair-minded weighing of the circumstances that courts should conduct under *Strickland*.

Not consulting with an expert, or even reviewing the science and the case law, because the identification is "confirmatory" would be an inexcusable abdication of zealous advocacy. Only where identification is *not* an issue in the case would there be no reason to pursue an alibi or mistaken identification defense. Even if a witness claims that the perpetrator is a close relative, an attorney must prepare for the battle and be ready to show why the witness could be mistaken. Furthermore, the People's alleged corroboration evidence was hotly contested. The jailhouse informant was attacked as a liar who wanted a benefit and the phone call between Mr. Mack and his father only confirmed that the informant had asked Mr. Mack about his pending charge.

Judge Dollinger ended as follows:

> "While a different strategy might have been more effective, this Court cannot conclude that such strategy was unreasonable in the context of the defendant's overall trial strategy. Overall, it 'is not for the court to second-guess whether a course chosen by defense's counsel was the best trial strategy, or even a good one, so as defendant was afforded meaningful assistance of representation' (*People v Howie*, 149 AD3d 1497, 1500 [4th Dept 2017])."

(MCCD2 10).

Contrary to this word salad, Mr. Vacca's pursuit of a mistaken identification defense, solely through cross-examination and without a basic understanding of reliability factors that could show why the eyewitness made a mistake, is not a reasonable alternative. No matter how favorably portrayed, remaining ignorant is not a legitimate strategy.

Mr. Vacca's inexcusable failure to consult with an expert on memory and perception, or otherwise to educate himself on the law and the science of eyewitness

identification, was deficient performance that caused prejudice to Mr. Mack, depriving him of effective assistance of counsel, due process, and a fair trial.

**(4) Counsel failed to educate the jurors about the danger of misidentification posed by cross-racial identification ("own race bias").**

The People's sole identification witness was a white, Hispanic female (H3 12). Terrance Mack is a black male (H3 25). At a minimum, this difference would have prompted a competent attorney in 2009 to request a jury instruction on cross-racial identification or "own race bias." Even better would have been to call an expert on memory and perception to educate the jurors on this reliability factor. Given the facts of this case, it is highly likely that the trial court would have given the instruction[13] and allowed the expert testimony.

The Monroe County Court (Dollinger, J.) acknowledged that the defense expert testified regarding "own race bias" (MCCD2 6) but never addressed whether Mr. Vacca's failure to educate himself or the jurors about this potential reason for misidentification was deficient performance or caused prejudice to Mr. Mack (MCCD2 9-10).

As Dr. Brainerd explained, by 2009, scientific studies had firmly established "that people are much poorer in eyewitness identification at identifying a suspect who is not of their own race." (H4 38-40; *see e.g.* C.A. Meissner & J.C. Brigham, Thirty Years of Investigating the Other-Race Effect in Memory for Faces: A Meta-Analytic Review, 7 PSYCHOLOGY, PUB. POLICY, AND LAW 3, 15 [2001], cited by *People v Boone*, 30 NY3d 521, 528 [2017]).

---

[13] https://www.nycourts.gov/judges/cji/1-General/CJI2d.Identification-One_Witness.pdf

As one court explained, more than 20 years *before* Mr. Mack's trial, "it is much easier for a person to identify a person of his own race rather than another . . . This phenomenon is crucial for the deliberative process as jurors are more apt to comfortably discuss racial differences without fear of discord in the jury room if there is some basis for such discussion in the record. Secondly, the difficulty of and possibility for error in cross-racial identifications is not something within the ordinary experience of jurors." (*People v Beckford*, 141 Misc 2d 71, 76-77 [Sup Ct, Kings County 1988].)

Recognizing these critical concerns, New York courts have allowed expert testimony about the potential danger posed by cross-racial identifications (*see e.g. People v Drake*, 188 Misc 2d 210, 215 [Sup Ct, NY County 2001]; *People v Norstrand*, 35 Misc 3d 367, 373 [Monroe County Ct 2011]; *People v Abney*, 31 Misc 3d 1231[A] [Sup Ct, NY County 2011]).

In 2008, the American Bar Association asked courts "to recognize that in particular cases cross-racial identification may increase the risk of erroneous conviction" and urged:

> "[F]ederal, state, local, and territorial jurisdictions to seek to assure that, in cases which the trial judge finds a sufficient risk of misidentification based on cross-racial factors, expert testimony that satisfies the applicable rules of evidence is admissible, adequate funding is available to enable both the government and indigent defendants to obtain such testimony, and trial judges have available model jury instructions that inform juries of all of the factors that may enhance or detract from the reliability of an eyewitness identification, one of which may be the cross-racial nature of the identification."[14]

---

[14] https://ndaa.org/wp-content/uploads/ABA_Pros_july_sept_08.pdf

During Mr. Mack's trial, however, Mr. Vacca never raised cross-racial identification as an issue. He never called or consulted with an expert and never asked for a jury instruction on this reliability factor. In 2022, he was "just guessing" when he correctly speculated "that own race bias has something to do with you are more inclined to be able to identify someone of your race as against another race" (H3 25).

After choosing to present a mistaken identification defense where the accused is black and the sole identifying witness is white, no competent attorney would have failed to educate himself and the jurors about "own race bias." At a minimum, an educated attorney would have requested a jury instruction on cross-racial identification. That instruction, standing alone, would have injected a significant source of doubt into the People's case. Given the singular importance of Ms. Torres's identification, no conceivable strategy could excuse Mr. Vacca's failure to raise an issue that would only strengthen Mr. Mack's mistaken identification defense. Moreover, the People had ample notice that Mr. Mack would argue that Mr. Vacca was ineffective for failing to address the cross-racial nature of the identification (A2 59, 210, 1140-1141). Despite such notice, the People rested at the CPL 440 hearing without submitting any proof that Ms. Torres had a background that might reduce the danger of "own race bias" (H4 69).

Mr. Mack suffered prejudice based upon Mr. Vacca's failure to educate the jurors on the danger of cross-racial identification. Given how close the jurors were to a deadlock, the expert testimony and/or the jury instruction might have provided one or more jurors with a reason to remain steadfast in the belief that the People had failed to prove Mr. Mack's guilt beyond a reasonable doubt. By depriving jurors of critical eyewitness

89

identification guidance in a weak, single-witness case, Mr. Vacca's blunder undermined the confidence in the outcome and deprived Mr. Mack of a fair trial.

**(5)    Counsel failed to educate the jurors about the danger of misidentification posed by "weapon focus."**

The Monroe County Court (Dollinger, J.) never acknowledged that the defense expert testified regarding "weapon focus" (MCCD2 6) and never addressed whether Mr. Vacca's failure to educate himself or the jurors about this potential reason for misidentification was deficient performance or caused prejudice to Mr. Mack (MCCD2 9-10).

By 2009, scientific studies had firmly established the phenomena known as "weapon focus" (H4 40). New York courts often permitted expert testimony about this reliability factor (*see e.g. People v Berry*, 27 NY3d 10, 18 [2016] [In June of 2009, the trial court allowed expert testimony about weapon focus]; *People v Drake*, 188 Misc 2d 210 [Sup Ct, NY County 2001] [weapon focus]; *People v Abney*, 31 Misc 3d 1231[A] [Sup Ct, NY County 2011] [same]).

As Dr. Brainerd explained, weapon focus is an unconscious phenomenon (H4 36):

> "Whenever we are in a situation where a dangerous weapon is present, and it doesn't even have to be a crime, what happens is that our attention is drawn to that weapon. It's probably a natural evolutionary thing. But, factually and experimentally, our attention gets drawn to the weapon, and what that means for a subsequent eyewitness identification and/or for a subsequent memory record on any event that happened in the crime, our accuracy is reduced because we are paying attention to the weapon itself."

(H4 37.)

Dr. Brainerd explained further that the presence of *multiple* weapons during in an incident would *amplify* the adverse effect of this reliability factor because a witness could unconsciously spend "a lot of time looking at weapons" (H4 37). Because most prospective jurors would be unfamiliar with this risk factor, asking questions about it during voir dire could help to ensure the selection of jurors with open minds on the topic (H4 38.)

In this case, the presence of multiple weapons (bottles, knives, two-by-fours, bats, broomsticks, etc.) could have deleteriously affected Ms. Torres's ability to focus on the facial characteristics of the perpetrator that she identified as Mr. Mack. It would be natural to assume that a person could focus on, and see, the face of a person even if that person is holding a weapon. But an expert could have explained to the jurors how the presence of a weapon significantly lowers the accuracy of identifications.

Mr. Vacca had no understanding of "weapon focus":

A. I don't know, maybe if there's a traumatic incident happening and someone pulls -- I'm guessing at all this stuff.

THE COURT: Mr. Vacca, don't guess.

THE WITNESS: I don't know what it is. I don't know what it is.

(H3 25; *but see* A2 210 [CPL 440 motion describing "weapon focus"].)

Unsurprisingly, Mr. Vacca, who apparently has never read about "weapon focus" in any cases addressing eyewitness identification, did nothing at trial to warn jurors that the presence of multiple weapons during the fracas would have taken Ms. Torres's attention away from the face of the perpetrator. If Mr. Vacca had educated himself on this topic, he could have addressed it during jury selection, witness questioning, closing argument, and

final instructions. An expert also could have provided the jurors with critical guidance on this unconscious phenomenon.

Instead, Mr. Vacca failed to raise the topic at any time. He never argued to the jurors that they should consider whether the presence of multiple weapons at the crime scene distracted Ms. Torres's attention away from the face of the perpetrator. Furthermore, the jury charge does not mention "weapon focus" as a factor that can reduce the reliability of an identification, or the amplifying effect of multiple weapons. Nor does the instruction mention, in similar fashion, how the presence of multiple perpetrators would tend to reduce the reliability of an individual eyewitness identification (H4 35-36).

Given the circumstances here, Mr. Vacca's inexcusable failure to educate himself or the jurors on "weapon focus" caused undue prejudice to Mr. Mack.

### (6) Counsel failed to educate jurors about the lack of correlation between witness confidence and witness accuracy.

The Monroe County Court (Dollinger, J.) acknowledged that the defense expert testified regarding "confidence vs accuracy" (MCCD2 6) but never addressed whether Mr. Vacca's failure to educate himself or the jurors about this potential reason for misidentification was deficient performance or caused prejudice to Mr. Mack (MCCD2 9-10).

Dr. Brainerd testified that, "the average person believes eyewitness identifications are highly reliable, and that they are especially reliable if they're expressed with high confidence" (H4 19). But scientific research shows the lack of a strong correlation between an eyewitness's confidence in the identification and accuracy of that identification.

"Our intuitions tell us and lay people think that high confidence means high accuracy. But what the research has always shown going back to the 1970s is the correlation between confidence and accuracy is very modest. It doesn't come close to rising to a forensic standard, and it also unfortunately -- so, that's even when confidence is taken under the best possible circumstances. That is to say, an eyewitness identification test is administered fairly."

(H4 42.)

This lack of strong correlation is not within the common knowledge of typical jurors, "because what the studies show is that lay people express the opposite view. If I get a confident eyewitness, a confident identification from a witness at trial, [then jurors believe] that confidence means it's highly reliable." (H4 43.) One reason for the lack of a strong correlation between eyewitness confidence and eyewitness accuracy is "confidence malleability":

"Unfortunately, with time, confidence tends to go up so that if someone makes an identification or reports the ability to make an identification, and even if they were fairly uncertain at the time, as time goes by, they become more and more certain. So, typically, a witness will make an eyewitness identification at trial with very high confidence, sort of drifted up over time, and those are very poorly correlated with accuracy."

(H4 43.)

"What I said about confidence drifting up with time, and notice that that can't possibly be right because what's happening to our memories as months goes by, our memories are getting worse, but our confidence in them is getting higher with time. That's the natural state of affairs, the natural trend. That's an example of confidence malleability in the sense that confidence is changing over time, but it's only one example. You can affect confidence. You can change confidence. You can make it greater by a number of other things that don't have to do with accuracy. For example, post event information. If a person receives feedback they have done well in an eyewitness identification, they have been helpful, that will also increase their

confidence in their identification. If they learn somebody else has identified the same person, that will increase their confidence. All of those are examples of malleability."

(H4 43-44.)

Mr. Vacca had no understanding of these concepts.

Q. What factors might falsely inflate the confidence of an eyewitness?

A. Well, like Torres, okay, her life experience, the distance of the incident from where she was, maybe distance, maybe lighting. I mean, that's about all I could think of right now without sitting down and reviewing it.

(H3 23-24.)

Q. What is confidence malleability?

A. Confidence what?

Q. Malleability.

A. Well, malleability must be bending, okay? If something's malleable, it bends, okay? So I must figure that has something to do with bending someone's memory. That's the most I could figure.

Q. Well, that gets to, what is memory malleability?

A. Well, I guess, you know, in the back of your memory you store some stuff. And maybe you twist it in the back of your head, you know? Maybe I'll use it the next trial I have, I don't know. But anyway, that's my understanding.

(H3 24; *but see* A2 1141 [CPL 440 motion describing witness confidence].)

At Mr. Mack's trial, the extreme confidence of Megan Torres was such a problem for Mr. Vacca that it caused him to suspect that she might be lying (H3 17). During his closing, he lamented to the jurors that, "I don't know her motive for coming in and saying

94

that and holding so steadfast" (T 721). Rather than suggesting that Ms. Torres might be lying, Mr. Vacca, if educated on how memory works, could have provided jurors with another reason for her steadfast confidence. Instead, on this topic, Mr. Vacca gave conflicting answers:

Q. What's your understanding of the correlation between eyewitness confidence and eyewitness accuracy?

A. No idea, I didn't go to medical school.

Q. Do jurors tend to believe confident eyewitnesses?

A. Do what?

Q. Do jurors tend to believe confident eyewitnesses?

A. Yes.

THE COURT: Are you asking based on his training and experience?

MR. JUERGENS: Yes.

THE WITNESS: What's the question again?

THE COURT: Based on your training and experience do jurors tend to believe confident eyewitnesses?

THE WITNESS: What do I know what jurors do? I've been trying to figure out what they've been doing for 47 years, and I can't get a handle on it.

THE COURT: Is that a no?

THE WITNESS: That's a no.

THE COURT: Or I don't know?

THE WITNESS: I don't know. Maybe I do and I'll surprise myself.

(H3 23.)

By 2009, scientific studies had established the lack of a strong correlation between witness confidence and witness accuracy. New York courts often would allow expert testimony to explain this result (*see e.g. People v Berry*, 27 NY3d 10, 18 [2016] [In June of 2009, trial court allowed expert testimony about witness confidence]; *People v Drake*, 188 Misc 2d 210 [Sup Ct, NY County 2001] [lack of correlation between confidence & reliability]; *People v Norstrand*, 35 Misc 3d 367, 373 [Monroe County Ct 2011] [confidence malleability]).

The "Identification - One Witness" instruction was amended in 2022 to include this warning: "A witness's confidence in the correctness of an identification is not a conclusive indicator of the accuracy of the identification." As shown in note 5 of this CJI2d instruction,[15] competent defense attorneys were preserving this issue at trials that occurred *before* Mr. Mack's trial (May 2009) (*see People v LeGrand*, 8 NY3d 449, 458 [2007] [the lack of "correlation between confidence and accuracy of identification" was "generally accepted by social scientists and psychologists working in the field" and testimony as to this factor "should not have been precluded"]; *People v Abney*, 13 NY3d 251, 268 [2009] ["the principles related to witness confidence upon which [the expert] proposed to testify are generally accepted within the relevant scientific community. They are also counterintuitive, which places them beyond the ken of the average juror. Accordingly, the trial judge in Abney abused his discretion when he did not allow [the expert] to testify on

---

[15] https://www.nycourts.gov/judges/cji/1-General/CJI2d.Identification-One_Witness.pdf

96

the subject of witness confidence"]; *People v Santiago*, 17 NY3d 661, 672 [2011] ["Supreme Court abused its discretion when it refused to allow testimony on studies showing that eyewitness confidence is a poor predictor of identification accuracy"]). The judgment in *Santiago* was entered April 28, 2004 (*see People v Santiago*, 75 AD3d 163 [1st Dept 2010], *revd* 17 NY3d 661 [2011]).

No expert testified at Mr. Mack's trial and his jury instructions contained no references to the lack of correlation between eyewitness confidence and eyewitness accuracy or the concept of memory or confidence malleability. Given Ms. Torres's "steadfast" confidence about her in-court identification, Mr. Vacca's unreasonable failure to educate himself or the jurors about these basic concepts caused significant prejudice to Mr. Mack.

**(7)    Counsel failed to educate jurors about the problem of "event stress."**

The Monroe County Court (Dollinger, J.) acknowledged that the defense expert testified regarding "event stress" (MCCD2 6) but concluded that Mr. Vacca "directly addressed" this factor "in his cross-examination of Ms. Torres" (MCCD2 9). This conclusion is objectively unreasonable because it has absolutely no record support. Mr. Vacca never asked or argued about "event stress" as a reason for misidentification.

An expert on memory and perception could have explained to jurors the significant impact of stress on a witness's ability to make an accurate identification and could have advised counsel to develop specific testimony regarding the level of stress experienced by Ms. Torres. Given the horrific nature of this brutal gang assault, it is reasonable to infer that she experienced a significant degree of stress.

97

As Dr. Brainerd explained,

"[W]ith respect to eyewitness identification, it refers to the amount of stress that's associated with a particular forensic event, like a crime. And, what the research shows is that the accuracy of the eyewitness identification goes down as the level of stress associated, that's inherent in the events goes up. And violence, violence to observing violence being committed on other people is -- represents one of the highest levels of stress. The reason why it interferes with eyewitness identifications is, once again, this is complicated. It all goes back to attention again. You can't remember things you don't encode, and to encode things, you have got to pay attention to them. And what stress does, it drains away your attention."

(H4 32-33.)

Dr. Brainerd noted that this factor is beyond the ken of a typical juror and should be a topic raised during jury voir dire. Indeed, studies show that some laypeople hold an opposite view, wrongly believing that stress actually enhances memory (H4 33-34; *see People v Brooks*, 128 Misc 2d 608, 619 [Westchester County Ct 1985] ["it is a myth that recall is enhanced by the violence of a situation"].)

When asked to explain his understanding of how "event stress" might affect eyewitness identification, Mr. Vacca answered,

A.  Well, I guess if there's an event that's very traumatic to you, you might be stressed out by it. Maybe they could argue that Torres was stressed out by this incident, seeing this crowd of people fighting and everything. That's all I can say.

Q.  Would that potentially affect the accuracy of an eyewitness' identification?

A.  I'm not an expert, I don't know. I can't give an opinion on -- I can't give an opinion on any of this brain stuff.

(H1 24-25.)

In Mr. Mack's case, the jury instruction most relevant to the phenomena of "event stress" asks the jurors to consider:

> "What was the mental, physical and emotional state of the witness before, during and after the observation? To what extent, if any, did that condition affect the witness's ability to observe and accurately remember the perpetrator?"

(T 761.)

The problem with this instruction is that it fails to explain how event stress actually *reduces* the accuracy of eyewitness identification. The instruction does nothing to dispel the common misconception that stress somehow *enhances* memory. By 2009, the scientific findings on this topic were well established (H4 40) and New York courts have allowed expert testimony to clarify this common misconception (*see e.g. People v Drake*, 188 Misc 2d 210 [Sup Ct, NY County 2001] [event stress]; *People v Norstrand*, 35 Misc 3d 367, 373 [Monroe County Ct 2011] [event stress];

*People v Abney*, 31 Misc 3d 1231[A] [Sup Ct, NY County 2011] [event stress]).

Mr. Vacca's failure to educate himself or the jurors about "event stress" as a reason for misidentification was deficient performance and caused prejudice to Mr. Mack.

**(8)   Counsel failed to educate jurors about the tendency of witnesses to overestimate time ("event duration").**

The Monroe County Court (Dollinger, J.) acknowledged that the defense expert testified regarding "event duration" (MCCD2 6) but never addressed whether Mr. Vacca's failure to educate himself or the jurors about this potential reason for misidentification was deficient performance or caused prejudice to Mr. Mack (MCCD2 9-10).

99

To be sure, most jurors would have some lay knowledge regarding this reliability factor. As Dr. Brainerd explained,

> "That's just how long a time a witness is able to pay attention to and encode a set of target events. And, what you're dealing with here as far as the accuracy of subsequent memory is, the old law of repetition. The more repetition now, the better memory is later. And repetition is, basically, two kinds of variables. How many times is something presented and how long is it presented. And, as you lengthen either of those, subsequent memory becomes better and, particularly, particularly verbatim memory. The critical memory that's so easily lost. Duration is really important for that."

(H4 34-35.)

What would be beyond the ken of a typical juror, however, is scientific research showing that witnesses tend to *overestimate* event duration.

> "There is a general tendency of people to overestimate durations. This is true, in general, in the psychology of judgment where you're trying to estimate the amount of something in the past. It doesn't have to be duration. It could be, oh, how many baseball games you have attended, for example, how many times you have had a particular conversation. People tend to overestimate . . . It's a very counterintuitive finding. Even research -- even research psychologists find it a counterintuitive finding."

(H4 35.) (*See Benn v United States*, 978 A2d 1257, 1268 n 37 [D.C. 2009] [acknowledging that, particularly with violent crimes, "witnesses most often think that the incident lasted longer than it did"]).

Dr. Brainerd emphasized that the most important component of event duration is witness attention – a feature of the memory process that arises with other reliability factors. "From the point of view of memory, the amount of time you spend attending to something

is always the critical dimension because you can't encode what you don't pay attention to."

(H4 36.)

Mr. Mack's jury instruction on "event duration" states:

"For what period of time did the witness actually observe the perpetrator? During that period of time, in what direction were the witness and the perpetrator facing, and where was the witness's attention directed?"

(T 761.)

While this instruction mentions "viewing angle" and "event duration," it does not provide any guidance on how these factors reduce reliability. More importantly, Mr. Vacca never argued to the jury that, for many reasons (including "weapon focus" and "event stress"), the attention of Ms. Torres was distracted from the face of the alleged male perpetrator such that the event duration for her identification could not have been more than a few seconds.

By 2009, the tendency of witnesses to overestimate "event duration" or "exposure time" was well recognized (H4 40). New York courts often permitted expert testimony on this topic (*see e.g. People v Williams*, 14 Misc 3d 571, 587-90 [Sup Ct, 2d JD 2006]; *People v Norstrand*, 35 Misc 3d 367, 373 [Monroe County Ct 2011]; *People v Abney*, 31 Misc 3d 1231[A] [Sup Ct, NY County 2011]).

Mr. Vacca's failure to educate jurors on scientific research that, contrary to the common understanding of laypersons, witnesses tend to overestimate how long an incident actually lasted was deficient performance that prejudiced Mr. Mack.

**(9)     Counsel failed to educate jurors about the problem of "partial disguise."**

The Monroe County Court (Dollinger, J.) acknowledged that the defense expert testified regarding "partial disguise" (MCCD2 6) but never addressed whether Mr. Vacca's failure to educate himself or the jurors about this potential reason for misidentification was deficient performance or caused prejudice to Mr. Mack (MCCD2 9-10).    By 2009, the effect of this factor (reducing the reliability of eyewitness identification) was well established (H4 40).

Megan Torres testified that the perpetrator wore a baseball hat (T 370, 376, 379). Scientific studies show that even small adornments, like a pair of glasses or a hat, will impair eyewitness identification (H4 31-32).  Mr. Vacca failed to present this information to the jury (*see State v Henderson*, 208 NJ 208, 266 [2011] ["disguises as simple as hats have been shown to reduce identification accuracy"]; *People v Banks*, 16 Misc 3d 929, 935-936 (County Ct 2007) [the fact that the perpetrator was wearing a hoodie, and other problematic factors, justified admitting expert testimony about eyewitness identification]; *Young v Conway*, 698 F3d 69, 80 [2d Cir 2012] [The gunman wore a hat, which covered his hairline]).

Given the distance, lighting, viewing angle, and partial disguise, Mr. Vacca, if educated on the phenomenon, could have challenged Ms. Torres's description of the perpetrator's eyebrows ("They were just like regular eyebrows.  They weren't bushy.") (T 380) as another example of a false memory perhaps triggered by the question itself. Notably, Defense Exhibit Q, a daytime photo taken from the porch at 868 Dewey Avenue

102

where Ms. Torres stood, shows a person with a hat, facing the porch and standing in the same area where the stabbing occurred.

During his closing, Mr. Vacca never mentioned the hat as a reason to doubt the accuracy of the in-court identification. Mr. Vacca's failure to educate jurors on "partial disguise" as a reliability factor was deficient performance that prejudiced Mr. Mack.

**(10) Counsel failed to educate jurors about "facial distinctiveness."**

The Monroe County Court (Dollinger, J.) did not acknowledge the defense expert's testimony on "facial distinctiveness" and did not conduct a *Strickland* analysis on Mr. Vacca's failure to raise this reliability factor.

Describing studies on facial distinctiveness, Dr. Brainerd testified,

> "If you give people hundreds and hundreds of faces, and you ask them to rate how distinctive those faces are, they can do it, and they rate them as being very different in distinctiveness. These are the kinds of faces, the distinctive faces are at the extremes. If they're men, they're the kinds of faces you would say are very handsome or would have been in an universal horror movie would be rated as distinctive, and it turns out if you then studied the ability to remember those faces on an eyewitness identification, people are really good at remembering -- much better at remembering those distinctive faces, but the sort of average face, not so much."

(H4 51.)

Mr. Mack's jury instruction did ask the jurors to consider, "Did the perpetrator have distinctive features that a witness would be likely to notice and remember?" (T 761). Yet, Mr. Vacca did not argue to the jurors that Ms. Torres never described Mr. Mack's face as being distinctive for any reason (*see People v Abney*, 13 NY3d 251, 268 [2009] [Witness

"did not describe [culprit] as possessing any unusual or distinctive features"]). This failure was deficient performance that prejudiced Mr. Mack.

**(11) Counsel failed to educate jurors about the problem of "unconscious transference."**

The Monroe County Court (Dollinger, J.) acknowledged that the defense expert testified regarding "unconscious transference" (MCCD2 6) but never addressed whether Mr. Vacca's failure to educate jurors about this potential reason for misidentification was deficient performance or caused prejudice to Mr. Mack (MCCD2 9-10).

Dr. Brainerd explained how "unconscious transference" may have influenced Torres's identification. Scientific research shows that when witnesses have an inadequate opportunity to view a person, they often unconsciously confuse that person with another individual who is familiar. Laypersons do not commonly understand this phenomenon. (H4 44; *see People v Santiago*, 17 NY3d 661, 673 [2011]; *People v Beckford*, 141 Misc 2d 71, 76 [Sup Ct, Kings County 1988] ["eyewitness confuses a person viewed in one context with a person observed in an entirely different situation"]).

Dr. Brainerd testified that unconscious transference occurs,

> "[W]hen a person identifies a suspect who happens to be familiar to them usually from the local context. Maybe they have seen him in the house, maybe on the bus, for example. And, if that person's picture shows up in an eyewitness identification, they will tend to identify that person."

(H4 44.)

> THE COURT: So, unconsci[ous] transference is basically the proposition, if somebody sees a face that they are familiar with, either in a lineup or an array, they will be sort of unconsciously drawn to that face?

104

THE WITNESS: Exactly.

(H4 45.)

Dr. Brainerd explained further that unconscious transference "is specific to a particular face, not to a gist like race or gender or age or body build" (H4 46). Studies show that this factor is additive and reduces the accuracy of eyewitness identifications along with the presence of other factors such as own race bias (H4 46).

Although Ms. Torres claimed that she was familiar with Mr. Mack "from the neighborhood," she did not specify any times or places of any prior viewing other than around noon on the day of the crime. When pressed, she merely described her prior viewings as "more than once" (T 357). She did not know this allegedly familiar person by name and did not describe any personal interaction with him.

Mr. Mack's jury instruction most relevant to this reliability factor asks jurors to consider:

> "Did the witness ever see the person identified prior to the day in question? If so, how many times did the witness see that person and under what circumstances? To what extent, if any, did those prior observations affect the witness's ability to accurately recognize and identify such person as the perpetrator?"

(T 762.)

This instruction merely prompts jurors to speculate about how prior observations might affect the witness's identification without providing any guidance on the risk of unconscious transference (*see People v Santiago*, 17 NY3d 661, 672 [2011] [recognizing

105

unconscious transference]). Notably, the judgment in *Santiago* was entered April 28, 2004

(*see People v Santiago*, 75 AD3d 163 [1st Dept 2010], *revd* 17 NY3d 661 [2011]).

Mr. Vacca had no knowledge of this reliability factor (H3 22). His failure to educate

jurors on "unconscious transference" was deficient performance that prejudiced Mr. Mack.

**(12) Counsel failed to object to inadmissible testimony and evidence about a non-blinded, photo-array procedure conducted with the People's single eyewitness.**

With respect to the fiasco created by Mr. Vacca's mishandling of all aspects

surrounding Ms. Torres's photo-array identification, the Monroe County Court (Dollinger,

J.) stated:

> "Defendant alleges that defense counsel was ineffective for 'opening the door' by questioning the eyewitness, Megan Torres, on cross examination about the photo array identification of the defendant. However, this 'opening the door' allowed the defense an opportunity to question Investigator Penkitis about other eyewitnesses to the attack that he showed photo arrays containing the defendant's photo, all of whom were unable to make an identification. Eliciting these non-identifications supported defense counsel's theory of the case that the identification was inaccurate or mistaken, and defendant was not in Rochester at the time of the killing. The testimony of all the non-identifications bolstered Mr. Vacca's attempt to discredit the photo array identification by Ms. Torres by suggesting that her father pressured her to make an identification."

(MCCD2 10.)

Judge Dollinger did not evaluate the prejudice caused to Mr. Mack by Mr. Vacca's

conduct. Instead, he made a limited ruling that Mr. Vacca supposedly had a legitimate

basis for "opening the door" to testimony about the photo-array identification. This limited

ruling omits any analysis of Mr. Vacca's deficient performance in failing to object to

receipt of the physical exhibit into evidence or the obvious prejudice that would flow from

having the unredacted photo array in the jury room during the deliberation. Because Judge Dollinger's ruling is limited to the "testimony" about the photo array and ignores the improper receipt of the physical exhibit into evidence, his conclusion that Mr. Vacca provided effective representation on the "'Inadmissible' Photo-Array Evidence" (MCCD2 10) is an objectively unreasonable application of *Strickland*.

Moreover, Judge Dollinger's limited ruling further ignores Mr. Vacca's alleged rationale for "opening the door" and then distorts logic to find an illusory benefit to Mr. Mack.

To begin, neither the People nor the court disputed Mr. Mack's central point: Under New York law (both today and in 2009), no proof of the photo-array identification was admissible. In 2009, CPL 60.30 limited proof of previous, out-of-court identification to *in*-person showups and lineups. Today, CPL 60.30 allows a previous, non-corporeal viewing but only if "the observation is made pursuant to a blind or blinded procedure." Here, the procedure was not an in-person viewing so it was inadmissible in 2009. Additionally, the procedure was not "blind or blinded" because Inv. Penkitis *knew* that Terrance Mack was the suspect in the array that Penkitis had prepared (H3 41). Therefore, even today, no proof about the photo-array would be admissible.

Next, Judge Dollinger ignored Mr. Vacca's bogus explanation for his conduct surrounding the photo array. When asked to explain how allowing this photo array (Defense Exhibit G) into evidence might benefit Mr. Mack (H3 38-40), Mr. Vacca testified about a persistent false memory:

"If I remember correctly, they had shown -- they had shown Torres a photo array lineup in this case and she couldn't identify anybody. And this was in October, I think, of 2008. 2007. It was right after the incident. That's my understanding. But -- yeah, date, 10/2/07. But then down the road she was able to identify my client on this. And my position was that because they showed her his picture – at that point in time she didn't know who it was, and had no idea who it was, *but after they showed her the array for a second time*, then she identified the person, and *my position was that she identified that person because of previously seeing him in the photographic array*."

(H3 40 [emphasis added].)

After agreeing that investigators displayed the photo array to Megan Torres on 10/24/2007, Mr. Vacca repeated his false memory:

"Correct, by Joe Dominic, who's now retired, and John Penkitis. And it's got witness, Megan Torres. She's got, that's the guy, and it's circled up at the top number three, but it's underneath number six. The only reason – *my position was, the only reason she was able to identify anybody in this, because she saw it before. They showed it to her before and pointed out who it was*."

(H3 41 [emphasis added].)

Q. And could you tell us how *Mr. Mack* may have benefitted from having the jury have that photo array in the jury room during deliberation?

A. Well, identification. I wanted to show that the police had created the identification. That she didn't know who he was before the 24th, and they showed it to her before then, then they showed it to her a second time, that's how – that's how *she* benefitted from it.

(H3 41 [emphasis added].)

When Judge Dollinger asked Mr. Vacca directly whether it was his understanding that the investigators showed the photo array to Megan Torres more than once, he

responded: "It's my understanding they showed her the array more than once. It may not be, I don't know, but that's my understanding." (H3 42.) Judge Dollinger continued, asking Mr. Vacca whether it was accurate to say that his strategy was to argue to the jury that the police showed Ms. Torres "an array containing Mr. Mack's picture on an earlier date and then shown another array containing Mr. Mack's picture on a later date" and "that process resulted in a suggestive identification." Without equivocation, Mr. Vacca responded, "Yes, sir." (H3 42-43.)

When asked about the clear prejudice to Mr. Mack that would result from having the unredacted exhibit in the jury room during deliberation, the following exchanges occurred.

Q. Do those handwritten notes where -- in a one witness identification case, handwritten notes under saying, *that's the guy*, how does that benefit Mr. Mack?

A. I couldn't answer that question.

(H3 43 [emphasis added].)

Q. Is there a possibility that could be detrimental to Mr. Mack, having the jury deliberate with that [exhibit] in the jury room?

A. Well, on this right here, they have number six, who is not Mr. Mack. And underneath that she puts, that's the guy. Number six, not Mr. Mack, that's the guy. It's in here.

Q. So you argued to the jury that she actually picked out number six?

A. Oh, I don't remember. I might've thought about it, I don't remember if I did.

(H3 44.)

The trial record fails to support Mr. Vacca's extemporaneous suggestion that he may have argued to the jurors that Ms. Torres selected photo #6 rather than photo #3 (Terrance Mack). When asked for a strategy reason for allowing Inv. Penkitis to testify about the photo array procedure, Mr. Vacca could not provide one. He implicitly agreed that such testimony would tend to bolster Ms. Torres's in-court identification and acknowledged that he never challenged the procedure for being *non*-blind (H3 44-47).

Given one last opportunity, Mr. Vacca maintained his position.

> THE COURT: What was your recollection with respect to how many times members of the Rochester Police Department showed a photo array to Ms. Torres?
>
> THE WITNESS: Twice.

(H3 138.)

Mr. Vacca's "strategy" reason for opening the door to testimony about the photo array procedure and for allowing admission of the unredacted physical exhibit into the jury room has no record support. Instead, Mr. Vacca's testimony on this subject appears to be a persistent, false memory that he developed many years earlier. Immediately before the *Wade* hearing in this case, at a time when Mr. Vacca should have been knowledgeable about the relevant facts, he stated:

> "Your Honor, this is the first I heard of this proposal,[16] and my position, in quickly thinking about it, is Miss Mack -- or Miss Torres was shown a photographic array on September 29th and could not identify Mr. Mack. She was then shown a photographic array on October 24th and she identifies Mr. Mack. That's my understanding."

---

[16] Mr. Mack's request to the People for a physical line-up.

(SH 4.)

The prosecutor responded,

"Actually, I can state on the record as an officer of the Court, I had Miss Torres in my office yesterday and she was not shown the array, nor was she shown any additional pictures, and I don't believe that she was shown any other arrays, as Mr. Vacca mentioned. I believe she was only shown the array on October 24th of '07."

(SH 5.)

At the *Wade* hearing, Inv. Penkitis confirmed the prosecutor's response. He showed Mr. Mack's photo array to Ms. Torres only once (October 24, 2007), more than three weeks after the crime (SH 9, 17.) She selected Number 3 (circled and initialed the number), not Number 6. Inv. Penkitis then wrote her response, "THAT'S THE GUY" onto the array (SH 20.) (*See* Defense Exhibit G).

In sum, Mr. Vacca had no valid strategy reason for allowing the photo array to come into evidence. He did not argue to the jury that the police showed the photo array to Ms. Torres twice or that Ms. Torres selected photo number 6 rather than photo number 3 (Mack). He did not attack any feature of the exhibit or assert that the exhibit or the identification procedure was somehow suggestive. For no discernable reason, Mr. Vacca asked Ms. Torres about the police showing her photographs where she identified Mr. Mack (T 359). Thereafter, the prosecutor stormed through the door opened by Mr. Vacca (T 381, 389, 418-420) and, during summation, used both the photo array exhibit and the procedure to bolster Ms. Torres's in-court identification testimony (T 738-739).

In contrast, if Mr. Vacca had consulted with an expert on memory, he may have developed a legitimate defense strategy. Dr. Brainerd testified regarding numerous challenges that Mr. Vacca could have made to the photo array identification, both at the *Wade* hearing and at trial.

As Dr. Brainerd explained,

"The procedures that are used in the original photo spread identification in a case - we know of specific aspects of those procedures, regardless of what the ruling is on them - will affect subsequent eyewitness identification. One of them I mentioned is post feedback information that's given to the witness when they make the identification will increase the confidence with which they give the identification at trial. So, discussing the procedures at trial that were used in the eyewitness identification for purposes of discussing that science wouldn't be the same thing as saying it was unduly suggestive because that's already been ruled on. It would just be the science."

(H4 73.)

First, Mr. Vacca could have educated jurors about the significance of conducting an identification procedure more than three weeks after the crime.

Q. Could you explain retention interval and explain does memory uniformly degrade over time?

A. So, retention interval in the context of a case like this refers to the length of time between the original events and the eyewitness identification. The rule is that in memory, initial reports are always more accurate than subsequent reports. That's just the way the memory works. And memory does not fade at a constant rate. Different memories fade at different rates. Verbatim memories, in particular, are literal verbatim memories of precise form of events. They fade the most rapidly. They fade rapidly. The gist hangs around. The gist is very stable. It's not fading very much, at least not across the first few weeks. A week can be a lifetime with a verbatim.

Q. To make sure I understand, a verbatim memory, did you testify, that that is sort of the aggregate of all the little features of a particular face that make that face unique?

A. Yes, and other things. Any kind of detail, any kind of surface detail that involves the crime, yes, it's true about the person's face, but it's true of other details in the crime of a literal verbatim in nature, they all fade rapidly.

(H4 40-41.)

Dr. Brainerd also testified about the "forgetting curve."

Q. What does the research show as far as when the most forgetting occurs?

A. It occurs in the first few hours and days, particularly the first three days after events.

Q. Would the research show that there is a significant drop in accuracy if the identification procedure is three weeks after the incident?

A. Yes, definitely.

(H4 41-42.)

Next, Mr. Vacca could have educated jurors about confidence malleability and post-event feedback.

Q. For example, if there is a photo array and the witness viewing the photo array has been told they identified a suspect, is that something that would potentially impact memory?

A. That's been extensively studied as a form of post-event feedback and, yes, that does. That increases the chances that in a subsequent identification, the same person is identified, and it greatly increases confidence in the identification.

(H4 47.)

Third, Mr. Vacca could have educated jurors about the best practices that the police should follow when creating photo arrays (H4 68 ["the fairness of the photo array"]),

> "[T]he fairest type of photo spread, the one that's least prone to false identifications just on the basis of the photo spread, is one that's constructed from witness descriptions of a suspect. So, first you have to have a suspect that can give you a detailed description of the suspect. You have to have a witness who can give you a detailed description of a suspect. Notice that right away you can just think ahead and say, oh, yes, that's probably going to be a reliable identification because this person has a good memory of the suspect . . . The witness gives a detailed description, and from that the photo spread is assembled. So, what is done is the lures, or distractors as they are sometimes called, the five pictures that aren't the suspect, are selected in such a way they too fit the witness's description so that, therefore, the suspect has to be identified on the basis of his or her unique facial features."

(H4 48.)

Importantly, nothing in this record shows that, on or before October 2, 2007 (when Inv. Penkitis created the photo array), anyone gave the police a description of a suspect matching Mr. Mack. Instead, the police apparently connected Mr. Mack to 310 Driving Park because he was a cousin of co-defendant Ebony Mack whose mother (Bessie Mack) lived at that address. To reduce the problem of "unconscious transference," Dr. Brainerd suggested an alternative method of selecting fillers for the array.

> "Well, so there is no way to get around in this case that the photo spread couldn't be constructed in the ideal way, at least based on my understanding the police didn't have a detailed description to work with. So, they couldn't have done that kind of array based on a witness description. The key thing they could have done in this case to eliminate lineup [un]fairness is to get rid of the familiarity effect. So, in this case where you have one face that's familiar and five strangers, the face stands out on the basis of familiarity. So, by having photos of other people from the neighborhood, then you would eliminate that all together. All the faces would be familiar, local faces."

(H4 49.)

Fourth, Mr. Vacca could have educated jurors about blind versus non-blind procedures.

> "[I]n the original APLS commissioned review of the eyewitness identification back in 1998, they laid down four rules for eyewitness identification that should be followed, and this was one of them. That the person who administers, the investigator who administers the eyewitness identification should be blind with respect to who the suspect is. They should not know who in the photo spread is actually the suspect in the case. So, when you have somebody who knows who the suspect is, this is like a classic conflict of interest situation. So, the person who is administering it is an interested party in what the results are, and, therefore, consciously or unconsciously can communicate things that move things in the direction that they want them to move."

(H4 49-50.)

Fifth, Mr. Vacca could have educated jurors about the need to videotape identification procedures.

> "Yes. One of the things that has been recommended in scientific reviews is every eyewitness identification be videotaped. So, it could be subsequently subjected to forensic analysis for the type of things we are talking about here, reliability factors."

(H4 50.)

Sixth, Mr. Vacca could have educated jurors about the need for proper instruction, such as informing the witness that the photo array may not contain a suspect (H4 68). The record of the *Wade* hearing contains no proof that the police gave this particular instruction to Ms. Torres.

115

On the subject of prior identifications, the relevant jury instruction given in Mr. Mack's case asks the jurors to consider:

> "When and under what circumstances did the witness identify the Defendant? Was the identification of the Defendant as the person in question suggested in some way to the witness before the witness identified the Defendant, or was the identification free of any suggestion?"

(T 762.)

Given that Mr. Vacca did not attack the photo-array procedure in any manner at all, this instruction would prompt jurors to give *undue credit* to the photo-array identification because, based upon the bolstering testimony of Inv. Penkitis, the procedure was seemingly "free of any suggestion." Moreover, Dr. Brainerd testified that allowing photo array evidence to come into a trial without any strategy to challenge its reliability would be damaging to the defense.

Q. Regarding what you just talked about, the photo array, if the attorney adopted a strategy to use the photo array procedure as being inherently suggestive and something that was going to be used to attack the in-court identification, do I understand you, you would advise the attorney to go into these flaws in the procedure itself?

A. Yes.

Q. Would you advise the attorney to allow the photo array itself to come in to the jury room with the notation, that's the guy, and number three circled?

A. Not without any context. That is to say, not without any testimony on the reliability factors that are associated with eyewitness identification because then all you have is the photo spread and the picture of the defendant and the fact that the defendant was chosen, that's all you have.

116

Q. If you're going to allow the photo array and all testimony about the photo array procedure to come in, would you advise the attorney to have a strategy on how to use flaws in the procedure to benefit Mr. Mack? (H4 74.)

A. Well, yes.

Q. And if there was no strategy to make those suggestions about what was wrong with the photo array procedure, would you advise the attorney not to open the door to the photo array coming into evidence?

A. Well, yeah. I mean, there is no purpose then. It's not going to be helpful if the opposite.

Q. It would be hurtful?

A. Yes.

(H4 74-75.)

In sum, Mr. Vacca had no valid reason for failing to object to the photo array, which contained damaging, hand-written notes (the initials "MT," a circle around number 3, and "THAT'S THE GUY"). When combined with the investigator's testimony about the unrecorded photo array procedure, this evidence improperly bolstered Ms. Torres's in-court identification testimony (*see People v Trowbridge*, 305 NY 471 [1953] [testimony by a police officer as to a previous identification of the defendant by another witness is inadmissible]). Thus, Mr. Vacca committed serious and inexcusable error by allowing the unredacted photo array to come into evidence, along with testimony from a police investigator who portrayed the unrecorded procedure as free from suggestion. The combined, prejudicial effect of these errors may have tipped the scales in favor of conviction (*compare Wilson v Mazzuca*, 570 F3d 490, 503-505 [2d Cir 2009] [On cross-

117

examination, the attorney opened the door to a photo array identification that was inadmissible under New York law. The attorney's misunderstanding of the legal issue was entirely unreasonable. Counsel's failure to seek redaction of a booking plaque hanging around the defendant's neck had no strategic explanation. In closing, the State relied upon the inadmissible evidence that would not have been admitted but for counsel's decisions at trial]).

Judge Dollinger found that Mr. Vacca had a legitimate basis for "opening the door" to testimony about the photo array procedure because it resulted in a benefit to Mr. Mack. This conclusion is objectively unreasonable because it unfairly distorts logic to the State's benefit. Judge Dollinger concluded that, "this 'opening the door' [by Mr. Vacca] allowed the defense an opportunity to question Investigator Penkitis about other eyewitnesses to the attack that he showed photo arrays containing the defendant's photograph, all of whom were unable to make an identification" (MCCD2 10). He added that, "Eliciting these non-identifications supported defense counsel's theory of the case that the identification was inaccurate or mistaken, and defendant was not in Rochester at the time of the killing." (MCCD2 10).

First, as a matter of logic and common sense, the failure of other witnesses to identify Mr. Mack as a participant in the assault only establishes that those other witnesses, for whatever reason, had no basis to make an identification. These non-identifications do not establish that the People's sole identification witness (Megan Torres) somehow made a mistake or that Mr. Mack "was not in Rochester at the time of the killing" (MCCD at 10). Similarly, Judge Dollinger's further conclusion that, "the non-identifications bolstered Mr.

Vacca's attempt to discredit the photo array identification by Ms. Torres by suggesting that her father pressured her to make an identification" is baseless. The non-identifications have nothing to do with any personal interaction between Ms. Torres and her father.

Second, Judge Dollinger's solitary focus on this illusory benefit to Mr. Mack ignores the significant, collateral damage caused by Mr. Vacca's "opening the door." In their closing, the People used Ms. Torres's non-identifications of suspects in five additional photo arrays shown to her to bolster her ultimate selection of Mr. Mack (T 738 [where the prosecutor argued that, out of 36 photographs, Ms. Torres selected Mr. Mack]).

The People also used Ms. Torres's interaction with her father to explain why she finally came forward - her father urged her to cooperate with the police (T 387, 416, 615) (*see* Ground 13). To be clear, nothing in the record suggests that her father directed her to identify Mr. Mack as a participant in the gang assault. Instead, responding to Mr. Vacca's open-ended question, Ms. Torres testified that she initially "was scared to identify anybody" but that her dad spoke with her and told her "that the right thing to do was to let them know what I saw" (T 358). Not recognizing how this testimony might increase Ms. Torres's credibility in the eyes of the jurors, Mr. Vacca elicited, for a second time, that she came forward after her dad told her "that the right thing would be to call [the police] and let them know what I saw" (T 362). During his closing, Mr. Vacca mentioned the father/daughter interaction only once: "She then says that she talked to her father. Her father said, you better call the police and cooperate" (T 711). Thus, contrary to Judge Dollinger's misanalysis of the photo array evidence, Mr. Vacca never suggested to the jurors that, "her father pressured her to make an identification" (MCCD2 10).

119

Without Mr. Vacca's inexcusable, opening-the-door blunders, the People's proof would have been Ms. Torres's alleged sighting of a suspect (09/29/2007) and then, almost twenty months later, an in-court identification (05/05/2009). In her closing, the prosecutor emphasized how this (inadmissible) evidence of a photo array identification was a compelling difference and greatly strengthened the People's case:

> "On October 24th, twenty-five days after Ms. Shaw's death, after looking at six separate photo arrays, thirty-six people, Megan looks at it, points to Number 3, the Defendant. She says, it is him. She says, that's the guy I saw. She says, that's the guy that hit her on the head with the bottle. *This is twenty-five days after, not May 5, 2009, when she IDs him in court.*"

(T 738 [emphasis added].)

**(13) Counsel asked an open-ended question that prompted the People's single eyewitness to bolster her in-court identification of Mr. Mack with new testimony.**

Like the People (*see* PHPM2), the Monroe County Court (Dollinger, J.) never addressed Mr. Mack's argument (PHDM2 70-76) that Mr. Vacca was ineffective for asking Ms. Torres why she finally came forward and why she could identify Mr. Mack during the incident. Both of these open-ended questions elicited damaging testimony.

As Mr. Vacca agreed, "a basic rule of cross-examination [is] that you try not to ask a question if you don't know the answer" where "the answer may hurt you" (H3 52). He added, "Second rule, never ask why questions" (H3 52). This rule parallels a basic tenet in the medical profession: "Do no harm."

Violating both rules, Mr. Vacca asked Ms. Torres why she could recognize Mr. Mack among a large, frantic group of individuals engaged in a street brawl, at night and

half-a-football-field away. This question resulted in her first-time explanation that Mr. Mack was "out front" of the group pursuing the victim (T 364-365). Although the prosecutor never elicited this explanation from Ms. Torres during direct examination, the prosecutor turned this answer into a key point of her summation (T 678-679, 688).

Violating both cross-examination rules for a second time, Mr. Vacca asked Ms. Torres why, more than three weeks after the crime, she came forward as a potential witness, even though, on the night of the crime, she told police she would not be able to identify anyone involved. That question elicited Ms. Torres's bolstering explanation she was initially scared to identify anybody but her father then encouraged her to do the "right thing" (T 358, 362). Once again, the prosecutor highlighting this explanation during her summation (T 680-681).

If Mr. Vacca's goal was to establish that it would have been extremely difficult for Torres to recognize Mr. Mack among a mob and that she was less credible because she did not come forward promptly to make an identification, he could have made both points on summation without the risk of eliciting damaging testimony.

When asked whether Ms. Torres's explanation about why she finally came forward would tend to bolster her testimony in the eyes of the jury, Mr. Vacca answered, "I couldn't give you a definitive answer, but I would just say no." (H3 55.) Not surprisingly, Mr. Vacca could not give any reason why such testimony might help Mr. Mack.

When asked to provide a strategy reason for asking Ms. Torres to explain her ability to identify Mr. Mack when the prior testimony had established that the scene was chaos, Mr. Vacca answered,

121

"Because it was my feeling that she couldn't pick him out, and you have to ask that question, or those lines of questioning, in order to get to the conclusion that he (sic) couldn't pick her (sic) out. I mean, that's the whole thing, he (sic) couldn't pick her (sic) out."

(H3 56.)

Notably, the record contained no prior statements or testimony from Ms. Torres that she picked out Mr. Mack because he was leading the pack that briefly chased the victim. Indeed, the People did not elicit this explanation during their direct examination of Ms. Torres. When asked whether he knew the answer to his open-ended question, Mr. Vacca responded,

"In other words, did I ask a question that I didn't know the answer to? There are some questions that you have to ask: Well, how'd you pick him out? He's, you know, marching or he's leading this pack, and how did you pick him out, how do you know who it was?"

(H3 57.)

On "cross-examination," the People tried to feed Mr. Vacca answers to create a strategy reason for asking Megan Torres why she could identify Mr. Mack out of the chaos. But their suggestion that Mr. Vacca intended "to lock the witness" into an answer and then to "break down each and every word in an attempt to" undermine the basis of her testimony (H3 114) fails to comport with Mr. Vacca's trial conduct. He never sought to impeach Ms. Torres with the complete omission of this claim (that Mr. Mack was supposedly leading the pack) from any of her prior statements. Instead, it was the People, during their summation, who highlighted Ms. Torres's defense-elicited testimony to shore up their case (T 678-679, 688).

122

On re-direct examination, Mr. Vacca finally admitted, without waffling or qualification, that he did not know the answer to his open-ended question.

Q. You asked Megan Torres how she could identify Mr. Mack with the chaos of the incident, and she responded that he was the one leading the pack.

A. Yeah.

Q. Did you know that that was going to be her answer?

A. Did I know that that was going to be her answer?

Q. Yes.

A. No.

(H3 140.)

Here, Mr. Vacca elicited "incriminating evidence against his own client, which is not part of any discernible or reasonably plausible trial strategy," thus depriving Mr. Mack of his right to the effective assistance of counsel (*People v Dietz*, 79 AD2d 476, 478-478 [4th Dept 1981]).

**(14) Counsel inadequately addressed the distance, the darkness, and the viewing angle.**

The Monroe County Court (Dollinger, J.) rejected Mr. Mack's argument that Mr. Vacca was ineffective for failing to establish: (1) that the viewing distance was 158 feet, (2) that it was dark (not dusk) because official twilight had ended before 7:30 p.m., and (3) that Ms. Torres's "viewing angle" could have reduced the accuracy of her identification (PHDM2 80-84). Judge Dollinger opined that Mr. Vacca had "directly addressed" distance, lighting, and viewing angle during his cross of Ms. Torres (MCCD2 9). More

specifically, Judge Dollinger agreed that proving it was dark because twilight had ended at 7:24 p.m. "is certainly a factor that the jury could consider in evaluating Ms. Torres's ability to accurately identify the defendant" (MCCD2 13). While Judge Dollinger did not dispute that no trial strategy could excuse this failure, he seemed to find no prejudice because "Mr. Vacca dedicated a portion of his cross examination to discrediting the identification in support of his alibi defense" (MCCD2 12-13). This cryptic rationale should be rejected.

Mr. Mack's conviction rests on identification testimony from a teenager who made her observation from the porch of 868 Dewey Avenue to the middle of the intersection of Dewey Avenue and Driving Park – a distance of 158 feet (H3 7) (not 100 to 150 feet).[17] At trial, Mr. Vacca was not prepared to contest the lesser limit of Ms. Torres's estimate (only 100 feet) because he did not verify the actual distance (H3 34, 93) although he commented, "It might've been a nice touch" (H3 94).

In addition, an expert could have explained the "foreshortening effect" that occurs with greater distances. As Dr. Brainerd described it,

> "If you stand on a railroad tracks and you look down the track, you can immediately see what happens. Right in front of you the ties are well separated. You can pick out all of them. And what happens, as you look in perspective, things move together, they're foreshortened, and everything blends together. So, the farther away you are, the more things are foreshortened and blended together and the more difficult it is to pick out individual people and objects and events."

---

[17] Megan Torres told the grand jury that she observed the street brawl from 100 to 150 feet away (A-312). During their opening, the People adopted this estimate of 100 to 150 feet (T 199). During direct examination, however, Ms. Torres testified that the distance was 150 feet (T 344).

(H4 29-30.)

While Mr. Mack's jury instruction asks jurors to consider, "What was the distance between the witness and the perpetrator?" (T 761), it failed to mention the foreshortening effect.

On September 29, 2007, in Rochester, New York, based upon Naval Observatory records, sunset was 6:56 p.m. and official twilight ended at 7:24 p.m. (H3 7-8; A-294) (*see People v Jackson*, 65 NY2d 265, 273, n 9 [1985] ["Defendant's brief notes that the United States Naval Observatory Almanac states that sunrise occurred at 5:53 a.m. on August 2, 1978. Although we can take judicial notice of that fact, it was not a fact before the jury"]).

Because the stabbing occurred at 7:30 p.m. and two prosecution witnesses (Megan Torres and Charnette Grayson) both claimed it was still dusk, not dark at that time, Mr. Vacca could have resolved this dispute in Mr. Mack's favor by asking this Court to take judicial notice of these official records. Nonetheless, Mr. Vacca did not do so. When asked if he could have provided the jury with objective proof of darkness, Mr. Vacca answered,

> "I probably could've. I could've called up some expert, like, you know, maybe a guy who's a meteorologist or whatever. But I can tell you this, okay, I've never had a meteorologist testify in any one of my trials, and there's been a lot of them. It's usually through a witness or multiple witnesses that describe it, and a lot of them mesh up together."

(H3 68-69.)

In addition, an expert could have explained the artificial lighting impairs a person's ability to discriminate colors and could distort descriptions of what color clothing people are wearing (H4 28-29.) The jury instruction given in this case asks the jurors to consider,

"What were the lighting conditions under which the witness made their (sic) observation?" (T 760.) It fails to mention the effects of color distortion.

Because that the attackers were running from the area of 310 Driving Park into the middle of the intersection of Driving Park and Dewey Avenue, a person sitting on a porch at 868 Dewey Avenue would only have had a side view of their faces. Studies of "angle" identification, instances where witnesses observe perpetrators in profile, show a significant reduction in accuracy relative to full-frontal observation. The results of such studies would be beyond the ken of a typical juror (as well as many attorneys) (H4 30-31.) Yet, contrary to Judge Dollinger's finding, Mr. Vacca never asked about "viewing angle" or argued to the jurors that Ms. Torres's identification might be less reliable because she only had a side view of the perpetrator.

**(15)   Counsel failed to impeach the eyewitness with the content of her 911 call.**

Like the People (see PHPM2), the Monroe County Court (Dollinger, J.) never addressed Mr. Mack's argument (PHDM2 74-76) that Mr. Vacca was ineffective for failing to impeach Ms. Torres with the content of her 911 call.

Initially, Mr. Vacca could not identify a strategy reason for this failure. (H3 36-37.) Later, he explained his alleged "decision not to play a 911 call" from Megan Torres (H3 101-102) in a manner that has no record support. Contrary to Mr. Vacca's memory of that 911 call, there were no people screaming in the background and it did not sound like "a chaotic scene" (H3 101). Furthermore, nothing in the call connected Mr. Mack to the incident. Although Mr. Vacca readily agreed with the prosecutor's friendly suggestion that

126

playing the 911 tape might somehow agitate the jurors and have them go down an unfavorable line of thought (H3 102), Mr. Vacca never gave any basis, supported by the record, for reaching any such conclusion.

On redirect examination, Mr. Vacca disagreed with the suggestion that "chaos" might be a good thing to establish when arguing that the eyewitness identification was unreliable. Instead, he feared that the jurors, hearing all this (non-existent) "screaming and yelling," might somehow conclude that Mr. Mack was present at the scene (H3 135-136.) This logic does not follow. In any event, the 911 tape contains no "chaos" presumably because, at that point, the attack was over.

Ms. Torres's 911 call, her first statement about the crime, would have been useful to the defense for three reasons. First, it would have been consistent with Mr. Vacca's chosen theme that "no men" were involved in this brawl. During the 911 call (Defense Exhibit F), when asked if she knew who stabbed the victim, Ms. Torres stated, "No. It was a whole group of girls." When asked again if she knew which one had the knife, Ms. Torres answered, "No, it was over like twenty girls." She never mentioned anything about a black male in a hat being involved.[18]

Second, the 911 call would have impeached Ms. Torres' trial testimony that she was on the phone with the police *during* the fracas. Clearly, she called after the fight was over.

---

[18] Charnette Grayson's original report to Officer Matthew Hill (A-117) and her supporting deposition (A-115-116) also makes no mention of any males. But Mr. Vacca never raised this omission during his cross-examination of Ms. Grayson.

127

Third, the 911 call would have produced another example of what would seem to be a false memory. Ms. Torres reported that the victim was stabbed with a presumably broken, glass bottle. At trial, during her direct examination, Ms. Torres did not mention any stabbing with a glass bottle. Furthermore, the medical examiner testified regarding stab wounds from a sharp object like a knife. She did not identify any wounds that would be consistent with a stabbing by a broken bottle. When asked why he did not use the 911 tape to impeach Megan Torres about this inconsistency or about her failure to mention the participation of any men, Mr. Vacca could not provide an answer (H3 35-37.)

Failing to impeach the eyewitness with the content of her 911 call was deficient performance that prejudiced Mr. Mack.

**(16) Counsel failed to object to impeachment testimony from the State's unnoticed, alibi rebuttal witness.**

In violation of fundamental fairness and due process (*see Wardius v Oregon*, 412 US 470 [1973]) and New York law (CPL 250.20 [2]), the People engaged in trial by ambush by calling an un-noticed, rebuttal alibi witness *after* Mr. Mack's witness (Jessica Smith) had already testified. Moreover, this witness (Inv. Samuel Soprano) made no notes during his pretrial interview of Ms. Smith, or, if he did, the People never disclosed such notes to the defense before the witness took the stand (T 694-695).

The Monroe County Court (Dollinger, J.) did not address whether Mr. Vacca's failure to object to the un-noticed alibi rebuttal testimony of Inv. Soprano was constitutionally deficient performance. Instead, Judge Dollinger ruled that Mr. Mack did

not prove, by some ambiguous standard of proof, that he suffered any prejudice. On its face, this ruling is an objectively unreasonable application of the *Strickland* analysis.

> "Defendant alleges that Mr. Vacca was ineffective for failing to make a meritorious objection to the People's rebuttal alibi witness. However, defendant's argument that a meritorious objection *would have resulted in preclusion* of the rebuttal alibi witness is speculative. Assuming that there was a timely objection, upon a showing of good cause, it was in the trial Court's discretion to: (1) overrule the objection; or (2) grant an adjournment; or (3) preclude the People's alibi rebuttal witness, Investigator Soprano, from testifying (CPL§§ 250.20[4]). An objection by the defense, if not summarily overruled, seems *as likely to have resulted in an adjournment as preclusion.* The adjournment is a relatively minor remedy that would not have been advantageous to defendant considering his theory of the case. The fact that Mr. Vacca failed to object to the testimony of the rebuttal alibi witness does very little to advance defendant's argument that Mr. Vacca was ineffective."

(MCCD2 11 [emphasis added].)

Disturbingly, Judge Dollinger never identified any conceivable basis for his suggestion that a defense objection for lack of notice might be "summarily overruled." To the contrary, Mr. Vacca had a meritorious objection to the receipt of any testimony from the People's un-noticed, rebuttal alibi witness (CPL 250.20 [2]). Inv. Soprano sought to impeach alibi testimony from Jessica Smith (T 588-594) with his own rebuttal testimony (T 689-693) about landline telephone records that supposedly contradicted her claim that she called Mr. Mack in Elmira at her landline telephone at various times during the day of the crime.

To be clear, the People would have sought to rebut Ms. Smith's alibi testimony whether, at trial, she agreed or disagreed with Inv. Soprano's memory of her unrecorded,

pretrial statement. Inv. Soprano recalled Ms. Smith telling him that, during the day, she called her landline telephone and spoke with Mr. Mack (T 689-693).

If Ms. Smith agreed with that version, then the People would have rebutted it with evidence establishing that the landline telephone records showed no calls during the relevant period (9:01 a.m. to 8:41 p.m.) (T 693-694).

If Ms. Smith disagreed with that version, then the People would have rebutted Ms. Smith's alibi testimony as they did. Ms. Smith recalled telling Soprano that Mr. Mack called her either on the landline or on his cellphone (T 590-592, 594). Soprano testified that she only said she called Mr. Mack on the landline and that those records contain no such calls (T 689-694). Curiously, Soprano did not obtain any telephone records from Ms. Smith's place of employment to resolve whether Ms. Smith placed calls to or received calls from Mr. Mack's cell phone (T 695-697).

As Mr. Mack alleged in his CPL 440.10 motion and proved at the hearing, the People never served the rebuttal alibi notice required for Inv. Soprano's testimony (CPL 250.20 [2]). Though a court has discretion to allow *service of a late notice*, the People never attempted such service.

In addition, there is good cause to believe that this trial court here would have precluded the rebuttal alibi witness had counsel properly objected on a lack-of-notice ground.

First, it was Mr. Vacca's dubious decision to provide the prosecution with copies of all witness statements procured by the defense investigator that prompted Inv. Soprano to meet with Jessica Smith and then obtain her landline telephone records. Under New York

130

law, Mr. Vacca had no obligation to provide statements from defense witnesses until *after* the People rested their case at trial (CPL 240.45 [2] [a]). Consistent with trial by ambush, Inv. Soprano made no "report" of his interview with Ms. Smith, took no written statement from her, and apparently took no notes of their conversation (T 694-695). Given this wide disparity in disclosure, precluding testimony from this un-noticed, alibi-rebuttal witness would have been a well-deserved sanction.

Second, it would have been inherently prejudicial to allow the People to proceed with testimony from an un-noticed, alibi-rebuttal witness after the defense had exercised its strategy to put Ms. Smith on the stand (*cf. People v Gonzalez*, 68 NY2d 424, 427-428 [1986] [missing witness instruction request untimely where it is made after the opposing party rests and cannot alter its trial strategy without prejudice]).

As stated by the Second Circuit,

> "There may, for instance, be cases in which the state learns information, in advance of the trial, that it knows with a fair degree of certainty will be useful in attacking the credibility of noticed alibi witnesses. In such cases, withholding notice of rebuttal witnesses until after the alibi witnesses have testified may be inadequate to meet the dictates of due process. And this may be so regardless of any continuance that the trial court might grant."

(*Fox v Mann*, 71 F3d 66, 70 [2d Cir 1995]; *see also Mauricio v Duckworth*, 840 F2d 454 [7th Cir 1988] ["Since the state knew in advance of trial that, whatever the alibi witnesses' testimony, the state would be able to launch a devastating counterattack, the failure to give pretrial notice created precisely the kind of unfair, irremediable surprise that, as *Wardius* held, violates due process," citing *Wardius v Oregon*, 412 US 470, 476 [1973]).

Third, the same trial court (Geraci, J.) had precluded a defendant from giving late alibi notice even though, in that case, a weightier interest (a defendant's constitutional right to present an alibi defense) was at stake (*People v Owens*, 26 AD3d 816 [4th Dept 2006]).

Mr. Vacca testified that he never received an alibi rebuttal notice for this witness from the People but could not recall why he did not move to preclude Soprano's testimony based upon a lack of this required notice (H3 73-74). The People did not offer any proof to counter Mr. Vacca's testimony or to justify their failure to provide notice. Thus, Mr. Mack established that the People did not provide the required notice and that Mr. Vacca had no legitimate explanation or reasonable trial strategy for failing to object.

Judge Dollinger's ruling that Mr. Mack suffered no prejudice because he did not establish that, if counsel had objected, the trial court would have granted preclusion is an objectively unreasonable application of *Strickland* because it puts a greater burden on a defendant than the Constitution requires.

Under the correct standard for determining prejudice, Mr. Mack only needed to show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding may have been different. Preclusion of testimony from an un-noticed witness was a viable remedy that had a reasonable probability of being granted by the trial court. Even Judge Dollinger himself saw a 50-percent chance of success, finding that a defense objection "seems as likely to have resulted in an adjournment as preclusion" (MCCD2 11). In other words, even Judge Dollinger viewed the expected remedy as a "toss up."

Given that the People used Inv. Soprano's impeachment testimony during summation to strengthen their argument (T 731), preclusion of that alibi rebuttal testimony, standing alone, could have changed the result of the trial.

**(17) Counsel gave an ineffective closing argument because he failed to give the jurors numerous reasons to doubt the accuracy of the identification.**

Mr. Vacca's primary flaw during summation was his failure to use the science of perception and memory to the benefit of Mr. Mack. Consultation with an expert, or at least doing some research into scientific studies and case law about common factors that reduce the accuracy of eyewitness identification would have given him an arsenal to undermine the People's case (PHDM2 79-80). In response to this general argument, the Monroe County Court (Dollinger, J.) portrayed Mr. Vacca's closing as "consistent with his trial strategy," stating that he "sought to discredit Ms. Torres's identification by highlighting the outside influences on her testimony including her father's pressure and previous viewings of the defendant prior to the photo array identification" (MCCD2 12).

Judge Dollinger's determination is inconsistent with the facts and logically flawed.

Mr. Vacca never argued that the father "pressured" Ms. Torres into making an identification. Instead, he merely repeated Ms. Torres's testimony "that that she talked to her father [who] said, you better call the police and cooperate" and the photo array identification (which was inadmissible but for Mr. Vacca's opening of the door) then followed (T 711.)

Judge Dollinger's suggestion that Mr. Vacca could discredit Ms. Torres's identification by highlighting her "previous viewings of the defendant prior to the photo

array identification" (MCCD2 12) makes no sense. "Previous viewings," if established by persuasive and specific proof, would tend to increase the reliability of an identification. The correct strategy would have been to discount Ms. Torres's claim of "previous viewings" because that claim was unsupported by any proof apart from Ms. Torres's memory and was much too vague to be credible. Instead, to Mr. Mack's detriment, Mr. Vacca seemed to agree, without qualification, that Ms. Torres recognized Mr. Mack's photo (T 712).

**(18)** **Counsel gave an ineffective closing argument because he needlessly required the jurors to adopt his theory that only women were involved in the attack and that all attackers came from a van.**

The Monroe County Court (Dollinger, J.) never addressed the merits of Mr. Mack's argument (PHDM2 79-80) that Mr. Vacca was ineffective by making two uncompromising arguments during his summation that may have pushed one or more jurors to accept the People's version of events (MCCD2 12).

When trying to persuade jurors, no competent attorney would take unnecessary, hardline stances on issues that might provoke jurors to reject the theory of defense. Yet, Mr. Vacca insisted (1) that no men were involved in the attack on Latasha Shaw (T 712-713, 718-719) and (2) that all of the attackers came from a black van or truck that pulled up near the intersection (T 723-724). This inflexible version of the event needlessly contradicted the People's version in a manner that may have alienated some jurors.

First, Megan Torres and Charnette Grayson both testified that men participated in the assault. Even defense witnesses agreed that men were present at 310 Driving Park (such as Jerome Walker and James Jenkins). Nevertheless, Mr. Vacca argued, in

134

uncompromising fashion, that "no men" were involved (H3 75). He never suggested to the jurors that, even if men were involved, none of them was Mr. Mack. Instead, he insisted that young Jasmine Shaw had "acquitted" Mr. Mack because she saw no men during this brief attack (T 718). The prosecutor brushed aside this exaggeration by pointing out that Jasmine turned her back to the fracas and ran away (T 732).

Alternatively, if Mr. Vacca reasonably believed that Mr. Mack's best chance for an acquittal was to maintain that only women were involved in the attack, then he could have done a much better job of promoting this theory by impeaching both Ms. Torres and Ms. Grayson with prior statements where they failed to mention the involvement of any men.

Second, Charnette Grayson and Jasmine Shaw both testified that the attackers came off the porch of 310 Driving Park. Nonetheless, Mr. Vacca argued, in uncompromising fashion, that the attackers came from a motor vehicle that pulled up near the crime scene, in a parking area next to the house at 310 Driving Park. He never suggested to the jurors that, even if some, or all, of the attackers came off the porch of 310 Driving Park, none of them was Mr. Mack.

When asked about presenting alternative arguments (even if men were involved and even if attackers came off the porch, the jury could still find that Mr. Mack was not involved) (H3 76-78), Mr. Vacca responded: "I think I did pretty much argue that in the alternative" (H3 78). Mr. Vacca's response has no record support.

Mr. Mack admitted that, "Standing alone, this uncompromising argument may fall into the category of unsuccessful, but-not-ineffective trial strategy" but argued that, "it adds one more error to the mountain of errors that permeated this trial." (PHDM2 80). Judge

135

Dollinger seized upon this admission as a basis to deny the CPL 440 motion (MCCD2 12) without addressing how these unsuccessful tactics increased the overall prejudice to Mr. Mack.

**(19)  Counsel did not elicit how Mr. Mack did not match Ms. Torres' description of the suspect.**

The Monroe County Court (Dollinger, J.) never addressed Mr. Mack's argument (PHDM2 80-81) that Mr. Vacca was ineffective for failing to elicit significant differences between Mr. Mack's physical description and Ms. Torres's physical description of the suspect.

At trial, Megan Torres testified that the perpetrator who she identified as Terrance Mack was 5'5" to 5'6" in height, 20 to 25 years in age and had an average build (T 376-379). At the CPL 440 hearing, Mr. Vacca acknowledged that, according to Mr. Mack's prisoner data report, he was 5' 10" in height, 29 years in age and 200 pounds (H3 72; Defense Exhibit K). Mr. Vacca could not provide any coherent reason for failing to establish for the jurors that Mr. Mack was *taller*, *older*, and *heavier* than the suspect description (H3 72-73).

At the CPL 440 hearing, Mr. Vacca amazingly agreed with the prosecutor's leading question that disclosing these significant physical differences to the jury would "detract from the bigger picture, which is the alibi" (H3 123-124). This feeble excuse fails the straight face test.

136

**(20) Counsel did not ask the jailhouse informant about the facts of the crime underlying his youthful offender adjudication.**

At trial, Mr. Vacca knew that the last-minute jailhouse informant (Ronaldo Donald) had a youthful offender adjudication for a robbery conviction *in addition* to his felony conviction for a knifepoint robbery (T 423-424). Mr. Vacca could not recall whether he cross-examined Donald about the facts underlying his youthful offender adjudication for robbery (H3 69-70). Clearly, he did not (T 432-448). Mr. Vacca did testify: "You could try, but the other attorney might object. So what you do in that situation, you always dip your toe in the water to see how far you can get. That would be my answer." (H3 70.) But Mr. Vacca never tried to dip his toe into any water and gave no legitimate explanation for this omission.

The Monroe County Court (Dollinger, J.) wrongly described the jail informant's youthful offender adjudication as arising from a misdemeanor (MCCD2 13). To the contrary, robbery in the third degree is a felony. Judge Dollinger also wrongly described Mr. Mack's argument as being a claim that Mr. Vacca conducted no cross-examination about Donald's prior record. To the contrary, Mr. Mack's claim focused on Mr. Vacca's failure to ask Donald about the facts underlying his commission of robbery in the third degree (PHDM2 81).

Mr. Vacca did not offer any strategic reason for failing to impeach Mr. Donald by delving into his commission of robbery in the third degree. Moreover, a court could not have adjudicated Mr. Donald as a youthful offender without a conviction (plea or verdict) for his criminal conduct. Judge Dollinger's rank speculation that, "Mr. Vacca could

137

justifiably have not wanted to give Mr. Donald an opportunity to deny or explain his prior criminal conduct" (MCCD2 13) is baseless and meritless. Where the goal is to attack the jailhouse informant as a liar, no competent attorney would refrain from impeaching the informant's credibility by showing his commission of a prior felony. The slight chance that Donald might try to deny or explain away his criminal conduct would still tend to reduce his credibility in the eyes of the jurors. Because Donald's testimony about Mr. Mack's alleged admission was critically important to the People's case, Mr. Vacca's failure to impeach him with his commission of a second robbery was deficient performance that prejudiced Mr. Mack.

**(21) Counsel did not object to the prosecutor's erroneous closing statement about Mr. Mack's relationship to all of the defense witnesses.**

The Monroe County Court (Dollinger, J.) never addressed Mr. Mack's argument (PHDM2 82) that Mr. Vacca was ineffective for failing to object when the prosecutor argued to the jurors that all of the alibi witnesses were blood relatives of Mr. Mack.

During summation, the prosecutor asked the jurors to reject the testimony of Mr. Mack's witnesses because they were all blood relatives (T 729).[19] That statement was untrue. Shatora Hampton (age 16) was not a blood relative (T 637; A2 158). Mr. Vacca inexplicably missed this important error and failed to raise any objection.

Q. Well, Shatora Hampton was an alibi witness, right?

A. Right.

---

[19] Notably, three of the uncalled defense witnesses (Christopher Travis White, Jerome Walker, and Sonia Spaight) were not blood relatives.

Q. And she wasn't a blood relative.

A. Again, there might be something in there that would refresh my recollection on it, but I don't remember that.

Q. Okay. So assuming that she was not a blood relative, can you give us a strategy of not objecting when the DA makes the statement that all of the alibi witnesses were blood relatives?

A. Well, that's not relevant because I thought they were blood relatives, so I wouldn't even get to that point of what if they're not blood relatives. So during the trial my frame of mind was not thinking about, well, what if they're not blood relatives because I thought they were blood relatives.

(H-79.)

As the transcript shows, Mr. Vacca asked Ms. Hampton if she was related to Mr. Mack and she testified "nope" (T 637). A competent attorney would have recognized the prosecutor's error during summation and would have objected to the prosecutor's misstatement of an important fact that was clearly favorable to the alibi defense and contrary to the People's theme. Mr. Vacca's silence may have led jurors to believe mistakenly that the prosecutor's erroneous claim about every defense witness being a blood relative of Mr. Mack was correct.

**(22) Counsel never obtained any telephone records.**

Mr. Vacca never obtained telephone records for Mr. Mack or any defense witness (H3 74-75). The People stipulated that, at the time of the CPL 440 proceeding, such records were no longer available to the defense from the telephone companies (H3 8). Nonetheless, the Monroe County Court (Dollinger, J.) concluded:

139

"Defendant argues that Mr. Vacca was ineffective for failing to subpoena and obtain the defendant's cell phone records. This argument is also belied by the record which reveals that the defendant was using multiple cell phones at the time of Ms. Shaw's killing and he was unsure of which cell phone he was using at the time. It would have been impossible for Mr. Vacca to subpoena the cell phone records for a phone that he could not identify."

(MCCD2 13.)

This conclusion reveals a cursory, less-than-fair-minded analysis. If the prosecution could subpoena Mr. Mack's cell phone records (A2 175-183), it would seem that a competent attorney could do the same. In fact, Mr. Vacca could have requested that the People provide him with copies of their subpoenaed records. Instead, he only asked for copies of the subpoenas, not the records (Minutes of 01/21/2009 at 5).

In addition, Mr. Mack faulted Mr. Vacca for failing to obtain the telephone records from the Elmira alibi witnesses. Mr. Vacca should have been able to obtain telephone numbers from these cooperative witnesses (*see* A2 174 [Precious Scott]; A2 147, 154 [Jessica Smith]). Indeed, the People obtained Jessica Smith's landline records and, without serving notice, attempted to rebut her alibi testimony with Inv. Soprano's inadmissible testimony about the content of these unadmitted records (*see* Ground 16). And, in his closing statement, Mr. Vacca even mentioned that Ms. Scott testified about speaking with Mr. Mack on the telephone "around 5:00 or 5:30" (T 722). Jurors may have wondered, "where are these records?"

Judge Dollinger also found Mr. Mack's argument to be speculative because the records may not have supported an alibi defense. "If the cell phone records showed that the defendant's cell phone was present in the area of Dewey and Driving Park, it would

140

have been devastating to his alibi defense" (MCCD2 14). In essence, Judge Dollinger sanctioned an attorney presenting an alibi defense while, at the same time, ignoring telephone records that the People could obtain and potentially use to devastate the defense. This Court should find Mr. Vacca's head-in-the-sand approach to litigation to be constitutionally deficient performance.

Given the unique circumstances of Mr. Mack's case, this Court should assume prejudice. The People have never denied possessing Mr. Mack's telephone records but, tellingly, have never used them to impeach his trial testimony. When Mr. Mack explicitly asked for copies of these records for the CPL 440 proceeding (A2 24, 61-62, 95-97), the People refused (A2 1071-1073, 1076-1077) and Judge Ciaccio declined to order disclosure (Minutes of 08/30/2017 at 2). Based upon the unfortunate passage of time, these telephone records were no longer available to the defense by subpoena (A2 292-293; H3 8).

**(23) Counsel never elicited evidence regarding his arrest date and immediate report of an alibi defense.**

The Monroe County Court (Dollinger, J.) never ruled whether this particular failure was deficient performance. Instead, he focused on the claim of prejudice:

> "Defendant alleges that Mr. Vacca should have elicited testimony regarding the circumstances of defendant's arrest and the timing of his reported alibi. A significant portion of this would not have been admissible and to the extent that it was admissible. Defendant has failed to demonstrate that this failure was prejudicial to his alibi defense."

(MCCD2 14.)

Mr. Vacca failed to elicit from Mr. Mack that, when arrested, more than thirteen months after the crime, he immediately told the police that he was in Elmira, not Rochester.

141

This evidence would have rebutted the People's claim that Mr. Mack's trial testimony was a recent fabrication that the jury should disbelieve. Mr. Vacca's response to this issue is informative.

> Q. Okay, now switching -- would the day of Mr. Mack's arrest and his immediate statement of an alibi, would that have been relevant information for the jury to hear?
>
> A. What, his date of arrest?
>
> Q. His date of arrest and the fact that when he was arrested he immediately said he was in Elmira.
>
> A. He testified to that.
>
> Q. Your recollection is you brought out on his direct examination the date of his arrest?

(H3 49-50.)

> Q. And if Mr. Mack -- if there was evidence before the jury that Mr. Mack upon arrest immediately, and before any alibi witnesses were identified, said that he was in Elmira, is that relevant information for the jury to consider on whether the alibi defense was sound?
>
> * * *
>
> THE WITNESS: Yeah, and I'm sure that one way or another the fact that the defendant was arrested and maintained his innocence from the start was brought out glowingly before the jury, especially on opening statements, okay, of both the DA and the defense and also in closing statements, along with the proof. I mean, why would you not want to have the jury feel or understand that your client maintains his innocence. That's the whole reason you have the trial and you litigate, the guy was innocent. Is innocent.

(H3 50-51.)

142

The trial record contains no showing, however, that the jurors ever received this vital information. At the time of the *Wade* hearing, the People withdrew their CPL 710.30 notice regarding Mr. Mack's post-arrest statements (SH 6, 34) and they chose not to call the three police investigators who went to Elmira to arrest Mr. Mack as witnesses at his trial.

The People's theory was that the alibi defense was a recent fabrication by Mr. Mack and his "blood" relatives who were motivated to lie to help Mr. Mack to achieve an acquittal. To counter this theory, a competent attorney would have brought to the jury's attention that, upon his arrest, Mr. Mack immediately insisted that he was in Elmira, not Rochester.

At a minimum, establishing Mr. Mack's date of arrest - more than 13 months after the crime - could have given jurors a proper context to evaluate the police investigation and would help explain any memory lapses by defense witnesses. The People never presented any proof to explain the significant delay in arresting Mr. Mack perhaps because Mr. Vacca simply failed to raise the issue. Based upon the People's proof at trial, the police developed no new evidence against Mr. Mack between the photo-array (10/24/2007) and Mr. Mack's arrest (11/04/2008).

**(24)** **Counsel failed to object to the court taking the verdict without addressing the jury's request for instruction on the law and a read-back of testimony.**

Deeply concerned about the integrity of this verdict, three New York jurists[20] voted to reverse Mr. Mack's conviction and grant him a new trial without regard to Mr. Vacca's performance. Whether the twelve jurors who decided Mr. Mack's fate rendered a guilty verdict based upon a correct understanding of the law is open to serious debate.

As the Appellate Division recognized on Mr. Mack's initial appeal:

> "[T]here are few moments in a criminal trial more critical to its outcome than when the court responds to a deliberating jury's request for clarification of the law . . . [T]he request for a readback of the instruction on reasonable doubt, the determination of which is the crux of a jury's function, and for a readback of the instruction regarding the importance of a single witness in a case versus multiple witnesses, demonstrates the confusion and doubt that existed in the minds of the jury with respect to . . . crucial issue[s]."

(*People v Mack*, 117 AD3d 1450, 1451 [4th Dept 2014] [3-1 decision], *revd* 27 NY3d 534 [2016] [6-1 decision], *affd* 142 AD3d 755 [4th Dept 2016] [3-2 decision]).

To comply with Due Process, a guilty verdict must arise from the unanimous finding of twelve jurors that the State has proven the defendant's commission of the crime beyond a reasonable doubt (*In re Winship*, 397 US 358, 364 [1970]; *see also Jackson v Virginia*, 443 US 307, 315–316 [1979]). As a matter of fairness and common sense, such a critical finding must rest upon a correct understanding of the phrase "reasonable doubt" by each juror (*see e.g. Cage v Louisiana*, 498 US 39, 41 [1990] [reversed where "a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof

---

[20] Hon. Jenny Rivera, Hon. Henry Scudder and Hon. Edward Carni.

144

below that required by the Due Process Clause"]). As Mr. Vacca agreed, "Beyond a reasonable doubt is the most important instruction to a defendant in a criminal case" (H3 83).

Similarly, as Mr. Vacca also agreed (H3 83), the once-delivered instruction on "the importance of a single witness in a case versus multiple witnesses" (T 759-762) was critical to Mr. Mack's case. Although the instruction could have been even better, it still described key factors for the jurors to consider when determining the accuracy of an identification by a single witness. One or more jurors wanted further instruction on these reliability factors. Because the trial court took the verdict without providing the requested guidance, any confidence in the correctness of the verdict must suffer. Indeed, the once-deadlocked jurors did not hear this powerful reminder:

> "Our system of justice is deeply concerned that no person who is innocent of a crime be convicted of it. In order to avoid that, a jury must consider identification testimony with great care, especially when the only evidence identifying the Defendant as the perpetrator comes from one witness."

(T 759.)

Another troubling aspect of this jury's post-deadlock deliberation is the "verdict by starvation" component. The jurors wanted instruction on the law, testimony re-read, and a smoke break. Yet, for nearly two hours (6:02 p.m. to 7:51 p.m.), the jurors heard nothing from the court. As Mr. Vacca further explained:

> "I always have concerns with a verdict when the jury's out, but especially on the weekends or on a Friday. Because of lot of times they're picked on a Monday and they have a verdict on Friday and the jurors can't wait to get home. Friday is the least friendly of defense strategies."

145

(H3 87.) Stated plainly, after nearly two hours of unexplained isolation, these tired, information-starved jurors (including two smokers) were ready to go home.

When reversing the Appellate Division, the New York Court of Appeals *did not address* whether a defense attorney's failure to object to the taking of a verdict without any court response to substantive jury requests constitutes *ineffective assistance of counsel*. Instead, the Court held that, where an attorney fails to object to the trial court's procedure, any error flowing from the lack of a meaningful response to outstanding jury requests is *unpreserved* for appellate review. "The question is not whether the trial court erred. Rather, the issue is whether the alleged error constitutes a mode of proceedings error requiring automatic reversal despite the lack of preservation" (27 NY3d at 540).

The Court of Appeals rejected an automatic-reversal rule for at least two reasons: (1) to avoid attorney gamesmanship, and (2) to allow for those special situations where an attorney might have a legitimate reason for not wanting further deliberation by a jury:

> "Defendant's rule would also incentivize a distinct tactic that diminishes the preservation rule. Here, the defense *may have made* a strategic choice not to challenge the trial court's procedure. Counsel, who was aware that the jury's last note before the recess declared a deadlock, *may have decided* that the *jurors were more likely to acquit defendant* if they were not given the chance to deliberate further."

(27 NY3d at 543 [emphasis added] [citation omitted].)

To be clear, the Court of Appeals did not conclude that *Mr. Vacca* thought that the jurors were more likely to acquit *Mr. Mack* if they were not given the chance to deliberate further. Instead, the Court recognized that, in a particular case, an attorney might have a

146

reasonable basis for concluding that answering a jury request, rather than taking the verdict, could reduce the defendant's chance for an acquittal.

The Court further explained its rationale for rejecting an automatic-reversal rule.

"In such situations, if the alleged error is deemed to be a mode of proceedings error, it would be unwise for counsel to object and seek correction of the error. If the verdict is an acquittal, counsel will have secured the desired trial outcome. If the jury convicts the defendant, counsel will have created an appellate issue requiring automatic reversal and a new trial simply by remaining silent. We decline to create a rule that would incentivize such tactics and would diminish the important purposes underlying the preservation rule."

(27 NY3d at 543-544 [internal quote and citation omitted].)

In other words, the Court of Appeals assumed, for the sake of argument only, that an attorney might have a legitimate reason for wanting to take the verdict: an actual belief that avoiding further deliberation may increase the likelihood of an acquittal. Assuming the existence of this legitimate reason ("In such situations"), the Court then explained how adopting an automatic reversal rule would create a no-lose proposition for defendants and encourage attorneys to remain silent. The Court viewed this sort of gamesmanship (remaining silent and taking a verdict to create an automatic-reversal issue for appeal) as an *illegitimate* reason for an attorney's silence. An attorney may remain silent if the attorney truly believes that such conduct will increase the defendant's chance for an acquittal. On the other hand, an attorney *must object* to the taking of a verdict if the attorney believes that a court response to unanswered jury requests will increase the likelihood of acquittal.

The Monroe County Court (Dollinger, J.) incorrectly treated the Court of Appeal's assumption that an attorney might have a legitimate reason for remaining silent, as *a finding of fact* that Mr. Vacca's silence (unexplained on direct appeal) was not ineffective representation. Judge Dollinger conflated the Court's holding about an *issue of law* involving the preservation requirement with Mr. Mack's claim of ineffective representation, erroneously describing these two separate matters as "this issue."

> "Defendant argues that Mr. Vacca was ineffective in his handling of unaddressed jury notes. He alleges that defense counsel was ineffective for not objecting to the Court taking the verdict without requesting clarification from the jury, and then not polling the jury on that issue. *This issue has been the subject of extensive appellate review.* As the Court of Appeals held, 'the defense *may have made* a strategic decision not to challenge the trial court's procedure. Counsel, who was aware the jury's last note before the recess declared a deadlock, *may have decided* that jurors were more likely to acquit defendant if they were not given the chance to deliberate further. In such situations, if the alleged error is deemed to be a mode of proceedings error, "it would be unwise for counsel to object and seek correction of the error"' (*People v Mack*, 27 NY3d 534, 543-544 (2016]). *As the Court of Appeals points out, defense counsel had reasonable grounds* to not try to further deliberations and, to the extent that counsel was aware of the recent case law at the time, it might be considered unwise to object to clear up the record. Thus, the defendant's claim of ineffective assistance of counsel on this ground must fail."

(MCCD2 14 [emphasis added].)

Judge Dollinger failed to address Mr. Vacca's articulated basis for his performance (silence) or the prejudice it caused to Mr. Mack. Judge Dollinger's conclusion is an objectively unreasonable application of *Strickland* because it merely adopts the Court of Appeals' hypothesis (some attorneys may have a strategic reason for their silence) as an established fact to excuse Mr. Vacca's inaction.

148

Most significantly, Mr. Vacca's alleged reason for failing to object is different from the legitimate reason that the Court of Appeals assumed might exist in a unique case. Mr. Vacca never claimed that he thought Mr. Mack had a better chance of acquittal if the trial court accepted the verdict without providing the jurors with their requested instructions on the meaning of reasonable doubt and the importance of a single witness in a case versus multiple witnesses. To the contrary, Mr. Vacca readily agreed that both instructions were crucial to Mr. Mack's case (H3 83) and admitted that he had no information on the numerical split of the jurors (H3 81). Given the recognized importance of the requested instructions, coupled with a genuine concern that the post-deadlock circumstances created the risk of "verdict by starvation," the strongest inference is that the jurors were much more likely to acquit Mr. Mack with these defense-friendly instructions than without them.

Mr. Vacca's sole basis for not objecting to the taking of the verdict without a court response to the jury requests was his dubious claim that he thought that he was "preserving" a mode-of-proceedings error for Mr. Mack's appeal. However, as the Court of Appeals held, that motive would be an illegitimate reason for staying silent.

While Mr. Vacca may have (unknowingly) "created" a temporary issue for appeal by his unprofessional silence, he did not "preserve" anything. Tellingly, Mr. Vacca never once suggested that he anticipated the Appellate Division's initial determination and, based upon his review of case law, expected an automatic reversal. Similarly, and despite Judge Dollinger's untethered, passing reference to legal research ("to the extent that counsel was aware of the recent case law at the time") (MCCD2 14), Mr. Vacca never testified that he did any legal research that led him to believe an automatic reversal for remaining silent

149

was a possibility. As one appellate justice noted, the relevant statute (CPL 310.30) "does not expressly require the court to respond to a note that is followed by an announcement from the jury that it has reached a verdict. *Nor is there any case law* specifically directing trial courts to respond to outstanding notes under such circumstances." (*Mack*, 117 AD3d at 1452 [Lindley, J., dissenting] [emphasis added].) Ironically, Mr. Mack's initial success with the Appellate Division was the first case in New York State to declare (temporarily) that taking a verdict without addressing a substantive jury note is a mode of proceedings error.

In theory, a trial attorney, experienced in appellate practice, may have anticipated the Appellate Division's original *People v Mack* decision. Yet, Mr. Vacca's testimony at the CPL 440 hearing does not establish such clairvoyance or legal scholarship. Instead, it shows Mr. Vacca's general misunderstanding of how a mode-of-proceedings error affects an appeal and suggests that he simply tailored his testimony to match his misreading of the Court of Appeals' decision in *People v Mack*.

Overly eager to portray his silence as reasonable conduct, Mr. Vacca latched onto the phrase "mode of proceeding" error, several times attempting to inject the phrase into his answers on preliminary questions (H3 80-82). When the questioning became relevant to this topic, the following exchange occurred:

Q.   So -- and you know the question's coming up. Why didn't you object to the taking of the verdict without the Court in some way responding to the outstanding jury notes?

A.   Because this is a mode of proceeding, okay? And you know that. It's a mode of -- it went up to the Appellate Division, it went to the second -- it went to

the Court of Appeals. If I had objected, okay, I wouldn't have preserved the issue for appeal for my client. If I didn't object, I had preserved the issue for appeal. In fact, that's what Judge Fahey says. Judge Fahey says, the defense attorney did the smartest move possible.

(H3 84.)

Q. Did you make the conscious decision that you didn't want the Court to respond to these jury notes?

A. Correct.

Q. And what did you base that decision on?

A. I just based that decision because if I objected to the note, it wouldn't give me an issue for appeal, which it ultimately gave me an issue for appeal, and we're partially here today because of that.

Q. And did the Court of Appeals say that you should object when you have outstanding jury notes or if you don't object you waive the issue? (H3 85).

A. The Appellate Division --

THE COURT: Hold on, hold on, hold on. All right, Mr. Juergens, I don't think that's relevant for the purpose of this hearing.

MR. JUERGENS: Well, it's basically -- I just want Mr. Vacca to tell us why he didn't object and ask the Court to address the outstanding jury notes, what was his --

THE COURT: Well, I think he's told you.

MR. JUERGENS: -- strategy?

THE COURT: We know what the Court of Appeals says about it.

MR. JUERGENS: Well, that - -

THE COURT: That's a legal --

MR. JUERGENS: I didn't bring that up.

151

THE COURT: Hold on.

MR. JUERGENS: I'm sorry.

THE COURT: A couple of Mr. Vacca's answers have been non-responsive in some respects, but . . .

The point of this hearing is whether Mr. Mack was provided effective representation at the trial. *So Mr. Vacca told you that the reason that he didn't object was so that the issue would be preserved for appeal.* Whether the Court of Appeals says he should've or shouldn't have, that's not relevant for the purpose of this hearing, at least with respect to his testimony.

(H3 85-86 [emphasis added].)

When asked whether, under the circumstances, answering the jury notes "would've been helpful to Mr. Mack," Mr. Vacca answered, "No, because we had an appeal issue" (H3 87-88).

On the People's "cross-examination," Mr. Vacca agreed that he made "a tactical decision not to address" the outstanding jury notes "because [he] had an appealable issue" (H3 126).

> Q. So you had a decision to make when you saw that note that came in that there was a verdict. You knew that you had the option to object to those notes, or address those notes, or you had the option to take the verdict and proceed forward, right?
>
> A. Right.
>
> Q. And based on your training and experience, you made the judgement call as the lawyer to preserve the appellate issue over addressing it because it was more beneficial to Mr. Mack than addressing it?
>
> A. Which I did.
>
> Q. Which is what you did.

152

A.	And ultimately the Appellate Division agreed.

Q.	So you were trying to make a tactfully wise decision like that?

A.	Why would you give up an appealable issue?  I'm trying the whole case.

THE COURT: Hold on, hold on.  It's a yes or no answer.

Q.	You did that because that was the best, most prudent thing in your professional judgement to help Mr. Mack?

A.	Yes.

Q.	And it ultimately did help Mr. Mack –

A.	Yes.

Q.	-- in the sense that his case is still pending now --

A.	Right.

Q.	-- partially because of that decision?

A.	Yep.

(H3 127-128.)

Contrary to this friendly consensus, Mr. Vacca's silence did not "ultimately help" Mr. Mack.  The Court of Appeals reversed the original reversal because Mr. Vacca did *not* object and, therefore, did *not* preserve any error flowing from the trial court's failure to instruct the jurors on the meaning of reasonable doubt and the importance of a single witness in a case versus multiple witnesses.  Moreover, the case is "still pending now" not because Mr. Vacca somehow made a wise decision not to object.  Instead, the case is still pending now because, in 2009, Mr. Vacca deprived Mr. Mack of a better chance at an acquittal (or at least a hung jury) by not demanding a court response to the jury requests.

153

Given one last opportunity to explain his position, Mr. Vacca showed his misreading of what the Court of Appeals wrote in *People v Mack.*

Q.    Good afternoon.  When the verdict note came in, you thought you had an appealable issue.  Explain that?

A.    The mode of proceeding issue --

Q.    Okay.

A.    -- okay?  That's why this was reversed on appeal.  And I think it went up to the Court of Appeals, and it came back down, and it came back down again, back, back, back, back, back.  If I objected, if I objected, I would've lost an appealable issue.  In fact, I believe that Judge Fahey said that.  He said, the defense attorney did the smart move.  If in fact, he objected –

THE COURT: Hold on, hold on. Mr. Vacca, again, hold on.  Don't talk -- it doesn't matter what the Court of Appeals say.

THE WITNESS: Okay.

THE COURT: At the time when you got the juror note --

THE WITNESS: Right.

THE COURT: -- just before the verdict, did you have a -- I think what Mr. Juergens is going to ask, and really the ultimate issue here is, did you have a strategic reason for not objecting or did you just fail to object because you didn't perceive it as an issue?

THE WITNESS: It was a strategic reason.

THE COURT: Okay.

(H3 128-129.)

154

Contrary to Mr. Vacca's misunderstanding, he did not *preserve* any error by failing to object and Judge Fahey never said that Mr. Vacca "did the smart move." Instead, the Court of Appeals concluded that, if a court's failure to respond to a substantive jury request is a mode-of-proceedings error, then, in theory, an attorney, by remaining silent, could create a no-lose scenario for the defendant: a possible acquittal by taking the verdict or an automatic reversal on appeal. The Court eliminated this no-lose scenario by rejecting the application of an automatic reversal rule.

Finally, Mr. Vacca showed his lack of knowledge about mode-of-proceedings errors when he tried to explain his failure to include the jury-note issue in his CPL 330 motion to set aside the guilty verdict (H3 129-131). If any competent attorney truly believed that he had an issue of law that would require an automatic reversal on appeal, then there is no doubt that such an attorney would include that issue in a filed CPL 330 motion.

In sum, Mr. Vacca's failure to ask the trial court to read to the jurors their requested instructions on the meaning of reasonable doubt and the importance of a single witness in a case versus multiple witnesses was constitutionally deficient performance that prejudiced Mr. Mack.

## Request for Relief

In Mr. Mack's case, the sheer volume of unprofessional blunders by assigned counsel erodes any presumption of effective representation. The cumulative impact of these multiple errors deprived Mr. Mack of his Federal constitutional rights to due process, to fundamental fairness, to present a defense, to a fair trial and to the effective assistance of counsel (US Const, Amends V, VI, XIV).

The state court's ruling that Mr. Mack received effective assistance of counsel is so lacking in justification that it readily constitutes "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement" (*Harrington v Richter*, 562 US 86, 103 [2011]). Because this guilty verdict represents an extreme malfunction in the state criminal justice system, this Court should vacate the judgment and grant a new trial.

Respectfully submitted to support Mr. Mack's
Pro Se Petition for a Writ of Habeas Corpus and
His Motion for the Assignment of Counsel

David R. Juergens, Esq.
Special Assistant Public Defender
10 North Fitzhugh Street
Rochester, New York 14614
(585) 753-4093