UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

TERRANCE MACK,

      Petitioner,

    v.                                                                    24-CV-366 (JLS)

JULIE WOLCOTT, Superintendent,
Attica Correctional Facility,

      Respondent.

_____

## DECISION AND ORDER

Petitioner Terrance Mack,[1] a prisoner in Respondent's custody, filed a counseled petition for a writ of habeas corpus under 28 U.S.C. § 2254. Dkt. 1. Mack challenges the constitutionality of the June 17, 2009 judgment entered against him in Monroe County Court, following a jury verdict convicting him of one count of first-degree gang assault (New York Penal Law ("PL") §§ 120.07/20.00). For the reasons below, the Court denies the request for a writ of habeas corpus and dismisses the petition.

## BACKGROUND

### I.   THE CRIME AND MACK'S ARREST

On the evening of September 29, 2007, in the City of Rochester, New York, Latasha Shaw called 911 to report that a group of women had assaulted her

_____

[1] Mack's first name is spelled as both "Terrance" and "Tarrance" in the state court records. The Court has used the spelling adopted by the parties in this habeas proceeding.

1

fourteen-year-old daughter, her niece, and her daughter's friend. SR: 142-44.[2] As

Shaw was walking towards the house at 310 Driving Park Boulevard—from which

she believed the attackers had come—a large group of people approached her,

wielding knives, bottles, sticks, and other improvised weapons. SR: 143. While

Shaw was still on the phone with 911, these people swarmed around her and began

attacking her. SR: 144. During the assault, Shaw suffered blunt force trauma to

her skull and stab wounds to her abdomen and died later that evening. SR: 249

(citations to record omitted).

On October 24, 2007, an eyewitness identified Mack as one of Shaw's

assailants from a photographic array. SR: 349 (citations to record omitted).

On November 4, 2008, Mack was arrested in the City of Elmira, where he

was residing with his girlfriend and their daughter. SR: 13-14.

## II.    PRE-TRIAL PROCEEDINGS

A Monroe County grand jury returned Indictment No. 2008-0921B on

November 25, 2008, against Mack and his cousin, Ebony Mack, charging them in

connection with Shaw's murder. SR: 7-8. The first count of the indictment charged

Ebony Mack with second-degree (intentional) murder (PL §§ 125.25(2)/20.00),

alleging that she intentionally caused Shaw's death by stabbing her. SR: 7. The

second count of the indictment charged Mack and Ebony Mack, as principals and

accomplices, with first-degree gang assault in violation of PL §§ 120.07/20.00. The

---

[2] Citations to "SR:" refer to the Bates-stamped page numbers of the state court
records, filed by Respondent at Dockets 17 and 17-1.

indictment alleged that "with the intent to cause serious physical injury to [Shaw], and when aided by two or more other persons actually present," they "caused serious physical injury to [Shaw]." SR: 7-8.

On December 2, 2008, Mack appeared before former Monroe County Court Judge Frank P. Geraci, Jr. ("trial court") with his assigned attorney, Paul Vacca, Esq. ("Vacca" or "trial counsel") for arraignment. 12/02/08 T: 2.[3] Mack pleaded not guilty. *Id.* The prosecution announced they were ready for trial. 12/02/08 T: 7.

At the next appearance on January 21, 2009, Vacca stated that he had filed a notice of alibi listing 18 alibi witnesses[4] and had provided the prosecution with copies of the witness statements that had been secured by the defense investigator. 01/21/09 T: 2-3. Vacca stated that:

> [a]s far as the strengths of the case are concerned, in the discovery there's one witness who identifies my client from a photographic array on October 24th of 2008 [sic], having previously been unable to identify him on September 29th of 2008 [sic]. There are several other individuals who were shown that photographic array and could not identify my client. Based on that, your Honor, I would ask that my client be released or that the bail be modified.

01/21/09 T: 3. Vacca also noted that the defense had sworn statements from multiple witnesses stating either that Mack was not in Rochester at the relevant

---

[3] Citations to "month/day/year T:" refer to the original page numbers of the transcripts of the pre-trial proceedings, filed by Respondent at pages 1 to 101 of Docket 17-2.

[4] The notice of alibi listed the following witnesses: Takiya Campbell, Aurulia Driscoll, Shatora Hampton, Deidra Jenkins, James Jenkins, Verdes Jenkins, Lakita Lewis, Sateria Lumpkin, Benjamin Mack, Bessie Mack, Javonne Mack, Carolyn McHenry, Precious Scott, Jessica Smith, Sonia Spraight, Kionna Speed, Jerome Walker, and Travis White. SR: 505 (citation omitted).

time or was in Elmira. 01/21/09 T: 4. The prosecutor requested that the bail remain the same, noting that Mack faced a serious charge, was a predicate felon, and previously had violated his parole. 01/21/09 T: 3-4. The trial court declined to modify Mack's bail. 01/21/09 T: 5.

On February 18, 2009, the parties appeared before the trial court. Vacca noted that there was

> one identification [sic] from a Megan Torrez (phonetic) who on September 29th [of 2007,] indicated that she couldn't identify anyone. And then she identifies someone on October 24th [of 2007]. However, there are, at least, 2 to 4 other witnesses who are shown in the array with Mr. Mack's photograph in it and cannot identify him.

02/18/09 T: 2. Vacca requested copies of the photo arrays and the opportunity to examine the police officers who showed the photo arrays to the witnesses. 02/18/09 T: 3. Vacca also asked for a probable cause hearing as to Mack's arrest in Elmira and the administering of a polygraph examination, which Mack purportedly had failed. 02/18/09 T: 3-4. The prosecutor indicated that Mack had requested a polygraph examination, which Mack denied. 02/18/09 T: 4.

The trial court granted Vacca's requests and ordered *Huntley*, *Wade*, and probable cause hearings. 02/18/09 T: 5. The trial court also granted Vacca's unopposed request to sever Mack's trial from that of his co-defendant, Ebony Mack, who was charged with murder. 02/18/09 T: 5-6. Vacca renewed his request to lower Mack's bail amount, which the prosecution opposed. 02/18/09 T: 7. The trial court declined to modify bail. 02/18/09 T: 8.

The *Wade* hearing was held on April 9, 2009. Before witnesses were called, the prosecutor noted that they had been working to try to corroborate or disprove

4

Mack's alibi and had not made much headway. 04/09/09 T: 3. The prosecutor stated that Mack had been writing letters to her and suggesting that he stand in a physical lineup. 04/09/09 T: 3-4. The prosecutor proposed a continuance of the hearing so that the eyewitness, Megan Torres, could attend a physical lineup to see whether she could identify Mack. 04/09/09 T: 4. Vacca indicated that this was the first he had heard of the proposal. Vacca said that it was his understanding that Torres was shown a photographic array on September 29, 2007, and could not identify Mack; and then she was shown a photographic array on October 24, 2007, at which time she identified Mack. 04/09/09 T: 4-5. Vacca noted that Mack's photograph had been in the newspaper and on television news broadcasts. 04/09/09 T: 5. The prosecutor said that she had spoken with Torres the previous day, and that

> [Torres] was not shown the array, nor was she shown any additional pictures, and I don't believe that she was shown any other arrays, as Mr. Vacca mentioned. I believe she was only shown the array on October 24th of '07.

04/09/09 T: 5. Vacca responded that he had not had sufficient time to discuss the matter with Mack and that, while he would not recommend Mack subject himself to any identification procedures, Mack "may want to stand in the line up, but he needs more time to consider it." 04/09/09 T: 5. The trial court granted the request. 04/09/09 T: 5.

The prosecutor withdrew the notice of intent to offer Mack's statements, noting that they all pertained to his alibi defense and were

general denials of his involvement. 04/09/09 T: 6, 34. Accordingly, the trial court proceeded with the *Wade* hearing.

The prosecution called one witness, Rochester Police Department ("RPD") Investigator John Penkitis, who testified that Mack's name "came up through what witnesses told [them] and through computer checks as relationships to Ebony Mack." 04/09/09 T: 16. In addition, computer checks showed that Mack's name was connected to 310 Driving Park, the home of Bessie Mack, Ebony Mack's mother. 04/09/09 T: 16. Based on that information, Penkitis put together a photo array containing Mack's photo. 04/09/09 T: 16.

Penkitis and his partner, RPD Investigator Joseph Dominick, went to Torres's home on October 24, 2007. 04/09/09 T: 8-9. Penkitis showed Torres a six-pack array containing a photo of Mack in position three. 04/09/09 T: 11. Prior to that, he had not shown any single photos of Mack to Torres. Within "seconds" of being shown the array, Torres pointed to Mack's photo in position three and said, "That's the guy." 04/09/09 T: 11. Penkitis asked Torres to elaborate; she said, "that's the guy that she saw, I believe it was a bottle, that had struck Latasha Shaw in the head with." 04/09/09 T: 12-13. Torres indicated that she had seen Mack in the neighborhood prior to the incident but did not know his name. 04/09/09 T: 27, 30. Torres circled the photograph in position three and wrote her initials "MT" next to it; Penkitis said that he wrote Torres's comment, "That's the guy," underneath the filler

6

photograph in position six. 04/09/09 T: 20. Torres viewed six photo arrays that morning; three contained males and three contained females. 04/09/09 T: 21-22. Torres did not identify anyone else from those arrays. 04/09/09 T: 22, 33.

After talking with Mack off-the-record, Vacca asked Penkitis whether Torres told them that she was sitting on a porch and saw "three or four guys grab the victim." 04/09/09 T: 30. Torres told them that there were more than three or four females present also and that it all happened very quickly. 04/09/09 T: 31. Penkitis admitted that he did not know the distance from which she viewed the event, which occurred at 7:30 p.m., and that when he arrived on the scene it was "dark." 04/09/09 T: 32.

While Vacca acknowledged that the trial court had to determine whether the identification was unduly suggestive, he confined his argument to asserting that the prosecution had not "prove[d] the ability of the person who made the identification to observe the incident at hand." 04/09/09 T: 34. After making findings of fact, the trial court held that the composition of the photo array itself and the identification procedure conducted by Penkitis were not suggestive; and that the reliability of Torres's identification was a separate issue for trial. 04/09/09 T: 39. Accordingly, the motion to suppress the identification was denied. 04/09/09 T: 39.

On April 29, 2009, the parties appeared for a status conference. Vacca noted that based on his conversations over the past week with the prosecutor,

7

there was going to be a lineup procedure with Mack and Torres on the previous day. 04/29/09 T: 2. The prosecutor had said that if Torres did not identify Mack, then the indictment would be dismissed. 04/29/09 T: 4. However, the prosecution never scheduled the lineup. In addition, the prosecution changed what the consequences would be if Torres failed to identify Mack. 04/29/09 T: 3-4. Instead of dismissing the indictment immediately, the prosecution would try Ebony Mack first and then decide whether to try Mack; he would be released from custody pending that decision. 04/29/09 T: 4. The trial court adjourned further discussion until the lead prosecutor could be present.

The following day, April 30, 2009, the parties appeared before the trial court following Vacca's letter of April 28, 2009, stating that the lineup procedure had not occurred. 04/30/09 T: 2. Vacca stated that he wanted to make sure that the lineup took place and that the parameters of the parties' agreement were honored. 04/30/09 T: 2. The prosecutor said that the lineup had been rescheduled for the following Tuesday. 04/30/09 T: 2. However, the prosecution had received "[n]ew information and new evidence" which they were attempting to verify. 04/30/09 T: 2. The prosecutor shared the new development with the trial court and Vacca in an off-the-record bench conference. 04/30/09 T: 3.

The prosecutor confirmed that if Torres did not identify Mack during a double-blinded lineup procedure in which all participants were wearing hats,

8

then "the most they will do is agree to his release from custody" pending the outcome of Ebony Mack's trial. 04/30/09 T: 4. At Vacca's and Mack's request, the trial court set a trial date of May 4, 2009. 04/30/09 T: 5. The lineup identification procedure did not occur.

## II.    TRIAL

Jury selection was conducted on May 4, 2009.[5] The prosecution's direct case began on May 5, 2009.[6] The prosecution called eyewitness Jasmine Shaw, eyewitness Charnette Grayson, RPD Officer Ryan Hickey, RPD Officer Gregory MacCracken, RPD Civil Evidence Technician Lisa Janicki, eyewitness Megan Torres, 911 Operator Michele Terrill, RPD Investigator John Penkitis, jail informant Ronaldo Marcell Donald, Monroe County Jail Corporal John Preston, Monroe County Medical Examiner Dr. Caroline Dignan, Frontier Communications representative Mary Jo Evans, Monroe County District Attorney's Office Investigator Robert Siersma, and Global Tel Link representative Charles Facteau.

The defense presented its case on May 7, 2009, and called eyewitness Kionna Speed, alibi witness Precious Scott, alibi witness Jessica Smith, Penkitis, eyewitness Carolyn Kenesha McHenry, eyewitness Shatora Hampton, and Mack. The prosecution put on a rebuttal case, calling RPD Investigator Gary Galletta, RPD Investigator Glenn Weather, and Monroe County District Attorney's Office Investigator Samuel Soprano.

---

[5] The transcripts of jury selection are located at pages 102 to 264 of Docket 17-2.
[6] The transcripts of the trial begin at page 80 of Docket 17-2 and end at page 873 of Docket 17-2.

9

### A.    Prosecution Witnesses

#### 1.    Jasmine Shaw

In September 2007, Jasmine was living in Rochester, New York, with her two younger siblings and her mother, the victim, Latasha Shaw. TT: 205. On September 29, 2007, Jasmine was on Driving Park Boulevard in Rochester with her friend, Jellia, and her cousin, Ajee. TT: 205-06. They had been at Jasmine's brother's house on Driving Park. After they left, they walked to a store located across the street from the Family Dollar, near the intersection of Dewey Avenue and Driving Park. TT: 206. When they left the store at about 5 p.m., they got into a fight with some other girls, only one of whom Jasmine knew. TT: 206-07, 215. As Jasmine was fighting one girl, another girl came up behind her and "put [her] to the ground" while "some other girl started stumping [sic] [her]." TT: 207. After the fight ended, Jasmine had a cut across her face, her nose was bleeding, and she had a shoe print on the side of her face. TT: 207.

Jasmine walked to her brother's house and told him what happened. Her brother called Latasha, who then was at the home of her sister, Charnette Grayson, in Webster. TT: 207-08.

At around 6:30 p.m. or 7 p.m., Latasha arrived at Jasmine's brother's house, accompanied by Grayson, Jasmine's grandmother, Jasmine's younger sister, and two of Jasmine's cousins. TT: 208-09, 218. Jasmine said that Latasha called 911 to report the earlier fight. TT: 218. While she was on the phone with 911, Latasha was walking up Driving Park Boulevard followed by Jasmine and other family

members. TT: 209-10, 218. Latasha was trying to determine the address of the house from which Jasmine's attackers had come to let the 911 operator know where to dispatch the police officers.

When Latasha, Jasmine, and the rest of the family members got closer to the brown house at 310 Driving Park, which was at the corner of Dewey Avenue and Driving Park, Jasmine saw "a lot of people" on the porch. TT: 210. The people on the porch were "yelling," and Latasha was "telling the police she didn't know what was going to happen next." TT: 210. Jasmine saw ten to fifteen people run off the porch of the brown house and head towards her and her mother and family members. TT: 210, 212. Jasmine said she "only s[aw] women" in the group of people who started running toward her and her family members. TT: 211. Jasmine did not recognize any of the people who had come from the porch at 310 Driving Park. TT: 219. Latasha "just told [Jasmine and her relatives] to run," so Jasmine started running toward the Family Dollar. TT: 211, 235.

Before Jasmine turned away from the group of people and started looking toward where she was running, she saw a woman throw a bottle at her mother or strike her in the head with a bottle. TT: 212, 219. The woman with the bottle was a brown-skinned, skinny woman with a weave. TT: 221-22. Latasha fell to the ground, dropping her cell phone. TT: 212.

As Latasha got back up, Jasmine saw about ten or fifteen women surrounding her mother and "fighting in the middle of the street." TT: 212. Jasmine was unable to distinguish all the people who were near her mother because

11

"[t]here was too many." TT: 213. Jasmine did not see any knives, baseball bats, or any other weapons. TT: 219-20. Jasmine said it "was dark outside" and the streetlights were on. TT: 234.

Jasmine continued running up Dewey Avenue to try to get help. TT: 213, 220. The next thing she remembered was turning around to find that "everyone was gone." TT: 213. She only saw "a man pacing back and forth asking where the dudes were at." TT: 213, 228.

Jasmine ran over to her mother, who was lying "face down with a puddle of blood next to her." TT: 214. Jasmine did not see any objects near her mother. TT: 214-15. Jasmine was "begging her to get up" but her mother did not respond. TT: 214. Jasmine attempted to turn her mother over, but when she "felt cuts, . . . [she] got scared and ran back up Dewey." TT: 214.

### 2. Charnette Grayson

Grayson testified that Latasha Shaw was her older sister. TT: 239. On September 29, 2007, at around 6 p.m. or 7 p.m., they were at Grayson's house in Webster when Latasha received a phone call from her son saying that some "grown women just jumped" Jasmine. TT: 240. Grayson and Shaw immediately got in the car and drove to Latasha Shaw's son's house near the corner of Dewey and Driving Park. TT: 240-41. When they got there, they saw that Jasmine had "claw scratches" on her face. TT: 241.

At some point, Grayson and Latasha left and walked up Driving Park toward Lake Avenue; Latasha was on the phone with 911 trying to describe the house

where Jasmine's attackers were located. TT: 243. Grayson said it "was working its way to be dark, but it wasn't dark." TT: 243; *see also* TT: 263. Grayson agreed it would be fair to say it was "dusk" and clarified that "[i]t was light enough to where you can see people and stuff." TT: 243-44.

When Latasha and Grayson got to the corner of Dewey by the traffic light, Latasha told Grayson and the other family members to stop. TT: 244. Grayson heard her telling the 911 operator, "they got knives and sticks and stuff." TT: 244. Then Latasha said, "you got to run," so everyone turned and started running. TT: 244.

When Latasha made those statements, she was referring to "basically a porch full of people" at 310 Driving Park Boulevard, a brown house near the intersection. TT: 244-45, 257. Grayson said that a "bunch" of men and women came off the porch; they were older than 19 or 20 years-old, and "[s]ome of the guys were like middle aged." TT: 245-46. Grayson said there were approximately four males. TT: 258. The people all were carrying something in their hands, including two-by-fours, various household tools, and items that made "silver flashes." TT: 246. These individuals were "just swinging" at Grayson and Latasha Shaw. TT: 246.

While Grayson was fighting one person, she saw that Latasha Shaw had fallen and had tried to push herself up, but "that's when the guy grabbed her, and he yanked her back," causing her to fall again in the middle of the street. TT: 246; *see also* TT: 247, 250. Grayson described the man who was holding Latasha Shaw as having a medium build; however, Grayson could not see his face as his back was

13

to her. TT: 267. Latasha was telling Grayson and the other family members to run. TT: 244, 246, 249. Grayson, Latasha's son, and other family members were all trying to get to Latasha while "the guy was still holding [her]" and about fifteen other people were "kicking and hitting" her. TT: 246-47; *see also* TT: 249, 258. In addition to the "guy holding her," there was another "guy in front of her." TT: 249. A "girl came out of nowhere hitting [Latasha's] hand, and [the girl] was going to stab her[,] too." TT: 247. Then "everything just went in slow motion." *Id.* Grayson saw "more girls running up" to Latasha and "jabbing at her" and a lady with a red stick hitting Latasha over the head. TT: 260.

As Grayson was trying to reach Latasha, she "got bombarded" by two women and a man, and she started fighting with them. TT: 259-60. Grayson said the man was "[b]rown-skinned," with short hair and a medium, "not too big" build, wearing jeans. TT: 266. Grayson saw broken glass in the street but could not say that she saw someone holding a bottle during the attack. TT: 260.

Then all the people "just scattered" and ran back up toward Driving Park. TT: 247-48. Grayson finally was able to make her way to her sister. As Grayson rolled her sister over, two knives fell out of her side. TT: 247-48. Grayson did CPR until the police arrived. TT: 248-49.

### 3. Ryan Hickey

RPD Officer Ryan Hickey received the 911 dispatch call at 7:30 p.m.; about a minute later, he arrived at the intersection of Dewey Avenue and Driving Park Boulevard. TT: 270. The initial dispatch was for a large group of people fighting in

the middle of the intersection. TT: 271. While driving, Hickey received additional information that a woman had been stabbed. TT: 271. It was not dark yet, but it was "getting dark." TT: 279, 284. Hickey described intersection as "pretty well-lit," since it is "right under a traffic light." TT: 273; *see also* T: 283. Hickey said that there are "numerous streetlights in the area" and "well-lit businesses." TT: 273; *see also* TT: 283.

Hickey saw about ten people standing in the middle of the intersection. TT: 271. A woman (Latasha Shaw) was lying in the street, bleeding and unresponsive, while another woman (Charnette Grayson) attempted to give her CPR. TT: 271-72. Two large knives with blood on them were lying in the street next to Latasha Shaw. TT: 273. Hickey observed a stab wound on the right side of Latasha Shaw's chest. TT: 272. Hickey did not recall seeing a bottle, broken glass, or a red stick. TT: 283.

An ambulance arrived, and first responders began treating Latasha Shaw; however, due to the severity of her injuries, she was transported to the hospital. TT: 274. Hickey later learned that Latasha Shaw was pronounced dead. TT: 274.

### 4. Lisa Janicki

Lisa Janicki testified that in September 2007, she was a civilian evidence technician working with the RPD. TT: 285. She was dispatched to Dewey and Driving Park at 7:45 p.m. on September 29, 2007. TT: 286. When she arrived at about 8 p.m., it was "nighttime," but the area at the intersection was "fully lit" due to the presence of streetlights, a signal light, and "lots of businesses" with their lights on. *Id.* Janicki located and took photographs of two knives with what

appeared to be blood on them, two pieces of a broken bat, a lighter, two pieces of different colored necklaces, beads, and an earring. TT: 287, 294-95. Janicki also made a video recording of the crime scene and took measurements for a rough sketch of the scene. TT: 288. Janicki did not recall seeing a bottle or any broken glass. TT: 312-13.

### 5.    Gregory MacCracken

Gregory MacCracken was an officer assigned to the RPD's Evidence Technician's unit in September 2007. TT: 315. MacCracken responded to the scene at about 8:45 p.m. to assist with the collection and processing of evidence. TT: 315-18. He collected the knives and the plastic cigarette lighter and brought them back to his office to dust them for fingerprints; however, he could not recover any prints of value. TT: 318-19, 331. He "probably" did not dust the bat because it was made of wood. TT: 331. MacCracken did not find a broken wine bottle and did not recall seeing any broken glass. TT: 328, 332.

### 6.    Megan Torres

On September 29, 2007, at about 7 p.m. or 7:30 p.m., Megan Torres was at the home of a friend who lived on Dewey Avenue across from the Family Dollar. TT: 334. She was on the front porch with her friend, Maria, and a bunch of their other friends. TT: 334, 337. She described the location of Maria's house as two houses in from the intersection of Dewey and Driving Park. TT: 335.

Torres had walked to Maria's house after getting off work as a lifeguard at the Driving Park YMCA. TT: 336. On her way to Maria's house, Torres had passed

16

by the brown house at 310 Driving Park. TT: 337. She noticed that there were "a lot of people just hanging out on the porch," as there was "[e]very time" she walked by. TT: 337

At about 7:30 p.m., Torres "heard a lot of screaming back and forth between girls," coming from the area of Dewey and Driving Park. TT: 337-38. Torres saw Latasha Shaw walking quickly across the intersection toward Family Dollar. TT: 338. Torres had seen Latasha Shaw in the neighborhood "a couple of times" but did not know her personally. TT: 338. Torres heard Latasha Shaw telling her daughters to keep running toward Family Dollar. TT: 340. Torres saw about 20 to 25 people, both male and female, running after Latasha Shaw. TT: 338-39. Torres said that the people pursuing Latasha Shaw had come from the direction of 310 Driving Park. TT: 338-39, 340. A lot of these individuals had different kinds of makeshift weapons in their hands, such as broomsticks, bottles, knives. TT: 339, 340-41. Torres said that Latasha Shaw was on her phone and did not have any weapons. TT: 339.

Torres stayed on the porch at her friend's house and called 911; she recalled that she was on the phone with the police as the incident occurred. TT: 339, 340, 344. Torres said that there was nothing obstructing her view from the porch of her friend Maria's house, which she estimated was about 150 feet from the intersection. TT: 341, 344. Torres said it was "just starting to get dark outside" and that "[t]he streetlights were coming on, but it was still real, um, light outside, so you could see everything fine." TT: 341; see also TT: 346. Torres recalled that she was trying to

17

focus on different people, but "so much" was going on that she "couldn't identify everybody." TT: 341.

Torres testified that she saw a man grab Latasha Shaw and hold onto her while "everybody else was running toward her to catch up." TT: 339. Torres said that "[t]hey all started hitting her with different objects, bottles, broomsticks, knives." TT: 339. Torres also saw Latasha Shaw get stabbed, but she did not see who did it. TT: 339.

Torres saw a black male hit Latasha Shaw in the head with a bottle. TT: 342-43. Torres identified that individual as Terrance Mack. TT: 343. When asked if she had known Mack prior to September 29, 2007, Torres said,

> I had seen him in the neighborhood because I have lived in the neighborhood almost my entire life, so I have seen him in the neighborhood quite a few times on the brown porch [at 310 Driving Park]. I saw him on the brown porch earlier that day as well.

TT: 343.

After Shaw fell, and once the police sirens could be heard, Shaw's attackers started running off in different directions. TT: 343. Torres was on the phone with 911 as the attackers were fleeing. TT: 344. Torres approached Grayson and asked if she wanted her (Torres) to try to perform CPR; Grayson replied that there was nothing more that could be done for Shaw. TT: 344.

During cross-examination, Torres admitted that Shaw was the best friend of Torres's friend, Javon Williams. TT: 349. Torres said that she had never met Shaw personally, however. TT: 349. Torres admitted that she knew Grayson; if she saw Grayson at the office where Grayson worked, she would say hello and ask how she

was doing. TT: 352. Torres said she has never talked to Grayson about the incident. TT: 352.

Torres admitted on cross-examination that she had "a connection with" Shaw and that she wanted "see someone brought to justice," but claimed that it was "not for the plain fact that just because I, um, know of her and know that she's not the type of person to be violent." TT: 350.

Torres said that the first time she had seen Shaw that day was at the time of the incident, when Shaw was "running across" the street, away from 310 Driving Park toward the Family Dollar. TT: 351, 353. Earlier that day, Torres had seen Shaw's children "arguing" when she was on her way to work at the YMCA; "[t]he cops came around the corner and broke the argument up." TT: 351. Torres did not know any of Shaw's children. TT: 351. She did not see Shaw's daughter at 310 Driving Park on the day of the incident. TT: 354.

When asked if it was possible that she identified Mack because he was the "African-American male sitting next to the guy who is dressed up like a lawyer at this table," Torres replied in the negative. TT: 356-57. Torres said she had seen Mack "quite a few times in the neighborhood"; she could not give a precise number of times but said it was "more than once." TT: 357. Torres did not know Mack's name. TT: 357.

Torres testified that she spoke to RPD Investigator Eric Grillo on the night of the incident and told him she could not identify anyone involved. TT: 357-58. When asked why she changed her mind, Torres testified that had been "scared to

19

identify anybody," but she talked to her father, who "told [her] that the right thing to do was to let them know what [she] saw." TT 358. Torres denied that she identified Mack simply because she knew him from the neighborhood. TT: 359.

### 7. Michele Terrill

Michele Terrill testified that she was working as a 911 operator and answered the 911 call from Shaw, which came in at 7:27 p.m. on September 29, 2007. TT: 399-400. The caller identified herself as "Tasha" and at first was "very calm and precise." TT: 403. The caller "seemed to get more agitated as time went on." TT: 403. Terrill verified that the CD recording of the 911 call was a complete and exact recording of the actual call she received on September 29, 2007. TT: 405-06. She also compared the transcript, SR: 142-44, with the CD recording and verified that it was a fair and accurate transcription. TT: 406-07. The CD recording of the 911 call was played for the jury,[7] who also received copies of the transcript. TT: 408.

### 8. John Penkitis

RPD Investigator John Penkitis testified that on September 29, 2007, he was assigned to the Major Crimes Unit and primarily investigated homicides. TT: 414. Between 8 p.m. and 8:30 p.m. on September 29, 2007, he was off duty but had been directed to respond to Dewey and Driving Park. TT: 414. He arrived on the scene at about 8:30 p.m. TT: 415. Penkitis said that the house at 310 Driving Park

---

[7] The recording of the 911 call was not part of the state court records filed with this Court.

immediately became the focus of the investigation because that is where Shaw was headed when she called 911. TT: 415.

Penkitis testified that Torres's name was on a list of individuals who had called 911 to report the incident. TT: 416. When Penkitis called the phone number Torres had provided, her father answered. TT: 416. Penkitis left a message asking Torres to call him back. TT: 416. Penkitis spoke to Torres on October 23, 2007, and arranged to meet the following day. TT: 417. On October 24, 2007, Penkitis and his partner, RPD Investigator Joseph Dominick, met Torres at about 10:30 a.m. at her residence. TT: 417-18. Penkitis showed Torres six photo arrays, one at a time; each array contained six photographs. TT: 418-19. Some arrays contained all females, and some contained all males. TT: 419.

The prosecutor introduced People's Exhibit 34, one of the photo arrays that Torres was shown on October 24, 2007. TT: 420. Penkitis testified that Torres made a positive identification from this array. TT: 419. People's Exhibit 34 contained Petitioner's photo in the number three position (the top right of the array). TT: 420.

On cross-examination, Penkitis testified that they spoke to between 75 and 100 different people who may have witnessed all or part of the attack on Shaw. TT: 421. Vacca stated that he intended to make Penkitis his witness and would recall him. TT: 422.

### 9.    Ronaldo Marcell Donald

Ronaldo Marcell Donald testified that he was 28 years-old and was incarcerated at the Monroe County Jail after pleading guilty to first-degree robbery and, on April 21, 2009, receiving a determinate sentence of five years to be followed by five years' post-release supervision. TT: 425-26. Donald testified that he had known Mack from "maybe middle school, high school," for "about five to eight" years. TT: 426. He and Mack "lived in the same neighborhood a couple of times." TT: 426-27.

When Donald returned to the Monroe County Jail to begin serving his sentence on April 21, 2009, he went from the booking area to the reception area of the jail. TT: 427-28. In the reception area, there are cells along the wall and bunk beds down the middle; about 20 to 30 inmates are housed there. TT: 428.

On April 22, 2009, at about 3:30 p.m. or 4:00 p.m., Donald saw Mack in the reception area near the bunk beds and telephones. TT: 428-29. Donald and Mack noticed each other, shook hands, and then walked around and chatted. TT: 429.

Mack asked Donald why he was in jail, and Donald told him. TT: 429. Donald asked Mack the same question; Mack replied that "he was being charged with what happened to Latasha Shaw, um, but he said that he told the people he was in Geneva at the time, but, um, he came—he said he told people he was in Geneva, yet he had about two weeks left on Parole." TT: 429. Donald testified that Mack also said that, "all he really did was he ran off the porch, grabbed her and held her, and they did that to her." TT: 429-30. Donald said that Mack commented

that "there was just one witness that could possibly identify him, but she wasn't sure if it was him or his father because they look alike." TT: 430. Donald did not know who Mack was referring to when he mentioned there was a witness who might be able to identify him. TT: 430. Donald described the conversation as "kind of brief," "possibly about less than five minutes, four to five minutes, maybe a minute or two, give or take." TT: 430.

Donald wrote down the information he learned from Mack on a piece of paper and kept it in his cell. TT: 431. About two or three days after the conversation, Donald passed the information to a deputy because he "felt like it was the right thing to do." TT: 431. Donald testified that the only benefit he had received for his testimony was a promise to move him to the Livingston County Correctional Facility. TT: 431.

The prosecutor introduced a DVD containing footage from the jail's closed circuit surveillance cameras showing Donald and Mack walking around and talking. TT: 432. Donald said that the first time he had learned about the DVD was shortly before he took the stand. TT: 432. Donald said he had watched the DVD and that the footage accurately depicted where their conversation took place. TT: 432. At the time of the conversation with Mack, Donald was unaware that the reception area had surveillance cameras. TT: 432. The video does not have any sound. TT: 440, 462.[8] The DVD was played for the jury during the testimony of Monroe County

---

[8] The recording of Donald and Mack's conversation at the jail was not part of the state court records filed with this Court.

Jail Corporal John Preston, who retrieved and burned the seven-minute segment from the surveillance system on May 1, 2009, at the request of his supervisor. TT: 455-57, 458-60.

On cross-examination, Vacca elicited that the basis of Donald's robbery conviction arose from a situation in which Donald agreed to have sex with a man in exchange for money. TT: 434. The man, however, did not have cash to pay Donald and wanted Donald to wait with him until the pawn shop opened so he could pawn a necklace for cash. TT: 434. Donald did not want to wait for the pawn shop to open, so he jumped out of the man's truck with the necklace. TT: 434. Donald said that the man had a knife; however, he (Donald) took the knife and had it when he was arrested. TT: 434. Donald refused to admit that he cut the man. TT: 434. He stated that they "did have a fistfight" and speculated that the man "possibly got cut with his keys." TT: 434. Donald admitted that he pleaded guilty to forcibly stealing property while using a dangerous instrument. TT: 435.

Donald admitted that the neighborhood from which he knew Mack was not anywhere near Dewey and Driving Park. TT: 435. He denied ever having an altercation with Mack in the past regarding "any female or females." TT: 435. Donald admitted that on the piece of paper he passed to the jail deputy, he wrote, "if needed, I will testify what Terrance told me so I can get a VFO." TT: 438. Donald first stated that he did not know what a VFO or violent felony override "exactly means," but then admitted that he "would love an override" so he "could get out [of prison] sooner." TT: 437-38. Donald conceded that when a defendant is sentenced

24

to a state correctional facility for a violent felony offense, he has "to do almost all of the five years." TT: 436. Donald said he "may" seek an override but insisted he was "testifying because it is the right thing to do, not because [he] [was] hoping for anything." TT: 439.

Prior to his conversation with Mack on April 22, 2009, Donald had learned about Shaw's death and Mack's arrest from watching the news, but he said he did not know the details of the crime. TT: 441. Donald knew Shaw's family and was friends with Shaw's brother, a man named "Mugsy." TT: 441-42. Donald and Mugsy went to Franklin High School together. TT: 442. Donald said he did not see Mugsy often because he (Donald) worked a lot. TT: 442. Donald said that he never talked to any of Shaw's family members about the incident. TT: 438-39, 441.

Donald testified that the last time he had seen Mack was a year or two earlier, that he and Mack "were pretty cool," and that they were "close." TT: 442-43. Donald testified that, when he said that Mack told him he (Mack) was in Geneva, Donald meant to say Elmira. TT: 445.

When asked if he had talked to anyone else in the prosecution's office regarding his testimony against Mack, Donald offered that he "took a polygraph, lie detector test, whatever it is called." TT: 446. Donald testified on redirect examination that the prosecution had not discussed a violent felony override with him or offered to assist him in obtaining a violent felony override. TT: 449.

25

### 9.    Caroline Dignan, M.D.

Caroline Dignan, M.D. testified that she was the Monroe County Medical Examiner and conducted an autopsy on Shaw on the morning of September 30, 2007. TT: 473. Dr. Dignan observed a stab wound to the right side of the chest; a stab wound to the middle, right side of the back; and multiple blunt-force injuries to the head area, specifically, the right forehead and the right temple region next to the eye. TT: 474-76. In addition, there was some bruising or bleeding in the right eye, some swelling of the right eye, and a smaller abrasion or scrape on the left forehead. TT: 474-75. Dr. Dignan testified that a lot of different things can cause blunt force trauma, such as bat or bottle. TT: 475-76. However, Dr. Dignan could not determine what type of object caused the abrasions on Shaw's head. TT: 491. During her internal examination, Dr. Dignan found additional blunt force injuries to Shaw's skull, namely, six separate areas of hemorrhaging or bleeding around the left side and back top of the head. TT: 480-81, 487-89.

The stab wound to the chest penetrated approximately seven inches and pierced Shaw's right lung, diaphragm, aorta, liver, and left lung. TT: 477-78. The stab wound to the back only penetrated the soft tissues and muscles and did not cause injuries to any of the internal organs. TT: 478-79. To a reasonable degree of medical certainty, the cause of Shaw's death was the stab wound to the chest. TT: 489. Dr. Dignan did not find any glass or wood particles on Shaw's body. TT: 490.

26

### 10.    Chuck Facteau, Mary Jo Evans, and Robert Siersma

At the commencement of the proceedings on May 7, 2009, the prosecutor stated that "[t]here was a jail telephone call last night" between Mack and his father, Anthony Jenkins, which she intended to introduce into evidence, and that the witness, Chuck Facteau, was on his way over to the courthouse. TT: 493. Vacca objected strenuously to the introduction of the phone call, arguing that there was nothing in the conversation that was relevant to Mack's case and that the prosecution was taking his words out of context. TT: 494-503. After listening to the recording, the trial court determined that the prosecution could admit the recording and argue to the jury that Mack and Jenkins were discussing Mack's conversation with Donald. TT: 502.

Mary Jo Evans of Frontier Telephone Company testified that she was served with a subpoena by the RPD to provide subscriber information for 585-254-7517; the subscriber's name was Anthony Jenkins. TT: 506-09. Monroe County District Attorney's Office Investigator Robert Siersma testified that he had been working on Mack's case and that he had listened to the recording. TT: 511-12. Over defense objection TT: 512-16, Siersma was permitted to testify that he recognized the two voices as belonging to Mack and Anthony Jenkins TT: 516-17.

Charles Facteau testified that he works for Global Tel Link, which contracts with the Monroe County Sheriff's Department to provide phone services to inmates at the Monroe County Jail. TT: 518. He explained that there is a written notice on the phone itself, and a verbal notice when a call is placed, that the call is subject to

monitoring and recording. TT: 520. Facteau was asked to retrieve a call made on May 6, 2009, at about 9:02 p.m., from the jail to 585-254-7517. TT: 523-24, 538. Facteau prepared a call log detail (People's Exhibit 44) as well as a CD of that call (People's Exhibit 43). TT: 525-26. Based on Vacca's objection to the correctness of the transcript, the parties listened to the recording multiple times, eventually reaching a stipulation as to the language. TT: 530-37. At the trial court's direction, the prosecutor corrected the transcript of the phone call, which was provided to the jury while they listened to the recording of the call. TT: 538-40.

The transcript of the call reads as follows:

| | |
|---|---|
| Mack: | Hello[.] |
| Jenkins: | Hello[.] |
| Mack: | What up? |
| Jenkins: | What? |
| Mack: | Yeah, what's goin' on. |
| Jenkins: | Nothin'[.] |
| Mack: | (Inaudible) what cha doin', nothin'[.] |
| Jenkins: | What? |
| Mack: | What cha doin'? |
| Jenkins: | Sittin' here watchin['] a little basketball game. |
| Mack: | Oh[.] |
| Jenkins: | [U]h huh[.] |
| Jenkins: | Now you see why ya (inaudible) say an[y]thing. |
| Mack: | Huh? |
| Jenkins: | You see you just talkin' about how (inaudible) . . . . use it against you. |
| Mack: | *Yeah, [n]o I did not ask, tell him he asked about the situation[.]* |
| Jenkins: | I don't want to talk about it like, I'm just tellin' you[.] |
| Mack: | I, uhh, understand. |
| Jenkins: | I told you that.  Saying, just saying to you, you (inaudible) run your mouth again. |
| Mack: | Uhhh[.] |
| Jenkins: | And they wanna put you on the stand[.] |
| Mack: | You told me that[.] |

28

| Jenkins: | But your problem is you want to run your mouth instead of just listen what somebody say you want to go off, you wanna go off with your own little self. . . . but you don't understand, so when somebody say something (inaudible) you don't understand that, I explained it to you in a different way; just answer any questions. |
| Mack: | I hear you[.] |
| Jenkins: | OK, that's what I'm telling you, you don't understand them people, what they say you let them know what you don't understand what he sayin'. They would ask you the same questions but in different ways. |
| Mack: | What's goin['] on. |
| Jenkins: | Ain't nothin['] (inaudible)[.] |
| Mack: | (Inaudible) I'll just see ya tomorrow in court. |
| Jenkins: | Yeah[.] |
| Mack: | Alright. |

SR: 151-52 (emphasis supplied; ellipses in original).

## B.    Defense Case

After the prosecution rested, Vacca moved for a trial order of dismissal, arguing that the prosecution did not present sufficient proof connecting Mack to the incident. TT: 540-41. In the alternative, Vacca requested that the charge of first-degree gang assault be reduced to second-degree gang assault due to the lack of proof of specific intent. TT: 541-42. The trial court denied the motion, finding that there were issues of fact as to each of the elements of first-degree gang assault. TT: 542.

### 1.    Kionna Speed

Kionna Speed testified that she was 20 years old and resided in the City of Rochester. TT: 543-44. On Saturday, September 29, 2007, she was visiting her aunt, Bessie Mack, at her home at 310 Driving Park Boulevard. TT: 544-45. Speed

29

arrived about 2 p.m. that afternoon. TT: 545. There were others present at Bessie Mack's house as well—Jessie Speed Jerome Walker, James Jenkins, Quonika Walker, Ebony Mack, Carolyn McHenry, Seteria Cunningham, and Shatora Lumpkin.[9] TT: 546. Terrance Mack is Speed's cousin, but he was not there at any time. TT: 546-47, 555. Speed and the others were "just chillin'" around the house. TT: 547.

Around 6:30 p.m., Shatora Lumpkin saw "the girl . . . she had problems with" who was walking to the convenience store on the opposite side of the street from 310 Driving Park. TT: 547-48. Speed, Ebony Mack, and Shatora Lumpkin walked up to the store. TT: 547. Shatora Lumpkin started fighting with the girl, who had pulled out a razor. TT: 547-48. Two of the girl's companions started fighting as well, so Speed and Ebony Mack jumped in. TT: 548. Carolyn McHenry and Seteria Cunningham came over and broke up the fight. TT: 549. Speed and her companions returned to 310 Driving Park at about 6:45 p.m. TT: 549. Speed testified that Mack was not there. TT: 549.

Speed recalled that, around "seven o'clock, seven something," as "[i]t was getting dark," "the police came and a group a people was there" on the sidewalk outside Bessie Mack's house. TT: 550-51. Kionna said that "the girl [sic] was outside saying . . . [w]here the bitch is that jumped my sister, my family member and all this other stuff." TT: 550. The police left. TT: 551. Then Shatora

---

[9] Based on Speed's description of Shatora Lumpkin's actions, and defense witness Shatora Hampton's testimony, *infra*, Shatora Lumpkin and Shatora Hampton appear to be the same person.

Hampton's mother, Linda Lawhorn, and Shatora Hampton's aunts ("Bee Bee" and "Diane"), pulled up in a van. TT: 551.

Speed estimated that there were 10 individuals in the van, none of whom were male. TT: 552, 554. The van was parked in the barbershop parking lot to the right-hand side of 310 Driving Park, got out, walked over to 310 Driving Park. TT: 552-53. The women stood in front of the yard at 310 Driving Park and talked amongst themselves. TT: 554. Speed was on the porch of 310 Driving Park with Carolyn McHenry, Seteria Cunningham, Bessie Mack, Jerome Walker, and James Jenkins. TT: 553-55. Terrance Mack was not present, according to Speed's testimony. TT: 555.

Speed saw Shaw and some other people walking up toward the house at 310 Driving Park from Dewey Avenue. TT: 552-53. When the women from the van (Diane Lawhorn, "BeeBee," and "Diane") spotted Shaw, "[t]hey started running toward her." TT: 554-55. They were all fighting at the intersection of Dewey and Driving Park. TT: 555. Speed said that "BeeBee" pulled a knife out of her shirt as she was running toward Shaw. TT: 555-56. Speed was able to "see them stabbing" Shaw from where she was standing on the porch. TT: 556. However, she was not sure if anyone else near Shaw was attacked, and she could not identify any of the individuals attacking Shaw. TT: 559. Speed said that she "was too far to see any of the faces." TT: 559-60. Speed said that while the attack on Shaw was happening, "[i]t was dark." TT: 558.

31

Speed's mother, Jessie Speed, called 911. TT: 557. The police did not take a statement from Speed at that time, but she eventually spoke to RPD Investigators Glenn Weather and Gary Galetta on December 10, 2008. TT: 558, 561.

On cross-examination, Speed denied that she told Weather that she, her mother, and her son left 310 Driving Park and walked back to Speed's house on Mason Street before the fight started because she "believed something was going to go down." TT: 562. Speed also denied that she told Weather that she was not present for any of the fight and only learned about what had happened after the incident. TT: 562. Speed denied that she told Weather that she had no idea who was responsible for the attack on Shaw. TT: 562-63.

### 2.   Precious Scott

Precious Scott testified that she lived in Rochester but, on September 29, 2007, she was living in Elmira, New York, with her sister, Tahisha Mack. TT: 565. Scott testified that Bessie Mack is her sister. TT: 566. Terrance Mack is Scott's nephew. TT: 565. At that time, Mack was living in Elmira with his girlfriend, Jessica Smith, and their infant daughter. TT: 567. Scott saw Mack on September 29, 2007, around 11 a.m. or 12 p.m. TT: 567. Mack and Scott's cousin, "Travis,"[10] came to Scott's sister's house and brought her food from McDonald's. TT: 567.

Scott testified that she talked to Mack at about 5:30 p.m. or 6 p.m. that evening, and that Mack was in Elmira at the time. TT: 567-68. Scott testified that she knew that he was in Elmira "[b]ecause at that time the type of phones they

---

[10] Scott is referring to Christopher Travis White.

had," "when you get to Rochester, it cuts off." TT: 568. Mack was supposed to bring his daughter to visit Scott that day, but he said he was busy and would call her back. TT: 568. Mack did not bring his daughter over to Scott's house. TT: 568. The following morning, Scott saw Mack at her house. TT: 569. According to Scott, she "talk[s] to [Mack] every day and see[s] him." TT: 570.

On cross-examination, Scott testified that she did not recall the address where she was residing in September 2007; she just remembered the color of the house. TT: 570-71. She spent all day on September 29, 2007, playing games on the computer. TT: 571, 576. She was with her son and her cousin Jessica. TT: 571. Mack and "Travis" just "popped up" at Scott's sister's house on September 29, 2007. TT: 572. After dropping off the food from McDonald's, Mack and Travis sat "for a couple minutes," and then they left. TT: 573. Scott did not see them for the rest of the day, but she "was talking to them on and off." TT: 573. She did not call Mack on his home phone; she called him on his cell phone. TT: 573-74. She did not know Mack's cell phone number, but she had it stored in her phone. TT: 574.

### 3. Jessica Smith

Jessica Smith testified that, in September 2007, she was working at United Cerebral Palsy Center in Elmira, caring for people with cerebral palsy. TT: 579-80. She was living at an apartment at 500 Hathorn Court with Mack and their infant daughter. TT: 580-81. On September 29, 2007, she left for work at 6 a.m. and worked from 6:57 a.m. to 7:19 p.m., as shown on her timecard. TT: 581-83. She had a lunch break from 12 p.m. to 12:34 p.m. TT: 583.

Smith testified that Mack was at their apartment when she left for work, and he watched their daughter that day. TT: 583-84. After work, Smith arrived home between 7:30 p.m. and 7:45 p.m. TT: 584. Mack was in the living room with their daughter, watching television. TT: 584. They went to bed around 10 p.m. TT: 585. From the time she woke up on Sunday, September 30, 2007, until she left for work at 3 p.m., Mack was at home with her. TT: 585.

On cross-examination, Smith confirmed that, on September 29, 2007, she had a landline telephone at the Hathorn Court apartment; the number was 607-846-2875. TT: 588-89. She called Totem Cab Company at 5:58 a.m. to get a ride to work. TT: 589. Smith recalled talking with Monroe County District Attorney's Office Investigators Robert Siersma and Samuel Soprano prior to trial. TT: 590. However, Smith denied telling the investigators that she made several calls from her work phone to the landline at 500 Hathorn Court to talk to Mack. TT: 590-91. Smith insisted that she told Investigators Siersma and Soprano that Mack had called her. TT: 590-91. Though Smith was informed by the investigators that there were no phone calls, incoming or outgoing, for the landline at Hathorn Court from before 9 a.m. until after 8:41 p.m. on September 29, 2007, Smith said she told them that Mack called her using the landline. TT: 592.

Smith acknowledged that she provided two statements to the prosecution's investigators (People's Exhibits 46 and 47). TT: 593-94. When confronted with the contents of those statements—that she told the investigators that she made frequent calls from her work phone to check on Mack and their daughter—Smith at

34

first denied it but then said she "probably did call." TT: 594. However, Smith denied telling Siersma and Soprano that she used her work phone to call the landline phone at her apartment and that she gave them the landline number. TT: 594.

### 4.    John Penkitis

Penkitis, along with his partner, Dominick, worked on the Shaw investigation for about a year. TT: 596-97. Penkitis was not involved in drafting any of the felony complaints. He prepared a six-page narrative report. TT: 599. Penkitis showed a photo array containing Mack's picture to Chris Yancey, who was reported to have made a 911 call about the Shaw attack. TT: 599-600. Prior to being shown the array, Yancey had told Penkitis that he thought he could identify some of the suspects. TT: 599-600. The trial court sustained the prosecutor's objection when Penkitis was asked if Yancey was able to identify Mack. TT: 599. Penkitis did not show any photo arrays to Pamela Lawhorn or Diane Lawhorn and did not develop any suspects based on his conversations with them. TT: 601. He showed a photo array containing Mack's picture to Charnette Grayson, who could not identify Mack. TT: 602. Penkitis spoke to another 911 caller, Amy Jackson, who could not identify anyone. TT: 602. Penkitis spoke to a woman named "Joyce" who saw the fight from inside her vehicle; she said that it was dark outside, and she could not identify anyone. TT: 602-03.

Penkitis also spoke to Carolyn Sykes, Shonell Pevy, a woman named "Kathleen," Shelly Pierce, Jasmine and Linda Gilliam, Tonica Anderson, Rob

Deland, Ted Lagasse, Melissa Gibson (who lived at 315 Driving Park, directly across the street from 310 Driving Park, and who was on her porch during the attack), and Tom Klemenz (who also was on the porch at 315 Driving Park). TT: 603-08. In addition, Penkitis spoke with Luis Valliant, Maria Engram, Michelle Hastings, Joe Pierce, Shelly Lippincott, Tony Lippincott, Dave Stemer, Belinda Bryant, and Willie Robinson. TT: 608-12. Valliant, Engram, and Hastings were on porch with Torres at 868 Dewey Avenue. TT: TT: 608-09. However, Penkitis did not develop any suspects based on his conversations with any of these individuals. TT: 603-12. Penkitis spoke to between 75 and 100 individuals regarding Shaw's death. TT: 612. Penkitis estimated that 100 people viewed the incident. TT: 612-13. Penkitis estimated that he showed between five and seven witnesses the photo array containing Mack's picture. TT: 616-17. Penkitis said that this was because a lot of them said they could not identify anyone, so he felt there was no sense in showing more people a photo array. TT: 617.

### 5.   Carolyn Kenesha McHenry

Carolyn Kenesha McHenry, who was 21 years old, testified that, on September 29, 2007, she was living at 310 Driving Park with her cousin, Bessie Mack. TT: 619, 630. On September 29, 2007, the following people were at 310 Driving Park with McHenry and Bessie Mack: Seteria Lumpkin, Shatora Hampton, Quonikka Walker, Kionna Speed, Jessie Speed, Sonya Spaight, James Jenkins, and Jerome Walker. TT: 619-20. McHenry testified that Terrance Mack, who was her

cousin, was not at 310 Driving Park at any point on September 29, 2007. TT: 620, 627.

McHenry testified that Shatora Hampton and "the girl Shalora" were "going back and forth over typical girl stuff," "probably over a boy." TT: 621. Shatora Hampton, Kionna Speed, and Ebony Mack were walking to the store, and Shalora and two other girls were walking from the store. TT: 621. McHenry testified that Shatora Hampton and Shalora "did like a group-to-group fight thing." TT: 621.

Afterwards, Shatora Hampton, Kionna Speed, and Ebony Mack came back to 310 Driving Park, and "then the police came." TT: 621. When the police arrived, Shalora, a male, and another female were outside the house. TT: 621. After the police left, "like when it started getting dark," a black truck pulled up and parked in the barbershop parking lot to the right-hand side to 310 Driving Park. TT: 621-22. When asked what time this occurred, McHenry said she did not know; it could have been about "seven something." TT: 626-27. McHenry said "[i]t was dark." TT: 622, 626.

About five or six females emerged from the black truck; one of them was Diane Lawhorn. TT: 622-23. As Shaw was crossing the intersection and approaching the women, McHenry heard the women who were in the truck say, "There go that bitch." TT: 623. Shaw was with a little boy and a teenage girl. TT: 625. The women from the black truck ran toward Shaw. TT: 623-24. McHenry saw that Diane Lawhorn had a knife. TT: 625. Then two other females who were

37

"coming from the store" "shot a bottle at [Shaw]," and then "all of them just ran in." TT: 624.

McHenry testified that the person who threw the bottle was a woman but was dressed like a man in a dark blue hoodie and a baseball cap; she knew from looking at the person's face that "it wasn't no dude." TT: 626. McHenry was not sure if the person who threw the bottle joined in the altercation. TT: 626. The person was standing across the street between the store and the fish market. TT: 626.

McHenry was at the bottom of the front porch stairs at 310 Driving Park when she witnessed the fight. TT: 624-25. Nobody who was at 310 Driving Park left the porch during the altercation, which "happened real quick." TT: 625. McHenry estimated that the altercation lasted "[m]aybe ten minutes, if that." TT: 625.

On cross-examination, McHenry said she told an RPD investigator about the woman dressed like a man who threw a bottle. TT: 632-33. She agreed that she told the RPD investigator that she did not see who was beating or stabbing Shaw, because there were too many people around. TT: 633.

### 6.    Shatora Hampton

Eighteen-year-old Shatora Hampton testified that, at about 6 p.m. on September 29, 2007, she encountered Jasmine Shaw and a girl named Jellia in front of the convenience store on Dewey and Driving Park. TT: 635-36. Jellia "pulled out a knife" and Shatora started fighting with her. TT: 635. Jasmine tried

to jump in. TT: 635. Seteria Cunningham and Shatora's sisters also jumped in. TT: 635. Then they stopped fighting, and Shatora and her sisters returned to 310 Driving Park. TT: 635, 637. Shatora did not live in that neighborhood and was waiting for her ride to pick her up. TT: 636.

Shatora testified that the following people were at 310 Driving Park that evening: Seteria Cunningham, Carolyn Kenesha McHenry, Quonikka Walker, Kionna Speed, Brenda Speed, James Jenkins, Jerome Walker, and Ebony Mack. TT: 637. Shatora is not related to Mack; she knew him because her brother, J.C. Johnson, had a baby with Mack's cousin. TT: 637, 641-42. Shatora had known Mack for five or six years. TT: 642. Shatora did not see Mack at 310 Driving Park on September 29, 2007. TT: 637.

Shatora testified that, while she was waiting for her ride at 310 Driving Park, "Jellia came back with her sisters, I guess with the police, ready to fight again." TT: 638. Later that night, Shatora said that Jasmine Shaw, Latasha Shaw, and "some dudes" came walking down Driving Park. TT: 638. Then "[p]eople just started running off the porch." TT: 638. Shatora testified that Shaw was fighting someone, and that her sister, Grayson was fighting a girl named Theresa. TT: 638-39. Shatora's mother, Linda Lawhorn, went over to the convenience store to break up the fight. TT: 638-39. Shatora followed her mother over to the convenience store during the altercation. TT: 639.

Shatora described it as "just a big old brawl" that involved about seven people, though she was not sure of the number. TT: 639. As far as how much light

there was, Shatora said that "[s]ince the lights aren't there, I would say it was a little bit of dark, but I would say medium." TT: 639. Shatora estimated that the altercation lasted "[p]ossibly say about thirty, forty-five, fifty minutes." TT: 640-41. Mack was not present and was not involved in the fight. TT: 640. Shatora did not see any sticks or knives; she was worried about her mother fighting and was not looking at what others had in their hands. TT: 641. Shatora left 310 Driving Park at about 8 p.m. TT: 643.

### 7.    Terrance L. Mack

Mack testified that, in September 2007, he lived at 500 Hathorn Court with Jessica Smith and their infant daughter. TT: 647-48. Mack was familiar with 310 Driving Park, where Bessie Mack, Jerome Walker, and Quonikka Walker lived. TT: 649-50. However, Mack was not at 310 Driving Park on September 29, 2007; he was at his and Smith's apartment with their daughter. TT: 650. Mack testified that Smith returned home at 7:30 p.m. from work; he was at the apartment with their daughter. TT: 660-61.

Mack testified that the conversation between him and Donald at the jail "was all over a female." TT: 650-51. Mack denied admitting to Donald that he was involved in the Shaw incident. TT: 651.

On cross-examination, Mack admitted that his father, Anthony Jenkins, was in the courtroom. TT: 651-52. Mack admitted he had the opportunity to hear the witnesses' testimony and to look at the various crime reports and witness statements, though he said that he was a bad student and did not know how to

read. TT: 653-54. Mack also admitted that he knew Donald because they lived in the same neighborhood. Mack went to Edison Tech, while Donald had gone to Franklin High School. TT: 654, 655.

In response to being asked if he and Donald met each other around the phones or the shower area, Mack responded,

> Ma'am, it was never around the phone. Ma'am, he came out of his cell. We had words in the street. We had words in the street. I don't lie. I don't believe in lying, ma'am. We had words in the street. We walked around. We was doing like this to each other. (Indicating.) We scratched a beef. Then my brother asked me about my case, why am I here. He said, ["]I heard about Latasha.["]

TT: 655-56. Mack testified that he never talked about his case with Donald; when Donald asked about it, Mack ignored him. TT: 656

Mack called his father the night before his testimony. TT: 656. The recording of the phone call, which was placed at 9:02 p.m. on May 6, 2009, was played for the jury. The prosecutor attempted to confirm what "situation" Mack was referring to when said to his father:

Q.   Okay. So, did you say words like: Yeah, no, I did not ask, tell him, he asked about the situation?

A.   I told my dad, because my dad help me with my case. I don't know anything about no case, ma'am. I never been in trouble a day in my life, besides Elmira. That's it.

Q.   I understand, Mr. Mack. I am trying to understand a comment that you made on the phone last night. When you say, yeah, no, I did not ask, tell him, he asked about the situation, were you referring to Mr. Donald at that time?

A.   He asked. I didn't say, I didn't tell him, tell him about my case. The way he asked me about my case is exactly as is on that paper and as said in court earlier to my lawyer, Paul Vacca.

Q.   That was regarding Mr. Donald?

41

A. My dad helped me with all my case, and my dad talked about everything, ma'am. I wasn't in Rochester on September 29th, ma'am.

TT: 658-59. The prosecutor could not obtain a responsive answer from Mack about whether he was referring to the conversation with Donald when he said, "I didn't tell him; he was the one that asked about the situation." TT: 658-59. Mack also testified that he did not even remember what he said to his father on the phone because he was "so stressed." TT: 658.

Mack testified that the apartment had a landline, but then said he could not remember whether their apartment had a landline. TT: 661, 665. Mack was using various cell phones back then, and Smith would have called him on his cell phone. TT: 661, 665. Mack said that he gave the prosecutor various cell phone numbers, but could not remember which cell phone he was using in September 2007. TT: 665-66.

Mack offered that he had previously told the prosecutor that he had gone to Christopher Crawford's Clothing Store on September 29, 2007; he knew Benjamin James Mack, the owner, but Mack did not remember if he was there that day. TT: 661. He said that he was in a "photo array" at Benjamin James Mack's clothing store, and that Vacca had the photo. TT: 662.

When asked on cross-examination who else he saw that day, Mack replied, "I seen a lot of people that day. I seen fiens." TT: 662. He said that a "fien" was "[n]ot really" someone who deals and uses drugs; a "fien" also "could be a person who smokes weed." TT: 662. Mack offered that he saw his cousin, Eric Jenkins, and his best friend, Christopher White. TT: 662-63.

When asked if he saw his first cousin, Ebony Mack, in Rochester in September 2007, Mack said no; he then offered that he "came to Rochester two times" for his grandmother's funeral, but did not specify when that was. TT: 667-68. Mack offered that his mother had a cookout on September 3, 2007, in Rochester, but that he was not there. TT: 668.

Mack said that he had told the prosecutor during their previous meeting that he was "never in Rochester" on September 29, 2007; that he was at Christopher Crawford's Clothing Store; and that he was working at McDonald's. TT: 669. Mack corrected himself, stating that he told the prosecutor that he picked up his uniform from the McDonald's store manager, Vicki, on that date. TT: 669-70. Mack then equivocated, stating "[i]t could have been the twenty-eighth" that he picked up the uniform from McDonald's. TT: 670. Mack testified that he had his daughter the entire day, that his girlfriend called him on his cell phone during her two work-breaks, and that he and his daughter visited Precious Scott at some point. TT: 671.

### C.    Prosecution's Rebuttal Case

#### 1.    Gary Galetta

RPD Investigator Gary Galetta testified that, on December 10, 2008, he and his partner, RPD Investigator Glenn Weather, met with Kionna Speed at her home on Rosewood Terrace. TT: 674. Galetta said that Speed told him that she and her mother had left 310 Driving Park before the fight "jumped off, before it got big" because they "feared something was going to go down." TT: 674-75. Speed told him that she did not see what happened after the fight started. TT: 675. When Galetta

43

asked whether she even had heard anything about the fight, Speed "again reiterated, emphasized, that she wasn't there, and she can't say anything about what other people said." TT: 675. On cross-examination, Galetta admitted that Speed's responses to him on December 10, 2008, were not made under oath. TT: 677.

### 2.    Glenn Weather

RPD Investigator Glenn Weather testified that, as part of the investigation into Shaw's death, he met with Carolyn Kenesha McHenry on December 3, 2008, at 608 Hayward Avenue. TT: 680-81. McHenry's great-uncle, Maun Ashford, also was there. TT: 681. McHenry had indicated to Weather that she had information regarding the Shaw case. TT: 681. McHenry told Weather that "everyone was scared to talk about what happened and felt that the wrong people were in custody." TT: 683. McHenry said that she was at Bessie Mack's home on the night of the attack. TT: 683. However, McHenry "[n]ever" mentioned anything to Weather about a woman dressed like a man who threw a bottle at Shaw. TT: 681. If she had done so, Weather would have included it in a report. TT: 681-82. Weather agreed that "[m]any times" people have forgotten to tell him things when he is investigating crimes. TT: 686.

### 3.    Samuel Soprano

Monroe County District Attorney's Office Investigator Samuel Soprano testified that he met with Mack's girlfriend, Smith, on January 13, 2009, in Elmira. TT: 687-88. He was accompanied by Monroe County District Attorney's Office

Investigator Robert Siersma. TT: 689. Soprano spoke to Smith about whether she had received or placed telephone calls to Mack on September 29, 2007; which phone(s) she had used; and which number(s) she called. TT: 690. Smith told Soprano that she had used her work phone to call the landline at her apartment, 607-846-2875. TT: 691-92. Smith told Soprano that she had spoken to Mack on the phone "several times" throughout her workday. TT: 692. Based on his review of the phone records he subpoenaed for the landline at Smith's apartment, Soprano testified that after 9:01 a.m. on September 29, 2007, there were no incoming calls to, or outgoing calls from, the landline until 8:41 p.m. TT: 693-94. Smith told Soprano that the calls she made to Mack were to the home phone. T: 694.

On cross-examination, Soprano admitted that he did not memorialize his interview with Smith or make a report. TT: 695. He did not obtain the records from Smith's place of employment. TT: 696-97. Mack provided the number of the cell phone he said he was using during September 2007, and Soprano conducted a search for phone records; however, the number was not active during that period. TT: 697, 698.

### D.    Jury Charge on Identification

The trial court issued the "one witness identification" jury charge, which directed the jury to determine whether the identification of Mack was "both truthful and accurate." TT: 760. In assessing whether the identification "was accurate, that is[,] not an honest mistake," TT: 760, the jurors were told that they should consider the following factors: the lighting conditions under which the witness made their

observation; the distance between the witness and the perpetrator; whether the witness's view was unobstructed, whether the witness had an opportunity to see and remember the perpetrator's facial features, body size, hair, skin color, and clothing; the length of time that the witness actually observed the perpetrator; the direction in which the witness and the perpetrator were facing; the location to which the witness's attention was directed; whether the witness had a particular reason to look at and remember the perpetrator; whether the witness had an opportunity to give a description of the perpetrator and, if so, to what extent did it match or not match the defendant as you find his appearance to have been on the day in question; the mental, physical and emotional state of the witness before, during, and after the observation; to what extent, if any, did that condition affect the witness's ability to observe and accurately remember the perpetrator; whether the witness saw the perpetrator prior to the crime and, if so, how many times and under what circumstances; to what extent, if any, did those prior observations affect the witness's ability to accurately recognize and identify such person as the perpetrator; and whether the identification of the defendant was suggested in some way to the witness. TT: 760-62.

### E.    Jury Notes and Verdict

The jury began deliberations at 12:30 p.m. TT: 773. At 2:19 p.m., the jury sent out their first note, requesting a smoke break for two jurors, all of Torres's testimony, the recording of Shaw's 911 call, Donald's direct testimony, all of Grayson's testimony, and the evidence of a baseball bat at the crime scene. TT: 775.

The trial court immediately brought the jury out and explained that it would delay the smoke break and would have the court reporter begin the read-back of the requested testimony. TT: 776. At 3:50 p.m., Vacca requested a five-minute break. TT: 777. The trial court agreed and took a recess until 4:13 p.m. TT: 777.

When the proceedings resumed, the trial court said that the jury had sent out a note requesting "just the conversation between Mack and Donald about why he was in custody and what happened in this situation only;" and rescinding the request for Grayson's testimony. TT: 777. The trial court suggested that to avoid confusion, the court report should just read Donald's entire direct testimony; neither party objected. TT: 777-78. The jury was brought out, and the trial court explained the procedure that would be followed regarding the second note. TT: 779-80. The read-back of testimony continued. TT: 780. When that was completed, the 911 call was played for the jury. TT: 780.

Before sending the jury back to deliberate, the trial court afforded a smoke break to the jurors who previously had requested one. TT: 780-81. The court was in recess from 4:37 p.m. to 5:04 p.m. TT: 781.

When the proceedings reconvened, one of the alternate jurors sent a note requesting to be released by 5:15 p.m. to attend a concert in Buffalo for which she had a ticket. TT: 781. Vacca had no problem releasing this alternate but wanted to continue to hold the second alternate. TT: 782. The prosecutor had no objection. TT: 782. The alternate juror was released, and the trial court took a recess from 5:10 p.m. to 5:42 p.m. TT: 783.

When the proceedings reconvened, the trial court said that the jury had sent a note asking "1. How late are we allowed to deliberate tonight? 2. What is protocol for a deadlock? Problem: We are deadlocked." TT: 784-85. After the trial court responded to that note, the jury returned to its deliberations at 6:02 p.m. TT: 786. The trial court then informed the attorneys that they "can remain unavailable" until 7:30 p.m. because, on a Friday night, it would possibly take some time to get the jurors their dinner. TT: 786. The trial court said that if the jurors had questions between now and then, "we will address them at 7:30." TT: 786. The proceedings recessed at 6:03 p.m. TT: 786.

During the recess, the jury sent out three notes. The first note, sent at 6:20 p.m., requested a reading of the jury instructions regarding "the importance of a single witness in a case versus multiple witnesses and the instructions about the meaning of reasonable doubt." TT: 786-87. The second note, sent at 6:43 p.m., requested a readback of Torres's testimony regarding Mack's "leaving of the crime scene." TT: 787. The note also asked for more request sheets. TT: 787. The third note, sent at 6:47 p.m., asked for a smoke break. TT: 787.

When the proceedings resumed at 7:51 p.m., the trial court marked these three notes as court exhibits and then read the notes verbatim into the record in the presence of the attorneys and Mack. TT: 786-87. The trial court and both attorneys agreed that Torres had not provided any testimony about Mack's departure from the crime scene. TT: 787-88. The trial court stated that it would respond that there

48

is no testimony regarding that matter. TT: 788. The trial court also said it would reread its earlier legal instructions on the requested topics. TT: 788.

Before the trial court summoned the jury into the courtroom to provide those responses, the court deputy handed up another jury note. TT: 788. The trial court then held the proceedings in recess from 7:54 p.m. to 8:10 p.m. At 8:10 p.m., the proceedings resumed, and the trial court announced on the record that the jury had reached a verdict and that it planned to bring the jurors into the courtroom to report their verdict. TT: 788-89. The jurors then entered the courtroom and reported that they had found Mack guilty as charged in the indictment. The trial court polled the jury and accepted the verdict. TT: 789-91.

### F.    Motion to Set Aside the Verdict

On June 10, 2009, Vacca filed a motion to set aside the verdict pursuant to CPL § 330.30(1) (legal insufficiency of the evidence) and (3) (newly discovered evidence). SR: 116-37. In support of the newly-discovered-evidence prong of the motion, Vacca submitted his affidavit and the one-page notarized statement of Christopher Travis White, which he characterized as newly discovered evidence. SR: 130. Vacca indicated that White had been listed "as a potential alibi witness[] because he accompanied [Mack] in the morning to Precious Scott's house, as per Ms. Scott's testimony," but White "could not be located with the usual effort" prior to trial by Geoffrey Resnick, the private investigator retained by the defense. SR: 126, 130. Vacca said that, after the trial, White was located and gave a sworn one-page statement, which was attached to the motion. SR: 125, 137. Vacca argued that

White had non-cumulative and "valid, important alibi testimony to give," and he requested that a new trial be granted under CPL § 330.30(3). SR: 131. White's statement read as follows:

> I was released from Shock Camp on May 07, 2009. After I was back in Elmira I found out on May 09, 2009[,] that Tarrance Mack had been convicted. I called his mother to confirm that he was convicted. I told her I was with Tarrance on the day the lady was killed in Rochester. Tarrance and I were together that day. He was taking care of his daughter while his girlfriend was at work. We were at his house at Hawthorne Court—we went to the Westin [sic] later in the day. It was starting to get dark. Tarrance got a phone call on his cell phone from a relative in Rochester. The relative told Tarrance some of his relatives in Rochester were being investigated for a murder. I think the murder happened earlier on the day that Tarrance received the phone call. We went back to Tarrance's house[,] and he made some calls, trying to get in touch with some relatives in Rochester. Tarrance did not have a driver[']s license or vehicle. If he wanted to go to Rochester[,] he had to find a ride to Rochester and back to Elmira—Tarrance mostly stayed in Elmira.

SR: 137.

As far as the legal-insufficiency prong of the motion, Vacca acknowledged that a "weight of the evidence" claim was reserved for direct appeal, but argued that the evidence of the perpetrator's identity was legally insufficient as a matter of law. SR: 133-35. Vacca cited the contradictions between Torres's account of the incident and the testimony offered by the defense witnesses who also were present. SR: 133-35. In addition, Vacca noted that Torres's identification of Mack did not occur until a month after the crime, and that Mack had an alibi. SR: 135. Finally, Vacca argued that the jury "hastily" came to a verdict, citing the timing of the jury notes. SR: 136.

The prosecutor responded by affirmation on June 16, 2009, arguing that White's proposed testimony that he was with Mack in Elmira on September 29, 2007, was "cumulative at best" and did not meet the standard for newly discovered evidence in *People v. Salemi*, 309 N.Y. 208, 215-16 (1955). SR: 138-41. The prosecutor also contended that Vacca was in fact attacking the weight of the evidence, which could only be reviewed on direct appeal.

At the beginning of the sentencing proceeding on June 17, 2009, the trial court heard oral argument from the parties on the CPL § 330.30 motion. ST: 2-4.[11] The trial court then denied the motion from the bench, ruling that there "clearly was sufficient evidence" supporting the verdict and that the proffered alibi evidence "in fact, [was] not newly discovered at all." ST: 4.

With the motion having been denied, the prosecutor questioned Mack regarding the allegations in the second felony offender information. ST: 4-5. Mack admitted to being the person convicted on October 1, 2004, in Chemung County Court, of one count of third-degree attempted criminal possession of a controlled substance, for which he received a sentence of one to three years' imprisonment. ST: 6; *see* N.Y. Crim. Proc. Law § 400.21. The trial court then certified Mack as a second felony offender for purposes of sentencing. ST: 6. For Mack's conviction of first-degree gang assault under P.L. § 120.07, a class B violent felony offense, the trial court imposed the statutory maximum—25 years' imprisonment to be followed

---

[11] Citations to "ST:" refer to the original pagination of the sentencing transcript, which begins at page 874 of Docket 17-2 and ends at page 891 of Docket 17-2.

by five years' post-release supervision.  ST: 16-17; *see* N.Y. Penal Law §§ 70.02(1)(a), 70.06(6)(a) (eff. until Sept. 1, 2025, pursuant to L.1995, c.3, § 74(d)).

## IV.   POST-JUDGMENT PROCEEDINGS

### A.   Direct Appeal

Monroe County Assistant Public Defender David R. Juergens ("appellate counsel") was assigned to represent Mack on direct appeal to the Appellate Division, Fourth Department, of New York State Supreme Court ("Fourth Department"). Appellate counsel filed a brief arguing that: (1) the trial court committed a mode-of-proceedings error by accepting the verdict without responding to three outstanding jury notes; (2) the trial court's response to the jury's deadlock note was unreasonably delayed as well as misleading; (3) trial counsel was ineffective for, among other things, failing to object to testimony related to Torres's identification of him from a photo array, failing to question Torres about discrepancies in her descriptions of Mack, failing to give a cogent summation, and failing to ask the trial court to respond to the jury notes; and (4) the trial court committed reversible error by admitting the telephone conversation between Mack and his father.  SR: 170-240.  The prosecution filed a brief in opposition.  SR: 241-68.  Appellate counsel filed a reply.  SR: 269-97.

On May 2, 2014, a four-justice majority of the Fourth Department reversed the judgment on the law.  *People v. Mack*, 117 A.D.3d 1450, 984 N.Y.S.2d 768 (4th Dep't 2014).  The majority determined that, "although defense counsel failed to object to the [trial] court's procedure of accepting the verdict without responding to

the jury's notes, the failure of the [trial] court to provide a meaningful response to the substantive requests of the jury [was] a mode of proceedings error for which preservation is not required." *Mack*, 117 A.D.3d at 1451. The majority did not have an issue with the fact that "[t]he jury may have resolved the factual issue regarding whether the eyewitness testified that she saw defendant leave the scene without further instruction assistance from the court." *Id.* But the jury should not have been "relegated to its own unfettered course of procedure" regarding the requests for readbacks of the instructions on reasonable doubt and "the importance a single witness in a case versus multiple witnesses." *Id.* (quotation omitted). As far as Mack's "remaining contentions," the panel unanimously rejected them as "without merit." *Id.*

One justice dissented on the basis that the trial court's failure to respond to the outstanding jury notes was not a mode of proceedings error. *See id.* at 1452-53 (dissenting opn.). In that justice's view, the jury "impliedly rescinded" its outstanding notes "by issuing a note stating that it had reached a verdict," and thus the trial court did not err in concluding that the jury no longer needed the requested information. *Id.* at 1452.

On June 30, 2014, the dissenting justice granted the prosecution's application for leave to appeal. *People v. Mack*, 23 N.Y.3d 1027 (2014).

In a six-one decision, the New York Court of Appeals reversed the Fourth Department's June 7, 2016 order. *People v. Mack*, 27 N.Y.3d 534 (2016). The majority agreed with the prosecution that the trial court's failure to respond to the

jury notes was not a mode-of-proceedings error. *Id.* at 541-43. Of "pivotal importance" to that determination was trial counsel's "knowledge of all the facts required to object to the trial court's procedure or lack of response to the jury's requests." *Id.* at 541. The majority opined that Mack's proposed rule

> would also incentivize a distinct tactic that diminishes the preservation rule. Here, the defense may have made a strategic choice not to challenge the trial court's procedure. Counsel, who was aware that the jury's last note before the recess declared a deadlock, may have decided that the jurors were more likely to acquit defendant if they were not given the chance to deliberate further. In such situations, if the alleged error is deemed to be a mode of proceedings error, "it would be unwise for counsel to object and seek correction of the error". If the verdict is an acquittal, counsel will have secured the desired trial outcome. If the jury convicts the defendant, counsel will have created an appellate issue requiring automatic reversal and a new trial simply by remaining silent. We decline to create a rule that would incentivize such tactics and would diminish the important purposes underlying the preservation rule.

*Id.* at 543-44 (citations omitted).

The majority concluded that, absent a mode-of-proceedings error, it lacked jurisdiction to review how the trial court handled the jury notes. *Id.* at 544. The majority also lacked jurisdiction to address the prosecution's contention that the trial court did not err because the jury implicitly withdrew its earlier requests by announcing it had reached a verdict. *Id.*

Finally, the majority rejected as "without merit" the remaining contentions offered by Mack as alternative grounds for affirming the lower court's ruling. *Id.* The case was remitted to the Fourth Department "for consideration of the facts and issues raised but not determined on the appeal to that [c]ourt." *Id.*

54

Mack filed a counseled motion to reargue, SR: 417-36, which the prosecution opposed, SR.437-40. The New York Court of Appeals denied reargument on September 8, 2016. *People v. Mack*, 28 N.Y.3d 944 (2016); SR: 441.

On remittal, Mack filed a counseled letter-brief reiterating that the trial court's failure to respond to the outstanding jury notes was reversible error. SR.442-50. The prosecution filed a letter-brief in opposition. SR: 451-53.

On August 17, 2016, the Fourth Department affirmed the conviction by a vote of three to two. *People v. Mack*, 142 A.D.3d 755, 36 N.Y.S.3d 538 (4th Dep't 2016); SR: 454-58. Because it had already reviewed Mack's other substantive contentions and concluded that they were meritless, the Fourth Department focused on the only remaining issue—whether it should exercise its power under CPL § 470.15(6)(a) to review the unpreserved jury note claim as a matter of discretion in the interest of justice. *Id.* at 756. The majority declined to do so, explaining that:

> [a]s the Court of Appeals noted, defense counsel "may have made a strategic choice not to challenge the trial court's procedure," and "may have decided that the jurors were more likely to acquit defendant if they were not given the chance to deliberate further". Such a strategic decision, if made, would have been entirely reasonable considering that the jury had asked for, among other things, a readback of testimony from the key prosecution witness.

*Id.* at 756 (citation omitted). The majority further determined that, that since trial counsel may have had a legitimate, strategic reason for not objecting to the trial court's procedure, it could not agree with the dissent that Mack was "seriously prejudiced" by the trial court's acceptance of the verdict. *Id.* The majority pointed out that, on the initial appeal, the panel had "unanimously rejected defendant's contention that defense counsel was ineffective for failing to object to the [trial]

55

court's procedure." *Id.* at 757; *see also id.* at 759 (dissenting opn.) ("[A]s the majority properly notes, we concluded that defendant was *not* denied effective assistance of counsel. . . . [C]ounsel may have anticipated under the [mode of proceedings] jurisprudence in effect at the time of trial that this [c]ourt would grant defendant a new trial, which indeed we did.") (emphasis supplied).

In response to the dissent's comment that the proof of Mack's guilt was "not overwhelming," *id.* at 758 (dissenting opn.), the majority observed that Mack had never challenged the weight or sufficiency of the evidence, which it characterized as "ample" to support the verdict. *Id.* at 757. The majority noted that "[t]he eyewitness who saw defendant attack the victim with a bottle knew defendant from the neighborhood, having seen him 'quite a few times,'" *id.* (citation to record omitted in original), and therefore "[i]t was not as though she were identifying a stranger," *id.* The majority found that the testimony of Donald, the jailhouse informant, "also was corroborated by [Mack] himself, who, during a recorded telephone conversation from jail with his father, essentially acknowledged that he made the damaging admissions to the informant." *Id.*

Through appellate counsel, Mack sought leave to appeal on the issue of whether the Fourth Department had applied the correct standard when it declined to review the unpreserved jury note claim in the interests of justice. SR: 459-92. The prosecution opposed the leave application. SR: 493-97. The New York Court of Appeals denied leave on October 31, 2016. SR: 498.

### B.    First Motion to Vacate the Judgment Under CPL § 440.10

#### 1.    Motion

On January 13, 2017, appellate counsel filed a motion to vacate the judgment pursuant to CPL § 440.10(1) ("440 motion"). SR: 499-573. Mack asserted that the prosecution's failure to disclose that Charnette Grayson had a 2002 town court conviction for third-degree criminal possession of a forged instrument violated *Brady v. Maryland*, 373 U.S. 83 (1963), SR: 542-53; and that the prosecution's failure to file and serve notice of their intent to call Soprano as an alibi rebuttal witness violated CPL § 250.20(2), SR: 553-55.

Mack also asserted that Vacca provided ineffective assistance under both the federal and New York State standards, SR: 556, because, among other things, he: failed to investigate and call Christopher Travis White as an alibi witness, SR: 532, 555-58; failed to call Bessie Mack, Jerome Walker, and Sonia Spaight to support the alibi defense, SR: 532, 555-58; failed to consult with or call an expert witness on the science of memory and perception, or otherwise become familiar with the science as it relates to eyewitness identification, SR: 531, 560-61; failed to educate the jurors about the risk of misidentification posed by factors such as cross-racial identification ("own race bias"), SR: 532, 535; failed to object to inadmissible testimony and evidence about a non-blinded photo array procedure conducted with Torres, SR: 530-31; erroneously asked open-ended questions to Torres about how she was able to identify Mack in the crowd, SR: 529, 558, and why she came forward to the police, SR: 529, 558; inadequately addressed the distance from which Torres

viewed the incident, the level of darkness at the time of the incident, and Torres's viewing angle, SR: 532, 535; failed to cross-examine Torres using her 911 call to expose inconsistencies in her testimony, SR: 530; failed to raise an objection based on CPL § 250.20(2) when the prosecution called Soprano as an alibi rebuttal witness, SR: 534; did not elicit from Mack his age, height, and weight to show that he did match Torres's description of the suspect, SR: 533; (20) failed to cross-examine Donald about the facts underlying his youthful offender adjudication, SR: 531, 567-68; failed to object to the prosecutor's erroneous closing statement about Mack's relationship to the defense witnesses, SR: 535; did not subpoena any telephone records for Mack or the alibi witnesses, SR: 527-28; did not elicit testimony regarding Mack's arrest date and immediate report of an alibi defense, SR: 568; and failed to object to the trial court taking the verdict without addressing the jury's request for instruction on the law and a read-back of testimony, SR: 535-36, 570-71.

Finally, Mack argued that he is actually innocent and that the prosecutor had a professional obligation to recognize the fundamental unfairness of his conviction. SR: 571-73.

The prosecution filed an answering affirmation. SR: 574-95. Appellate counsel filed an affirmation in reply. SR: 596-617.

### 2.    First Hearing on the 440 Motion

The 440 motion was assigned to Monroe County Court Judge Christopher S. Ciaccio ("first 440 court") who, after oral argument, held an evidentiary hearing.

58

SR: 664. The hearing was, however, limited to one portion of the ineffectiveness claim—Vacca's failure to investigate Christopher Travis White as an alibi witness and failure to call Bessie Mack, Jerome Walker, and Sonia Spaight, all of whom had been included in the notice of alibi. SR: 664. The hearing was conducted on November 20 and 21, 2017.[12] Appellate counsel called Vacca, White, Spaight, Bessie Mack, defense investigator Geoffrey Resnick, and Mack. The prosecution did not call any witnesses or offer any proof.

### a.    Paul Vacca, Esq.

Vacca testified that he had been practicing law for 41 years. H1: 61. As of the time of Mack's trial in May 2009, Vacca had tried between 100 to 150 felony cases; in the period following Mack's trial, he tried 50 or 60 additional cases. H1: 61-62. Vacca no longer had Mack's case file; at Mack's request, he had given it to Mack's father, Anthony Quinn Jenkins, after trial. H1: 64-65

Within a few days of Mack being arrested, and prior to Mack's arraignment, Vacca retained private investigator Geoffrey Resnick on behalf of the defense. H1: 20, 46, 62-63. Vacca spoke to Mack, Mack's father (Anthony Quinn Jenkins) and Mack's aunt (Bessie Mack) to develop a list of alibi witnesses. H1: 63.

Vacca and Resnick traveled to Elmira and interviewed Carolyn Kenesha McHenry, Precious Scott, Bessie Mack, and Shatora Hampton. H1: 53, 64. Vacca

---

[12] The transcripts of the first 440 hearing are located at pages 1-173 of Docket 17-3 (November 20, 2017 transcript) and pages 1-32 of Docket 17-4 (November 21, 2017 transcript). Citations to "H1:" refer to the original page numbers of the November 20, 2017 transcript. Citations to "H2:" refer to the original page numbers of the November 21, 2017 transcript.

spoke to Bessie Mack "maybe two or three times a month about the developing alibi witnesses." H1: 54. Vacca testified that he chose not to call Bessie because there was "something about her testimony that was inconsistent with a couple of the other witnesses" and "[i]t was a judgment call on [his] part in that it may have confused rather than helped." H1: 54. Vacca could not recall whether he subpoenaed any phone records related to Mack's case. H1: 55. Vacca could not recall why he did not call Sonia Spaight. H1: 56.

Vacca testified that when he spoke with Mack about James Jenkins and Christopher Travis White testifying at trial, Mack "told [him] they were incarcerated, [']I don't want to call them as witnesses.[']" H1: 47; *see also* H1: 74 (same). Vacca said that "one of the reports from Resnick he talks about Jenkins and he talks about White both being incarcerated in State correctional facility."[13] H1: 47. Vacca's conversation with Mack about Christopher Travis White and James Jenkins conversation occurred in November or December of 2008, or January of 2009. H1: 47. Vacca explained that:

> the answer to the question about White, White was not interviewed or called and neither was Jenkins, but it was at the direction of my client because we had enough people, five, plus two that the prosecution had for a total of seven that we felt were enough alibi witnesses without causing problems.
> . . .

---

[13] Vacca is referring to a written status report from Resnick dated March 5, 2009, which indicated that "James Jenkins is in custody at Clinton Correctional Facility in Dannemora"; that "Christopher T. (for Travis?) White is in custody at Lakeview Shock Incarceration in Brocton"; and that White's "next visit date is March 15[,] 2009." SR: 907. Resnick also said that he would "hold on interviews with James Jenkins and Christopher White at this time." SR: 907.

> We didn't call 'em. No, we didn't call 'em. We interviewed several other witnesses, 17 or 18, and we were able to distill it down to five people where times fit. Most of them were unavailable. I tried calling them. Resnick called some of them. I don't remember anything, it was over a year [sic] ago, I can't remember. We are lucky we got the alibi witnesses that we did.

H1: 47-48; *see also* H1: 66. As far as the witnesses in New York State custody, Vacca testified that:

> [My] thought process is the defendant is telling me don't talk to them, they are in custody, it's going to look bad before a jury having someone testify who is in custody, as far as these individuals are concerned[,] I really don't know what they are going to say, they may hurt me, don't call them. I just put my efforts in[to] another area.

H1: 74.

In securing alibi witnesses, Vacca was looking for individuals who could say either that Mack was not around Dewey Avenue and Driving Park Boulevard on September 29, 2007; or that Mack was in Elmira on that date. H1: 66-67. Vacca questioned potential witnesses about their ability to observe the incident and about "who else was there, you know, some of the witnesses that testified, both for the prosecution and the defense, said that there were no men there at the time," which lent "credence to our defense by saying that there were no men there at the time." H1: 69. If the witnesses did see any males, Vacca would ask for a name or at least a description of that individual. H1: 70. Vacca "believe[d] that the witnesses we chose were the best witnesses to testify in this case." H1: 72. Vacca attempted to speak with Torres in May of 2009, prior to trial, but was unable to do so. H1: 76.

As far as how Vacca came to include the statement from White in the 330 motion, Vacca thought that Mack's father or Bessie Mack had called Resnick and

61

told him that White had been released from prison and wanted to testify.  H1: 75.
As a result, Resnick went out and talked to White.  H1: 75.

At the time Vacca prepared his attorney affirmation in support of the 330
motion, in which he stated that White could not be located at the time of trial,
Vacca "did not remember where he was.  I did not remember Resnick's indication
that he was at this boot camp."  H1: 49-50.

### b.    Christopher Travis White

White, who was 32 years old at the time of the hearing, testified that, on
September 29, 2007, he was living in Elmira.  H1: 84.  He currently was serving a
45-day jail sentence for resisting arrest.  H1: 84.  He and Mack first met in
Rochester and had been "[b]est friends" for the past 20 years.  H1: 85, 90.  When
asked to describe what he remembered about being with Mack in Elmira on
September 29, 2007, White replied:

> The most I really, really remember about that day is me being with
> him and getting a phone call, him getting a phone call, someone saying
> they have your family in custody about or under investigation about a
> murder or something like that.

H1: 85.

Asked to describe his contact with Mack that day, White said that he went to
Mack's apartment in the morning and picked up Mack and his infant daughter;
they spent the day "riding around."  H1: 86.  The only store he "specifically
remember[ed]" visiting was the "West End,"[14] a corner bodega.  H1: 86.  White was

---

[14] The Court assumes that "The West End" is the same location that White referred
to as "The Westin" in his 2009 statement in support of the 330 motion.

"not sure" "what street or whatever" they were on when Mack received the call from his family member. H1: 86. White remembered "sitting like right next to him and someone said that his mother and his aunts were being held for an investigation." H1: 86. Then Mack started "making a bunch of more phone calls" to "try[] to figure out what was going on." H1: 86.

In September 2008, White was in the Shock Incarceration Program at Lakeview Correctional Facility. During a visit, White's ex-wife told him that Mack was incarcerated and that there was a chance he (White) would be called to testify on Mack's behalf. H1: 86. White told her that he was willing to do so. H1: 86-87. Although White's ex-wife told him about Mack's trial while he was in shock camp, White did not reach out to any staff members because he "didn't know no guards to reach out to." H1: 107-08.

After White was released from shock camp on May 7, 2009, the defense investigator came to his house and talked to him. H1: 87, 88. White provided a statement saying, "basically Terrance was with me." H1: 87. White told the investigator he was willing to testify, but he never heard anything further about it. H1: 87.

On cross-examination, when asked to provide more details about his activities with Mack on September 29, 2007, White responded, "We were there [sic] everyday thing, we go around, we chill, we do run around stuff like that." H1: 104. He described Mack's daughter as "a few months[ old], no older than one." H1: 104. Mack took the baby with them in a "[c]ar seat, stuff like that" or "whatever, that's

63

how you proper manage of a baby." H1: 104, 105. White could not remember what time they went to the corner bodega. H1: 105. He did not remember "the specific activities of that day" apart from Mack receiving the phone call "when it starting [sic] about getting dark." H1: 105. Mack's daughter was with them when Mack received the call, but White did not know if she was napping at that time. H1: 105. White could not remember where they were when Mack received the call about his family members being in police custody. H1: 105-06.

When confronted with his statement to Resnick in which he said they "'mostly stayed in Elmira that day,'" White said that they "[s]tayed in Elmira that day period," and that "[he] never left Elmira." H1: 106. White suggested that Resnick "made a misprint" when he wrote "'mostly stayed.'" H1: 106.

White described Precious Scott as a close friend who he thought of as family. H1: 88. When asked if he recalled seeing her on September 29, 2007, White replied, "I'm not actually sure. I don't remember that part." H1: 88.

According to White, Mack did not have a car in September 2007, and he relied on White or family members for transportation. H1: 88.

White was shown a copy of a photograph that purported to depict Mack at a clothing store in Elmira called "Benjamin's Christopher Crawford." H1: 99, 100. The photograph had been introduced into evidence during Mack's trial testimony. White said that he recognized himself and Benjamin Mack, the store owner, in the photograph. H1: 100-01. White initially said he saw Mack in the picture but then said, "I really can't tell, it's blurry." H: 100. White said he was "not actually sure"

64

who took the photograph or when it was taken. H1: 101. White said that when he was shown the original of the photograph by Resnick in May 2009, it was "in color and you can really see." H1: 100. White could not answer responsively when the prosecutor confronted him with his inability to identify anyone at that time, even though the photograph supposedly was clearer than the one he was shown at the 440 hearing.

### c.    Sonia Spaight

Sonia Spaight testified that she was 47 years old at the time of the hearing. H1: 114, 128. Mack is her nephew by marriage; her sister was married to his uncle. H1: 115. Spaight's sister was married to a person whom Spaight described as the uncle of one of Anthony Quinn Jenkins's sons and the uncle of Ebony Mack, Mack's co-defendant. H: 122-23.

On September 29, 2007, at about 4 p.m., Spaight went to 310 Driving Park after she got off work. H1: 116. Bessie Mack and her husband, Jerome Walker, lived at 310 Driving Park. H1: 116.

Spaight was still at 310 Driving Park at 7:30 p.m., when the attack on Shaw occurred. H1: 117. The police arrived about half-an-hour after the attack and took Bessie and Walker into custody. H1: 118. Spaight did not see Mack at 310 Driving Park on September 29, 2007. H: 119, 136.

Spaight was subpoenaed to testify at Mack's trial but never spoke to his attorney about it. H1: 119-20. She attended the trial, but "[t]hey wouldn't let [her]

in because [she] was supposed to be a witness." H1: 121. She was given the subpoena by Mack's father. H1: 121-22.

On cross-examination, Spaight was confronted with her November 22, 2007 statement to Resnick (People's Exhibit 10). H1: 120-21. When he came to her house, Resnick said he "wanted to know what [she] knew." H1: 121. Spaight agreed that she said in her statement to Resnick that she went over to tell people to get off Shaw. However, she denied knowing who was on top of Shaw. H1: 123. She said "[i]t appeared to be all females." H1: 123-24; *see also* H1: 135-36. Spaight also denied telling Resnick that Ebony was one of the people near Shaw. H1: 123.

When confronted with her December 3, 2007 statement to Penkitis, Spaight denied telling him that she did not arrive at 310 Driving Park until *after* the stabbing occurred and after the officers initially responded to the scene. H1: 124, 125. She did, however, tell Penkitis that she stayed at 310 Driving Park to lock up the house for everyone. H1: 125. Spaight denied telling Penkitis that she had gone to 310 Driving Park to pick up her children because Bessie Mack and Jerome Walker had been taken into custody by the police and were no longer at the house. H1: 124-25.

About a year later, on November 7, 2008, Spaight spoke with Galetta and Weather. H1: 125-26. Spaight told Galetta and Weather that she was at 310 Driving Park when the attack occurred. H1: 127. Spaight also told them that James Jenkins "was on the run from the police at the time of the stabbing" but did not know why he was "on the run." H1: 128. She testified that she did not think

66

that her November 2008 statement to Galetta and Weather contradicted her December 2007 statement to Penkitis. H1: 127.

Spaight was shown her affidavit in support of Mack's 440 motion, signed on September 28, 2016. H1: 129-30. When asked how she came to give that statement, Spaight replied, "Somebody came and talked to me, I guess." H1: 130. Spaight could not recall where she was when she gave the statement. H1: 130. She did not actually recall giving a statement in 2016; nor did she recall having a notary public witness her signature. H1: 131, 133. She then said that she thought the statement was mailed to her. H1: 133-34.

### d.    Bessie Mack

Bessie Mack testified that she was 52 years-old and that she is Mack's aunt; Mack is the son of her sister, Mary Mack. H1: 137-38. On September 29, 2007, Bessie was living at 310 Driving Park with her late husband, Jerome Walker. H1: 138. Jerome passed away on February 28, 2013. H1: 152. Bessie and Jerome were at home all day. H1: 138. Spaight is her sister-in-law. H1: 138. Bessie has three daughters (Ebony, Sateria, and Quonika). H1: 142-43, 147. Only Quonika lived at 310 Driving Park. H1: 149.

Spaight came over between 1 p.m. and 2 p.m. to do Bessie's hair, and was still there at 7:30 p.m. H1: 138-39, 147-48. Bessie said that her nephew, Mack, was not at 310 Driving Park that day. H1: 139.

When asked if she "witnessed any part of the killing," Bessie said "[n]o." H1: 139. When asked where she was, Bessie responded, "I was on the porch. I was on

the porch that morning, that afternoon[,] about between 4:30 and five I was inside doing the house, Sonia was doing my hair." H1: 139. On cross-examination, her testimony implied that she was inside the house getting her hair done just before the attack:

> Q. And before the stabbing happened what were you doing in the house?
> A. Getting my hair done.
> Q. Who was doing your hair?
> A. Sonia.
> . . .
> Q. How did you end up on the porch?
> A. Oh, somebody came, came and said a fight was down the street.
> Q. And can you describe the group in the fight?
> A. No, I can't, couldn't see, there were too many people down there, couldn't see.
> Q. You ran to the porch, correct?
> A. I walked on the porch, yes.
> Q. You didn't leave the porch?
> A. No.
> Q. Who left the porch?
> A. Nobody, nobody, except Sonia [Spaight] went down there and say, went down there and said[, "]get off that girl, get off that lady.["]

H1: 148. Bessie claimed that she did not see her daughter, Ebony—Mack's former co-defendant—on the evening of September 29, 2007, and did not recall where Ebony was at the time of the incident. H1: 148-49.

Bessie could not remember if she came to the courthouse to attend Mack's trial. H1: 141-42. She later admitted she was in the courtroom but claimed she did not remember if she saw any witnesses testify. H1: 144-45. Bessie also claimed that she did not know who Vacca is and said she had never been to his office. H1: 145-46. Bessie admitted she pleaded guilty on July 17, 1996, to third-degree assault, in satisfaction of a second-degree assault charge. H1: 151-52.

e.    Geoffrey E. Resnick

Resnick testified that he was retained by Vacca to investigate Mack's case. (H1: 153-54). He and trial counsel met with Mack at the Monroe County Jail on February 25, 2009. H1: 154. At that meeting, Mack provided them with the names of Christopher Travis White and James Jenkins, both of whom were in prison. H1: 155-56. Resnick subsequently discovered that James Jenkins was at Clinton Correctional Facility and White was at Lakeview Shock Incarceration, and that White's next "visit date" was March 15, 2009. H1: 156-57. Resnick included this information in a report dated March 5, 2009, which he provided to trial counsel. H1: 157. Resnick did not talk to James Jenkins or White prior to Mack's trial. H1: 157. Resnick did not recall Mack expressing any reservations about calling White or James Jenkins as witnesses; if he had, he "would have written it down." H1: 157.

Resnick thought that the defense team had "a lot of witnesses lined up that would help us" and thought he "talked to everybody that we were supposed to or wanted to." H1: 163. Resnick did not know why White, Bessie Mack, Walker, and Spaight were not called. H1: 170-71.

After the verdict, Resnick conducted a follow-up investigation and took a statement from White on May 14, 2009. H1: 158-59. Resnick acted on his own initiative, without charging a fee, because he had become friends with Mack's father and because he believes Mack is innocent. H1: 164-65, 169.

69

### f.    Terrance L. Mack

Mack testified that he, Vacca, and Resnick met on February 25, 2009, at the Monroe County Jail. H2: 3. Mack told Vacca and Resnick that he was in Elmira at the time of the crime. H2: 3. Mack named two alibi witnesses who could verify that he was in Elmira—White and James Jenkins. H2: 3-4. Mack said White and James Jenkins were incarcerated at Lakeview Shock Camp and Clinton Correctional Facility, respectively. H2: 3-4. Mack denied telling Vacca that he did not want to call White as a witness. H2: 4.

On cross-examination, Mack said he could not remember if he provided White's name at the first meeting with Vacca or at a subsequent meeting. H2: 9, 10-11. He later said it was at the second meeting that he provided Vacca with White's name; "[a] lot of witnesses was already on the list when [Vacca] talked to [Mack]." H2: 20, 23.

Mack said that since Vacca "had a witness list," he "thought [Vacca] was going to call everybody" on the list. H2: 25. Mack stated he "never had no discussion" with Vacca "about which witness to call, which witness not to call." H2: 19; *see also* H2: 21. Mack never discussed with Vacca what the various witnesses would say if they testified. H2: 18. Mack told Vacca to subpoena and call each of the eighteen individuals on the witness list though "[t]he only person [he] can vouch for [he] was with [was] Christopher White that day and Precious Scott." H2: 18.

### 3.    First Order Denying the 440 Motion

The first 440 court denied the 440 motion in a written decision and order dated May 11, 2018. SR: 663-76. In reaching its decision, the first 440 court reviewed the trial transcript, the hearing transcript, and pre-trial and post-trial written submissions. SR: 664. The first 440 court found that there was "no doubt" that Vacca "conducted an extensive pre-trial investigation," "immediately retained the services of an investigator to locate and interview potential alibi witnesses," "followed up with his own interviews and traveled to Elmira to interview a number of witnesses," "conducted aggressive and probing cross[-]examination of the People's witnesses," and "put on extensive proof, calling to testify five witnesses as well as the defendant, all with a coherent and focused strategy of proving that the defendant was not present at the scene of the attack." SR: 670.

The first 440 court found that Vacca's explanation for not calling White—"he had enough credible alibi witnesses and did not want to taint the jury by placing on the stand someone who had been hauled in from state prison"—was "reasonable on its face, but [was] the product of not entirely accurate recollection of what his thinking was prior to trial." SR: 671. The first 440 court instead found that, through "simple neglect," Vacca failed to interview White. SR: 670. The first 440 court surmised that Vacca "must have pushed to the side" Resnick's letter saying White had been located, as "no other excuse makes sense" given Vacca's reputation and experience as a trial attorney. SR: 671. The first 440 court could not deem the failure to call White to be a "conscious, reasonably informed decision" that "reflected

71

a reasonable investigation and preparation of defense witnesses." SR: 671 (quotation marks and citations omitted).

The first 440 court characterized White as "a key and perhaps indispensable witness" given "the limited evidence" in support of the prosecution's case. Nonetheless, the first 440 found that Mack "was not prejudiced by an unfair trial." SR: 675. The first 440 court applied the New York State ineffectiveness standard, which "focuses on the quality of the representation provided to the accused" and "is ultimately concerned with the fairness or the process as a whole rather than its particular impact on the outcome of the case." SR: 674 (quotation omitted). The first 440 court found that it was "doubtful that White's testimony . . . would have made a difference" because White

> could not give specific details about what happened on the day in question. He left out details that should have been prominent in his memory, even given the lapse of time. He was evasive about his prior criminal history. As noted above, his demeanor did not inspire a perception of integrity and honest respect for the truth.

SR: 674. In sum, the first 440 court deemed it "unlikely" that "a jury would have believed [White] when he said he was with the defendant or credited his testimony to an extent necessary to reach a different result." SR: 674. The first 440 court found that while Vacca's failure to call White "was perhaps egregious, but having observed and heard White's testimony," it "cannot say that counsel's failure to call White was prejudicial. SR: 674-75.

The first 440 court found that Vacca's decision not to call Spaight, Bessie Mack, and Walker was "more strategic than neglectful" since their "testimony was compromised by their relation to the defendant and was merely cumulative of other

72

witnesses." SR: 674-75. The first 440 court said that "Spaight's credibility was suspect," considering her earlier inconsistent statement to Penkitis that she arrived after the stabbing had already occurred. SR: 675. The first 440 court found that Vacca was "justifiably concerned" that both Bessie Mack and Spaight's proposed testimony "would not have been helpful" because their "ability to recall dates and specific events was not reliable." SR: 675. Furthermore, the first 440 court found that Vacca was "justified in concluding that" Kionna Speed, Carolyn McHenry, and Shatora Hampton "offered more credible testimony than Bessie Mack or Sonia Spaight, who clearly did not witness the attack." SR: 676. And since Jerome Walker did not testify at the hearing, as he had died in 2013, the first 440 court determined that it "was unclear" what testimony Walker would have provided. SR: 675.[15] Finding that Mack's "remaining contentions" were "without merit," the first 440 court denied the 440 motion. SR: 676.

### 4.    Appeal of First 440 Order

Through appellate counsel, Mack sought leave to appeal the first 440 court's denial of his motion to the Fourth Department, SR: 677-716, which the prosecution opposed, SR: 717-19. The Fourth Department granted leave to appeal. SR: 724.

---

[15] Jerome Walker gave a statement to defense investigator Resnick on November 24, 2008, explaining that he was "in the area of Driving Park and Dewey Avenue" on September 29, 2007, and he observed "a lot of people arguing." SR: 1922. Walker went inside Bessie Mack's house and continued to hear people arguing; when he came back outside, he "saw some people around someone" and "saw hands swinging." SR: 1922. As everyone scattered and ran away, Walker saw a "lady in the street, bleeding." SR: 1922. Walker said that Mack was not among the people he saw arguing in the street, but he did not offer any other information about what he observed. SR: 1922.

Appellate counsel filed a brief arguing that: Vacca's failure to investigate and call White as an alibi witness resulted in prejudice to Mack's defense; and Mack was entitled to a hearing on his other claims of ineffective assistance of trial counsel. SR: 2001-058. Mack did not pursue the *Brady* claim or the CPL § 250.20(2) claim. The prosecution filed a brief in opposition. SR: 2059-113.

On June 17, 2021, the Fourth Department unanimously reversed the first 440 court's order on the law and remitted the matter pursuant to CPL § 440.30(5) for an evidentiary hearing. *People v. Mack*, 195 A.D.3d 1601, 145 N.Y.S.3d 917 (4th Dep't 2021); SR: 2114-115.

The Fourth Department agreed that the first 440 court "erred in limiting the scope of the hearing regarding his claim of ineffective assistance of counsel to only those alleged errors of defense counsel that could not have been raised on direct appeal." *Mack*, 195 A.D.3d at 1602. The Fourth Department stated that where, as here, a defendant asserts a "mixed claim" of ineffectiveness, *i.e.*, "errors of defense counsel based on both matters appearing in the record and matters dehors the record," *id.* (some internal quotation marks omitted), "a 'CPL [§ ]440.10 proceeding is the appropriate forum for reviewing the claim of ineffectiveness *in its entirety.*'" *Id.* (emphasis in original) (quoting *People v. Maxwell*, 89 A.D.3d 1108, 1109, 933 N.Y.S.3d 386, 388 (2d Dep't 2011)). Accordingly, the Fourth Department reversed the first 440 court's order and "remit[ted] the matter . . . for a hearing on defendant's respective claims of ineffective assistance of counsel in their entirety." *Id.* The Fourth Department denied Mack's other claims as "without merit." *Id.*

74

### 5.    Post-Remittal Hearing on the 440 Motion

The post-remittal hearing was conducted by Monroe County Court Judge Michael Dollinger ("second 440 court"). The parties stipulated that, based on an aerial survey of the Driving Park Boulevard and Dewey Avenue intersection, the distance between the porch at 868 Dewey Avenue from which Torres viewed the incident and the location of Shaw's dead body was 158 feet. H3: 7, 10.

### a.    Paul Vacca, Esq.

Vacca testified that the first work he did on Mack's case was to speak to Mack's father and Mack and to develop a list of potential alibi witnesses. H3: 13. Vacca said that "[a]nybody who [he] did not call as a witness was somebody that [he] felt would not be advantageous to the defense in the case." H3: 65.

When asked about his defense theory against Torres's eyewitness identification, Vacca adopted alternative theories of misidentification—that Torres "might've been lying or she might've been mistaken." H3: 17. Vacca said that Torres "was so convinced, so convinced that she was right, she was too convinced. It became . . . a personal thing for her, that [']you have to believe me.[']" H3: 17; *see also id.* ("I think she made a mistake, or she was so stubborn and so insistent that she was borderline lying.").

Vacca did not review any scientific studies on eyewitness identification, explaining that:

> You gotta realize that up to this point I had been practicing for 30 years. So a lot of this stuff you could see from my closing argument, you could see in the paperwork, you could see that a lot of the questions, a lot of handling of it is from experience. So I didn't hire an

expert in identification to come in and testify in this case because really — it really wasn't identification, except as to Torres, but it was alibi, was [Mack] there?

H3: 18.

When asked why he did not consult with an identification expert, Vacca responded:

> Well, we didn't — we didn't consult with one here because we had a number of alibi witnesses. There were in my view, in my view, eight or nine alibi witnesses, okay? I started working on the alibi area the day after he was arrested. And to me there were eight or nine alibi witnesses with this, in addition to Mr. Pen — Officer Penkitis speaking to 75 to a hundred people trying to get an identification, and he couldn't find anybody that was an alibi [sic] witness,[16] although he talked to that many people.

H3: 27. Vacca testified that to undermine Torres's identification, he focused on the distance from which she viewed the incident and the lack of lighting. H3: 16-17. Vacca's "position [was] that she was not able to see that far and identify my client as doing anything and couldn't identify my client even being there." H3: 16-17.

Appellate counsel also questioned Vacca about the other alleged errors set forth in the 440 motions. To avoid unnecessary repetition, any relevant testimony by Vacca will be set forth below in the Court's discussion of the alleged errors.

### b.    Charles Brainerd, Ph.D.

Mack offered Dr. Brainerd as an expert in the science of perception, human memory, and cognitive psychology. H4: 8. The prosecutor did not object. H4: 8.

---

[16] Based on the context, Vacca apparently intended to say identification witness, not alibi witness.

76

The second 440 court determined that Mack had laid a sufficient foundation, *see* H4: 4-8, for Dr. Brainerd to give an opinion on those topics. H4: 8.

Dr. Brainerd testified at length about the history of psychologists conducting scientific research around eyewitness identification, H4: 8-14, and how human memory works, H4: 16-25. The second 440 court eventually interjected and requested that Mack's counsel "focus on the issue of the eyewitness identification which is really the issue why Dr. Brainerd is here." H4: 25.

Appellate counsel then questioned Dr. Brainerd about "perceptual conditions" (*e.g.*, lighting, distance, and viewing angle) and "risk factors" that can affect the accuracy and reliability of a witness's memory and ability to identify a person from a perceived event, including "own race bias," "weapon focus," the lack of correlation between witness confidence and witness accuracy, "event stress," "event duration," "partial disguise," "facial distinctiveness," and "unconscious transference." H4: 25-52. To avoid unnecessary repetition, Dr. Brainerd's testimony regarding the "perceptual conditions" or "risk factors" raised in the petition will be set forth below in the Court's discussion of the relevant claims.

### 5.    Second Order Denying 440 Motion

After the hearing, the second 440 court reserved decision and accepted post-hearing briefing. On January 25, 2023, the second 440 court issued a decision and order denying the motion. SR: 2417-31. The second 440 court "affirm[e] and incorporate[d] by reference the findings of fact made by [the first 440 court]" SR: 2420 (referring to SR: 664-68), but also made independent findings of fact, SR: 2420-

22. The second 440 court applied the New York State standard for evaluating ineffective assistance of counsel claims under the New York State Constitution, "which provides greater protection than its federal counterpart," and "is satisfied when 'the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation.'" SR: 2422-23 (quoting *People v. Baldi*, 54 N.Y.2d 137, 147 (1981)). The second 440 court found that, "[c]onsidering all of the alleged errors, individually and collectively," Mack "failed to demonstrate that Mr. Vacca's representation fell below an objective standard of reasonableness" and that it was "evident" that he "provided meaningful representation" to Mack. SR: 2348. To avoid unnecessary repetition, the second 440 court's analysis of Vacca's alleged errors will be discussed below in connection with the Court's analysis of the petition.

### 6. Denial of Leave Application

Mack applied to the Fourth Department for leave to appeal the denial of the second 440 court's order. SR: 2349-97. The prosecution opposed the application. SR: 2398-2469. The Fourth Department denied leave to appeal on April 25, 2023. SR: 2470-71.

## V. FEDERAL HABEAS CORPUS PETITION

Appellate counsel filed a petition, Dkt. 1, and a memorandum of law, Dkt. 2, on Mack's behalf, along with a CD-ROM containing copies of the state court records, transcripts, briefs, and orders, as well as copies of the habeas pleadings and various

cases cited therein. Mack asserts a claim of ineffective assistance of trial counsel based on the following alleged errors, all of which were raised in the 440 motion:

- failure to investigate and call Christopher Travis White as an alibi witness (Point 1);
- failure to call Bessie Mack, Jerome Walker, and Sonia Spaight to support the alibi defense (Point 2);
- failure to consult with or call an expert witness on the science of memory and perception as related to the accuracy and reliability of eyewitness identifications (Point 3);
- failure to educate the jury about the risk of misidentification posed by cross-racial identification ("own race bias") at (Point 4);
- failure to educate jury about the risk of misidentification posed by "weapon focus" (Point 5);
- failure to educate the jury about the lack of correlation between witness confidence and witness accuracy (Point 6)
- failure to educate the jury about the effect of "event stress" on the accuracy of memory and identification (Point 7);
- failure to educate the jury about the tendency of witnesses to overestimate time ("event duration") (Point 8)
- failure to educate the jury about the effect of "partial disguise" on the accuracy of identifications (Point 9)
- failure to educate the jury about the effect of "facial distinctiveness" on the ability to remember a face (Point 10);
- failure educate the jury about the phenomenon of "unconscious transference" (Point 11);
- failure to object to inadmissible testimony about a non-blinded photo array procedure conducted with Torres (Point 12)
- asking open-ended questions to Torres during cross-examination about how she was able to identify Mack in the crowd and why she came forward to the police (Point 13)
- failure to address the distance from which Torres viewed the incident, the level of darkness at the time of the incident, and Torres's viewing angle (Point 14)
- failure to impeach Torres using her 911 call (Point 15);
- failure to object to alibi rebuttal witness based on CPL § 250.20(2), (Point 16);
- failure to give the jury numerous reasons to doubt the accuracy of the identification (Point 17);
- summation required the jury to adopt his theory that only women were involved in the attack and that all attackers came from a van (Point 18);

79

- failed to elicit from Mack his age, height, and weight to show that he did not match Torres's description of the suspect (Point 19);
- failure to cross-examine Donald, the jailhouse informant, about the facts underlying his youthful offender adjudication (Point 20);
- failure to object to the prosecutor's erroneous closing statement that the defense witnesses were Mack's "blood relatives" (Point 21);
- failure to subpoena telephone records (Point 22);
- failure to elicit from Mack testimony regarding his arrest date and immediate report of an alibi defense (Point 23); and
- failure to object to the trial court taking the verdict without addressing the jury's request for instruction on the law and a read-back of testimony (Point 24).

*See* Dkt. 2 at 3-5.[17]  Respondent filed an answer, Dkt. 16, memorandum of law in opposition, Dkt. 16-1, the state court records, Dkt. 17 to Dkt. 17-1, and the state court transcripts, Dkt. 17-2 to Dkt. 17-6.  Mack filed a reply.  Dkt. 20.

## DISCUSSION

## I.    STATUTORY LIMITATIONS ON HABEAS RELIEF

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, 562 U.S. 86, 97 (2011) ("*Richter*").  Section 2254(d) "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings."  *Id.* at 102.  It "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents," but it "goes no further."

---

[17] Citations to pages in the parties' pleadings are to the pagination automatically generated by CM/ECF and located in the header of each page.

*Id.* Section 2254(d) thus "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring opn.)).

AEDPA provides that where a petitioner's federal constitutional claim has been "adjudicated on the merits" in state court, 28 U.S.C. § 2254(d), habeas relief "shall not be granted" unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1); or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding," *id.* § 2254(d)(2).

AEDPA further provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The Supreme Court and the Second Circuit have not decided "whether [a habeas petitioner] not only must establish that the state court's factual determination was unreasonable pursuant to 28 U.S.C. § 2254(d)(2), but also must overcome a presumption of correctness by clear and convincing evidence pursuant to 28 U.S.C. § 2254(e)(1)." *Ross v. Annucci*, No. 21-1281-PR, 2022 WL 16984527, at *2 (2d Cir. Nov. 17, 2022) (citing *Brumfield v. Cain*, 576 U.S.

305, 322 (2015); *Wood v. Allen*, 558 U.S. 290, 293, 299 (2010)); *see also Cardoza v. Rock*, 731 F.3d 169, 177 n.5 (2d Cir. 2013) (same).

Although the Supreme Court granted *certiorari* in *Wood* to resolve how §§ 2254(d)(2) and (e)(1) fit together, it again declined to reach the question because its "view of the reasonableness of the state court's factual determination in this case d[id] not turn on any interpretive difference regarding the relationship between these provisions." 558 U.S. at 300. The Supreme Court assumed that the pertinent factual determination—that Wood's defense attorney made a strategic decision not to pursue or present evidence of Wood's mental deficiencies—should be reviewed only under § 2254(d)(2) and not under the "arguably more deferential standard" in § 2254(e)(1). *Id.* at 300-01. Similarly, the Second Circuit has characterized § 2254(d)(2)'s unreasonableness standard as "broader" and thus more favorable to the petitioner than § 2254(e)(1)'s "more stringent" standard. *Cardoza*, 731 F.3d at 177 n.5. Because the petitioner's challenge in *Cardoza* failed under § 2254(d)(2)'s unreasonableness standard, the Second Circuit determined that it was unnecessary to consider the application of the "clear and convincing evidence" standard in § 2254(e)(1). *Id.* In *Cotto v. Herbert*, 331 F.3d 217 (2d Cir. 2003), the Second Circuit did not consider the relationship between § 2254(d)(2) and § 2254(e)(1), but implicitly determined that both applied to the state trial judge's findings of fact, including assessments of witness credibility. *Id.* at 233. Due to the uncertainty in the case law, and out of an abundance of caution, this Court has applied both

standards to any factual determinations the second 440 court made in connection with Mack's habeas claims.

A state court adjudication on the merits is "contrary to," *id.* § 2254(d)(1), clearly established federal law if it "contradicts the governing [Supreme Court] law" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court decision and "nevertheless arrives at a result different from" that decision. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application," 28 U.S.C. § 2254(d)(1), of clearly established federal law can occur in two ways. *Id.* at 407.  The first is when a "state court identifies the correct governing legal rule from th[e] [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.*  The second is when "the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*

"For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Richter*, 562 U.S. at 101 (quoting *Williams*, 529 U.S. at 410).  As Respondent points out, Dkt. 16-1 at 44, Mack relies on outdated Second Circuit precedent to argue that he satisfies the "unreasonable application" prong of 28 U.S.C. § 2254(d)(1) if he can identify "some increment of incorrectness beyond error" that "need not be great." Dkt. 2 at 60 (quoting *Sorto v. Herbert*, 497 F.3d 163, 169 (2d Cir. 2007)).  The Second Circuit has recognized that its "some increment of incorrectness" standard did not survive

*Richter*, which "imposes a more deferential . . . standard of review.'" *Garner v. Lee*, 908 F.3d 845, 861 n.14 (2d Cir. 2018) (quoting *Richter*, 562 U.S. at 103).

"To meet [AEDPA's] standard, a prisoner must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quoting *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017)). If that were the inquiry, "the analysis would be no different" than if the habeas court "were adjudicating a [constitutional] claim on direct review of a [federal defendant's] criminal conviction in a United States district court." *Richter*, 562 U.S. at 101. Where the state court has adjudicated a petitioner's federal claim on the merits, that determination "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("*Alvarado*").

Satisfying the standards in 28 U.S.C. § 2254(d)(1) or § 2254(d)(2) are necessary but not sufficient to obtain a writ of habeas corpus, as "AEDPA 'sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it[.]'" *Cardoza*, 731 F.3d at 178 (ellipsis in original) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). "[T]he petitioner still 'bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated,'" *id.* (quoting *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012)).

84

## II.    RELEVANT STATE COURT DECISION

### A.    Legal Principles

"By its terms[,] § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Richter*, 562 U.S. at 98. In determining whether a federal claim was adjudicated on the merits, the habeas court examines the "last reasoned decision" issued by the state court. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (holding that where there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "should then presume that the unexplained decision adopted the same reasoning"); *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

### B.    Analysis

Here, the Fourth Department denied Mack's application for leave to appeal the second 440 court's post-remittal denial of his 440 motion. SR: 2470-71. Therefore, the second 440 court's written decision and order dated January 25, 2023, SR: 2417-31, constitutes the "last reasoned decision" on the ineffective assistance claim in the petition. *See, e.g., Correa v. Collins*, No. 22-CV-02366 (NRM), 2025 WL 1220213, at *9 (E.D.N.Y. Apr. 28, 2025) ("Because the Court of

Appeals summarily denied Petitioner leave to appeal, this Court '[looks] through' to the Appellate Division's opinion as the last reasoned decision to evaluate the claims in state court." (alteration in original) (quoting *Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (presuming "that the unexplained decision adopted the same reasoning"), and citing *McCray v. Capra*, 45 F.4th 634, 640 (2d Cir. 2022)).

## III.   ADJUDICATED ON THE MERITS

"The necessary predicate to [AEDPA's] deferential review is . . . that [the] petitioner's federal claim has been 'adjudicated on the merits' by the state court." *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001). "If a state court has not adjudicated the claim 'on the merits,' [federal courts] apply the pre-AEDPA standards, and review *de novo* the state court disposition of the petitioner's federal constitutional claims." *Id.* (citing *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001)); *accord Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam).

"[F]or purposes of AEDPA, a state court 'adjudicates' a petitioner's federal constitutional claims 'on the merits' whenever 'it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment.'" *Aparicio*, 269 F.3d at 93 (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)). However, AEDPA "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Richter*, 562 U.S. at 100. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the

absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

Though the *Richter* presumption is "strong," it "can in some limited circumstances be rebutted." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). For example, the presumption does not stand "when the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." *Id.* at 303. "The Supreme Court has cautioned, however, that petitioners will rarely be able to overcome the presumption of merits adjudication." *Smith v. Cook*, 956 F.3d 377, 386 (6th Cir. 2020) (citing *Johnson*, 568 U.S. at 304 (stating that the presumption prevails even when the state court's opinion wholly omits discussion of the federal claim)); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (noting that AEDPA "does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

Mack asserts that the second 440 court "never addressed" the allegations in Point 4 (counsel failed to educate himself or the jurors about "own race bias"), Dkt. 2 at 92; Point 5 (counsel failed to educate himself or the jurors about "weapon focus"), *id.* at 95; Point 6 (counsel failed to educate himself or the jurors about the lack of correlation between witness confidence and accuracy), *id.* at 97; Point 8 (counsel failed to educate himself or the jurors about the tendency to overestimate "event duration"), *id.* at 104; Point 9 (counsel failed to educate himself or the jurors about "partial disguise"), *id.* at 107; Point 10 (counsel failed to educate himself or the jurors about "facial distinctiveness"), *id.* at 108; Point 11 (counsel failed to educate

himself or the jurors about "unconscious transference"), *id.* at 109; Point 13 (counsel asked open-ended questions to Torres on cross-examination), *id.* at 125; Point 15 (counsel failed to impeach Torres with her 911 call), *id.* at 131; Point 18 (counsel argued during summation that all the attackers were women who arrived in a van), *id.* at 139; Point 19 (counsel failed to elicit testimony from Mack regarding his age, height, and weight), *id.* at 141; and Point 21 (counsel failed to object to the prosecutor's misstatement about Mack's relationship to the defense witnesses), *id.* at 143.

Mack's argument disregards the Supreme Court's decision in *Johnson*, which held that the *Richter* presumption of a merits-adjudication applies equally to "a state-court order that did not address *any* of the defendant's claims" and "a state-court opinion [that] addresses *some but not all* of a defendant's claims." 568 U.S. at 298 (emphasis supplied). The Supreme Court explained that:

> [t]here would be a reason for drawing a distinction between these two situations if opinions issued by state appellate courts always separately addressed every single claim that is mentioned in a defendant's papers. If there were such a uniform practice, then federal habeas courts could assume that any unaddressed federal claim was simply overlooked.
>
> No such assumption is warranted, however, because it is not the uniform practice of busy state courts to discuss separately every single claim to which a defendant makes even a passing reference.

*Id.* The Supreme Court observed that there were "several situations in which state courts frequently take a different course," such as when: "a line of state precedent is viewed as fully incorporating a related federal constitutional right," *id.*; the petitioner makes only "a fleeting reference to a provision of the Federal Constitution

or federal precedent," *id.* at 299; and the claim is "simply regard[ed] . . . as too insubstantial to merit discussion," *id.*

The Supreme Court concluded that:

because it is by no means uncommon for a state court to fail to address separately a federal claim that the court has not simply overlooked, we see no sound reason for failing to apply the *Richter* presumption . . . [w]hen a state court rejects a federal claim without expressly addressing that claim. . . .

*Id.* at 300-01.

Thus, the second 440 court's mere failure to discuss a particular alleged error by Mack's counsel does not establish that it failed to adjudicate the ineffectiveness claim on the merits. Mack must do more to rebut the *Richter* presumption. Specifically, he must point to "evidence" in the record and the second 440 court's decision that "leads very clearly to the conclusion that [the] federal claim was inadvertently overlooked in state court." *Id.* at 303.

For instance, in *Worthington v. Roper*, 631 F.3d 487 (8th Cir. 2011), the petitioner argued that the state court failed to adjudicate part of his ineffective assistance claim because it did not "adequately scrutinize his allegation that counsel performed ineffectively at the penalty phase by failing to supply experts with comprehensive background information." *Id.* at 496. The Eighth Circuit rejected this argument because a review of the state court's "decision leaves no question that it rejected [the] ineffective[]assistance claim *in toto*." *Id.* Noting that AEDPA does not require that a state court's decision be "well-articulated or even . . . correct," the Eighth Circuit determined that the state court's decision "plainly suffice[d] as an adjudication on the merits under AEDPA." *Id.*; *see also, e.g.,*

89

*Jimenez v. Guerrero*, 133 F.4th 483, 490 (5th Cir. 2025) (despite the district court's agreement that "the state court appear[ed] to have ignored the issue entirely," the petitioner did "nothing to rebut the presumption that the state courts in this case considered his judicial-bias claim too 'fleeting' to 'raise a separate federal claim' or 'too insubstantial to merit discussion'" and therefore it was adjudicated on the merits) (quoting *Johnson*, 568 U.S. at 299) (internal citation omitted; alteration in original); *Smith v. Cook*, 956 F.3d 377, 386 (6th Cir. 2020) (stating that it has held that the presumption of a merits-adjudication "prevails when a state court imperfectly discusses, rather than omits, a petitioner's federal claim"); *Jenkins v. Bergeron*, 824 F.3d 148, 152 (1st Cir. 2016) (applying AEDPA deference even though the state court "did not explicitly discuss one subsidiary argument" that the petitioner made to support his claim based on the denial of his right to testify); *Lee v. Comm'r, Ala. Dep't of Corrs.*, 726 F.3d 1172, 1211 (11th Cir. 2013) (rejecting the petitioner's argument "that a state court opinion must show it actually 'consider[ed] every relevant circumstance' (and every argument) by explicitly mentioning each one" in order to be accorded deference under AEDPA) (alteration in original); *Miller v. Thaler*, 714 F.3d 897, 902 n.3 (5th Cir. 2013) (applying AEDPA deference because even though the state court "may not have described [the petitioner]'s claim in precisely the manner he preferred, it addressed the substantive legal issues he presented").

Mack has not pointed to evidence that "very clearly" leads to the conclusion that the second 440 court inadvertently overlooked any of his allegations of

ineffectiveness. To the contrary, the second 440 court demonstrated its awareness that the 440 motion raised a host of alleged errors by Mack's trial attorney: "[Mack] alleges that he received ineffective assistance of trial for multiple reasons, *including, but not limited to*" sixteen errors which the second 440 court enumerated in its order "*and other claims within the motion* (Attorney Affirmation, p 55-72)." SR: 2335-36 (emphasis supplied).[18] There is no doubt that the second 440 court recognized, both from reading Mack's motion papers and presiding over the post-remittal hearing where Vacca was questioned about the various alleged errors, that Mack was asserting other arguments in support of the ineffective assistance claim beyond those specifically listed. Moreover, as in *Worthington*, 631 F.3d at 496, the second 440 court rejected Mack's ineffective assistance claim "*in toto*," *id. See* SR: 2348 ("Considering all of the alleged errors, individually and collectively, defendant has failed to demonstrate that Mr. Vacca's representation fell below an objective standard of reasonableness. . . .").

Furthermore, a closer review of the second 440 court's order does not bear out Mack's assertion that certain points were "never addressed." Points 4, 5, 6, 8, 9, 10, and 11 refer to Vacca's failure to "educate" himself or the jurors about various reliability factors discussed by Dr. Brainerd, the expert witness. Notably, the second 440 court found that "several of the factors addressed by Dr. Brainerd, such as distance and lighting, viewing angle, event stress *and other factors* were directly

---

[18] Twelve of the sixteen errors listed correspond to the allegations in Points 1, 2, 3, 12, 14, 16, 17, 18, 19, 20, 23, and 24 raised in the instant petition, SR: 2335-36, while the remaining four alleged errors have not been reasserted here.

addressed by Mr. Vacca in his cross[-]examination of Ms. Torres." SR: 2342 (emphasis supplied). The allegations in Points 4, 5, 6, 8, 9, 10, and 11 represent additional arguments in support of Point 3, which asserts that Vacca was ineffective for failing to call an expert witness such as Dr. Brainerd. Because the second 440 court rejected Point 3, the most reasonable conclusion is that it viewed Points 4, 5, 6, 8, 9, 10, and 11 as "too insubstantial to merit discussion." *Johnson*, 568 U.S. at 299.

As for Points 13 and 15, they assert three arguments about why Vacca's cross-examination of Torres was ineffective (asking two open-ended questions (Point 13) and failing to impeach Torres with her 911 call (Point 15)). In its order, the second 440 court included a heading titled, "Ineffective Cross Examination," showing its recognition that the 440 motion raised complaints about Vacca's cross-examination tactics. The second 440 court specifically mentioned Mack's assertion that Vacca did not expose an inconsistency between Torres's testimony and her statements to the 911 operator. SR: 2343. While it did not identify each of the arguments in Points 13 and 15, the second 440 court offered several reasons for concluding that Vacca's cross-examination was consistent with, and in furtherance of, his chosen trial strategy and, therefore, not ineffective. SR: 2344. Considering this, the most reasonable conclusion is that the second 440 court viewed Points 13 and 15 as "too insubstantial to merit discussion." *Johnson*, 568 U.S. at 299.

Likewise, Points 17 and 18 assert arguments why Vacca's summation was ineffective. The second 440 court recognized that Mack's 440 motion asserted that

92

Vacca "presented an ineffective closing argument," SR: 2340, but it did not identify the arguments in Points 17 and 18. However, under the heading "Closing Argument," the second 440 court offered several reasons why Vacca's summation was consistent with his trial strategy and not ineffective. SR: 2344-45. Given its finding that Vacca did not perform deficiently during summation, the most reasonable conclusion is that the second 440 court viewed Points 17 and 18 as "too insubstantial to merit discussion." *Johnson*, 568 U.S. at 299.

After examining the record, including the 440 motion pleadings, the hearing transcripts, and the second 440 court's order, the Court concludes that Mack "has not pulled off the exceedingly rare rebuttal of the *Richter* presumption." *Jimenez*, 133 F.4th at 491 (citing *Johnson*, 568 U.S. at 302 (stating that "the *Richter* presumption is a strong one that may be rebutted only in unusual circumstances")). All the points raised in the petition are, therefore, subject to the limitations on relief set forth in 28 U.S.C. § 2254(d).

## IV    CLEARLY ESTABLISHED FEDERAL LAW

The "clearly established Federal law" referenced in 28 U.S.C. § 2254(d)(1) "refers *only* to the holdings of the Supreme Court extant at the time of the relevant state court decision." *Jackson v. Conway*, 763 F.3d 115, 134 (2d Cir. 2014) (emphasis supplied; internal quotation marks omitted). A circuit court may look to its precedent "to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (citing *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam)

("*Matthews*")). But "it may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." *Id.* (citing *Matthews*, 567 U.S. at 48; *Renico v. Lett*, 559 U.S. 766, 778-79 (2010)). Nor may it use circuit precedent "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Id.*

Here, the two-part test articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), is the "clearly established" federal law applicable to Mack's ineffective-assistance claim.[19] *Englert v. Lowerre*, 115 F. 4th 69, 81 (2d Cir. 2024) (citing *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("*Pinholster*")), *cert. denied sub nom. Englert v. Bishop*, 145 S. Ct. 2826 (2025). The Supreme Court has "made clear that 'the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation . . . [but] simply to ensure that criminal defendants receive a fair trial.'" *Pinholster*, 563 U.S. at 189 (ellipsis and alteration in original) (quoting *Strickland*, 466 U.S. at 689). To succeed on an ineffective assistance claim, "a petitioner must show that (1) counsel's performance was objectively deficient, and (2) petitioner was actually prejudiced as

---

[19] Although the second 440 court only referred to the New York State standard for ineffectiveness as articulated in *Baldi*, 54 N.Y.2d at 146-47, the Second Circuit has held that *Baldi* is not "contrary to" *Strickland* for purposes of AEDPA. *Rosario v. Ercole*, 601 F.3d 118, 124 (2d Cir. 2010) (collecting cases). Therefore, the only avenue by which Mack can satisfy 28 U.S.C. § 2254(d)(1) is to establish that the second 440 court unreasonably applied *Strickland*. *Rosario*, 601 F.3d at 126.

94

a result." *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012) (citing *Strickland*, 466 U.S. at 687-88). "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

To establish deficient performance under *Strickland*, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Even without the overlay of AEDPA deference, "[a] court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). To overcome the presumption, the petitioner must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

To fulfill the "prejudice" prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The likelihood of a different result must be "substantial," not just "conceivable." *Richter*, 562 U.S. at 112. Because it is the petitioner's burden to "affirmatively prove prejudice,"

*Strickland*, 466 U.S. at 693, mere speculation and conjecture about an alleged error's effect on the outcome is insufficient.

*Strickland*'s standard is "highly deferential," 466 U.S. at 689, and where AEDPA's "deferential lens" also applies, the habeas court's review is "doubly" so. *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2, 123 (2009) ("*Mirzayance*")). The Supreme Court has explained that, in such cases:

> [t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard.

*Richter*, 562 U.S. at 101. "[A] federal court may grant relief only if every 'fairminded jurist' would agree that every reasonable lawyer would have made a different decision." *Dunn v. Reeves*, 594 U. S. 731, 739-40 (2021) (per curiam) (quoting *Richter*, 562 U. S. at 101).

## IV.    MERITS OF THE PETITION

### A.    Failure to Investigate Christopher Travis White as an Alibi Witness (Point 1)

Mack asserts that Vacca's failure to investigate Christopher Travis White amounted to constitutionally deficient performance because there was "no legitimate[] strategy to ignore Mr. White as an alibi witness." Dkt. 2 at 66; *see generally* Dkt. 2 at 62-75. As summarized above, White testified at the first 440 hearing that he spent September 29, 2007, "riding around" Elmira with Mack and his infant daughter; the only activity he remembered was visiting a corner bodega at some point during the day. The first 440 court found that Vacca's decision not to

96

interview and call White was an oversight rather than a strategic decision. SR: 670-71. But the first 440 court determined that because White's testimony was so vague, and because he was not a credible witness, the failure to call him as a witness did not affect the verdict. SR: 674-75.

At the post-remittal hearing, Vacca testified again about the failure to call additional defense witnesses, stating that any individual he did not call was someone he felt "would not be advantageous to the defense." H3: 65. The second 440 court, in contrast to the first 440 court, concluded that Mack failed to establish the absence of a reasonable strategy on Vacca's part for declining to call White. SR: 2338, 2341. The second 440 court adopted the first 440 court's credibility finding as to White and found that White's testimony "vindicated" Vacca's decision not to call him. SR: 2341.

### 2.   Analysis

Mack raises two preliminary arguments regarding how this Court should analyze the first 440 court's and second 440 court's rulings. First, he urges this Court to conclude that the second 440 court improperly rejected the first 440 court's finding as to *Strickland*'s performance prong. *See* Dkt. 2 at 64, 66. Mack has not cited—and this Court has not located—any authority for the proposition that the second 440 court was bound by the first 440 court's order which, at Mack's request, was reversed on the law by the Fourth Department on appeal. *Mack*, 195 A.D.3d at 1601-02. A reversal is, by definition, "[a]n annulling or setting aside." REVERSAL, Black's Law Dictionary (12th ed. 2024). Moreover, the Fourth Department ordered

97

the second 440 court to hold a hearing to consider what amounted to a different ineffectiveness claim, since it considered additional alleged errors than had been evaluated by the first 440 court. *Mack*, 195 A.D.3d at 1601-02.

Even if the second 440 court adhered to the first 440 court's determination that Vacca lacked a legitimate strategic reason for not interviewing and calling White, that does not mean Mack succeeds on his Sixth Amendment ineffectiveness claim. Prejudice is an indispensable element of such a claim, *Strickland*, 466 U.S. at 697, and the first 440 court found that that Vacca's failure to call White was not prejudicial. SR: 674-75.

Though Mack argues that the first 440 court applied the wrong legal standard in determining prejudice, he nonetheless asserts that it is the last reasoned state court decision on the "prejudice" prong because the second 440 court "did not address the issue of prejudice other than to mention and misquote [the first 440 court]'s personal assessment of Mr. White's 'credibility.'" Dkt. 2 at 71. As discussed above, the first 440 court's order was reversed and no longer has any legally binding effect. Simply put, it is not the last reasoned state court decision subject to 28 U.S.C. § 2254(d).

Turning to the issue of whether the second 440 court failed to make a ruling on *Strickland*'s prejudice prong, it is true that court did not refer specifically to "prejudice" or cite *Strickland* in its discussion of the failure to call White. However, AEDPA does not "require citation" of Supreme Court cases by the state court—or

even "awareness" of those cases—"so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8.

As noted above, the second 440 court found that Vacca's decision not to call White was "vindicated" by White's "incredible" hearing testimony. SR: 2341. The second 440 court accepted and incorporated the first 440 court's credibility determination. SR. 2341. The first 440 court, which had ample opportunity to observe White's manner of answering questions and his demeanor during the hearing, found that White utterly lacked credibility. *See* SR. 668 ("White testified that if he had been called to testify at the trial, he would have said that he spent the day with the defendant. The Court finds him to be *credible on that statement alone,* in other words, on *what he would have said* if he had been called to testify.") (emphasis added); SR: 672 ("[White] lacked the relaxed demeanor and assurance on the stand that are often for a jury the hallmark of credibility. He would have made a less[-]than[-]ideal witness.") (internal citations omitted)). The first 440 court concluded that "it [was] unlikely, had [White] testified at trial, at a jury would have believed him when he said he was with the defendant or credited his testimony to an extent necessary to reach a different result." SR: 674. Although neither court used the language of *Strickland*, both effectively concluded that Mack was not prejudiced by Vacca's failure to investigate and call White because White's proposed testimony would not have changed the outcome of Mack's trial. As the Supreme Court has explained, the "prejudice" prong asks whether it is "reasonably likely" the outcome would have been different. *Strickland*, 466 U.S. at 696.

In reaching this conclusion, the state court made factual findings, including assessments of witness credibility, to which this Court owes deference under AEDPA's provisions dealing with factual determinations. *Williams v. Shanley*, No. 20-CV-688 (JLS), 2023 WL 7168871, at \*25 (W.D.N.Y. Oct. 31, 2023) (citing *Shabazz v. Artuz*, 336 F.3d 154, 163 (2d Cir. 2003) ("Credibility determinations are properly within the province of the state court."); *Cotto*, 331 F.3d at 233 (stating that the presumption of correctness in 28 U.S.C. § 2254(e)(1) "is particularly important when reviewing the trial court's assessment of witness credibility")); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (stating that federal courts sitting in habeas review have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

Mack has not attempted to fulfill the requirements in Section 2254(d)(2) or Section 2254(e)(1) for overturning the second 440 court's factual finding as to White's credibility. Whether either or both statutory provisions apply, the Court finds that the credibility determination was a reasonable determination of the facts in light of the evidence presented at the hearings on his 440 motion and, therefore, Mack has not satisfied 28 U.S.C. § 2254(d)(2). Furthermore, Mack cannot satisfy 28 U.S.C. § 2254(e)(1) because he has not come forward with any evidence, much less "clear and convincing" evidence, to rebut the presumption of correctness accorded to the second 440 court's credibility determination.

The second 440 court reasonably determined that White's testimony was "incredible" and would not have changed the outcome at Mack's trial. "When

evaluating a new witness's testimony, a court should 'consider [1] the potential motives to be untruthful that the witness may possess, [2] corroboration or the lack thereof, [3] internal consistency, and [4] the inferences or presumptions that crediting particular testimony would require.'" *Parsons v. Artus*, No. 06-CV-06462-CJS, 2020 WL 2572739, at *18 (W.D.N.Y. May 21, 2020) (quoting *Doe v. Menefee*, 391 F.3d 147, 164-65 (2d Cir. 2004)).

First, White had a potential motive to fabricate. According to White, he and Mack had been "[b]est friends" for the past 20 years. H1: 85, 90. White certainly had an interest in seeing Mack avoid criminal liability. It would not have been difficult for the prosecutor to make White appear biased on cross-examination. *See, e.g., Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995) ("As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias."); *Gonzalez v. Wong*, 667 F.3d 965, 988 (9th Cir. 2011) (holding that trial counsel's failure to present witnesses did not constitute ineffective assistance where the witnesses were "family or close friends" whose testimony was therefore "suspect based on their close relationship with [the petitioner]").

Second, corroboration of White's proposed testimony was impossible due to the vagueness of White's description of his and Mack's activities on September 29, 2007. The entirety of White's recollection was that he, Mack, and Mack's infant daughter spent the day—from 9 o'clock in the morning until around the time it was starting to get dark—just "riding around" Elmira. H1: 86, 105. The only specific

101

place White recalled visiting was a corner store, but he could not remember what time that occurred. H1: 86. The most prominent memory White had was being with Mack when he received the call about his family being detained in connection with a murder. H1: 85. However, White could not remember what street they were on at the time. H1: 105-06. This suggests that they were in White's car when Mack received the call, which had to have been sometime after 7:30 p.m., based on the trial testimony concerning the timing of the 911 calls and the first responding officer's arrival at the scene. *See* TT: 270-71. However, Smith, Mack's girlfriend, testified at trial that when she got home from work between 7:30 p.m. and 7:45 p.m., Mack was in the apartment with their daughter. TT: 584. Smith did not mention anything about White being present.

Third, White's May 2009 statement to Resnick, the defense investigator, was inconsistent with White's hearing testimony. For instance, in his statement, SR: 137, White said that he and Mack "'*mostly* stayed in Elmira that day.'" H1: 106 (emphasis supplied). White insisted that Mack "[s]tayed in Elmira that day period," and claimed that Resnick had "made a misprint." H1: 106.

Moreover, White's testimony was inconsistent with the trial testimony of Mack and Precious Scott. Scott, who White described as family, said that Mack and White brought her food from McDonald's in the late morning. However, White said he "d[id]n't remember that part." H1: 88. Mack testified that he visited a clothing store in Elmira on September 29, 2007, but White did not mention anything about that during his direct testimony. On cross-examination, White failed to identify

102

Mack in a photograph, SR: 1293, that had been introduced at trial which purported to depict Mack, White, and Benjamin Mack, the store owner. *See* H1: 99-101. According to White, the photograph was "too blurry" for him to tell if Mack was in it. White also was not sure who took the photograph or when it was taken. When the prosecutor confronted White with his inability to identify anyone when he previously was shown the original of the photograph by the defense investigator, White's answer was non-responsive. *See* H1: 99-101. Thus, not only was White's testimony unable to be corroborated, but his testimony also undermined the testimony offered by Mack, Smith, and Scott.

The second 440 court reasonably determined that White was not a credible witness and that there is no reasonable probability that his proposed testimony would have resulted in a more favorable outcome. Because Mack has not shown that every fairminded jurist would agree that every reasonable lawyer would have made a different decision, *see Dunn*, 594 U.S. at 739-40, Mack cannot satisfy Section 2254(d) and is not entitled to habeas relief on Point 1.

### B.    Failure to Call Bessie Mack, Sonia Spaight, and Jerome Walker as Witnesses to Support the Alibi Defense (Point 2)

#### 1.    Overview of Claim and Relevant Background

Mack asserts that Vacca was ineffective for failing to call Bessie Mack, Jerome Walker, and Sonia Spaight, all of whom were located at 310 Driving Park Boulevard at the time of the incident. *See* Dkt. 2 at 76-83 (Point 2). Bessie Mack and Sonia Spaight testified at the first 440 hearing that they did not see Mack in the area where the attack happened. Jerome Walker passed away in 2013 and

therefore did not appear at the hearing. The only evidence of Walker's proposed testimony was the statement he provided to Resnick in which he said that he did not see Mack during the attack on Shaw. Vacca testified that he did not call Bessie because her testimony was inconsistent with other witnesses he planned to call, that he did not call Walker because he had a recent felony conviction, and that he could not recall why he did not call Spaight.

The second 440 court held that "[t]he same logic and conclusions relevant to" Vacca's decision not to call White applied to his decision not to call Sonia Spaight, Bessie Mack, and Jerome Walker. SR: 2341. The second 440 court found that Vacca, "an experienced criminal defense attorney," made those decisions "after weighing the potential benefit of their testimony in the context of his theory of the case." SR: 2341. The second 440 court held that "[t]he record reflects that these decisions were strategic, albeit unsuccessful decisions." SR: 2341.

### 2. Analysis

The record clearly reveals "legitimate justifications," *Greiner v. Wells*, 417 F.3d 305, 320 (2d Cir. 2005), for Vacca's decision not to call Bessie Mack, Jerome Walker, and Sonia Spaight. To the extent the second 440 court made factual findings in resolving the allegations in Point 2, the Court finds that it reasonably determined the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(2), and Mack has not overcome the presumption of correctness by clear and convincing evidence, *id.* § 2254(e)(1). Furthermore, the second 440

court reasonably determined that Vacca's strategic decisions were objectively reasonable and did not result in prejudice to Mack's defense.

First, all three witnesses were Mack's relatives. Bessie's sister, Mary Mack, was Mack's mother. Jerome Walker, Bessie's husband, told the defense investigator that he had known Mack for about 30 years and that Mack was "like [his] nephew." SR: 1922. Spaight was Mack's aunt by marriage; her sister was married to Mack's uncle. Due to their closeness with Mack, all three were interested in the outcome of his trial and had a motive to fabricate to help him avoid criminal liability. As was the case with White, Mack's longtime best friend, the prosecutor readily could have made them appear biased on cross-examination. *See, e.g., Bergmann*, 65 F.3d at 1380 ("As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias."); *Gonzalez*, 667 F.3d at 988 (holding that trial counsel's failure to present witnesses did not constitute ineffective assistance where the witnesses were "family or close friends" whose testimony was therefore "suspect based on their close relationship with [the petitioner]").

Second, the three witnesses did not have non-cumulative testimony to offer. Walker, who died before the 440 hearing, had given a statement in 2008 saying that he mostly remained inside Bessie's house during the altercation. SR: 1922. Walker could say only that he did not see Mack among the people fighting. SR: 1922. Walker's proposed testimony at best was cumulative of the trial testimony provided by Kionna Speed, Carolyn McHenry, and Shatora Hampton. Further, Walker was

105

in jail for a recent felony conviction and did not appear to Vacca to be a reliable or trustworthy witness. H3: 67. Vacca reasonably was concerned that Walker could have undermined the credibility of Mack's defense. *See Ryan v. Rivera*, 21 F. App'x 33, 34 (2d Cir. 2001) (stating it was not "inclined to second-guess th[e] strategic decision" not to call the petitioner's proposed alibi witnesses where defense counsel "spoke with the proposed alibi witnesses before trial and told them that he would not call them to testify because the prosecution 'would tear [them] apart'") (second alteration in original).

Bessie's proposed testimony was as vague as Walker's. She claimed that she did not witness any part of the attack on Shaw and could not see any of the individuals involved, even though the fight was occurring on the street directly in front of her house and allegedly involved her daughter (Ebony Mack, Mack's co-defendant). H1: 139. In addition, as Vacca testified, Bessie's statement was inconsistent with the statements provided by some of the witnesses he intended to call at trial, and Vacca was concerned those inconsistences might have confused the jury. H1: 54. For instance, while Spaight said that she went over to Bessie's house at about 4 p.m., when she got off work, H1: 116, Bessie said that Spaight arrived between 1 p.m. and 2 p.m. to do Bessie's hair, H1: 138-39, 147-48. In addition, Spaight told Penkitis that she saw Bessie's daughter, Ebony, during the incident, while Bessie claimed that she did not see her daughter and did not recall where Ebony was at the time. H1: 148-49.

Not only would Spaight have provided cumulative testimony, but she was also vulnerable to impeachment due to her prior inconsistent statement to Penkitis. As noted above, Spaight told Penkitis that she did not arrive at Bessie's house until around 7:30 p.m., *after* the stabbing had occurred. *See* SR: 675, 849. Spaight also told Penkitis that she went to Bessie's house to pick up her children because she had learned that Bessie and Walker had been taken into custody. *Id.* When the prosecutor confronted Spaight with that statement at the first 440 hearing, Spaight claimed that she never told Penkitis any of those things. H1: 124-25.

Had Spaight been called to testify at trial, the prosecutor certainly would have made full use of her prior inconsistent statement to attack her credibility. *See Parsons*, 2020 WL 2572739, at *18 ("One of the most common methods of attack[ing]" "the credibility of a witness . . . is by proof that the witness previously made a statement that is inconsistent with [his] current testimony.") (alterations and ellipsis in original) (quoting § 6094 Bases For Attacking Credibility, 27 Fed. Prac. & Proc. Evid. § 6094 (2d ed.) (footnote and citations omitted in original)). Vacca reasonably could have concluded that, due to this significant impeachment material, calling Spaight would have undermined the believability of the defense. *See Ryan*, 21 F. App'x at 34 (stating it was not "inclined to second-guess th[e] strategic decision" not to call the petitioner's proposed alibi witnesses where defense counsel "spoke with the proposed alibi witnesses before trial and told them that he would not call them to testify because the prosecution 'would tear [them] apart'") (second alteration in original).

107

The second 440 court reasonably applied *Strickland* in determining that Vacca made a reasonable strategic decision that the risks of calling Bessie, Walker, and Spaight outweighed the benefits with respect to their testimony, which lacked detail and was cumulative of other defense witnesses. Because Mack has not established that "every fairminded jurist would agree that every reasonable lawyer would have made a different decision," *Dunn*, 594 U.S. at 739-40 (quotation marks and citation omitted), he cannot satisfy AEDPA. Point 2 does not provide a basis for habeas relief.

### C. Failure to Consult or Call an Expert Witness Regarding Eyewitness Identifications (Point 3)

#### 1. Overview of Claim and Relevant Background

Mack asserts that Vacca erred by failing to consult with or call an expert witness to testify regarding the science of perception and memory as it relates to the accuracy and reliability of eyewitness identifications. *See* Dkt. 2 at 83-92 (Point 3). Mack contends that if Vacca had consulted with or called such an expert, "he could have provided the jurors with many reasons to doubt the accuracy of the identification." *Id.* at 86.

Vacca testified that he had never called an expert witness in the field of eyewitness identifications or in the field of memory. H3: 69. With regard to an expert regarding eyewitness identifications, Vacca said that "we didn't consult with one here because we had a number of alibi witnesses." H3: 26. Vacca testified that he did not call an expert regarding how human memory works, explaining that the

topic had never come up in any of his previous cases. H3: 99. He also expressed concern that the subject matter would be overly confusing for the jury. H3: 99.

The second 440 court rejected Mack's claim, reasoning that, "[w]hile a different strategy might have been more effective," it "cannot conclude that such strategy was unreasonable in the context of the defendant's overall trial strategy." SR: 2343. The second 440 court observed that Vacca "chose a trial strategy that focused on the defendant's alibi and Ms. Torres's identification being mistaken," so "[a]ny value that an expert may have had is tempered by the fact that the identification in this case was confirmatory." SR: 2342-43. The second 440 court noted that Torres, "[t]he identifying eyewitness[,] had seen the defendant 'in the neighborhood quite a few times on the brown porch' [of 310 Driving Park, Bessie Mack's house,] and had also seen him earlier that day on the same porch." SR: 2342-43. The second 440 court further found that Torres's "confirmatory identification was corroborated by the confession by the defendant to the jailhouse cooperator[, Donald,] and by a jail call made by the defendant to his father in which he made an implicit confession." SR: 2343.

### 2. Analysis

Where, as here, a claim is subject to AEDPA, the federal court "may grant habeas relief only if" the state court "violated 'clearly established Federal law, as determined by the *Supreme Court* of the United States.'" *Dunn*, 594 U.S. at 739 (emphasis in original) (quoting 28 U.S.C. § 2254(d)(1)). Mack has not cited, and the Court has not found, any clearly established Supreme Court precedent stating that,

109

in cases where identity is disputed, the Sixth Amendment requires defense counsel to consult with or call an expert witness concerning the reliability of identifications. *See Crisp v. Covello*, No. 19-16987, 2023 WL 154959, *1 (9th Cir. 2023) ("Neither *Strickland* and its progeny, nor 'prevailing professional norms,' require trial counsel to consult or call an eyewitness expert[.]"); *see also Clardy v. Pounds*, 126 F.4th 1201, 1209 (6th Cir.) ("[D]efense counsel is not always required to 'call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment.'" (quoting *Perkins v. McKee*, 411 F. App'x 822, 833 (6th Cir. 2011)), *cert. denied sub nom. Clardy v. Nelsen*, 145 S. Ct. 2755 (2025).

As the Supreme Court has noted, "[w]hile identification testimony is significant evidence, such testimony is still only evidence." *Manson v. Brathwaite*, 432 U.S. 98, 113 n.14 (1977) (footnote omitted in original) (quoting *Clemons v. United States*, 408 F.2d 1230, 1251 (D.C. Cir. 1968) (concurring opn.)). And the Supreme Court has long held that the "time-honored process of cross-examination" is "the device best suited to determine the trustworthiness of testimonial evidence." *Watkins v. Sowders*, 449 U.S. 341, 349 (1981); *see also Perry v. New Hampshire*, 565 U.S. 228, 246 (2012) (noting that defense counsel "can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments"); *United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996) ("Any weaknesses in eyewitness identification testimony can ordinarily be revealed by counsel's careful cross-

examination of the eyewitnesses."); *Jones v. Smith*, 772 F.2d 668, 674 (11th Cir. 1985) (finding that the failure of the petitioner's "attorneys to offer in evidence the opinion of a qualified expert as to the unreliability of eyewitness testimony" did not "constitute ineffective assistance of counsel" where "[t]he likelihood of mistaken identification . . . brought to the jury's full attention through cross-examination" and "[n]o prejudice resulted from the lack of expert testimony").

As the foregoing cases illustrate, relying on cross-examination to advance a mistaken identification defense is not an unreasonable strategy, particularly considering the absence of any clearly established Supreme Court precedent dictating that a defense attorney must consult with or call an expert witness on identification when the perpetrator's identity is disputed. Indeed, the Supreme Court has recognized that counsel may sometimes forgo key arguments or decline to call an expert witness when doing so could "increase[ ] the likelihood of the prosecution[ ] producing its own evidence," "shift attention to esoteric matters of forensic science, . . . or transform the case into a battle of the experts." *Richter*, 562 U.S. at 108-09.

The second 440 court reasonably determined that, since Torres's identification was confirmatory, an expert witness in eyewitness identification and memory would have had little impact. As an initial matter, Mack has not established that the second 440 court's characterization of the identification as confirmatory was an unreasonable determination of the facts in light of the evidence presented, *see* 28 U.S.C. § 2254(d)(2). Nor has he come forward with clear

111

and convincing evidence to rebut the second 440 court's factual determination, *id.* § 2254(e)(1). Significantly, the Fourth Department made the same findings on direct appeal regarding the confirmatory nature of Torres's identification. *See Mack*, 142 A.D.3d at 757, 36 N.Y.S.3d at 540 ("The eyewitness[, Torres,] . . . knew defendant from the neighborhood, having seen him 'quite a few times.' It was not as though she were identifying a stranger.") (citation to record omitted in original)).

Having determined that Torres's identification was confirmatory, the second 440 court reasonably found that an expert witness in eyewitness identifications and memory was unnecessary in this case. "The primary concern expressed in cases discussing the problems with eyewitness identification relates to a witness observing and subsequently identifying a stranger." *Moss v. Hofbauer*, 286 F.3d 851, 862 (6th Cir. 2002) (citing, *inter alia*, *Manson*, 432 U.S. at 111-12 (discussing previous Supreme Court cases focusing on the risks of eyewitness identification, and noting that "[u]sually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress")). The present case does not present such a situation, as the second 440 court and Fourth Department both concluded. *See Moss*, 286 F.3d at 862 ("[T]he witness who testified that she observed Moss shoot Manley saw him on a daily basis as a person in the neighborhood. This case is simply not the 'stranger who jumps out of the dimly lit alley' situation that would raise reasonable doubts about [the witness]'s perception.").

The second 440 court's decisions to credit Donald's testimony about his conversation with Mack and to determine that Mack's conversation with his father was an "implicit confession" were reasonable determinations of the facts in light of the record below, 28 U.S.C. § 2254(d)(2), and Mack has not come forward with clear and convincing evidence to rebut the correctness of the second 440 court's factual findings, *id.* § 2254(e)(1). As noted above, Donald testified to certain details about the incident that he could only have learned from Mack—that Mack, "ran off the porch, grabbed her and held [Shaw]" while "they," *i.e.*, the other attackers, "did that" to her, TT: 429-30; that he had told the authorities he was in Elmira at the time of the stabbing, TT: 445; and that there was one female witness (*i.e.*, Torres) who "could possibly identify him, but she wasn't sure if it was him or his father because they look alike," TT: 430.

As for the "implicit confession" finding, the Fourth Department reached the same conclusion, noting that "the testimony of [Donald,] the jailhouse informant . . . was corroborated by defendant himself, who, during a recorded telephone conversation from jail with his father, essentially acknowledged that he made the damaging admissions to the informant." SR: 489. During the call, Mack's father chided him for "talkin'" and giving the prosecution something to "use . . . against [him]." SR: 151. Mack responded that he did not voluntarily offer information to Donald ("No I did not ask, tell him. . . ."). SR: 151. Instead, Mack said, Donald "asked about the situation." SR: 151. Mack's father retorted that he did not "want to talk about it" and informed Mack that his "problem" was that he "want[ed] to run

[his] mouth." SR: 151. The timing of the call—the evening of the day that Donald testified about his conversation with Mack—only reinforces the reasonableness of the second 440 court's and the Fourth Department's interpretation of the call as an implicit confession.

Furthermore, when the prosecutor asked Mack on cross-examination whether he was referring to Donald asking him about his case when Mack said to his father, "he asked about the situation," Mack did not answer "no" or otherwise deny it. Instead, he repeatedly stated that he talked to his father about his case, which did not answer the prosecutor's question. See TT: 658-59.

Mack has failed to establish that the second 440 court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Therefore, he has not satisfied 28 U.S.C. § 2254(d) and Point 3 does not warrant habeas relief.

### D.    Failure to Educate the Jury About "Own Race Bias" (Point 4)

#### 1.    Overview of Claim and Relevant Background

Mack asserts that Vacca was ineffective for failing to educate the jurors about the danger of misidentification posed by "own race bias" in the context of cross-racial identifications. Dkt. 2 at 92-95 (Point 4). Dr. Brainerd testified that the "bottom line is that people are much poorer in eyewitness identification at identifying a suspect who is not of their own race." H4: 38. Dr. Brainerd described Torres as a white Hispanic female based on a photograph he viewed of her and

114

based on notations about her race/ethnicity on police reports. H4: 60-61. However, he did not know her family lineage. H4: 60-61. According to Dr. Brainerd, Torres is a white Hispanic female and Mack is a black male, making "own race bias" a relevant factor. H4: 39.

Mack conceded that the "the value of expert testimony about cross-racial identification may be diminished if the eyewitness (Megan Torres) is not strictly a white, Hispanic female but also has some African-American traits." SR: 1862. In a letter to appellate counsel in connection with the 440 motion, Vacca described Torres as a "female Hispanic, and I would say that she was white, but had some African-American traits." SR: 590-91 (quoting SR: 1019). Then, at the post-remittal hearing on the 440 motion, Vacca testified that his recollection was that Torres was a white Hispanic female, but he could not identify her from a photograph. H3: 12. The second 440 court did not make a factual finding regarding Torres's race or ethnicity. The second 440 court noted that Dr. Brainerd had testified concerning the phenomenon of "own race bias," but did not specifically discuss the allegation in Point 4. SR: 2339.

As discussed above, Point 4 is subject to 28 U.S.C. § 2254(d). Because the second 440 court did not explain its reasoning, this Court must determine what arguments or theories could have supported the second 440 court's decision and then must ask "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Richter*, 562 U.S. at 101-02.

115

## 2.   Analysis

Where counsel has not necessarily articulated a justification for a decision, the habeas court must "affirmatively entertain the range of possible 'reasons . . . counsel may have had for proceeding as they did.'" *Pinholster*, 563 U.S. at 198 (citation to lower court opinion omitted).  The record reveals "legitimate justifications for [counsel's] conduct," *Greiner*, 417 F.3d at 320, based on which the second 440 court reasonably could have determined that Vacca's omission was not professionally unreasonable.

At the time of Mack's trial in 2009, the expanded identification charge in the criminal pattern jury instructions did not include the cross-race effect among the list of factors for the jury to consider. *People v. Watkins*, 42 N.Y.3d 635, 642 (2024). Furthermore, at the time of Mack's trial, a defendant could not automatically obtain a jury charge that included language concerning the unreliability of cross-racial identifications. *See, e.g.*, *People v. Applewhite*, 298 A.D.2d 136, 137, 748 N.Y.S.2d 4, 5 (1st Dep't 2002) (finding that the trial judge "properly refused to charge the jury on the asserted unreliability of cross-racial identifications, since the . . . charge correctly conveyed the applicable legal principles on witness credibility and identification testimony"); *see also, e.g.*, *People v. Ellison*, 8 A.D.3d 400, 401, 777 N.Y.S.2d 760, 761 (2d Dep't 2004) (finding that trial judge properly denied defendant's request for a jury charge on "cross-racial identification" where the proof at trial included the victim's eyewitness identification and evidence that defendant, when apprehended shortly after the crime, was in possession of a necklace with a

116

medallion stolen from the victim). Given the evidence of guilt that corroborating Torres's identification, Vacca reasonably could have decided that a cross-racial identification charge was unlikely to have been granted.

Further, Mack has not shown a reasonable probability of a different result even if the charge had been requested and issued. Mack claims only that expert testimony or a jury instruction concerning cross-racial identifications "*might* have provided one or more jurors with a reason to remain steadfast in the belief that the [prosecution] failed to prove" his guilt beyond a reasonable doubt. Dkt. 2 at 94 (emphasis added). However, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding,'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693), as "[v]irtually every act or omission of counsel would meet that test," *Strickland*, 466 U.S. at 693.

Not only does Mack's prejudice argument fail to apply the correct legal standard, but it is also based on pure speculation. Mack has no knowledge of how the jurors were split or why they were deadlocked. Vacca testified at the post-remittal hearing on the 440 motion that, at the time of the deadlock note, he did not have any information as to how the jury was split. H3: 81. Likewise, prior to the announcement of the verdict, Vacca did not "acquire any information as to how—whatever the earlier split, how that was resolved." H3: 81. "It is well settled that speculation and conjecture about the possibility of success . . . is insufficient to fulfill *Strickland*'s prejudice prong." *Fernandes v. United States*, 583 F. Supp. 3d 403, 418 (W.D.N.Y. 2022) (collecting cases).

117

The second 440 court reasonably could have determined that Mack did not satisfy *Strickland*'s requirement of showing a reasonable probability of a different result but for Vacca's failure to request a jury charge on cross-racial identifications. Because Mack has not shown that no fairminded jurist could agree that the above-discussed arguments are consistent with *Strickland*, Mack has not satisfied 28 U.S.C. § 2254(d). Point 4 does not warrant habeas relief.

### E. Failure to Educate the Jury About "Weapon Focus" (Point 5)

#### 1. Overview of Claim and Relevant Background

Mack contends that Vacca was ineffective for failing to educate himself or the jurors about "weapon focus." Dkt. 2 at 95-97 (Point 5). Dr. Brainerd testified that "weapon focus" is an unconscious phenomenon that occurs when a person is in a situation where a dangerous weapon is present. H4: 37. According to Dr. Brainerd, the "accuracy [of the person's memory] is reduced because [they] are paying attention to the weapon itself." H4: 37. Vacca testified at the post-remittal hearing that he did not know what "weapon focus" is. H3: 25. As discussed above, the Court has found that Point 5 was adjudicated on the merits for purposes of 28 U.S.C. § 2254(d) even though the second 440 court did not explain its reasoning for rejecting this allegation. "Even when the final state court decision 'is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was *no reasonable basis* for the state court to deny relief.'" *Wilson v. Sellers*, 584 U.S. 122, 136 (2018) (emphasis in original) (quoting *Richter*, 562 U.S. at 98).

118

### 2.   Analysis

It is beyond debate that an attorney's decision whether to cross-examine a witness is strategic in nature. *See United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature.").

The second 440 court reasonably could have determined that expert testimony on "weapon focus" was unnecessary and that Vacca made the same point through his cross-examination of Torres, during which he questioned her with the intent of showing she was confused about what she witnessed, including the number and types of weapons. *See, e.g.*, TT: 360-61.

The second 440 court also reasonably could have found that Mack did not demonstrate prejudice, since he argued only that the presence of multiple weapons "*could have* deleteriously affected" Torres's "ability to focus on the facial characteristics of the perpetrator that she identified as Mr. Mack." Dkt. 2 at 96 (emphasis supplied). Mack thus admits that any effect on the verdict was at most "conceivable." However, as the Supreme Court has stated many times, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 56 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693).

119

In fact, Mack's assertion that the accuracy of Torres's identification was marred by "weapon focus" is undermined by his argument in Point 15 that since the medical examiner failed to find evidence of stab wounds inflicted by glass, Vacca should have impeached Torres with her 911 call in which she stated that Shaw was stabbed with a knife and a glass bottle. The fact that Torres was mistaken in her description of one of the weapons and how it was used weakens Mack's argument that Torres's focus was on the weapons versus the assailants' faces. Conversely, it strengthens the believability of Torres's testimony that her attention was trained on the attackers' faces so that she could try to identify someone.

Because the second 440 court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, Mack has not satisfied the limitations on relief in 28 U.S.C. § 2254(d) as to Point 5.

### F.    Failure to Educate the Jurors About the Lack of Correlation Between Eyewitness Confidence and Accuracy (Point 6)

#### 1.    Overview of Claim and Relevant Background

Mack asserts that Vacca failed to educate the jurors about scientific research showing the lack of a strong correlation between an eyewitness's confidence in an identification and accuracy of that identification. Dkt. 2 at 97-102 (Point 6). Vacca testified that he was not familiar with the correlation between eyewitness confidence and accuracy and could not give an opinion about whether jurors tend to believe confident witnesses. H3: 23. Dr. Brainerd testified that there is a poor correlation between a witness's confidence in an identification and the accuracy of

that identification.  H4: 42-44.  According to Dr. Brainerd, "the average person believes eyewitness identifications are highly reliable, and that they are especially reliable if they're expressed with high confidence."  H4: 19.

The second 440 court noted that Dr. Brainerd referred to "confidence v[er]s[us] accuracy" and "research show[ing] that an average person has an overconfidence in eyewitness identification."  SR: 2422.  Although the second 440 court did not discuss the alleged error in Point 6, the Court has found that it was adjudicated on the merits for purposes of 28 U.S.C. § 2254.  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Richter*, 562 U.S. at 98.

### 2.  Analysis

Mack contends that instead of arguing that Torres was lying about her identification, Vacca, "if educated on how memory works, could have provided jurors with another *reason for* her steadfast confidence."  Dkt. 2 at 100 (emphasis supplied).  However, the second 440 court reasonably could have concluded that Dr. Brainerd did not provide any "reasons" to explain Torres's confidence in her identification of Mack; nor did Dr. Brainerd testify that a witness's confidence in his or her identification means that the identification is, in fact, unreliable or mistaken. Instead, Dr. Brainerd simply testified that there is a lack of correlation between eyewitness confidence and accuracy.  Thus, the second 440 court reasonably could have determined that Mack's argument as to how Dr. Brainerd would have assisted

the defense improperly conflated "correlation" with "causation." Because any relationship between eyewitness confidence and accuracy was correlative rather than causative, the second 440 court reasonably could have found that it was relatively unimportant and did not affect the outcome, particularly because the second 440 court also found that Torres's identification was confirmatory and there was other evidence corroborating Mack's identity.

The second 440 court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Therefore, Mack has not satisfied the limitations on relief in 28 U.S.C. § 2254(d) as to Point 6.

## G.    Failure to Educate the Jury About "Event Stress" (Point 7)

### 1.    Overview of Claim and Relevant Background

Mack argues that Vacca failed to educate the jurors about the impact of "event stress" on a person's "ability to make an accurate identification." Dkt. 2 at 102-04 (Point 7). Dr. Brainerd testified that according to the research, the accuracy of the identification decreases as the level of stress inherent in the event increases. H4: 32-33. Dr. Brainerd said that there were "some studies" showing that "jurors kind of hold an opposite theory," "[n]amely, if you're in a series of events of events where you're under a high level of stress, that preferentially preserves memories." H4: 33. Dr. Brainerd opined that event stress would be relevant because there was "serious physical violence" in this case. H4: 34. Vacca could not offer an opinion as to whether the stress of watching a traumatic event potentially might affect the accuracy of an eyewitness's identification. H3: 24-25.

122

The second 440 court found that Vacca "directly addressed" this factor in his cross-examination of Torres. SR: 2342. Mack asserts that the second 440 court's finding that Vacca cross-examined Torres about "event stress" has "absolutely no record support." Dkt. 2 at 102.

### 2.  Analysis

Mack is correct that Vacca did not specifically ask Torres to quantify her stress level while watching the event. To the extent the second 440 court inaccurately characterized Vacca's actual cross-examination of Torres raises the question of whether Mack might be able to satisfy the requirements of 28 U.S.C. § 2254(d)(2) and (e)(1). *See Collier v. Norris*, 485 F.3d 415, 422-23 (8th Cir. 2007) ("Before we address the 'unreasonable application' provision of § 2254(d)(1), we find it helpful to determine first whether the [state] [c]ourt decision was based on an 'unreasonable determination of facts' under subsection (d)(2)" where the state court erroneously attributed portions of one witness's testimony to a person who did not testify and erroneously referred to "the testimony of other witnesses who saw the shooting" when only one witness testified to seeing the shooters").

"[B]asic, primary, or historical facts" in the state court record are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1)." *Collier*, 485 F.3d at 423 (quoting *Lupien v. Clarke*, 403 F.3d 615, 620 (8th Cir. 2005) (citing *Thompson v. Keohane*, 516 U.S. 99, 110-11 (1995)). In *Collier*, the respondent had conceded the state appellate court's factual errors, so the circuit court assumed that the

presumption of correctness in § 2254(e)(1) had been rebutted. *Id.* Here, however, Respondent has not acknowledged the factual error pointed out by Mack.

Even if Mack cleared the hurdle in § 2254(e)(1), "it does not necessarily follow that the state court adjudication was based on an unreasonable determination of facts because subsection (d)(2) instructs federal courts to evaluate the reasonableness of the state court decision 'in light of the evidence presented in the State court proceeding.'" *Collier*, 485 F.3d at 423 (quoting 28 U.S.C. § 2254(d)(2)). "Rather, in order to receive relief under this clause, the petitioner must show that the state court's adjudication of the claim 'resulted in a decision that *was based* on an unreasonable determination of the facts in light of the evidence presented.'" *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011) (emphasis in original) (quoting 28 U.S.C. § 2254(d)(2)). In other words, the petitioner cannot satisfy § 2254(d)(2) unless he can "cannot show that the 'decision'—*i.e.*, the overall *Strickland* determination of the court—was 'based on'—*i.e.*, 'rests upon,'" *id.* (quoting *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003)), "an unreasonable determination of the facts," *id.*

Considering Vacca's cross-examination of Torres and the trial record as a whole, the second 440 court's finding of no ineffectiveness rests upon an unreasonable determination of the facts.

While Vacca did not ask Torres specific questions about her stress level, he did seek to demonstrate the chaotic nature of the scene and the improbability of Torres being able to identify anyone out of "those twenty-five to thirty people all

fighting and struggling and pushing." TT: 369. Vacca elicited from Torres that "everybody was obstructing everybody else's view at a certain point because everybody was trying to get away." TT: 368-69. Torres conceded that all the attackers lived in the same neighborhood in which Torres had lived her whole life, yet she did not recognize anyone else among the crowd besides Mack. TT: 368. In addition, the expanded jury charge on identification asked the jurors to consider the eyewitness's mental, physical and emotional state before, during, and after the observation and evaluate whether and how her ability to observe and remember, with accuracy, the perpetrator. *See* TT: 760-62.

The second 440 also court reasonably could have concluded that the failure to introduce expert witness testimony on this factor did not affect the outcome of trial, in light of Vacca's cross-examination and the expanded jury charge. Notably, Mack has not attempted—either in state court or here—to demonstrate a reasonable probability of a different result but for Vacca's alleged failure to educate himself or the jurors about "event stress" and its effect on the accuracy of eyewitness identification. Dkt. 2 at 104. Speculation as to "whether a different trial strategy might have been more successful" is not enough. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

Because the second 440 court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, Mack has not satisfied the limitations on relief in 28 U.S.C. § 2254(d) as to Point 7.

### H.   Failure to Educate the Jury About "Event Duration" (Point 8)

#### 1.   Overview of Claim and Relevant Background

Mack argues that Vacca failed to educate the jurors about "event duration." Dkt. 2 at 104-06 (Point 8). Dr. Brainerd testified that "event duration" is "how long a time a witness is able to pay attention to and encode a set of target events." H4: 34. Dr. Brainerd testified that the research shows a "general tendency of people to overestimate durations," which is "counterintuitive" to what most people think. H4: 35. It does not appear that Vacca was questioned about this factor at the post-remittal hearing on the 440 motion.

The second 440 court mentioned that Dr. Brainerd testified about "event duration," among other factors, but it did not discuss Mack's claim that Vacca erred by not educating the jurors about it. Nonetheless, as discussed above, the second 440 court adjudicated Point 8 on the merits for purposes of 28 U.S.C. § 2254(d). Since the second 440 court did not provide a rationale, the Court "must determine what arguments or theories . . . could have supported, [its] decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Richter*, 562 U.S. at 102.

#### 2.   Analysis

The second 440 court also reasonably could have determined that it was not objectively deficient performance for Vacca not to educate the jurors about "event duration" since it could have been used against one of the defense witnesses,

126

Shatora Hampton, to undermine her credibility. Hampton testified that the incident lasted for 30 to 45 minutes, which was impossible given the timing of the victim's 911 call and Torres's 911 call, and Officer Hickey's testimony about when he received the emergency dispatch regarding the attack. Had Vacca called an expert to testify about the tendency of witnesses to overestimate "event duration," the prosecutor could have cross-examined Hampton on this factor and undermined her credibility.

The second 440 court reasonably could have determined that Mack failed to establish prejudice—*i.e.*, a reasonable probability of a more favorable verdict—but for Vacca's alleged error. Torres testified that the incident lasted for about 30 to 60 seconds. According to Mack, the amount of time that Torres watched the incident unfold "could not have been more than a few seconds." Dkt. 2 at 106. Mack has offered no record support for this assertion. Instead, he surmises that because of "weapon focus" and "event stress," Torres *must* have been "distracted from the face of the alleged male perpetrator." Dkt. 2 at 106. Contrary to Mack's supposition, Torres testified that throughout the attack, she focused her attention on the faces of the various participants so that she could identify someone. Neither in state court nor here has Mack offered anything more than a "purely speculative" argument about the impact of the alleged error, which does not establish prejudice. *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991).

Because the second 440 court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond

127

any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, Mack has not satisfied the limitations on relief in 28 U.S.C. § 2254(d) as to Point 8.

I.    **Failure to Educate the Jury About "Partial Disguise" (Point 9)**

1.    **Overview of Claim and Relevant Background**

Mack contends that that Vacca failed to educate the jurors about the problem that "partial disguise" poses to the accuracy of eyewitness identifications. Dkt. 2 at 107 (Point 9). Mack bases this allegation on Torres's testimony that the person she identified as Mack was wearing a baseball hat. TT: 370, 376, 379.

Dr. Brainerd testified that there are studies on "partial disguise" which indicate that "fairly small adornments, like a pair of glasses or a bat, will impair eyewitness identification." H4: 32. When asked about theories to explain this, Dr. Brainerd said that the "overall shape of the head is important," and that hats or glasses tend to break that up. H4: 32. It does not appear that Vacca was questioned regarding "partial disguise" at the post-remittal hearing.

The second 440 court acknowledged that Dr. Brainerd testified regarding "partial disguise" but did not discuss the alleged error in Point 9 specifically. As explained above, the second 440 court nevertheless adjudicated Point 9 on the merits for AEDPA purposes. Since the second 440 court did not provide a rationale, the Court "must determine what arguments or theories . . . could have supported, [its] decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Richter*, 562 U.S. at 102.

2.    **Analysis**

128

As an initial matter, the record belies Mack's assertion that during his summation, "Vacca never mentioned the hat as a reason to doubt the accuracy of the in-court identification," Dkt. 2 at 108. In fact, Vacca argued that Torres could not have been able to identify Mack, "with a hat pulled down over his eyes, as an individual who hits Latasha Shaw over the head with a bottle." TT: 711. The prosecutor countered by pointing out that Torres "didn't say it was pulled over his face. She said it was riding up here. (Indicating.) She made the gesture to you when she was on the stand." TT: 734. However, Torres's gesture, if any, was not noted in the transcript of her testimony. Torres did say that she was able to see the person's eyebrows notwithstanding that he was wearing a hat. TT: 380.

The second 440 court reasonably could have determined that Vacca did not perform in a professionally unreasonable manner because, during his summation argument, *see* TT: 711, Vacca conveyed the relevant points concerning "partial disguise" to the jurors. Further, the second 440 court reasonably could have determined that Mack did not demonstrate how the alleged error had a "substantial" effect on the outcome of trial. Mack made nothing more than a conclusory assertion that Vacca's omission "was deficient performance that prejudiced Mr. Mack." Dkt. 2 at 108. It is well settled that speculation alone is not sufficient to demonstrate prejudice. *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) ("*Bartholomew*") (reversing grant of habeas relief because the "federal appellate court, second-guess[ed] a convict's own trial counsel, [and] grant[ed] habeas relief on the basis of little more than speculation with slight support,"

thereby disturbing "the proper delicate balance between the federal courts and the States").

Because the second 440 court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, Mack has not satisfied the limitations on relief in 28 U.S.C. § 2254(d) as to Point 9.

### J    Failure to Educate the Jury About "Facial Distinctiveness" (Point 10)

#### 1.    Overview of Claim and Relevant Background

Mack asserts that Vacca was ineffective for failing to raise "facial distinctiveness" as a reliability factor for the jury to consider. Dkt. 2 at 108-09 (Point 10). Dr. Brainerd testified that "[i]f you give people hundreds and hundreds of faces, and you ask them to rate how distinctive those faces are, they can do it, and they rate them as being very different in distinctiveness." H4: 51. According to Dr. Brainerd, "people are really good at remembering—much better at remembering those distinctive faces, but the sort of average face, not so much." H4: 51. Mack concedes that the jury instruction did ask the jurors to consider whether "the perpetrator ha[d] distinctive features that a witness would be likely to notice and remember." TT: 761. Mack claims that Vacca should have emphasized to the jury that Torres never described Mack's face "as being distinctive for any reason." Dkt. 2 at 108. It does not appear that Vacca was questioned about "facial distinctiveness" at the post-remittal hearing.

While the second 440 court did not discuss the alleged error in Point 10, this Court has found that there was an adjudication on the merits for AEDPA purposes. Since the second 440 court did not provide a rationale, the Court "must determine what arguments or theories . . . could have supported, [its] decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Richter*, 562 U.S. at 102.

### 2.    Analysis

The second 440 court reasonably could have determined that Vacca's failure to argue that Mack did not have a distinctive face was not professionally unreasonable because it was not especially relevant where, as here, Torres's identification was confirmatory. The second 440 court also reasonably could have determined that the expanded identification jury instruction sufficiently alerted the jurors to consider the relative distinctiveness of Mack's facial features. Further, the second 440 court reasonably could have determined that Mack did not demonstrate how the alleged error had a "substantial" effect on the outcome of trial given that he asserted nothing more than that Vacca's omission "was deficient performance that prejudiced Mr. Mack." Dkt. 2 at 109. Mack's inability to show prejudice affirmatively is fatal to his ineffectiveness claim. *See Strickland*, 466 U.S. at 697.

Because the second 440 court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond

131

any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, Mack has not satisfied the limitations on relief in 28 U.S.C. § 2254(d) as to Point 10.

### K. Failure to Educate the Jury About "Unconscious Transference" (Point 11)

#### 1. Overview of Claim and Relevant Background

Mack contends that Vacca was ineffective for failing to educate the jurors concerning the phenomenon of "unconscious transference." Dkt. 2 at 109. Mack concedes that the expanded identification jury instruction asked jurors to consider:

> Did the witness ever see the person identified prior to the day in question? If so, how many times did the witness see that person and under what circumstances? To what extent, if any, did those prior observations affect the witness's ability to accurately recognize and identify such person as the perpetrator?

TT: 762. Mack complains that the instruction "merely prompts jurors to speculate about how prior observations might affect the witness's identification without providing any guidance on the risk of unconscious transference," which Dr. Brainerd could have provided. Dkt. 2 at 110. Vacca testified that he was not familiar with "unconscious transference." H3: 22.

Dr. Brainerd testified that "unconscious transference" occurs "when a person identifies a suspect who happens to be familiar to them usually from the local context. . . . And, if that person's picture shows up in an eyewitness identification, they will tend to identify that person." H4: 44. When asked how this "risk factor [would] be relevant to the facts of this case," Dr. Brainerd responded:

> Well, to the best I understand it, Mr. Mack's photo was the only one in the array who was a familiar face who Ms. Torres had seen in the neighborhood. As far as I have been able to determine, the other faces were all strangers, not people who had been specifically selected so

that they too were familiar faces from the neighborhood and, therefore, there couldn't have been any familiarity effect here.

H4: 45.

Later, during cross-examination, Dr. Brainerd elaborated on the "familiarity effect," stating that:

> familiarity is not specific recollection. Familiarity is a feeling that you have. It's rather inchoate. If it's a person you have seen in the park, seen on the street, seen on the bus, when you see the face, it's suddenly — it feels old to you, it feels familiar to you. You know you have seen it. And that, the face, stands out to you, and what you do, to connect it up for you, what goes on here is called a sourceness attribution. When we experience a face that's familiar to us, and we are asked, was this face in this context, we are not good at remembering. And we import it — we misjudge the context. The face is definitely familiar to us, but we *misremember the context*. That's the process that produces unconscious transference.

H4: 64 (emphasis supplied).

The prosecutor elicited several admissions that undermined the helpfulness of Dr. Brainerd's testimony about unconscious transference to the defense:

> Q. So, [Torres is in] her own context?
> A. Yes.
> Q. She is not in a foreign context. She's viewing people, an incident that's occurring, and one of the people involved in that incident is somebody in her context, correct?
> A. Yes.
> Q. So, she should have an easier time identifying that person because they were placed in their proper context?
> A. Well, apparently not, because she didn't. So, when she was originally questioned when the investigation was originally conducted, she had and indeed indicated she couldn't identify anybody at all. It was only much later when they came in with a photo spread that she then was [sic] identified a person who was a familiar face from the neighborhood. And even when she did that identification, she didn't say that the person had actually done anything. Just said identified somebody, I think she put it, one of the guys, something like that. So, she actually didn't do that at the time. She actually said she couldn't.

133

H3: 66.

While the second 440 court did not discuss the alleged error in Point 11, there was an adjudication on the merits for AEDPA purposes. Since the second 440 court did not provide a rationale, the Court "must determine what arguments or theories . . . could have supported, [its] decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Richter*, 562 U.S. at 102.

### 2.    Analysis

As noted above, Dr. Brainerd testified that unconscious transference occurs when a person sees a face that they recognize as familiar, but they "misremember the context" from which they know the face. H4: 64. However, on cross-examination, Dr. Brainerd admitted Torres was in her "own context" when she was watching the attack and trying to identify participants. H4: 66. Dr. Brainerd also agreed that Mack was a person from Torres's "own context." H4: 66. This was not a situation where Torres saw a familiar face but could not recall the context from which the face was familiar; instead, Torres saw a person from her own context in that same context. Based on Dr. Brainerd's testimony, then, it was reasonable to conclude this was not the type of situation that would have produced unconscious transference.

Moreover, it was obvious that, given his answers to the questions building the foundation for the prosecutor's final hypothetical, Dr. Brainerd knew that the

134

correct answer to the question of whether Torres "should have had an easier time identifying that person because they were placed in their proper context," H4: 66, was "yes." Dr. Brainerd's answer was non-responsive to the actual question. Instead, he revealed his bias by repeating the defense's arguments (*e.g.*, Torres truly could not identify anyone) and inventing theories and facts helpful to the defense (Torres did not really identify Mack as one of people who attacked Shaw because Torres merely told Penkitis that Mack was "one of the guys" and she did not say that he "had actually done anything").

Because Dr. Brainerd's testimony about unconscious transference easily could have been used against Mack to strengthen the believability of Torres's identification, the second 440 court reasonably could have concluded that it was not deficient performance to refrain from presenting this information to the jury. Further, the second 440 court reasonably could have determined that Mack did not demonstrate how the alleged error had a "substantial" effect on the outcome of trial given that he asserted nothing more than that Vacca's omission "was deficient performance that prejudiced Mr. Mack." Dkt. 2 at 111. Mack's inability to affirmatively show prejudice is fatal to his ineffectiveness claim. *See Strickland*, 466 U.S. at 697.

Because the second 440 court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, Mack has not satisfied the limitations on relief in 28 U.S.C. § 2254(d) as to Point 11.

135

L.    **Failure to Object to Testimony and Evidence Regarding the Photo Array (Point 12)**

1.    **Overview of Claim and Relevant Background**

Mack asserts that Vacca was ineffective for "opening the door" to testimony and evidence about a non-blinded photo array procedure that Penkitis conducted with Torres on October 24, 2007. *See* Dkt. 2 at 111-28 (Point 12). Mack also contends that Vacca was ineffective for failing to object to admission of the photo array itself and to request redaction of "prejudicial material"[20] that appeared on the photo array. *See id.*

During cross-examination, Vacca elicited from Torres that she had told a police officer on the night of the incident she could not identify any of Shaw's assailants. Vacca subsequently questioned Torres as follows:

| | |
|---|---|
| Q. | Okay. And then, then you change your mind; is that correct? |
| A. | Yes. |
| Q. | How does that happen? |
| A. | Because the day that [the police officer] asked me, I was scared to identify anybody because I didn't know who was watching or what was going on. Once I had talked to my dad, my dad told me that the right thing to do was to let them know what I saw. |
| Q. | When did you let them know? |
| A. | They had contacted me once I had gotten to my house. After the incident happened, they had contacted me a couple of times. |
| Q. | Did they go over to your house? |
| A. | Yes. |
| Q. | Did they talk to you? |

---

[20] The photograph in position number three (Mack) is circled, and the initials "MT" appear next to it. SR: 2136. There is also a handwritten notation by Penkitis stating, "That's the guy," which appears under the filler photograph in position number six. SR: 2136.

136

| A. | Yes. |
|---|---|
| Q. | Did they show you pictures? |
| A. | Yes. |
| Q. | How many times did they show you pictures? |
| A. | They had showed me one time. |
| Q. | One time they showed you pictures? |
| A. | One time that I remember. |
| Q. | Right. You identified Mr. Mack? |
| A. | Yes. |
| Q. | Okay. That's because you knew him from the neighborhood, correct? |
| A. | No, that's because I saw him leaving the incident and from hitting her with the bottle. |

TT: 358-59.

After Torres was excused, the prosecutor requested permission to argue outside the jury's presence:

| MS. DOORLEY: | Thank you, Judge. I believe based upon the cross-examination by Mr. Vacca, he has opened the door to my further questioning of Ms. Torres about the photo array identification procedure. I believe he asked her specific questions as to whether or not she was shown pictures of the Defendant by the investigators in October of 2007. |
|---|---|
| MR. VACCA: | Absolutely. I will question her about it. |
| THE COURT: | Okay. |
| MS. DOORLEY: | Okay. No problem with that? I just wanted to clarify for the record. |
| MR. VACCA: | Okay. That's fine. |

TT: 381.

When cross-examining Penkitis, Vacca elicited that between 75 and 100 individuals may have witnessed the attack on Shaw. TT: 421. Vacca later called Penkitis as a defense witness to establish that he did not develop any suspects based on his conversations with those 75 to 100 witnesses, and that he showed the photo

array containing Mack's picture to five to seven eyewitnesses who did not identify Mack. TT: 598-613.

During summation, Vacca relied on the testimony elicited when Penkitis was recalled as a defense witness to argue the improbability of Torres being able to identify Mack as someone who participated in the attack:

> [Penkitis] indicated that they interviewed over one hundred people in this case, over one hundred potential witnesses in this case. He indicated that he showed photographic arrays to between five and seven people with Mr. Mack's photograph in it. Of those five to seven people, there was one individual that was able to identify Terrance Mack. They interviewed over one hundred people who were witnesses. One identification. Less than one percent is less than one percent proof beyond a reasonable doubt. Even if you discard all of the other people and you go with five to seven people who viewed Mr. Mack's photographic array, we have between twelve and one-half and twenty percent that identified Mr. Mack. Eighty to eighty-seven and one-half percent could not identify Mr. Mack. Is that proof beyond a reasonable doubt? Are you going to convict this young man of such a serious crime with that type of limited proof in the case? I submit to you that you would be derelict in your obligation if you did that.

TT: 713-14.

At the post-remittal hearing on the 440 motion, when asked if he had questioned Torres about looking at a photo array, Vacca responded that he may have but was not sure, and that he did not remember whether the prosecution sought to introduce the array into evidence. H3: 39. When asked if there was any strategic reason that he wanted the jury to see the photo array, Vacca said that if his memory was correct, Torres was shown two photo arrays and did not identify anyone until the second array. H3: 40, 138. Vacca said that it was his position that Torres identified Mack because she had seen him in an earlier photo array. H3: 41-

138

42. Vacca agreed that his argument was that the procedure used by the police—showing Torres two photo arrays containing Mack's photograph—resulted in a suggestive identification. H3: 43.

However, the prosecutor clarified at a pre-trial appearance that Torres was shown only one array. 04/09/09 T: 5. Torres testified on cross-examination that she only viewed one photo array, TT: 359, and Vacca did not argue on summation that Torres identified Mack after viewing multiple photo arrays. At the time of the post-remittal hearing, Vacca apparently had a mistaken recollection about the number of times that Torres viewed Mack's picture in a police-created photo array. In addition, Vacca testified that he made an argument that he did not, in fact, make to the jury.

The second 440 court rejected Mack's assertion that Vacca "was ineffective for 'opening the door' by questioning the eyewitness, Megan Torres, on cross examination about the photo array identification of the defendant." SR: 2343. The second 440 court found that Vacca had a legitimate strategy for "opening the door" in this manner because it "allowed the defense an opportunity to question Investigator Penkitis about other eyewitnesses to the attack that he showed photo arrays containing the defendant's photo, all of whom were unable to make an identification." SR: 2343. The second 440 court explained that "[t]he testimony of all the non-identifications bolstered Mr. Vacca's attempt to discredit the photo array identification by Ms. Torres by suggesting that her father pressured her to make an identification." SR: 2343-44. The second 440 court determined that "[e]liciting these non-identifications supported

139

defense counsel's theory of the case that the identification was inaccurate or mistaken, and defendant was not in Rochester at the time of the killing." SR: 2343.

### 2.   Analysis

The post-remittal hearing transcript reveals multiple inaccuracies in Vacca's recollection of the factual circumstances surrounding Torres's identification of Mack through a photo array and how the issue played out at trial. These discrepancies are perhaps unsurprising given the 13-year passage of time between the time of trial and the hearing. As the Second Circuit has noted, "[t]ime inevitably fogs the memory of busy attorneys," but "[t]hat inevitability does not reverse the *Strickland* presumption of effective performance." *Greiner*, 417 F.3d at 326. Nonetheless, they raise the question of whether Mack might be able to satisfy the requirements of 28 U.S.C. § 2254(d)(2) and (e)(1). *See Collier*, 485 F.3d at 422-23.

Even if Mack cleared the hurdle in § 2254(e)(1), "it does not necessarily follow that the state court adjudication was based on an unreasonable determination of facts because subsection (d)(2) instructs federal courts to evaluate the reasonableness of the state court decision 'in light of the evidence presented in the State court proceeding.'" *Id.* at 423 (quoting 28 U.S.C. § 2254(d)(2)). "Rather, in order to receive relief under this clause, the petitioner must show that the state court's adjudication of the claim 'resulted in a decision that *was based* on an unreasonable determination of the facts in light of the evidence presented.'" *Byrd*, 645 F.3d at 1172 (emphasis in original) (quoting 28 U.S.C. § 2254(d)(2)). In other words, the petitioner cannot satisfy § 2254(d)(2) unless he can "cannot show that

the 'decision'—*i.e.*, the overall *Strickland* determination of the court—was 'based on'—*i.e.*, 'rests upon,'" *id.* (quoting *Ward*, 334 F.3d at 704), "an unreasonable determination of the facts," *id.* As discussed below, the "evidence in the state court record is more than sufficient to support," *Collier*, 485 F.3d at 423, the second 440 court's determination that Vacca made a legitimate, strategic decision to introduce testimony and evidence regarding the photo array. Furthermore, the second 440 court rejection of these allegations reflects an objectively reasonable application of *Strickland* such that Mack cannot satisfy 28 U.S.C. § 2254(d)(1).

As an initial matter, the Supreme Court has "repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) (collecting cases). Under New York State law, a prosecutor may not present evidence of the pretrial photographic identification of a defendant. *People v. Cuiman*, 229 A.D.2d 280, 282, 656 N.Y.S.2d 243, 245 (1st Dep't 1997) (collecting cases). The rule is based on two concerns. First, it is "readily possible to distort pictures as affecting identity." *People v. Caserta*, 19 N.Y.2d 18, 21 (1966). Second, where the photos that are used in the array are arrest photos, the inference to the jury is obvious that the person has been in trouble with the law before." *Id.* However, "[e]ven after *Caserta*, photographic identification evidence has been admitted when the *defendant has opened the door to its introduction*; when the prosecution has impeached its own, hostile witness; or when defendant has chosen to elicit testimony about a pre-trial identification from photographs." *People v. Stanislous*, 40 Misc. 3d 805, 808, 967

141

N.Y.S.2d 911, 914 (Sup. Ct. 2013) (emphasis supplied); *see also Cuiman*, 229 A.D.2d at 282, 656 N.Y.S.2d at 245.

The second 440 court reasonably determined that, based on the trial transcript, Vacca made a strategic decision to elicit testimony about the photo array procedure for purposes of bolstering the defense theory of misidentification. The deliberateness of that decision is evidenced by Vacca's immediate agreement when the prosecutor requested permission to question Torres and Penkitis about the photo array and Vacca's line of questioning when he re-called Penkitis as a defense witness. Then, during summation, Vacca used Torres's and Penkitis's testimony to argue that it was highly improbable for Torres to have been able to identify anyone, given that 75 to 100 other witnesses were unable to do so; and that her identification was the product of her father's influence and her personal interest in holding someone accountable for Shaw's death. Vacca's conduct, as reflected in the transcript, shows that the decision to elicit testimony about the photo array was intentional and part of the overall strategy to discredit Torres's identification. *See, e.g., Charles v. Fischer*, 516 F. Supp. 2d 210, 220 (E.D.N.Y. 2007) ("[I]t was obvious that, although the defendant could have precluded the prosecution from introducing evidence of the photo array identifications, defense counsel's repeated questioning regarding this subject were part of a deliberate strategy intended to cast doubt on the identification of the petitioner as the shooter and the prosecution's ability to prove beyond a reasonable doubt that the petitioner held the gun.").

Furthermore, the second 440 court reasonably could have found that Vacca's decision not to object to the unredacted photo array was not objectively unreasonable. The two concerns that animated the *Caserta* decision, *see* 19 N.Y.2d at 21, are not present here. First, there was no suggestion that the police distorted Mack's photograph in any way to make it align with a particular set of facial features. Second, because Mack took the stand, the jury was bound to hear that he had a criminal history. Mack also has not shown that he had a meritorious basis on which to request redaction of the handwritten notation, "That's the guy." In fact, the notation arguably was ambiguous because it appeared under a filler's photograph, not Mack's photograph. Even so, the defense was not contesting that Torres identified Mack after being shown a photo array but, instead, was arguing that her identification of Mack was wrongful or mistaken.

Mack asserts that "[t]he combined, prejudicial effect of these errors *may have tipped the scales* in favor of conviction." Dkt. 2 at 122 (emphasis supplied) (citing *Wilson v. Mazzuca*, 570 F3d 490, 503-05 (2d Cir. 2009)). Once again, Mack wrongly articulates his burden under *Strickland*'s prejudice prong. Moreover, his reliance on *Wilson* is misplaced. First, it not "clearly established federal law as established by the Supreme Court" for purposes of AEDPA. *See, e.g., Renico v. Lett*, 559 U.S. 766, 778 (2010) (reversing grant of habeas corpus where circuit court of appeals relied on its own decision interpreting a Supreme Court decision; circuit court's precedent did not constitute clearly established Federal law, as determined by the

143

Supreme Court, such that any failure by the state court to apply it could not have authorized habeas relief under AEDPA).

Second, *Wilson* is distinguishable on the facts. Unlike Mack, the petitioner in *Wilson* did not testify at trial. In addition, the attorney in *Wilson*, unlike Vacca, apparently did not have a strategic reason behind his questioning. Rather, the Second Circuit determined that the "record indicates that defense counsel misinterpreted and misunderstood the law, failed to pay attention, acted recklessly, and did not appreciate the consequences of his decisions, even though in many cases he was explicitly warned of the risks by the trial court." 570 F.3d at 506. Indeed, during trial, the judge stated on the record he had "very serious problems" with the "representation of the defendant." *Id.* The Second Circuit noted that the judge "resolved [his] concerns by simply asking [the attorney] whether he had a strategy-any strategy-in mind as he was pursuing his case," and when the attorney "answered affirmatively," the judge stated "'[t]hat's sufficient for me.'" *Id.* (citation to record omitted; alteration in original).

Further, the prosecution's case in *Wilson* was based "*entirely* on a single eyewitness identification made two years after the robbery by a reluctant eyewitness who testified only after being served with a material witness warrant." *Id.* (emphasis in original). Unlike in Mack's case, there was no corroborating evidence of guilt in *Wilson*. *Id.* at 506-07.

Third, *Wilson* predated *Richter*'s elucidation of the appropriate standard for judging "objective unreasonableness," which is substantially more deferential than

144

the Second Circuit's original gloss on that term. *See Garner*, 908 F.3d at 861 n.14. Although the panel in *Wilson* stated it was applying AEDPA, "it is not apparent how the Court of Appeals' analysis would have been any different without AEDPA." *Richter*, 562 U.S. at 101. For instance, the panel concluded that, "[i]n [their] view, defense counsel's errors—taken together and viewed in light of all the evidence— 'undermine [their] confidence in the outcome' of the trial." 570 F.3d at 506 (quoting *Strickland*, 466 U.S. at 694). The panel then stated that it "was an unreasonable application of *Strickland* for the state court to conclude otherwise." *Id.* at 507. But mere disagreement with the state court's decision does not suffice under 28 U.S.C. § 2254(d). *See Bell v. Cone*, 535 U.S. 685, 699 (2002) ("[I]t is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly."). For all these reasons, *Wilson* does not compel the result sought by Mack.

The second 440 court's ruling articulated a reasonable argument, supported by the record, that Vacca's decision to introduce testimony regarding the identification procedure was "within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689. Because Mack has not established that "every fairminded jurist would agree that every reasonable lawyer would have made a different decision," *Dunn*, 594 U.S. at 739-40 (quotation marks and citation omitted), he cannot overcome the limitations on relief in 28 U.S.C. § 2254(d) as to Point 12.

### M.    Erroneous Use of Open-Ended Questions on Cross-Examination (Point 13)

#### 1.    Overview of Claim and Relevant Background

Mack contends that Vacca's cross-examination of Torres was deficient because he asked two open-ended questions that purportedly allowed Torres to "bolster" her identification. *See* Dkt. 2 at 125-28 (Point 13). During cross-examination, Vacca asked Torres how she was able to identify Mack among the large group of individuals involved in the attack on Shaw, to which she responded that Mack was "out [in] front" of the group pursuing Shaw. TT: 364-65. As Mack notes, Dkt. 2 at 126, the prosecutor had not elicited this information on direct examination and later referenced it during her summation. TT: 678-79, 688. Vacca also asked Torres why she came forward as a potential witness after telling the police at the time of the incident she could not identify anyone involved. Torres responded that she was initially scared to identify anyone but was encouraged by her father to do the "right thing." TT: 358, 362. As Mack notes, the prosecutor used this answer during her summation. TT: 680-81.

At the post-remittal hearing on the 440 motion, Vacca agreed that two basic rules of cross-examination were that attorneys should not ask questions they did not know the answers to and should not ask "why" questions. H3: 52. Vacca did not remember if he asked Torres to explain the three-week delay in coming forward with information about the stabbing, but said that it was something he would have asked. H3: 53. Vacca's recollection was that Torres told her father that "she knew who it was, and he said, you have to go forward, accept responsibility and tell the

146

truth." H3: 54. Vacca also thought that Torres said she was scared to come forward. H3: 54. Vacca believed that Torres's testimony was "helpful because she couldn't identify him until after the police showed her the arrays [sic]." H3: 54. When asked whether Torres's testimony about her conversation with her father would tend to lend credence to her identification, Vacca said, "no," but could not give a "definitive answer" as to why it would not. H3: 55.

Vacca did not remember if he asked Torres how she was able to pick out Mack from among the mob of people attacking Shaw. H3: 55. When asked what benefit to the defense that question would have had, Vacca said,

> Because it was my feeling that she couldn't pick him out, and you have to ask that question, or those lines of questioning, in order to get to the conclusion that he [sic] couldn't pick her [sic] out.

H3: 56. When asked if he knew what Torres's answer was going to be, Vacca responded:

> In other words, did I ask a question that I didn't know the answer to? There are some questions that you have to ask: Well, how'd you pick him out? He's, you know, marching or he's leading this pack, and how did you pick him out, how do you know who it was?

H3: 57. Vacca conceded that he did not know what Torres's answer was going to be. H3: 140. Vacca did attempt to speak with Torres prior to trial but was unable to do so. H1: 76.

The prosecutor questioned Vacca about his cross-examination strategy, asking him "how important is it to lock in a witness' testimony clearly before you start really trying to break it down and potentially impeach them." H3: 113. Vacca responded:

147

You lock that in as quick as possible, because then the witness, or the juror, depending on who you're talking about what, are locked into their statements. But the danger you run into there is they may surprise you and say something else that you are surprised that they're saying because they didn't say this before.

H3: 113-14. When he was asking, "how did you pick out my guy," Vacca's intention was to "lock the witness in" and then "break down each and every word" to try to "undermine whatever basis" that Torres had for being able to single Mack out of the crowd. H3: 114. Vacca agreed that "[w]ithout that first question," he "really couldn't tailor the cross-examination in the way that he wanted to." *Id.*

### 2.    Analysis

While the second 440 court did not discuss the alleged error in Point 13, it concluded that Vacca's "cross-examination was consistent with, and in furtherance of, the overall trial strategy." SR: 2344. Since the second 440 court did not provide a rationale for rejecting the argument in Point 13, the Court "must determine what arguments or theories . . . could have supported, [its] decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Richter*, 562 U.S. at 102.

To the extent that the second 440 court made factual determinations in resolving the allegations in Point 13, Mack has not come forward with clear and convincing evidence to rebut the presumption of correctness accorded to those findings, 28 U.S.C. § 2254(e)(1), Nor has he demonstrated that the second 440 court's adjudication of the claim "'resulted in a decision that *was based* on an

148

unreasonable determination of the facts in light of the evidence presented.'" *Byrd*, 645 F.3d at 1172 (emphasis in original) (quoting 28 U.S.C. § 2254(d)(2)).

Although the answer Torres gave was used by the prosecutor during summation, it was subject to an interpretation that was consistent with the defense theory—that Torres only came forward after her father pressured her to assist the police and, because she really did not know who she saw attacking Shaw, she simply picked out Mack because she had seen him around the neighborhood previously. The second 440 court reasonably could have determined that the open-ended question about why Torres changed her story was consistent with and in furtherance of the defense strategy.

The second 440 court reasonably could have relied on Vacca's strategic reason, articulated at the post-remittal hearing, for asking the open-ended question about how Torres was able to pick out Mack from the crowd—Vacca said he was attempting to demonstrate that, given the chaotic scene, it was improbable that Torres could discern Mack among the crowd of people surrounding Shaw. Vacca testified that asking the question of "how did Torres pick Mack out" was necessary for his cross-examination to be effective.

While Torres's answer perhaps was not what Vacca expected, it was not unreasonable for the second 440 court to conclude that the question was part of a legitimate strategy to cast doubt on the credibility of Torres and the strength of the prosecution's evidence. The fact that unhelpful testimony was elicited does not mean that Vacca's performance was objectively unreasonable. *See Janosky v. St.*

149

*Amand*, 594 F.3d 39, 48 (1st Cir. 2010) (noting that "counsel's [cross-examination] strategy was not free from risk" but "[w]hen, as in this case, counsel's decision to elicit potentially damaging testimony is part of a plausible trial strategy, that decision does not fall below an objective standard of reasonableness" (citing *United States v. Toms*, 396 F.3d 427, 436 (D.C. Cir. 2005) (holding that defendant was not prejudiced by counsel's eliciting damaging testimony from government witness about key defense witness and by portraying defendant's relatives as involved in drug trafficking, in trial on drug and weapons charges, where government already provided evidence that defendant drove expensive cars, spent money on tapes and videos, and defendant had been found on multiple occasions in cars with drugs, firearms, or large amounts of cash; decision were "tactical" and "did not result in any prejudice"); *Campbell v. United States*, 364 F.3d 727, 734 (6th Cir. 2004) (counsel's performance in eliciting prejudicial testimony from three government witnesses on cross-examination at trial for drug-trafficking conspiracy was not deficient, as required to support claim of ineffective assistance, because questions asked on cross examination were part of legitimate strategy to cast doubt on witnesses' testimony)).

Although Mack contends that Vacca could have made the same points on summation "without the risk of eliciting damaging testimony," Dkt. 2 at 126, "[t]here are . . . 'countless ways to provide effective assistance in any given case.'" *Richter*, 562 U.S. at 106 (quoting *Strickland*, 466 U.S. at 689). "Rare are the situations in which the 'wide latitude counsel must have in making tactical

150

decisions' will be limited to any one technique or approach." *Id.* (quoting *Strickland*, 466 U.S. at 689). Based on Vacca's hearing testimony and the record as a whole, the second 440 court reasonably could have concluded that Vacca was attempting to elicit testimonial evidence based on which he later could craft more persuasive arguments to the jury. The chosen strategy was not without risk, but Mack has not established that all fairminded jurists would agree that the second 440 court's decision was inconsistent with *Strickland*'s teachings regarding the "deficient performance" prong.

Moreover, Mack's argument in support of Point 13 does not address the "prejudice" prong of the *Strickland* test. The elicitation of unfavorable evidence during a defense attorney's cross-examination is not the type of ineffectiveness claim in which courts presume prejudice. *See Strickland*, 466 U.S. at 693 ("Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice."). The inability to demonstrate prejudice is fatal to an ineffectiveness claim. *See id.* at 697. That failure alone demonstrates the reasonableness of the second 440 court's application of *Strickland* in rejecting Point 13. Because the second 440 court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, Mack has not satisfied the limitations on relief in 28 U.S.C. § 2254(d) as to Point 13.

151

N.    Failure to Adequately Address the Distance, Viewing Angle,
and Level of Lightness or Darkness (Point 14)

Mack contends that Vacca erroneously failed to establish that: (1) the viewing distance from Torres's porch was 158 feet, not 150 feet as she had testified on direct examination, *see* TT: 344; (2) Torres's viewing angle could have reduced the accuracy of her identification; (3) sunset occurred at 6:56 p.m. and that "official [sic] twilight had ended before 7:30 p.m." in the City of Rochester on September 29, 2007. Dkt. 2 at 128 (Point 14).

The second 440 court stated that "[t]he timing of sunset and twilight end on September 29, 2007, stipulated at the hearing to have been at 6:56 p.m., and 7:24 p.m. respectively, is certainly a factor that the jury could consider in evaluating Ms. Torres's ability to accurately identify the defendant." SR: 2345. The second 440 court determined that Vacca "dedicated a portion of his cross examination to discrediting the identification in support of his alibi defense." SR: 2345-46. This Court notes that elsewhere in the decision, in connection with the expert witness claim, the second 440 court found that Vacca "directly addressed" the viewing distance, lighting, and viewing angle, among other factors, during his cross-examination of Torres. SR: 2342. Thus, as to the specific allegations concerning the failure to elicit facts concerning the precise viewing distance, the viewing angle, and the degree of darkness or lightness, the second 440 court effectively ruled that Mack did not suffer prejudice because Vacca addressed those factors, albeit in a less detailed manner.

## 2.    Analysis

The second 440 court reasonably applied clearly established Supreme Court precedent regarding *Strickland*'s prejudice prong in rejecting the allegations in Point 14. Mack concedes that Vacca addressed the viewing distance and viewing angle, but he argues that the second 440 court "grossly over-valued what little Mr. Vacca accomplished . . . ." Dkt. 2 at 86. Moreover, Mack has never explained how there was a reasonable probability of a different verdict if Vacca had pointed out the eight-foot discrepancy. Similarly, Mack has never articulated how there would have been a reasonable probability of a different result if Vacca had pursued further questioning about Torres's viewing angle. Since the inability to demonstrate prejudice is fatal to an ineffectiveness claim, *see Strickland*, 466 U.S. at 697, this failure alone demonstrates the reasonableness of the second 440 court's application of *Strickland*.

Mack's arguments concerning the degree of darkness at the time of the attack are belied by the Naval Observatory's website, which provided the data to which the parties stipulated at the second 440 hearing (*i.e.*, sunset occurred at 6:56 p.m. in Rochester, New York, on September 29, 2007).[21] Contrary to Mack's assertion, *see* Dkt. 2 at 6 n.1; *id.* at 130, there is no such thing as "official twilight." Instead, there

---

[21] https://aa.usno.navy.mil/calculated/rstt/year?ID=AA&year=2007&task=0&lat=43.16&lon=-77.61&label=Rochester%2C+NY&tz=5&tz_sign=-1&submit=Get+Data (last accessed Dec. 4, 2025).

are three different types of twilight—civil, nautical, and astronomical.[22]  Civil twilight ended at 7:24 p.m. on September 29, 2007, in Rochester.[23]  During civil twilight, "the brightest of the 3 twilight phases," "[t]he Sun is just below the horizon, so there is generally enough natural light to carry out most outdoor activity."[24]  Nautical twilight, the next phase of twilight, lasted from the end of civil twilight until 7:57 p.m. on September 29, 2007, in Rochester.[25]  The last phase of twilight, astronomical twilight, lasted from the end of nautical twilight until 8:31 p.m. on September 29, 2007, in Rochester.[26]  During all three types of twilight, there is light outside, but the sun is below the horizon to varying degrees.[27]

---

[22] https://www.weather.gov/fsd/twilight (last accessed Dec. 4, 2025).

[23] https://aa.usno.navy.mil/calculated/rstt/year?ID=AA&year=2007&task=2&lat=43.16 &lon=-77.61&label=Rochester%2C+NY&tz=5&tz_sign=-1&submit=Get+Data (last accessed Dec. 4, 2025).

[24] https://www.timeanddate.com/astronomy/civil-twilight.html (last accessed Dec. 4, 2025).

[25] https://aa.usno.navy.mil/calculated/rstt/year?ID=AA&year=2007&task=3&lat=43.16 &lon=-77.61&label=Rochester%2C+NY&tz=5&tz_sign=-1&submit=Get+Data (last accessed Dec. 4, 2025).

[26] https://aa.usno.navy.mil/calculated/rstt/year?ID=AA&year=2007&task=4&lat=43.16 &lon=-77.61&label=Rochester%2C+NY&tz=5&tz_sign=-1&submit=Get+Data (last accessed Dec. 4, 2025).

[27] https://www.timeanddate.com/astronomy/different-types-twilight.html (last accessed Sept. 12, 2025); *see also* https://www.weather.gov/fsd/ twilight (last accessed Dec. 4, 2025).

154

Thus, Mack's own data source contradicts his assertion that it was "dark" at the time of the attack on Shaw, which occurred no later than 7:30 p.m. based on the timing of Torres's 911 call and Officer Hickey's testimony about his receipt of the emergency dispatch and time of arrival at the crime scene. At 7:30 p.m., civil twilight had ended about five minutes earlier, and it was the beginning of nautical twilight. According to the Naval Observatory's website, there would have been some degree of light available at the time of the attack. Furthermore, "[t]here are 3 stages of dusk, each marking the end of 1 of the 3 phases of evening twilight."[28] Therefore, contrary to Mack's assertion, the prosecutor did not make a false representation when she said that it was "dusk" at the time of the attack, *see* TT: 677. The second 440 court reasonably could have found that Vacca could not have performed deficiently by failing to object to a statement that was not factually incorrect, and that Mack could not have been prejudiced thereby.

Because the second 440 court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, Mack has not satisfied the limitations on relief in 28 U.S.C. § 2254(d) as to Point 14.

---

[28] https://www.timeanddate.com/astronomy/dusk.html (last accessed Nov. 24, 2025).

## O.    Failure to Use the 911 Call to Impeach Torres (Point 15)

### 1.    Overview of Claim and Relevant Background

Mack contends that Vacca erroneously failed to impeach Torres with her 911 call. Dkt. 2 at 131-33 (Point 15). According to Mack, the 911 call, *see* SR: 829-31, would have undermined Torres's credibility by showing that she: (1) called 911 after the assailants had dispersed, not before or during the attack as she testified on direct examination; (2) did not tell the 911 operator that any males were involved, which was inconsistent with her trial testimony; and (3) told the 911 operator that Shaw had been stabbed with a glass bottle and a knife, while the trial evidence showed that Shaw had been stabbed only with knives.

Vacca initially could not identify a strategic reason for not using the 911 call during his cross-examination of Torres. H3: 101-02. During cross-examination, Vacca agreed with the prosecutor that Torres's 911 call might serve to agitate the jurors and cause them to pursue an unfavorable line of thinking. H3: 102. Mack contends that Vacca never provided a record-based reason for reaching the conclusion that Torres's 911 call would have been upsetting for the jury to hear.

The second 440 court, under the heading "Ineffective Cross Examination," held as follows:

> Defendant argues that Mr. Vacca was ineffective for not sufficiently exposing other discrepancies, such as the height and weight differences between the eyewitness's original statement in the 911 call and her later identification of the defendant. However, Mr. Vacca cross[-]examined Ms. Torres regarding her belated disclosure and tried to cast the identification as a wrongful identification, consistent with his trial strategy. He challenged whether her identification was mistaken, confronted her with the fact that she did not identify the

156

defendant at the first opportunity, suggested that the identification was borne [sic] out of sympathy for the victim's family, implied that the victim identified the defendant under pressure from her father to "do the right thing", and pointed out inconsistencies in her testimony to discredit her identification of the defendant. While his questioning may not have been perfect and another strategy might have yielded a better result, Mr. Vacca's cross-examination was consistent with, and in furtherance of, the overall trial strategy.

SR: 2343-44.

As discussed above, the Court has found that the second 440 court adjudicated Point 15 on the merits even though it did not discuss Vacca's failure to use the 911 call as impeachment material. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

### 2. Analysis

"Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (ellipsis in original) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)). The second 440 court reasonably could have found that Mack has failed to establish how or why the timing of Torres's 911 call was a significant issue, and therefore Vacca did not act unreasonably in declining to attempt to impeach her on that basis. Furthermore, Mack's assertion that everyone had dispersed by the time Torres called 911 is not accurate. In response to the 911

157

operator asking, "Are the people that attacked her still there," Torres replied, "They're at the corner but her family is in the middle of the street." SR: 830.

Torres's statement to the 911 operator that "[i]t was a whole group of girls" who attacked Shaw was unsurprising given her testimony that, at first, she was reluctant to identify Mack as one of the assailants. Elsewhere, Mack faults Vacca for eliciting testimony from Torres that she was afraid to come forward with information. Had Vacca cross-examined Torres about the discrepancy between how she described the group of attackers and her identification of Mack, it would have allowed her the opportunity to provide that explanation again.

Mack's argument regarding Torres's mistaken assertion that she saw Shaw being stabbed with a bottle and a knife is disingenuous given his concession in state court that "no one really disputed that someone hit the victim with a bottle during the assault." SR: 547. In any event, Mack has not established how, if Vacca had questioned Torres about this discrepancy, it would have changed the outcome of his trial; the type of weapon that caused Shaw's death was not an issue the jury had to decide.

Once again, Mack has failed to demonstrate prejudice stemming from the alleged error; he argues only that further cross-examination using the 911 call would have been "useful to the defense." Dkt. 2 at 132. There is "no Supreme Court precedent establishing a 'nothing to lose' standard for ineffective-assistance-of-counsel claims." *Mirzayance*, 556 U.S. at 122. Because the second 440 court's decision was not "so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, Mack has not satisfied the limitations on relief in 28 U.S.C. § 2254(d) as to Point 15.

P.    Failure to Object Under CPL § 250.20 to Alibi Rebuttal Witness (Point 16)

1.    Overview of Claim and Relevant Background

Mack contends that Vacca unreasonably failed to object to testimony from Investigator Samuel Soprano of the Monroe County District Attorney's Office, who was called by the prosecution to rebut portions of Jessica Smith's testimony that was inconsistent with her earlier testimony. Dkt. 2 at 133-39 (Point 16). According to Mack, if Vacca had raised an objection that the prosecution failed to comply with CPL § 250.20's notice requirements for alibi rebuttal witnesses, there is a reasonable probability the trial court would have granted preclusion of Soprano's testimony.

Vacca testified at the post-remittal hearing on the 440 motion that he never received an alibi rebuttal notice for Soprano, but he could not recall whether he considered moving to preclude Soprano's testimony under CPL § 250.20 and, if so, why he did not do so. H3: 73-74.

The second 440 court found that the failure to object based on CPL § 250.20 did "very little" to advance the argument that Vacca was ineffective. SR: 2344. Characterizing Mack's argument as "speculative," the second 440 court found that any objection by the defense "if not summarily overruled, seems as likely to have resulted in an adjournment as preclusion." SR: 2344 (citing N.Y. Crim. Proc. Law

159

§ 250.20(4)). The second 440 court found that even if an adjournment had been granted, it was "a relatively minor remedy that would not have been advantageous to [Mack] considering his theory of the case." SR: 2344.

Although the second 440 court did not use the language of *Strickland*, it effectively found that Vacca's failure to object was not an objectively unreasonable decision and did not affect the outcome of the trial, *i.e.*, it did not result in prejudice to the defense. Mack bears the burden of showing that the second 440 court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Richter*, 562 U.S. at 103.

### 2.    Analysis

As an initial matter, the Supreme Court has "repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw*, 546 U.S. at 76.  Under CPL § 250.20, the prosecution must serve on the defense, and file with the trial judge, a list of witnesses the prosecution intends to offer to rebut evidence of the defendant's alibi. N.Y. Crim. Proc. Law § 250.20(2). This list must be served within a reasonable time after receiving the defense witness list and, in any event, not later than 10 days before trial. *Id.* However, "[f]or good cause shown," the judge "may extend the period for service of the list of witnesses by the [prosecution]." *Id.* If the prosecution fails to provide the required list, "the judge *has the discretion* either to exclude the testimony of any unnoticed

160

rebuttal witness or *to receive the witness's testimony after granting an adjournment of no longer than three days.*" *Id.* § 250.20(3), (4) (emphasis supplied).

As the second 440 court recognized, "[e]xclusion . . . is not mandatory" where a party fails to serve timely notice under CPL § 250.20. *People v. Cuevas*, 67 A.D.2d 219, 225, 414 N.Y.S.2d 520, 524 (1st Dep't 1979). Moreover, courts in New York State have expressed a preference for attempting to "fashion a lesser sanction [to preclusion]," *People v. Green*, 70 A.D.3d 39, 45 (2d Dep't 2009), as contemplated by subsections (3) and (4) of CPL § 250.20. Given this preference, "trial courts do not abuse their discretion in granting an adjournment after the [prosecution] fail[s] to serve notice as to an alibi rebuttal witness where a 'contradiction goes to a material, core issue in the case—defendant's whereabouts at the time of the crime.'" *People v. Lenihan*, 30 Misc. 3d 289, 295, 911 N.Y.S.2d 588, 593 (Sup. Ct. 2010) (quoting *People v. Cade*, 73 N.Y.2d 904, 905 (1989); citing *People v. Vasquez*, 189 A.D.2d 578, 592 N.Y.S.2d 34 (1st Dep't 1993) (psychiatrist was properly allowed to testify as alibi rebuttal witness, despite prosecution's failure to serve notice of intent to call him, where alibi defense witnesses testified that defendant was near their home fixing an automobile at time of charged crimes; witnesses stressed that they remembered seeing defendant on afternoon in question because they were on their way to make telephone call about appointment that day with that psychiatrist, so any testimony by psychiatrist indicating that no such appointment existed would directly contradict their alibi testimony, and contradiction went to material, core issue in case)).

161

Moreover, the second 440 court reasonably could have found that the prosecutor could not have anticipated that Smith would testify in a manner contrary to some of the statements she made previously to Soprano. SR: 2290. That factor would have weighed strongly in favor of the trial court exercising its discretion to impose a lesser sanction than preclusion. *See Lenihan*, 30 Misc.3d at 295, 911 N.Y.S.2d at 592 (finding that the "defendant's due process rights were not violated by the state's failure to give reciprocal notice of its alibi rebuttal witnesses prior to trial where the prosecutor was not, and could not reasonably have been, aware of the facts that gave rise to the opportunity for rebuttal until after the alibi witnesses had testified"). Thus, even if Vacca had objected and the trial court had sustained the objection, the second 440 court reasonably could have concluded that there was no more than a remote possibility of preclusion given the New York State caselaw on this issue.

The second 440 court also reasonably could have found that Mack's prejudice argument focused on the wrong outcome—whether the objection would have resulted in preclusion of Soprano's testimony. Mack's argument concerning the effect of the failure to object under CPL § 250.20 on the verdict, the only outcome that matters in the prejudice analysis, was conclusory and speculative. *See* Dkt. 2 at 138 (asserting that because the prosecution used Soprano's rebuttal testimony during summation, TT: 731, "preclusion of that alibi rebuttal testimony, standing alone, *could have* changed the result of the trial") (emphasis added). Showing prejudice under *Strickland* requires more than just a "conceivable" effect on the

162

trial's outcome and cannot be based on speculation, conjecture, or surmise. *See Bartholomew*, 516 U.S. at 8 (reversing grant of habeas relief because the "federal appellate court, second-guess[ed] a convict's own trial counsel, [and] grant[ed] habeas relief on the basis of little more than speculation with slight support," thereby disturbing "the proper delicate balance between the federal courts and the States").

Fairminded jurists could agree with the second 440 court that Vacca did not perform in an objectively unreasonable manner by Vacca's failure to raise an objection under CPL § 250.20, and that Mack was not prejudiced, since there was no reasonability probability of a different result even if the objection had been made. Because Mack has not established that "every fairminded jurist would agree that every reasonable lawyer would have made a different decision," *Dunn*, 594 U.S. at 739-40 (quotation marks and citation omitted), he cannot satisfy AEDPA as to Point 16.

### Q. Deficient Summation Argument Regarding the Accuracy and Reliability of Torres's Identification (Point 17)

#### 1. Overview of Claim and Relevant Background

Mack contends that Vacca's "primary flaw during summation was his failure to use the science of perception and memory" to give the jurors "numerous reasons" to doubt the accuracy and reliability of Torres's identification. Dkt. 2 at 138-39 (Point 17). According to Mack, if Vacca had consulted with an expert witness or read some scientific studies, he would have had an "arsenal" with which to attack Torres's identification. The second 440 court rejected this claim, finding that

163

Vacca's summation incorporated some of Dr. Brainerd's recommendations and was consistent with the defense strategy of discrediting Torres's identification testimony.  SR: 2345.

### 2.    Analysis

While "[t]he right to effective assistance extends to closing arguments," "deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (per curiam) ("*Gentry*").  "Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,'" *id.* at 6 (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)), "but which issues to sharpen and how best to clarify them are questions with many reasonable answers." *Id.*  "Judicial review of a defense attorney's summation is therefore highly deferential—and doubly deferential when it is conducted through the lens of federal habeas." *Id.*  Even if counsel omits some arguments that "would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them," because "[f]ocusing on a small number of key points may be more persuasive than a shotgun approach." *Id.* at 7.

The Sixth Amendment "guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Gentry*, 540 U.S. at 8, *see also id.* at 6-7 (holding that intermediate state appellate court's determination that trial counsel had not performed deficiently by failing to highlight all potentially exculpatory pieces of evidence in his closing argument, highlighting the petitioner's

164

bad character traits while arguing that these traits were irrelevant to issues, and by making only passive request that jurors reach a verdict rather than demanding that they acquit, was not objectively unreasonable application of federal law).

The second 440 court reasonably determined the facts in light of the evidence presented below, 28 U.S.C. § 2254(d)(2), and Mack has not overcome the presumption of correctness accorded to these factual determinations, *id.* § 2254(e)(1), when it found that Vacca's summation focused on the key issue of undermining Torres's identification. To that end, Vacca presented the jury with specific reasons to reject Torres's testimony. Vacca suggested that Torres was an interested witness because she was closer to Shaw and her family than she was willing to admit, TT: 709-10; and that Torres's estimates of Petitioner's height, weight, and age were inaccurate and inconsistent with each other, TT: 710. Vacca argued the improbability of Torres being "able to isolate and identify [his] client, Terrance Mack, with a hat pulled down over his eyes, as an individual who hits Latasha Shaw over the head with a bottle" while "it is dark outside," and Torres is viewing the incident "from one hundred fifty feet away, which is half a football field, . . . possibly three times the length of this room." TT: 711.

Vacca addressed the "distance" factor in another manner by urging the jury to compare Torres's testimony with that offered by Jasmine Shaw, who was about ten to fifteen feet away from the incident, with "a clearer and less obstructed view" than Torres had. TT: 713. Vacca noted that even from that "very close" distance, Jasmine could not see anyone's faces "[b]ecause of the distance, and because it was

165

too dark outside." TT: 712-13. Vacca further contended that what Torres saw "did not happen, because the proof is that there was no broken bottle, there was no broken glass" found either by the police officers and technicians at the crime scene or by the medical examiner during the autopsy. TT: 711.

Fair-minded jurists could agree with the second 440 court that Vacca satisfied the reasonableness standard set forth in *Strickland*. Because Mack has not established that "every fairminded jurist would agree that every reasonable lawyer would have made a different decision," *Dunn*, 594 U.S. at 739-40 (quotation marks and citation omitted), he cannot satisfy AEDPA's limitations on relief as to Point 17.

### R.    Erroneous Summation Focus on Theory of Female Attackers Who Arrived in a Van (Point 18)

#### 1.    Overview of Claim and Relevant Background

Mack asserts that Vacca erred during summation because he "needlessly required" the jurors to adopt his theory that Shaw's attackers were exclusively female and arrived on the scene in a van instead of coming from the porch at 310 Driving Park. Dkt. 2 at 138-41 (Point 18). According to Mack, Vacca should have argued in the alternative that if the jury found that some of Shaw's assailants were males, then Mack was not one of them. *See id.*

The references to the female attackers who arrived at the scene in a van occurred while Vacca was summarizing the testimony of the defense witnesses and arguing why they were credible and how their stories harmonized with the other

testimony and evidence in the case. TT: 723-25. For instance, Vacca noted that Kionna Speed said:

> she saw a vehicle pull in the driveway next to 310 [Driving Park]. I am pointing to it on the map there. (Indicating.) That about six to eight women got out, started swearing and started going toward Ms. Shaw in the middle of the street. That kind of would make sense because Torres says she sees some people coming from that direction, and she assumes it is the porch of 310, but she can't see 310 because she's in the second house in, the red house in, on Dewey Avenue, and 310 is around the corner. She sees these women all come and go toward Latasha Shaw. Now, here is the thing that makes that credible. Torres claims she lived in the neighborhood. She claims that she did not know or was unable to identify any people that attacked Latasha Shaw except for Terrance Mack. That's what she said. However, if she lived in the neighborhood, she would know the people who were on the porch at 310 because they were all relatives that visited there, people who stayed there; and the people who committed the attack, she did not recognize. It would make sense that it was some different people that came into the neighborhood. That makes sense.

TT: 723-24. At no point did Vacca "require" the jury to adopt a theory that only women were involved in the attack on Shaw.

### 2.    Analysis

The Supreme Court has held that "deference" to a defense attorney's "tactical decisions" during summation "is particularly important because of the broad range of legitimate defense strategy at that stage." *Gentry*, 540 U.S. at 5-6. The second 440 court reasonably determined that Vacca's argument (all female attackers who arrived in a van) was consistent with and in furtherance of the chosen defense strategy. Notably, the argument harmonized with both the testimony of defense witnesses Kionna Speed and Carolyn McHenry and with Shaw's 911 call and the testimony of Shaw's daughter, Jasmine.

During her conversation with 911, Shaw told the operator about how a "whole bunch of grown women" jumped her daughter; moments later, she said that "they standin' out with sticks and knives and everything" near the intersection of Dewey Avenue and Driving Park Boulevard. SR: 142-43. Shaw did not mention the presence of any men in the area. Speed, McHenry, and Jasmine testified that Shaw was attacked by a crowd of women; Speed and McHenry also testified that these women emerged from a van or a truck. TT: 210-11 (Shaw); TT: 551-52, 554 (Speed); TT: 623-24 (McHenry).

As Respondent argues, focusing on the characterization of Shaw's assailants as females strengthened the argument that Mack, a male, could not have been one of them. Dkt. 16-1 at 65. In addition, it was not objectively unreasonable to argue that the attackers had arrived in a vehicle instead of coming from the porch of Bessie Mack's house at 310 Driving Park, where some of the defense witnesses were located. The argument was consistent with the testimony offered by defense witnesses Speed and McHenry. In addition, it insulated Mack from liability as there was no testimony or evidence connecting him to a van or other vehicle. Moreover, it protected the defense witnesses (Speed, McHenry, and Shatora Hampton), by shifting responsibility away from people with a connection to Mack or his aunt's house at 310 Driving Park. Finally, the argument that even if some attackers were males, Mack was not one of the attackers, was implicit in Mack's presentation of an alibi defense. Given that the argument was consistent with multiple witnesses' testimony and with Mack's alibi defense, the second 440 court

168

reasonably could have found that Mack did not meet his burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689. Because fair-minded jurists could agree with the second 440 court that Vacca satisfied the reasonableness standard set forth in *Strickland*, Mack has not met the requirements in 28 U.S.C. § 2254(d) as to Point 18.

### S.    Failure to Elicit Testimony Regarding Mack's Age, Height, and Weight (Point 19)

#### 1.    Overview of Claim and Relevant Background

According to Mack, Vacca was ineffective for failing to elicit "significant differences" between his physical appearance and Torres's description of the person she identified. Dkt. 2 at 141 (Point 19). On the 911 call, Torres described Mack as about 20 to 25 years old; between 5'5" to 5'6" in height; and having an average build. TT: 376. Three weeks later, when Torres spoke to the police, she described him as about 5'8" in height, about 20 to 25 years old, and having an average build. TT: 377-78.

At the post-remittal hearing on the 440 motion, Vacca acknowledged that, according to Mack's prisoner data report, he was 5'10" in height; 29 years old and weighed 200 pounds. H3: 72. Vacca could not recall why he did not question Mack about his height, age, and weight. H3: 72-73. On cross-examination, he agreed with the prosecutor's suggestion that highlighting those differences would have detracted from the alibi defense. H3: 123-24. Vacca agreed with the prosecutor

169

that he made a "tactical decision" "not to address the difference of a perceived six inches [in Mack's height] from 150 feet away." H3: 123-24.

### 2    Analysis

Though the state court did not provide reasons for its rejection of the allegations in Point 19, the record reveals arguments supporting the decision that are wholly consistent with *Strickland*'s standard. *See Richter*, 562 U.S. at 102. The second 440 court reasonably could have found that any alleged discrepancy between Torres's description and Mack's actual height, weight, and age was minor; Torres accurately estimated Mack to be in his twenties, less than six-feet-tall, with an average build. According to the Centers for Disease Control's National Center for Health Statistics, the measured average height and weight for male adults ages 20 and older is 68.9 inches and 199.00 pounds.[29]  Further, the jurors had ample opportunity to see Mack for themselves in the courtroom—seated at the defense table, standing up, and walking back and forth from the witness chair. They were well equipped to compare Torres's description with Mack's actual physical characteristics. The second 440 court thus reasonably could have determined that Mack failed to overcome the presumption of reasonable competence that applies to Vacca's performance or to show that there was a reasonable probability of a different verdict but for Vacca's failure to question Mack about his age, height, and weight.

---

[29] *See* https://www.cdc.gov/nchs/fastats/body-measurements.htm (last accessed Dec. 4, 2025).

Because Mack has not established that "every fairminded jurist would agree that every reasonable lawyer would have made a different decision," *Dunn*, 594 U.S. at 739-40 (quotation marks and citation omitted), he cannot satisfy AEDPA's limitations on relief as to Point 19.

T.    **Failure to Impeach Donald with Facts Underlying Youthful Offender Adjudication (Point 20)**

1.    **Overview of Claim and Relevant Background**

Mack asserts that Vacca was ineffective for failing to impeach Donald, the jailhouse informant, by using the underlying facts of a third-degree robbery conviction for which Donald received a youthful offender ("YO") adjudication and five years of probation. Dkt. 2 at 142-43 (Point 20) (referring to TT: 366-67). Prior to Donald's testimony, the prosecutor noted on the record that she had provided Vacca a copy of Donald's NYSIIS report, which showed that he had a previous conviction for third-degree robbery. TT: 423. The prosecutor confirmed that a Monroe County Court judge had issued an order granting YO status as to that conviction. TT: 423. Vacca commented that the third-degree robbery conviction was "obviously vacated because it is [YO]." TT: 423. Vacca sought permission to question Donald regarding a bench warrant that was issued after he pleaded guilty to the third-degree robbery charge. TT: 423-24. The trial court granted Vacca's request to inquire if Donald failed to appear in court on a particular occasion. TT: 424. Vacca also cross-examined Donald concerning the then-recent first-degree robbery conviction for which he was incarcerated. TT: 432-35.

171

At the post-remittal hearing on the 440 motion, Vacca was asked whether it would have been permissible to ask a witness about the facts underlying a YO. Vacca responded that such a question might be met with an objection; in that situation, "you always dip your toe in to see how far you can get." H3: 70. Vacca did not recall whether he asked any questions about Donald's YO adjudication at Mack's trial.

The second 440 court characterized Mack's claim as asserting that "Vacca was ineffective for failing to cross examine Ronaldo Donald, the jailhouse informant, about a misdemeanor youthful offender adjudication *and subsequent felony conviction for a knifepoint robbery*." SR: 2346. The second 440 court went on to hold that

> [t]his cross examination would have been minimally probative and unlikely to discredit the informant. Mr. Vacca could properly have considered that the jury was aware that Mr. Donald was in jail because of prior criminal conduct when he purportedly heard the jailhouse confession of the defendant. There are also strategic reasons that Mr. Vacca could have chosen not to cross examine Mr. Donald on his previous convictions. Mr. Vacca could justifiably have not wanted to give Mr. Donald an opportunity to deny or explain his prior criminal conduct. Instead, Mr. Vacca made a strategic decision to ask other questions meant to discredit Ronaldo Donald's testimony.

SR: 2346. However, the second 440 court's ruling reflects a misstatement of the petition and the trial record. Mack did not and does not claim that Vacca was ineffective for failing to cross-examine Donald about his then-recent felony conviction for robbery at knifepoint. *See* Dkt. 2 at 142 (stating that the second 440 court "wrongly described" Mack's argument as asserting that Vacca "conducted no cross-examination about Donald's prior record"). The transcript indicates that

172

Vacca began his cross-examination with questions about that topic. *See* TT: 432-35. Mack also asserts that the second 440 court "wrongly described" Donald's YO adjudication "as arising from a misdemeanor" since "robbery in the third degree is a felony." Dkt. 2 at 142.

### 2.    Analysis

The second 440 court's erroneous characterization of the allegations in Point 20 and Vacca's actual cross-examination of Donald as reflected in the trial transcript raises the question of whether Mack might be able to satisfy the requirements of 28 U.S.C. § 2254(d)(2) and (e)(1). *See Collier*, 485 F.3d at 422-23.

"[B]asic, primary, or historical facts" in the state court record are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1)." *Id.* at 423 (quoting *Lupien*, 403 F.3d at 620 (citing *Thompson*, 516 U.S. at 110-11). In *Collier*, the respondent had conceded the state appellate court's factual errors, so the circuit court assumed that the presumption of correctness in § 2254(e)(1) had been rebutted. *Id.* Here, however, Respondent has not acknowledged the factual error pointed out by Mack. *See* Dkt. 16-1 at 60.

Even if Mack had cleared the hurdle in § 2254(e)(1), "it does not necessarily follow that the state court adjudication was based on an unreasonable determination of facts because subsection (d)(2) instructs federal courts to evaluate the reasonableness of the state court decision 'in light of the evidence presented in the State court proceeding.'" *Collier*, 485 F.3d at 423 (quoting 28 U.S.C. § 2254(d)(2)). "Rather, in order to receive relief under this clause, the petitioner

173

must show that the state court's adjudication of the claim 'resulted in a decision that *was based* on an unreasonable determination of the facts in light of the evidence presented.'" *Byrd*, 645 F.3d at 1172 (emphasis in original) (quoting 28 U.S.C. § 2254(d)(2)). In other words, the petitioner cannot satisfy § 2254(d)(2) unless he can "cannot show that the 'decision'—*i.e.*, the overall *Strickland* determination of the court—was 'based on'—*i.e.*, 'rests upon,'" *id.* (quoting *Ward*, 334 F.3d at 704), "an unreasonable determination of the facts," *id.*

Here, "the evidence in the state court record is more than sufficient to support," *Collier*, 485 F.3d at 423, the second 440 court's determination that Vacca decision not to cross-examine Donald about the facts underlying his YO adjudication was not objectively unreasonable performance. First and foremost, the record shows that Vacca cross-examined Donald aggressively, questioning him at length about his then-recent felony conviction for armed robbery as well as his stated desire for a VFO in exchange for his testimony against Mack. TT: 434-35, 437-38. Vacca also elicited testimony showing that Donald had a potential bias in favor of the prosecution, since he knew Shaw's family and was friends with Shaw's brother. TT: 441-42.

"Although it is impermissible to use a youthful offender or juvenile delinquency adjudication for impeachment purposes because those adjudications are not convictions of a crime," *People v. Lucius*, 289 A.D.2d 963, 963, 737 N.Y.S.2d 717, 719 (4th Dep't 2001) (citing *People v. Gray*, 84 N.Y.2d 709, 712 (1995)), a witness may be cross-examined concerning "the illegal or immoral acts underlying

174

such adjudications." *People v. Greer*, 42 N.Y.2d 170, 176 (1974). The witness may, however, "refuse to answer questions about the charges and police investigation, whether he or she pleaded guilty, and whether a [YO] adjudication was made." *Castiglione v. James F.Q.*, 115 A.D.3d 696, 697, 981 N.Y.S.2d 801, 803 (2d Dep't 2014). "The extent to which a party may use the 'illegal or immoral acts underlying such adjudications' to impeach the credibility of a witness is a matter that is generally left to the discretion of the court." *People v. Lemery*, 107 A.D.3d 1593, 1594, 967 N.Y.S.2d 809, 811 (4th Dep't 2013) (some internal quotation marks omitted) (citing *Gray*, 84 N.Y.2d at 712) (holding that the court "properly exercised its discretion in precluding cross-examination with respect to the prior bad acts underlying the victim's juvenile adjudication inasmuch as they did not reflect on her credibility"). Thus, contrary to Mack's suggestion, permission to cross-examine Donald about the facts underlying the earlier robbery would not have been automatically given.

Furthermore, Mack has not attempted to demonstrate how Vacca's omission resulted in prejudice. He asserts only that "[t]he slight chance that Donald might try to deny or explain away his criminal conduct would still tend to reduce his credibility in the eyes of the jurors." Dkt. 2 at 143. Mack's prejudice argument does not apply the correct standard—whether there was a reasonable probability of a different result. Further, it does not focus on the correct outcome—the verdict—and instead surmises that the facts underlying the YO adjudication would have "tend[ed] to reduce" Donald's credibility. Mack does not point to any factual basis to

support that speculative assertion. Indeed, the transcript and the state court records do not contain any information about the facts underlying the robbery conviction for which Donald received the YO adjudication, including when the robbery occurred. There is "no Supreme Court precedent establishing a 'nothing to lose' standard for ineffective-assistance-of-counsel claims." *Mirzayance*, 556 U.S. at 122.

Because Mack has not established that "every fairminded jurist would agree that every reasonable lawyer would have made a different decision," *Dunn*, 594 U.S. at 739-40 (quotation marks and citation omitted), he cannot satisfy AEDPA's limitations on relief as to Point 20.

### U. Failure to Object to the Prosecution's Summation (Point 21)

#### 1. Overview of Claim and Relevant Background

Mack asserts that Vacca was ineffective for failing to object to the prosecutor's erroneous statement that all the defense witnesses were Mack's "blood relatives." Dkt. 2 at 143-44 (Point 21) (referring to TT: 729). While four of the defense witnesses were Mack's relatives, Shatora Hampton testified that she was not related to Mack; she testified that she knew him through her brother, who had a baby with Mack's cousin. TT: 637, 641-42.

At the post-remittal hearing on the 440 motion, Vacca testified that his recollection was that "virtually everybody" whose name he was given was some type of relative, either a cousin or aunt or uncle. H3: 79. Asked to assume that Shatora Hampton was not a blood relative and to give a reason for not objecting to the prosecutor's statement that all the alibi witnesses were blood relatives, Vacca

176

replied that it was "not relevant because [he] thought they were blood relatives."

H3: 79.

### 2.   Analysis

As the second 440 court did not discuss the allegation in Point 21, this Court must determine what arguments or theories could have supported the second 440 court's decision and then must ask "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Richter*, 562 U.S. at 101-02.   Reviewing courts typically do not second-guess "decisions such as when to object and on what grounds" because they "are primarily matters of 'trial strategy and tactics,'" *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (quoting *Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir.1997) (internal quotation marks omitted in original)).   Sometimes defense attorneys will refrain from objecting to an arguably improper or inaccurate comment to avoid highlighting it.   *See, e.g., Gatto v. Hoke*, 809 F. Supp. 1030, 1039 (E.D.N.Y.) ("[C]ounsel's failure to object to the prosecutor's summation represents his tactical decision to avoid underscoring the prosecutor's statements so as to draw the jury's attention to them." (citing United States v. Grunberger, 431 F.2d 1062, 1068–69 (2d Cir. 1970)), *aff'd*, 986 F.2d 500 (2d Cir. 1992).   However, based on his hearing testimony, Vacca apparently did not think that the prosecutor was incorrect about the alibi witnesses all being blood relatives.

Even assuming Vacca did not have a strategic reason for not objecting to the comment on the ground that it misstated the evidence, Mack has never attempted

177

to demonstrate that there is a reasonable probability the result of the proceedings would have been different if Vacca had objected. Instead, he has speculated that "Vacca's silence *may have led* jurors to believe mistakenly that the prosecutor's erroneous claim about every defense witness being a blood relative of Mr. Mack was correct." Dkt. 2 at 144. Even if the jurors had concluded that all the defense witnesses were Mack's relatives, it does not necessarily follow that it affected their deliberation such that there was a reasonable probability of a different verdict but for the erroneous belief. Once again, Mack's prejudice argument does not apply the correct standard or focus on the correct outcome. The second 440 court reasonably could have determined that Mack failed to make a concrete showing of how the verdict would have been different if Vacca had objected and that he therefore was not prejudiced.

The second 440 court also reasonably could have determined that any potential prejudice was alleviated by the trial court's instructions, which alerted the jurors not to accept the attorneys' arguments as evidence. Prior to summations, the trial court instructed the jurors that they alone were "the sole and exclusive judges of the facts in this case." TT: 706. The trial court further informed them that "nothing that [c]ounsel may say in their summations is evidence in this case." TT: 706.

It is a "well-settled proposition that jurors are presumed to follow instructions," *United States v. Stewart*, 433 F.3d 273, 307 (2d Cir. 2006), as reflected in numerous Supreme Court decisions. *See, e.g., Zafiro v. United States*, 506 U.S.

534, 540-41 (1993) ("'[J]uries are presumed to follow their instructions.'" (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *Spencer v. Texas*, 385 U.S. 554, 562 (1967) ("[T]he jury is expected to follow instructions in limiting . . . evidence to its proper function."). Because Mack failed to offer any grounds for disregarding the presumption that the jurors understood and abided by the trial court's instructions, the second 440 court reasonably could have determined that the jurors understood they were the sole factfinders and that counsels' statements were not evidence.

"When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. The record reveals multiple reasonable arguments that Vacca satisfied *Strickland*, and therefore Mack cannot show that "every fairminded jurist would agree that every reasonable lawyer would have made a different decision," *Dunn*, 594 U.S. at 739-40 (quotation marks and citation omitted). Point 21 does not provide a basis for habeas relief.

## V.    Failure to Subpoena Cell Phone Records (Point 22)

### 1.    Overview of Claim and Relevant Background

Mack faults Vacca for failing to subpoena his cell phone records or those of the alibi witnesses who testified at trial. Dkt. 2 at 144-46 (Point 22). When asked if he ever obtained any telephone records for any of the defense witnesses, Vacca replied that he did not because he talked to them in person and took notes. H3: 74-75.

179

The second 440 court rejected the contention that Vacca was "ineffective for failing to subpoena and obtain the defendant's cell phone records." SR: 2347. The second 440 court explained that this "argument was belied [sic] by the record which reveals that [Mack] was using multiple cell phones at the time of Ms. Shaw's killing and he was unsure which cell phone he was using at the time." SR: 2346 (referring to TT: 665-66 (Mack); *see also* TT: 698 (Soprano)). Therefore, it "would have been impossible" for Vacca "to subpoena the cell phone records for a phone that he could not identify." SR: 2346-47. In addition, the claim "improperly assumes that the cell phone records would support his alibi defense," and therefore it failed as "speculative." SR: 2347. The second 440 court noted that "[i]f the cell phone records showed that [Mack]'s cell phone was present in the area of Dewey and Driving Park, it would have been devastating to his alibi defense." SR: 2347.

### 2.    Analysis

The second 440 court did not mention, in its discussion of Point 22, the allegation regarding Vacca's failure to obtain the defense witnesses' phone records. However, Mack has not argued that the second 440 court failed to adjudicate this claim. As discussed above, the Court has found that there was an adjudication on the merits such that the limitations on relief in 28 U.S.C. § 2254(d) are applicable. As to the allegations regarding Mack's cell phone records, the Court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). As to the unexplained rejection of the allegations regarding the defense witnesses' phone records, the

180

Court "must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Richter*, 562 U.S. at 102.

The reasons provided by the second 440 court regarding Mack's cell phone records apply with equal force to his allegations concerning the defense witnesses' cell phone records. Mack's inability to supply any information regarding the contents of his own cell phone records or those of the defense witnesses prevents him from overcoming the presumption that Vacca's conduct was professionally reasonable. *See, e.g.*, *Jackson v. Senkowski*, No. 03 CV 1965 (JG), 2007 WL 2275848, at *15 (E.D.N.Y. Aug. 7, 2007) (finding that "[w]ithout any attempt at a demonstration that the telephone records in question were material," there was no basis to "conclude counsel's failure to obtain them was deficient performance, because [the petitioner] does not rebut the 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (quoting *Strickland*, 466 U.S. at 689)).

And it is well settled that speculation alone is not sufficient to demonstrate prejudice. *See Bartholomew*, 516 U.S. at 8 (reversing grant of habeas relief because the "federal appellate court, second-guess[ed] a convict's own trial counsel, [and] grant[ed] habeas relief on the basis of little more than speculation with slight support," thereby disturbing "the proper delicate balance between the federal courts and the States"). Courts have rejected, as speculative, similar claims where the

181

petitioner fails to present any evidence as to what the cell phone records, or the related cell site location data, would have shown. *See, e.g., Williams v. Anglea*, No. 2:19-cv-10867 PSG (SHK), 2021 WL 2965440, at *4 (C.D. Cal. May 18, 2021) ("Although Petitioner speculates that the records would show that he (or at least his phone) was not in the area when the arson occurred, speculation alone is not sufficient to demonstrate prejudice."), *report and recommendation adopted*, No. 2:19-cv-10867 PSG (SHK), 2021 WL 2953141 (C.D. Cal. July 9, 2021).

Mack asserts that Vacca took a "head-in-the-sand approach to litigation" that amounts to "constitutionally deficient performance," and requests that this Court "assume prejudice." Dkt. 2 at 146. In a garden-variety *Strickland* claim such as this, where Mack has not suffered an "[a]ctual or constructive denial of the assistance of counsel altogether," 466 U.S. at 692, no presumption of prejudice is available. *See, e.g., Smith v. Robbins*, 528 U.S. 259, 286-87 (2000) (reiterating that there are only three categories of cases in which a defendant is entitled to a presumption of prejudice rather than having to affirmatively prove it—when "there has been a complete denial of counsel," there has been "'various kinds of state interference with counsel's assistance,'" and "'counsel is burdened by an actual conflict of interest'" (quoting *Strickland*, 466 U.S. at 692)); *see also, e.g., Brown v. Dir.*, No. 3:19-CV-2301-L-BN, 2022 WL 18231891, at *63 (N.D. Tex. Aug. 10, 2022) ("The presumption of prejudice . . . does not apply where the petitioner complains of merely shoddy or poor performance by his trial counsel; for a defendant to be entitled to such a presumption, his attorney's failure must be complete." (citing *Bell*

*v. Cone*, 535 U.S. 685, 697 (2002)), *report and recommendation adopted sub nom.* *Brown v. Lumpkin*, No. 3:19-CV-2301-L-BN, 2023 WL 158911 (N.D. Tex. Jan. 11, 2023).

Given that Mack has not established that there is no reasonable argument that Vacca performed according to prevailing professional norms by not obtaining Mack's or the defense witnesses' cell phone records or that he was prejudiced as a result of Vacca's failure to do so, he has not shown that the second 440 court unreasonably applied *Strickland.* Fairminded jurists could disagree on the correctness of the second 440 court's rejection of Point 22, and therefore Mack cannot satisfy Section 2254(d).

### W. Failure to Elicit Evidence Regarding Mack's Arrest and Report of Alibi (Point 23)

#### 1. Overview of Claim and Relevant Background

Mack contends that Vacca erroneously failed to elicit testimony from him regarding the date he was arrested and the fact that he immediately reported his alibi defense to the police. Dkt. 2 at 146-48 (Point 23). At the post-remittal hearing on the 440 motion, Vacca incorrectly recalled that Mack testified as to both his date of arrest and the fact that he immediately said he was in Elmira. H3: 49-50. When asked whether Mack's prompt assertion of an alibi would be "relevant information for the jury to consider on whether the alibi defense was sound," H3: 50, Vacca responded affirmatively. H3: 50.

On cross-examination, however, Vacca agreed with the prosecutor that "advertising and really hitting home the 14-month delay [between the incident and

183

Mack's arrest] could've been adversarial [sic]" to Mack's alibi defense because "the jury could worry that these individuals who were testifying" as alibi witnesses "had 14 months to potentially tailor their testimony." H3: 110-11.

The second 440 court rejected the contention that Vacca "should have elicited testimony regarding the circumstances of defendant's arrest and the timing of his reported alibi," explaining that "[a] significant portion of this would not have been admissible and to the extent that it was admissible, Defendant has failed demonstrate that this failure was prejudicial to his alibi defense." SR: 2347.

### 2.   Analysis

In assessing whether prejudice resulted from Vacca's failure to elicit testimony regarding the timing of his arrest and his report of an alibi to the police, the second 440 court interpreted New York State evidentiary law. As the Supreme Court has "repeatedly held," "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw*, 546 U.S. at 76.

Respondent argues that the second 440 court properly found that Mack was not prejudiced because any testimony that Mack gave an exculpatory statement to the police upon his arrest would constitute hearsay for which there is no exception. Dkt. 16-1 at 61-62 (citing *People v. Wilson*, 123 A.D.3d 747, 748, 997 N.Y.S.2d 725 (2d Dep't 2014) (finding that "the defendant failed to demonstrate that the self-serving hearsay statements [to the police upon his arrest] were admissible under any exception to the hearsay rule"); *People v. Mitchell*, 183 A.D.2d 503, 503, 583

N.Y.S.2d 432, 433 (1st Dep't 1992) ("Defendant's self-serving exculpatory statements made outside of the courtroom are inadmissible hearsay.")).

Mack counters that the evidence would have been admissible to rebut the prosecution's claim that his alibi was a recent fabrication. Dkt. 2 at 147. Generally, a witness's testimony may not be corroborated or strengthened by evidence of his or her prior consistent statements made before trial. *People v. McClean*, 69 N.Y.2d 426, 428 (1987) (collecting cases). An exception to this general rule allows prior consistent statements to be admitted if, upon cross-examination, the witness's testimony is assailed as a recent fabrication, and the motive to fabricate predates the making of the prior consistent statements. *Id.*

Mack has not established that his circumstances fall within the "recent fabrication" exception. First, as Respondent points out, Mack fails to identify any place in the record where the prosecution claimed that his alibi was a recent fabrication. Dkt. 16-1 at 61-62. The New York Court of Appeals has held that "[a]n impeached witness cannot be rehabilitated by his antecedent consistent statements *unless* the cross-examiner has created the inference of, or directly characterized the testimony as, a recent fabrication." *McClean*, 69 N.Y.2d at 428 (emphasis added).

Second, Mack's motive to fabricate did not predate the making of the prior consistent statements—Mack always had an interest in avoiding criminal liability for the attack on Shaw. *See, e.g., People v. Perez*, 193 A.D.2d 630, 630, 597 N.Y.S.2d 445, 446 (2d Dep't 1993) (holding that the exception to the general rule against admission of prior consistent statements did "not apply, because the codefendant's

motive to favor his friend was the same when he made his prior consistent statement as it was at trial" (citing *People v. White*, 57 A.D.2d 669, 669, 393 N.Y.S.2d 615, 616 (3d Dep't 1977) (holding that the judge properly refused to admit the prior consistent statement of the defendant's alibi witness, a friend and close relative of the defendant; the exception to the general rule did not apply because the witness's "motive to favor her uncle[, the defendant,] was the same when she made her prior written statement as it was at trial")).

While the second 440 court said that a "significant portion" of the evidence would have been inadmissible, it is unclear which portion, if any, could have been admitted or how it would have been introduced. The prosecution withdrew its CPL § 710.30 notice regarding Mack's oral, post-arrest statements, SR: 12-14, and declined to call, during its direct case, the three investigators who traveled to Elmira to arrest him. Dkt. 2 at 148 (citation to record omitted). Mack has never argued that Vacca should have called the arresting officers as defense witnesses.

Given the state of the case law and the record before it, the second 440 court reasonably determined that there was not a reasonable probability of a more favorable verdict had Vacca sought to introduce the testimony in question. Moreover, it is well settled that an attorney is not ineffective for declining to make an argument that lacks merit. *See United States v. Regalado*, 518 F.3d 143, 150 n.3 (2d Cir. 2008) (rejecting ineffectiveness claim because "'[f]ailure to make a meritless argument does not amount to ineffective assistance.'" (alteration in original)

(quoting *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999)). Point 23 does not warrant habeas relief.

But even assuming that, as the second 440 court suggested, at least some testimony regarding Mack's date of arrest and prompt report of his alibi could have been admitted under an exception to the rule against hearsay, Mack has not established how he was prejudiced. Mack argues only that establishing his "date of arrest—more than 13 months after the crime—could have given jurors a proper context to evaluate the police investigation and would help explain any memory lapses by defense witnesses." Dkt. 2 at 148. Accepting Mack's logic, the delay between the crime and the arrest also could have been used to help explain any memory lapses by the prosecution's witnesses, which would not have been beneficial to his defense. Mack fails to articulate why there would have been a reasonable probability that the outcome of the trial would have been different and thus ignores the focus of *Strickland*'s prejudice inquiry.

Because fairminded jurists could agree that the second 440 court's rejection of the allegations in Point 23 was consistent with *Strickland*, Mack has not satisfied AEDPA's limitations on relief. Point 23 does not warrant habeas relief.

### X. Failure to Object to Trial Court's Taking of Verdict Without Responding to Jury Notes (Point 24)

#### 1. Overview of Claim and Relevant Background

Mack asserts that Vacca erroneously failed to object to the trial court taking the verdict without addressing the jury's note, sent during the dinner recess, requesting "instructions regarding the importance of a single witness in a case

versus multiple witnesses and [to have] the meaning of reasonable doubt read back to us." Dkt. 2 at 38 (citation to record omitted); *see also id.* at 149-60 (Point 24).

At the remittal hearing on the 440 motion, Vacca was asked why he declined to object to the taking of the verdict without the trial court responding to the outstanding jury notes. Vacca testified that:

> A. Because this is a mode of proceeding [error], okay? And you know that. It's a mode of – it went up to the Appellate Division, it went to the second – it went to the Court of Appeals. If I had objected, okay, I wouldn't have preserved the issue for appeal for my client. If I didn't object, I had preserved the issue for appeal. In fact, that's what Judge Fahey says. Judge Fahey says, the defense attorney did the smartest move possible.
>
> . . .
>
> Q. Did you make the conscious decision that you didn't want the Court to respond to these jury notes?
> A. Correct.
> Q. And what did you base that decision on?
> A. I just based that decision because if I objected to the note, it wouldn't give me an issue for appeal, which it ultimately gave me an issue for appeal, and we're partially here today because of that.

H3: 84-85. Under questioning by the prosecutor, Vacca confirmed it "was a tactical decision not to address the note" because he "had an appealable issue." H3: 126. Vacca agreed with the prosecutor that it was the trial court's job to address the outstanding jury notes, not his job. H3: 126. In Vacca's professional judgment, the "prudent" and "more beneficial" course was "to preserve the appellate issue" by not addressing the jury notes. H3: 127-28.

The second 440 court rejected the claim that Vacca was ineffective for failing to object:

As the Court of Appeals held, "the defense may have made a strategic decision not to challenge the trial court's procedure. Counsel, who was aware the jury's last note before the recess declared a deadlock, may have decided that jurors were more likely to acquit defendant if they were not given the chance to deliberate further. In such situations, if the alleged error is deemed to be a mode of proceedings error, 'it would be unwise for counsel to object and seek correction of the error'" (*People v Mack*, 27 NY3d 534, 543-544 [2016]). As the Court of Appeals points out, defense counsel had reasonable grounds to not try to further deliberations and, to the extent that counsel was aware of the recent case law at the time, it might be considered unwise to object to clear up the record. Thus, the defendant's claim of ineffective assistance of counsel on this ground must fail.

SR: 2347 (citations and brackets as in original).

### 2.    Analysis

In evaluating whether Vacca's failure to object to the taking of the verdict without responding to the outstanding jury request for a readback of certain jury instructions, the second 440 court relied on the New York Court of Appeals' decision interpreting New York State law and reversing the Fourth Department's original judgment on direct appeal. As the Supreme Court has "repeatedly held," "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw*, 546 U.S. at 76.

Respondent contends that, given the state of the case law at the time, it was not unreasonable for Vacca to believe that the trial court had committed a mode of proceedings error and that it was in Mack's interest not to object and seek correction of the error. Dkt. 16-1 at 67-68. As Respondent notes, Vacca testified at the second 440 hearing that he had purposefully declined to object to the trial court's procedure for that very reason. Dkt. 16-1 at 68 (citing H3: 84-85 (direct), 87-88 (direct), 126-29 (cross-examination)).

189

Mack asserts that Vacca's failure to include the jury note claim in the CPL § 330.30 motion to set aside the verdict shows that he did not understand the nuances of this issue and that his failure to object prior to taking the verdict was not strategic or tactical. Dkt. 2 at 160. Mack's argument ignores the Supreme Court's oft-repeated instruction that "[t]he object of an ineffectiveness claim is not to grade counsel's performance." *Strickland*, 466 U.S. at 697. Furthermore, the Supreme Court has made clear that a reviewing court is not concerned with counsel's subjective motivation for acting. *See Richter*, 562 U.S. at 110 ("*Strickland* calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").

Mack also suggests that Vacca may have tailored his testimony to match his interpretation of the Court of Appeals decision. Dkt. 2 at 155. Mack states that Vacca's "sole basis" for not objecting to the taking of the verdict without the trial court responding to the jury's notes was his "dubious claim that he thought he was 'preserving' a mode-of-proceedings error" for appeal but, as the "Court of Appeals held, that motive would be an illegitimate reason for staying silent." Dkt. 2 at 154.

Mack has mischaracterized the Court of Appeals' decision, which did not hold that declining to object in the circumstances presented at Mack's trial would be an "illegitimate" strategy. To the contrary, the Court of Appeals recognized that if the trial judge's failure to respond to outstanding jury notes was deemed to be a "mode of proceedings" error, then *not* objecting would be a win-win strategy for the defense:

190

> If the verdict is an acquittal, counsel will have secured the desired trial outcome. If the jury convicts the defendant, counsel will have created an appellate issue requiring automatic reversal and a new trial simply by remaining silent.

*Mack*, 27 N.Y.3d at 544. Because the Court of Appeals did not want to "incentivize such tactics" or "diminish the important purposes underlying the preservation rule," it rejected the argument that the judge's failure to respond to jury notes was outside the preservation requirement. *Id.*

It bears emphasizing that the Fourth Department justices who initially reversed the conviction based on the trial court's failure to address the jury notes never held that Vacca was ineffective for failing to object. *See Mack*, 142 A.D.3d at 759, 36 N.Y.S.3d at 542 (dissenting opn.) ("Indeed, as the majority properly notes, we concluded that defendant was not denied effective assistance of counsel."). In fact, the dissenting justices stated in their post-remittal decision that "[t]he Court of Appeals and the majority *correctly note* that defense counsel '*may have made a strategic choice* not to challenge the trial court's procedure.'" *Mack*, 142 A.D.3d at 759, 36 N.Y.2d at 541 (dissenting opn.) (emphasis added) (quoting *Mack*, 27 N.Y.3d at 543).

The only question for this Court, reviewing the second 440 court's adjudication on the merits, is whether there is a reasonable argument that Vacca satisfied *Strickland*'s deferential standard. *See Richter*, 562 U.S. at 105. Clearly, there is such an argument. Because fairminded jurists would agree—and have agreed—that the second 440 court correctly concluded that Vacca did not perform ineffectively by not objecting to the taking of the verdict without responding to the

191

outstanding jury notes, Mack has not overcome the limitations on relief in 28 U.S.C. § 2254(d). The allegations in Point 24 therefore do not provide a basis for habeas relief.

## V. CONCLUSION

For all of the foregoing reasons, the request for a writ of habeas corpus is denied, and the petition, Dkt. 1, is dismissed. Because Mack has failed to make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. The Clerk of Court is directed to enter judgment in Respondent's favor and close this case.

**SO ORDERED**.

_____
JOHN L. SINATRA, JR.
United States District Judge

Dated: December 4, 2025
Buffalo, New York

192